UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

Bernie Clemens, et ux,          )
        Plaintiffs              )
                                )
        VS.                     )       CASE NO. 3:13-CV-02447
                                )
                                )
New York Central Mutual         )
Fire Insurance Company,         )
        Defendant               )
                                )
_____  )

TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
BEFORE THE HONORABLE MALACHY E. MANNION
FRIDAY, OCTOBER 23, 2015 AT 11:00 A.M.
SCRANTON, PENNSYLVANIA

FOR THE PLAINTIFF:

    Michael J. Pisanchyn, Jr., Esq.
    Marsha Lee Albright, Esq.
    Pisanchyn Law Firm
    524 Spruce Street
    Scranton, PA  18503

FOR THE DEFENDANT:

    Charles E. Haddick, Jr., Esq.
    Dickie, McCamey & Chilcote, PC
    Plaza 21, Suite 302
    425 North 21st Street
    Camp Hill, PA  17011

_____

DIANA GILBRIDE, RMR, FCRR
FEDERAL OFFICIAL COURT REPORTER
P.O. BOX G
SCRANTON, PA 18501-0090

2

1                    (11:00 a.m., convene.)

2          THE COURT:  Okay.  We're here in the matter of

3  Clemens against New York Central Mutual Fire Insurance Company.

4  Civil No: 3-CV-13-2447 for a final pretrial conference in the

5  case.  The case is scheduled for trial on November 2, and so we

6  need to go over the matters related to trial.

7          I have reviewed the parties' pre-trial memorandums

8  and the documents that have been filed in the case.  So, let me

9  go back to start with did counsel meet and confer with respect

10  to deposition objections and resolve those?

11          MR. HADDICK:  I believe we have, your Honor.  Charles

12  Haddick for New York Central Mutual.  We communicated all week,

13  had a lengthy conference yesterday, and I believe we resolved

14  issues related to the depositions.

15          THE COURT:  Good.

16          MR. HADDICK:  Anything that's disputed we would leave

17  to your Honor as the case proceeds.

18          THE COURT:  Okay.  Hopefully there will be very few

19  of those, unless they're of real substance.

20          MR. HADDICK:  Yes.

21          THE COURT:  Now, Judge Conaboy back in June had done

22  a lengthy decision on the 15 separate motions in limine that

23  were filed in the case, and I note that when he finished those

24  in the last paragraph he specifically advised counsel for both

25  sides that they are to make sure that their witnesses or anyone

1 else, including counsel in their opening statements, closing

2 statements or during the questions that they elicit on direct

3 examination follow those rulings.  So, everybody is on notice

4 of what the rulings were by Judge Conaboy in the case, and they

5 will be followed.

6             MR. PISANCHYN:  Your Honor --

7             THE COURT:  There are at least two that are left

8 open.  I'm sorry.

9             MR. PISANCHYN:  No worries, your Honor.  I do -- may

10 need some clarification with regard to some of the rulings,

11 because I just want to make sure I'm abiding by the rulings.  I

12 think that I will be, but certainly -- I don't know if you want

13 me to stand when I'm addressing the Court?

14             THE COURT:  No, you don't have to stand.

15             MR. PISANCHYN:  But just because of the microphone.

16             THE COURT:  No, you don't have to stand.

17             MR. PISANCHYN:  Okay.  But yes, I do have some

18 questions in regard to them.  Because there are some things

19 that are very -- if you think about them, they're going to be

20 very difficult for certain things to be implemented, and I want

21 to make sure that all of the parties, Mr. Haddick and myself

22 have spoken about these, but I want to make sure we have it on

23 the record and your Honor knows the position, so that maybe you

24 can make sure that we're directed and make sure we need to do

25 what we need to do.

4

1            THE COURT:  Okay.  We can cover those things.  I

2    mean, I read through each one of his determinations.  It's hard

3    for me to figure out that the sides -- I was able to figure

4    them all out, and I'm not certainly any smarter than anybody

5    else here.  But if there is any uncertainty then we'll talk

6    about that.

7            There were two that were left open.  One was whether

8    counsel can testify in the case.  I can tell both of you now

9    that while Judge Conaboy I think used the words his

10   disinclination, I would be completely and utterly shocked if

11   there was some circumstance that would ever require counsel to

12   testify.  And in light of local Rule 43.1, I think that

13   everyone gets the point that no lawyers are going to be calling

14   other adversary lawyers in this case.  That's not going to

15   happen.

16           The other one that was left somewhat open was

17   evidence of plaintiff's settlement demand, that was No. 12,

18   with the exception under 408B that talks about whether that

19   would be something that would be affected by an allegation that

20   that was a result of the delay in the processing of the claim.

21   That -- we'll wait and see how that plays through in the course

22   of the testimony and what's brought out in the case.

23           We'll get back to the motions in limine.  I require

24   counsel to file a joint verdict slip.  I looked at both of your

25   verdict slips.  Not surprisingly, they could not be more

1 different.  The unusual part in all honesty is normally that

2 the plaintiffs' is the one that's long and meandering with all

3 areas of damages, and the defendant is usually the one that's

4 requesting one line that says damages or no damages.  In this

5 we have exactly the opposite.

6        You will agree upon a verdict slip.  This -- so we

7 make it very clear to everybody, this is a simple run of the

8 mill bad faith case.  There is nothing about this case that

9 ever should have gotten to 183 documents or whatever the costs

10 are on both sides to do this case.  Nothing.  But it is a

11 simple, straightforward bad faith claim.  And a verdict slip in

12 a simple, straightforward bad faith claim should be exactly

13 that.

14        And so you will get together and you will agree upon

15 a reasonable verdict slip.  And both of you will do that in

16 good faith and accommodate that.  And you'll submit that to the

17 court next Friday.  Before next Friday is fine, but if not, on

18 or before next Friday.  Which is the -- what, that's the 30th?

19             THE DEPUTY CLERK:  30th.

20             THE COURT:  The 30th.  Similarly, I looked at your

21 request to charge.  You are each to go over and discuss with

22 each other the request to charge.  A couple caveats on that.

23 Now, I know in a bad faith case I don't believe there are any

24 Pennsylvania standard jury instructions related to bad faith.

25 My normal practice is I never charge snippets from case law.

1 It's like getting a doctor to say something or a lawyer. You

2 can find any lawyer or any doctor to say anything you want.

3 You can find any snippet from some court to say anything you

4 want. So, my practice is generally to use in a diversity case

5 the Pennsylvania standard jury instructions.

6          Now, you don't have to submit them on issues like

7 credibility of witnesses, number of witnesses, objections,

8 direct and cross. You may if you wish, and if you wish then

9 they should be the standard Pennsylvania jury instructions.

10 But frankly, what I'll probably do is use the standard forms

11 that I've used all along in jury trials related to standard

12 information.

13          I am, though, always particularly interested in

14 counsel's input with respect to the substantive law in the

15 case. So that's where I think it would be beneficial to you to

16 sit down together, and to -- there's a lot of case law out

17 there. You both submitted case law. And the truth is, in many

18 versions of your submissions they are not that different. So

19 you need to get together and get versions that are agreeable to

20 both sides.

21          As I said, you're not reinventing anything here.

22 This is not like a new law that just passed. This is not the

23 Supreme Court just gutted the restatement second of torts.

24 This is a tried and true, been-around-for-a-long-time process.

25 So get together and agree. And submit your proposed charge --

1  hopefully your proposed agreed charge.

2          Now, occasionally different parties want something

3  different.  For example, sometimes a plaintiff in a standard

4  language charge wouldn't be requesting that -- because they

5  have a real person -- that an entity should be treated like any

6  other person.  And the defense, if it's a company, would often

7  want the charge that says that all parties should be treated

8  the same, like they're all equal.

9          So, there may be ones that normally the defense would

10 want that the plaintiffs wouldn't ask for.  There may be some

11 that the plaintiffs want that the defendants wouldn't ask for.

12 But in reality, when you look at them neither one can really

13 object to them.  They're not that kind of an adversarial

14 matter.

15         So let's agree upon, if we can, our charge in this

16 case.  And like I said, it's a standard area of law, and so you

17 ought to be able to agree upon at the very least 95 percent of

18 it.

19         If there are items that you as a party wouldn't

20 normally request in the standard Pennsylvania instructions, but

21 the other side would suggest, and they're a standard

22 instruction in the Pennsylvania jury instructions, I'm probably

23 going to give them.  So why waste time fighting over stuff like

24 that if it's a standard charge?  Please don't.

25         MR. HADDICK:  Judge, may I ask one quick question, if

8

1  I can?

2         THE COURT:  Yeah, sure can.  You don't have to stand

3  either.

4         MR. HADDICK:  Has your Honor ever charged a jury in a

5  bad faith case?

6         THE COURT:  Yes.

7         MR. HADDICK:  So that we might be able to see what

8  your charge is, I think that might be useful to guide the

9  parties --

10        THE COURT:  Okay.

11        MR. HADDICK:  If it's not too much trouble.

12        THE COURT:  Why don't we -- you can go on to CM/ECF,

13 in the docket system.  What was the most recent one we had?

14        LAW CLERK:  Sabol.

15        THE COURT:  What was it?  Sabol?

16        LAW CLERK:  Sabol.

17        THE COURT:  Do you know what the docket number on

18 Sabol is Barbe?  Since I give a copy of the charge to the jury

19 in the case, then it will be docketed.

20        THE DEPUTY CLERK:  It's not on the docket.

21        THE COURT:  It's not?

22        DEPUTY CLERK:  No, because that didn't go to jury.

23        THE COURT:  Oh, it didn't go to jury.  Okay.  All

24 right.  Well, you know what, why don't we get counsel a copy of

25 Sabol's charge and then you can use that as a helpful go by.

1   Was there an agreed upon jury verdict form in that case?

2          THE DEPUTY CLERK:  I believe there was, yes.

3          MR. HADDICK:  That would be helpful also I think,

4   Judge.

5          THE COURT:  Okay.  Well, why don't we see if we've

6   got those.  We'll give copies to counsel.  And you can -- I'm

7   not requiring you to follow that verbatim, but it may be a good

8   indication of what we thought was appropriate and fair under

9   the circumstances.

10          MR. HADDICK:  All right.

11          THE COURT:  All right?  Now, there are some matters

12   that I want to talk about in this case.  They include the

13   defendant's -- by the way, on the record, the defendant's still

14   have -- Document No. 177 is I believe their motion in limine

15   related to sanctions.  And I had discussed that with them

16   during the course of our -- I won't say our last discussion,

17   since I did all of the discussing, that I know it is still

18   listed as an open motion.  That motion is dismissed, as I find

19   it to be cumulative, if that's the right word, of the prior

20   motion in limine that I had dismissed as untimely filed.

21          Now, in noting that I dismissed the prior motion in

22   limine as untimely filed, there were two of them, one was

23   related to a video, the other was related to demonstrative

24   evidence.

25          My intent as I indicated was that it was untimely and

1  I was dismissing it.  That doesn't mean that it's inadmissible,

2  and so I want to talk about those two matters -- actually I

3  think there's three.  There's a video, there is some chart

4  related to insurance, and then there is some chart related to

5  financials I believe.

6        Now, I haven't seen any of these items, but I do

7  require -- so you're aware, I have no problem with counsel

8  using demonstratives in openings, as long as you have cleared

9  them and showed them to the other side, and the other side

10 is -- has a chance to make an objection before that and when

11 that occurs.

12       So, let's talk first about the video.  My

13 understanding is, and I'm going to go to you Mr. Pisanchyn or

14 Ms. Albright, I'm not sure who is going to --

15       MR. PISANCHYN:  Yes, your Honor, I'll address it.

16       THE COURT:  Tell me, No. 1, when was the video made?

17       MR. PISANCHYN:  Okay.  So the video was made at the

18 time of the depositions of the parties.

19       THE COURT:  Which was?

20       MR. PISANCHYN:  Which would have been on June -- let

21 me see, June 12, 2014, your Honor.

22       THE COURT:  All right.  And it was identified to the

23 defendants when?

24       MR. PISANCHYN:  Hum, just recently, probably within a

25 month I'd say.

1          THE COURT:  And the substance of the video is what?

2          MR. PISANCHYN:  Well, basically what we had is in

3    essence you drive through this town that looks like there's

4    only horses and cows, and then you go to NYCMI Insurance, which

5    is a campus probably in my opinion closer to the size of Penn

6    State.  So we had their videographer go on the roadway.  He at

7    first said no, I can't video.  I said yes you can, as long as

8    you go to a public place and video.  So we had him do a picture

9    of a panoramic scene of the outside of the building.

10          It's not that big of a deal because if they want to

11   object to that we'll withdraw it, but during cross examination,

12   your Honor, we don't have to turn over our cross examination

13   material.  I'll just merely go to Google Earth and show a

14   picture of the place and ask if that's what it is, and is that

15   where you do business.

16          THE COURT:  Let me ask you, what's the relevance of

17   that?

18          MR. PISANCHYN:  Well, your Honor, the relevance of it

19   is that first off it's demonstrative to show where all of this

20   money is going as opposed to being paid out in claims.  Our

21   theory of this case from the very beginning is that NYCMI did

22   not pay as much money on the claim for numerous reasons.  They

23   have bonus structures which their adjusters get.  They also

24   had -- fell on hard times during these periods where their

25   ratio fell.  And then to just generally show where they do

1  business, how they do business, and the format in which they do

2  business from.

3          THE COURT:  Let me ask you this, why did you not turn

4  that over if you had that back then?

5          MR. PISANCHYN:  Your Honor, again, first off, it's

6  something they have knowledge of.  It's their own campus.

7  Second off, it was work product.  We're not sure if we're even

8  still going to use it.  It is demonstrative evidence.  If it

9  was substantive I would have turned it over, same with any

10 demonstrative.  I've never really had any objections.  You

11 know, it's like saying there's a herniation and me showing

12 someone three weeks before trial a picture of a herniated disc.

13         THE COURT:  Hold on.  It depends on what the

14 demonstrative evidence is and what it relates.  A lot of

15 demonstrative evidence is very appropriate.  Others is not

16 appropriate.  So I guess it would depend if you wanted to use

17 demonstrative evidence with a large handwritten note that said

18 the defendant is a rat, even if you thought that was true, it

19 may not be appropriate.  So, the point is the mere fact that

20 there's an objection to demonstrative evidence doesn't bother

21 me.

22         I've listened to the arguments.  I'm not going to

23 allow it.  I don't think that -- I don't see anything that's

24 relevant about what their physical facility looks like,

25 particularly as to whether or not that relates to whether or

1  not they had acted in bad faith in this particular claim, so

2  that's out.

3          Now, the two other demonstratives that you've talked

4  about, one is some sort of insurance guidelines.  And Judge

5  Conaboy had ruled in one of his motions in limine that there

6  was to be no reference of any kind to any Pennsylvania

7  insurance regulations or things of that nature.  What is this

8  that you're talking about?

9          MR. PISANCHYN:  The only thing we were referencing,

10  your Honor, and Attorney Haddick and myself spoke about this,

11  just so we clarified, and we did it yesterday, and he had said

12  he had no problems with it, it's my understanding, but we can

13  put it on the record to be sure.  But what we were doing is in

14  light of all the documents and sanctions and everything, no

15  matter what we do that has been filed.  We just wanted to be

16  sure we were covering all bases.

17          So in essence what we intend on doing is having

18  witnesses on the stand, you know, basically fill out charts on

19  either the screen or one of those white papers in regard to

20  whether it's a timeline or not.  Now, I had talked --

21          THE COURT:  Let me go back.  So when you talk about a

22  demonstrative you just mean as you have a witness on the stand

23  and you're asking the witness questions you'll have them note

24  it somewhere, write it someplace, or check off something?

25          MR. PISANCHYN:  In essence, yes.  What I had told

1  Attorney Haddick -- and we don't have this yet -- we may intend

2  on having a timeline.  Now, I can have a witness -- if we have

3  it prepared and we do intend on present -- now, I can represent

4  as an officer of the court we don't right now because we've

5  been preparing, doing a lot of the other things on this trial.

6        But instead of having the witness draw a line and

7  putting a line down and write this date and what happened on

8  that date, if we were going to do that and if I can get it

9  prepared in time, what I would do is I would show it to him

10 beforehand and then we would just merely have the witness flip

11 over the thing and say would you agree this, would you agree

12 this happened and would you agree this happened.

13        THE COURT:  Is that -- so I was reading that to be

14 potentially something else.  Do you have any problem with that?

15        MR. HADDICK:  I do, Judge, only in this sense.  I

16 think that -- I believe Judge Conaboy left it open, but he did

17 say -- he did comment on the place of the insurance regulations

18 in the trial itself.  There is case law which clearly says that

19 in a bad faith case whether or not a company violated a state

20 regulatory --

21        THE COURT:  No, no, but he's not saying that.

22        MR. HADDICK:  Okay.

23        THE COURT:  I don't disagree with you.  Judge Conaboy

24 has ruled that the state regulations aren't coming in.

25        MR. HADDICK:  Okay, that's true.

1        THE COURT:  But he's talking about some timeline,

2   which I assume means from -- something of we filed a claim, we

3   did this --

4        MR. HADDICK:  Sure.

5        THE COURT: -- we did that, we did whatever -- any

6   objection to that?

7        MR. HADDICK:  I do not.  I have a timeline also.

8        THE COURT:  That's fine.  I mean, you can -- look it,

9   you guys can show your witnesses virtually whatever you want to

10  show them that's admissible evidence.  My concern was that the

11  objection seemed to imply that your intention was to make a

12  checklist of what the Pennsylvania regulations are and how they

13  didn't follow these, and that's not something that we'd allow.

14        MR. PISANCHYN:  Now, the only thing in that regard,

15  Judge, is that Judge Conaboy, and I just want to make sure that

16  because I hate assuming things and making then -- wait a

17  second, I told you Mr. Pisanchyn.  But in regard to obviously

18  our expert --

19        THE COURT:  Your expert can testify.  He just can't

20  refer to them as being Pennsylvania regulations or anybody

21  else's regulations, but he can give -- Judge Conaboy has

22  allowed his opinion.  So he can give his opinion as to what he

23  believed is good insurance practice or bad insurance or --

24        MR. PISANCHYN:  And if we'd like for him to do that

25  -- and that's again, we were trying to err on the side of

1  caution and that's what I told Attorney Haddick, just to be

2  sure because I don't want someone saying I'm trying to pull a

3  fast one on anyone.  We may obviously either have him come up

4  and write and draw a little dash and say I think this, I think

5  this.  So there's no difference between us doing that or

6  flipping a board over and saving everyone the time of having

7  this gentleman write it out in his handwriting, as opposed to

8  just saying yes, this is what I agree, this is what I agree, or

9  bringing it up on the screen obviously if need be.

10            THE COURT:  I got it.

11            MR. PISANCHYN:  Okay.  Thank you.

12            MR. HADDICK:  Judge, very briefly.  I agree that an

13  expert will testify.  My only concern is that consistent with

14  the case law, that expert not be entitled to say that something

15  constitutes bad faith or good faith.

16            THE COURT:  What case law would that be?  Rule 704 of

17  the Federal Rules of Civil Procedure -- Evidence, Federal Rules

18  of Evidence specifically indicate that unless it's a criminal

19  case and it's going to the state of mind of an individual --

20            MR. HADDICK:  Right.

21            THE COURT:  -- an expert can give testimony as to

22  what they believe.  The jury is not bound by that, but they can

23  give testimony as to the ultimate issue in anything but a

24  criminal case involving intent.

25            MR. HADDICK:  I will file a bench memorandum, very

1  short.

2          THE COURT:  Very short.

3          MR. HADDICK:  Just a page or two to --

4          THE COURT:  That's good, two-pages, go ahead.  But

5  explain to me why Rule 704, that's a Rule of Evidence, you're

6  in federal court so it's the Federal Rules of Evidence that

7  apply, not the State Rules of Evidence.

8          MR. HADDICK:  Understood.

9          THE COURT:  And that's not an area of substantive

10 law.  Bad faith is a substantive law that applies in

11 Pennsylvania.  So my understanding of Rule 704 is that if

12 somebody wants to give an opinion as to ultimate issue, that

13 they'll be instructed, the jury, in the standard jury

14 instructions related to experts, that they don't have to credit

15 anything the expert says.  But I'm not aware of anything that

16 would require them not to be able to do that.

17         MR. HADDICK:  Okay.

18         THE COURT:  All right?

19         MR. HADDICK:  All right.

20         THE COURT:  Okay.  And the last one is some chart

21 related to financials.  What is that?

22         MR. HADDICK:  Go ahead.

23         MR. PISANCHYN:  Well, your Honor, I mean really we

24 don't have a chart, but the NYCM insurance is kind enough every

25 year to put out a thing on-line --

1          THE COURT:  That basically says they're worth a

2   million dollars or ten million?

3          MR. PISANCHYN:  Yeah, it has all their numbers.

4          THE COURT:  Just answer my question.

5          MR. PISANCHYN:  Yes, your Honor.

6          THE COURT:  Okay.  They're requesting punitive

7   damages, they're entitled to indicate what the net worth and

8   theory of whoever it may be, correct, and if it gets to that

9   stage is there any objection to that, aside from, you know, it

10  hurts?

11         MR. HADDICK:  The objection would only be to the type

12  of data, Judge.  I think net worth is exactly the right number.

13  Mr. Pisanchyn has made reference in the past to the company's

14  surplus, which is a regulatory set aside, which is not the same

15  thing as the company's net worth.  I just want to be careful

16  that the jury gets the net worth number if that becomes

17  necessary and not the surplus number, because that's really not

18  the proper number.

19         THE COURT:  All right.  So do you -- have you -- I

20  don't know.  Is this some document that's prepared by them?

21         MR. PISANCHYN:  Yes.

22         THE COURT:  Okay.  And so why don't the two of you

23  talk about whatever is in the document to see if you can figure

24  out what --

25         MR. PISANCHYN:  This is easier, though, your Honor

1  and I already -- we already had a long discussion and it seems

2  like he doesn't agree with my position.  But surplus is less

3  than the net worth, okay?  So I'm not asking for more.  So if I

4  want to ask for less, that's my prerogative.  I don't see how I

5  can be bound -- if I want to say less, how the plaintiff cannot

6  ask for less.

7          Net worth is here.  And surplus means that if they

8  pay all of their claims -- in other words, say they write a

9  $500,000 policy and they have a net worth of a hundred, that

10 means there's 500 surplus.  If I want to argue that I am

11 allowed -- how can I not be allowed to argue that?  He's saying

12 that because it's less I don't get to introduce it?  I mean, I

13 don't have to ask for as much -- I don't have to ask for

14 anything.  I certainly get to present numbers less than that.

15          But even more so, your Honor, these numbers come in

16 during the case in chief because it's our allegations, and it

17 has been in our complete theory of the case -- and I hate to

18 say because he'll be writing down, but he should know from the

19 questions of our witnesses -- is that during this period of

20 time there were hurricanes and that's why they stopped paying

21 claims like they should have.  So these numbers, these ratios,

22 if you look at the testimony, and you'll hear from --

23          THE COURT:  Well, I'm more interested right now in

24 just the question of amount of value of the company and how

25 that relates.  So, your argument is that the document that

1  you're going to produce is a document that is produced by the

2  defendants that indicates their financial settings basically?

3          MR. PISANCHYN:  Yes, your Honor.

4          THE COURT:  All right.

5          MR. HADDICK:  I believe we may be able to agree on a

6  net worth number.

7          THE COURT:  Okay.  Why don't you try to do that.

8  Maybe you can just agree on a net worth number.

9          MR. HADDICK:  And we may stipulate to that.

10          THE COURT:  Okay.

11          MR. HADDICK:  I don't know if this is the proper time

12  to ask or bring it up for discussion, but I'm wondering what

13  the Court's view is on bifurcation.

14          THE COURT:  I'm not going to bifurcate.

15          MR. HADDICK:  Okay.

16          THE COURT:  I don't bifurcate.  If this had been an

17  underinsurance claim, together with a bad faith claim, I

18  wouldn't bifurcate that either in federal court.  We just don't

19  do that.  I'm not bifurcating.  We're not going to do a second

20  -- now that being said, under damages potential in a bad faith

21  claim, those that relate to attorneys' fees and cost are only

22  for the Court to decide and I will decide those.

23          The determination of what the time period and the

24  interest rate would be, the three percent or whatever, that's a

25  legal determination that I will make, not for the jury.  The

1   jury's determination is going to be, is there bad faith?  And

2   if the request is for punitive damages, if there are punitive

3   damages.  But the other damage issues, attorneys' fees and

4   costs, and the calculation, statutory calculation I will make.

5   The jury will not be asked to make that.

6          MR. HADDICK:  They'll just be issuing a number on

7   punitive damages?

8          THE COURT:  That's right.  Whether they believe --

9   assuming that they find bad faith, they would then move on and

10  decide whether they believe punitive damages are appropriate.

11         MR. PISANCHYN:  Your Honor, I think -- and the cases

12  are pretty clear, and I don't mean -- I think we're slicing

13  words, but --

14         THE COURT:  Go ahead.

15         MR. PISANCHYN:  It's not two separate questions.

16  It's my understanding that the bad faith has the punitive

17  damage component in it.  And so basically they'll be asking if

18  it was bad faith.  If it was bad faith then it automatically

19  equals punitive damages and then there's just the number.  If

20  you look at --

21         THE COURT:  I think that's what we said.  That the

22  bottom line, the jury has to decide in the first instance

23  whether or not the defendants acted in bad faith.  If they find

24  that you've proved by clear and convincing evidence that the

25  defendants have acted in bad faith they'll then move on to step

1 two and decide whether or not -- or what the punitive damages

2 should be.  Assuming that they -- and then if -- so I don't

3 think that we're -- I don't know, I think that's what we said.

4          MR. PISANCHYN:  Yeah.  The only thing is I think

5 Attorney Haddick would never want, and neither would I, the

6 line that says punitive damages, because that may not be

7 covered by his insurance carrier.  So what we would just want

8 is a line, and would you agree with that Mr. Haddick?

9          THE COURT:  Why don't you two do this:  You must

10 agree upon a verdict slip, so you can work that out when you

11 agree on your verdict slip.

12          MR. HADDICK:  Your Honor, I have a feeling that's not

13 a problem.

14          THE COURT:  Okay.

15          MR. HADDICK:  One thing I did hear, Judge, that is a

16 problem is Mr. Pisanchyn's reference to hurricanes and other

17 claims.

18          THE COURT:  You know what, I'm not going into

19 everything that might or could or would show up during the

20 course of the trial.  Now, what has been clear is there was

21 motion in limine, and Judge Conaboy ruled on the issue that no

22 other claims made by any other individuals are pertinent to

23 this particular case.  This case is about whether or not they

24 acted in bad faith with respect to your client in not paying

25 this claim.  It's not about whether they're paying anybody else

1  or any other suits or anybody else taking anything else in.

2  So, let's move back to our case.  So, that covers our -- those

3  matters.  There was something I had in the plaintiff's I think

4  too that I wanted to talk about.  I think that part of it was

5  that both of you listing each other as witnesses, you're not

6  getting each other as witnesses.

7           The case is not going to take five or six days to

8  try.  It is not taking five or six days.  So there's no

9  misunderstanding, there won't be five hours of direct

10 examination on a case like this, no way.  But I don't set time

11 limits either, so I'm not adhering to the defense request to

12 set time limits, I don't do that.  I listen to see what's

13 reasonable.

14          Sometimes some witnesses are longer than others, but

15 my experience has generally been that after we get to the first

16 or second witness things move on because we will not be

17 reiterating and going over ad nauseam all the things we did

18 with every witness, like as if this is the first witness in the

19 case.  So, the case will -- it will begin on the second, it

20 will end during that week completely.

21          Now, in terms of our scheduling.  9:30 we begin jury

22 selection on Monday, the 2nd.  The jury will be here at 8:30.

23 They will get their preliminary instructions downstairs and

24 they have to watch a video.  They'll come up at 9:30.  Jury

25 selection will commence.  It's a civil trial.  In federal court

1  we will select eight jurors, there will be no alternates.  So

2  both sides have three peremptory challenges.  If you have a

3  challenge for cause, you will, as you speak to the witnesses,

4  you can discuss it among yourselves, and hopefully if there's a

5  legitimate challenge for cause you will agree upon that.

6          If there is a challenge for cause that the other side

7  does not agree upon, then I will talk to the -- before counsel,

8  we will talk outside the hearing of the rest of the jury to

9  that witness as to the issue and then I will make a ruling on

10 that.

11         There are 14 seats in the jury box.  So what will

12 happen will be is that once we have finished any potential

13 challenge -- after you have asked all of your questions and we

14 finished any potential challenges for cause, we'll have 14 --

15 we'll remove anybody for challenge of cause and put somebody

16 else in and there will be 14 people that are sitting in the

17 jury box.  When each of you make your three peremptory

18 challenges that will leave the eight people who will be your

19 jurors.  And so that process is relatively simple.

20         After we finish jury selection openings in federal

21 court will be plaintiff first then defendant.  The -- I allow

22 you to have free reign of the courtroom.  I don't care if you

23 ask questions sitting, standing, running, jumping, laying, it

24 doesn't make any difference to me.  If you want to approach a

25 witness to show them something go ahead and do it.  If the

25

 1  other side thinks you're badgering they'll make an objection

 2  and I'll rule on it.

 3          MR. HADDICK:  Judge, can I ask two questions in that

 4  regard?

 5          THE COURT:  Yeah.

 6          MR. HADDICK:  The first would be where we're

 7  permitted to address the jury in openings and closings?

 8          THE COURT:  Let me go back and resay that.

 9          MR. HADDICK:  Yeah.

10          THE COURT:  You can ask anything you want anywhere in

11  the courtroom sitting, standing, running, jumping, laying, I

12  don't care where you do it, except you probably can't sit with

13  the jury because there's no seats.  But aside from that, you

14  can go anywhere you want.  You can try the case in whatever way

15  makes you feel comfortable.

16          MR. HADDICK:  Is this a monitor or portable monitor

17  that if I were closer to the jury I'd be able to see?  For

18  instance, can I use the witnesses' --

19          THE COURT:  You know what, I think it's nailed to

20  the --

21          MR. HADDICK:  To the side?

22          THE COURT:  It's -- you can turn it to the side if

23  you want.

24          MR. HADDICK:  Okay.

25          THE COURT:  Yeah, you can put it up there and turn it

1  to the side if you want.

2      MR. HADDICK:  Thank you.  And do we require unanimity

3  of eight or six of eight in this case?

4      THE COURT:  It's eight.

5      MR. HADDICK:  Eight.

6      THE COURT:  In federal court it's got to be unanimous

7  and it must be all eight, unlike the 10 of 12 or whatever it is

8  across the street in the state court.  All federal juries,

9  whether they're civil or criminal, must be unanimous.  12

10 criminal, eight on civil.

11     MR. PISANCHYN:  Your Honor, just some questions.

12     THE COURT:  Yes.

13     MR. PISANCHYN:  Since we're not doing alternates, I

14 know like the state rules have enacted now that they actually

15 have to -- and please, I'm just asking, I don't --

16     THE COURT:  Okay.  We don't do alternates.

17     MR. PISANCHYN:  So what happens?  The parties agree

18 or your Honor will just say we're going to do seven or six, or

19 do we have to start all over?

20     THE COURT:  No.  What happens is that -- no, we don't

21 start all over.  There are eight.  In order to make

22 constitutional muster there only need to be six.  And so the

23 result is if for some reason -- somebody got sick -- we would

24 continue with seven; if two people got sick we would continue

25 with six.

1          MR. PISANCHYN:  But the issue is, is if all of them

2    sit then we let all of them deliberate?  Is that what you're

3    saying?  We don't dismiss two --

4          THE COURT:  No, no.  The jury will be eight people.

5          MR. PISANCHYN:  Okay.

6          THE COURT:  At the end of the case all eight will

7    decide the case, deliberate, and all eight must be unanimous.

8    If somebody got sick during the interim we could remove them

9    and continue with seven, then all seven would have to

10   deliberate.  But whatever number of jurors we have, at the end

11   here they will all be deliberating and they must be unanimous.

12         MR. PISANCHYN:  And in regard to jury selection, your

13   Honor, would you be present?

14         THE COURT:  I don't normally.  Honestly, I think in

15   15 years I've only sat in on one jury selection.  I have to

16   admit that I wondered whether I'd have to sit in on this jury

17   selection.  I hope I do not have to sit in on this jury

18   selection.

19         Now, that being said, I don't have a problem in jury

20   selection if counsel references the case or the type of case.

21   It doesn't make sense to try to pretend that I'm not allowed to

22   say anything about the case.  But I do specifically advise

23   counsel you're not to do a closing, an opening, you're not to

24   try your case in jury selection.  I do give you leeway to be

25   able to ask questions that seem to make sense in order for both

1 sides to get jurors who they believe can honestly decide the

2 case, and that requires obviously some kind of information,

3 more than it's just a bad faith case.  That's not going to mean

4 something to some people.  So you're free to have leeway in

5 that regard, reasonable leeway in that regard.

6          MR. PISANCHYN:  Your Honor, one last thing, and I'm

7 sorry, I just want to make sure.

8          THE COURT:  Go ahead.

9          MR. PISANCHYN:  Usually -- and I know most Courts

10 dislike it -- but I usually like to have one and I would

11 request that we have a stenographer for voir dire.  It's

12 starting to be more mandatory in state courts.

13          THE COURT:  It's not mandatory here, but you can

14 request that and that's fine, we can have a court reporter here

15 for voir dire.

16          MR. PISANCHYN:  Thank you, your Honor.

17          THE COURT:  Okay.  There was -- let me see what else

18 I highlighted here.

19          MR. PISANCHYN:  Your Honor, you had said in regard to

20 the openings, and I inter- -- one of us had interrupted.

21          THE COURT:  Go ahead.

22          MR. PISANCHYN:  But then you were going to say the

23 witness presentation I guess would be plaintiffs then

24 defendants?

25          THE COURT:  Right.  So what's going to happen is when

1 we finish selecting our jury, that will be sometime in the

2 morning, depending on the time, we'll either take a short break

3 then and probably go right into opening statements.  And after

4 that we'll begin the plaintiff's case.

5          You, both parties, are to have when it's your case

6 witnesses available.  I go till -- I start every day, we don't

7 end till five, sometimes 5:30, last week it was twice at six

8 o'clock.  Now, I don't normally go to six because what I will

9 do is, after you have selected your jurors I'm going to look to

10 see where they come from.  Unlike the local county juries that

11 only come from the county, our jurors come from as far south

12 and east as the very eastern part of Schuylkill County, which

13 is two and a half miles -- two and a half hours away, and they

14 come from the very top, up near New York State, so sometimes

15 with back roads it can be two and a half hours for them to get

16 here.

17          After you've selected your jurors I will look at

18 where they come from, I'll do a mileage check.  And then what I

19 will do based on that is make a determination of what time we

20 start.  So we probably will not start at 8:30 in the morning

21 each morning, we'll probably start at 9:00 or 9:15, depending

22 on where they are.

23          We're now getting later in the year and so I am a

24 little bit more concerned about time, but counsel should be

25 prepared to have witnesses through five o'clock every day.

1          What I would appreciate that you would do is that you

2   would advise each other of the witnesses you intend to call

3   during that day, and when the plaintiff comes close or you

4   think you're going to rest your case that the defendant knows

5   that the day before so you can have witnesses available and

6   we'll continue.

7          We break for lunch somewhere around noon.  I'm not

8   anal retentive, I'm not Judge Muir about what time we break for

9   lunch, but some time around lunchtime.  So if we see a logical

10  time, the end of a witness's testimony, a witness who we know

11  is going to be long and we're only halfway through it and it's

12  already 12:30 we'll probably break.

13         I give the jury an hour and 15 minutes.  15 minutes

14  to get where they're going, 15 minutes to get back and 45

15  minutes to eat lunch.  We'll take a break in the morning at

16  some point in time and a break in the afternoon.  You know,

17  again, no set times.  At some time to let everyone stretch and

18  use the facilities.  If anybody needs a break at any time

19  during the day or the trial or something then let me know,

20  we'll do that.

21         We'll go through the direct until you've finished all

22  of your witnesses, direct and then cross and then redirect if

23  necessary.  I very seldom go past that, so everyone should be

24  aware of that in advance.  It would have to be extraordinary

25  for me to go -- and even on redirect it's going to be related

1  to information that wasn't brought up -- or that was brought up

2  on cross, that needs to be for both sides.

3         When we conclude the case, I do a couple things a

4  little bit differently.  After the plaintiff has rested, the

5  defense will present their witnesses.  When the defense rests I

6  give counsel the option of I will close -- I will charge first

7  and then allow them to close after I charge.  And I will give

8  you a copy of the charge.  And that way, if you want to harness

9  your facts to the law that the jury has already received, you'd

10  be able to do that.

11         I also give the jury a written copy of the charge.

12  Not during the charge itself, but when they leave to deliberate

13  I give them a written copy of the charge so that if they have

14  any questions they can first look there, rather than be writing

15  questions and coming back here.

16         MR. HADDICK:  Are juries allowed to take notes?

17         THE COURT:  Juries are allowed to take notes.  I will

18  advise them of taking notes.  And I discourage them from taking

19  notes, but I tell them they're allowed to.  If you look, the

20  Third Circuit has a standard instruction that talks about jury

21  notes.  And basically it says is -- and they will have papers

22  and pens if they wish to take notes, and I'll tell them you can

23  do it if you want, but it's important that you also look at the

24  credibility of witnesses and you watch their demeanor and

25  things.  It's not a transcript and you can't share it with

1  other jurors.  And they get that.  And most people I find that

2  take notes, they'll start the first day taking notes then they

3  don't take any more notes.  I do tell them as well that they're

4  not allowed to take their notes home with them.  That they will

5  leave them in an envelope here.  At the end of the case we

6  collect them and shred them.  So there are no notes that go

7  anywhere.  But yes, if they want to take notes.

8           I do not allow jurors to ask questions, I don't know

9  if you wanted to ask that question.  I know some judges do.  I

10 think it interferes with counsel's strategy and how they want

11 to present or ask questions so I don't allow jurors to ask

12 questions.  And when we complete the case, the day before we're

13 going to actually charge we'll do a final charge conference.

14 Now this way by next week when you give me your requests to

15 charge, hopefully we'll have everything that we need and the

16 verdict slip.

17          But the night before we're going to actually charge

18 we will have a charge conference to see if anything has come

19 into the case since we started it that we need to add.  If

20 there's anything that's in the case we no longer need to add

21 and we need to take out, or any other minor adjustments we need

22 to make to make sure we've covered all the bases we need to

23 cover.

24          Once the jury gets the case -- and of course the

25 order is plaintiff closes first, defense second, and plaintiff

1   has a short rebuttal.  Once we conclude the case and the jury

2   goes out to deliberate on the case we stay as long as they

3   want.  I don't go in at five o'clock and say, you know, go home

4   for the night now or whatever.  If they want to stay here until

5   two o'clock in the morning we'll stay till two in the morning.

6   If they want to go home at five because they're tired for the

7   day we'll go home at five.  So whatever they want to do, once

8   they get the case it's their case.  Let me think what else I

9   wanted to cover on that.

10          MR. PISANCHYN:  Tuesday, your Honor, because I

11   noticed on your schedule it says that you have court.  I asked

12   the sheriffs -- or the federal marshal officers.  They said

13   that they weren't sure, that they never heard of it.  So

14   Tuesday remember, this Tuesday is election day, which I think

15   on your calendar --

16          THE COURT:  It's not a holiday in federal court.

17          MR. PISANCHYN:  Okay.  So we'll be going on Tuesday,

18   good.

19          THE COURT:  Absolutely.

20          MR. PISANCHYN:  Awesome.  We may want to talk --

21          THE COURT:  It's only when it's a federal election, I

22   think every four years we get the Tuesday off.

23          MR. PISANCHYN:  They may -- and maybe it's just

24   because I threw the question out there, but I'm telling you

25   that I think downstairs they're under the assumption that --

1          THE COURT:  Well, we have a lot of stuff scheduled

2    for that week.  And so what happens is the trial will disrupt

3    that and we'll just move that stuff.

4          MR. PISANCHYN:  Okay.

5          THE COURT:  All right.  I may do it before we begin

6    each day or after we conclude each day.

7          MR. PISANCHYN:  And your Honor, we have stuff that we

8    need to bring, like we probably have maybe like 50 binders

9    which are Bates stamped.  Can we do that on Friday before?

10         THE COURT:  Yeah.  You can leave your stuff in the

11   courtroom, nobody is going to bother it.  During the course of

12   the trial you can all leave whatever you want in the courtroom.

13   It will be your courtroom to use.

14         MR. HADDICK:  Is there a technical person you want

15   our technical people to contact?

16         THE COURT:  Yeah.  What I would do is Barbe, my

17   courtroom deputy, if you want to at any time over the course of

18   -- before the trial, between now and before the trial, if you

19   just figure a time that works for her and your people, she'll

20   come in and show you how everything runs.  It's relatively

21   intuitive, to be honest with you.  But I always think it's a

22   very good idea for counsel to come in so that they can feel

23   comfortable.  You can either do whatever you want from the

24   podium.  You can either bring in laptops and do it right from

25   counsel table, or you can have somebody sitting with laptops

1   behind you at that table and can do it.  All of those things

2   are available.

3           MR. HADDICK:  Would it be okay if my tech person

4   contact --

5           THE COURT:  Yeah, absolutely.

6           MR. PISANCHYN:  Your Honor, the only one last thing,

7   and I just want to clarify, and just so we're all of the same

8   understanding, I know it seems weird and I know Mr. Quinn

9   usually files a motion and I usually request Ms. Albright to do

10  it, but we are trying not to file a million motions in limine,

11  but our IT people are our IT people.  We don't want requests

12  from the defense.  We usually file a motion in limine saying

13  our IT people are going to do our IT stuff, your people do your

14  stuff.  We're not going to direct you to do it.  We're not

15  going to direct you to -- we only say, Ma'am, pull up 422, and

16  then, you know --

17          THE COURT:  No, no, both sides just do their own

18  thing.  Everybody does their own.  Now, that doesn't mean that

19  if for some reason somebody had something that -- if we need to

20  accommodate them we would do that.  But the bottom line is no,

21  everybody is doing their own thing.

22          MR. PISANCHYN:  Thank you.

23          THE COURT:  That's completely up to you.  What else?

24          DEPUTY CLERK:  Exhibits.  Electronically do JERS is

25  no?

1          THE COURT:  Do you guys want to use the JERS system?

2     Or do you want to do your exhibits in your own method?  Do we

3     have the new software that we can pull out individual pages?

4          THE DEPUTY CLERK:  He's going to show me that next

5     week.

6          THE COURT:  Okay.

7          MR. PISANCHYN:  We believe that we have ours, and

8     then we were going to -- I think you had to provide them for a

9     few days before if we wanted to use electronic.  So we were

10    thinking about putting the ones that we have -- now, there

11    always may be extras that we might have to add in here and

12    there, but we were going to put all of our exhibits in, and

13    then depending on which one we use -- but I'm sorry for --

14    because I know we already --

15         THE COURT:  It's -- the JERS system is the electronic

16    use of the exhibits, so if you want to do that you can submit

17    your exhibits to us in pdf on a disc.

18         MR. PISANCHYN:  And it's my understanding that

19    doesn't get shared with defense counsel, because of course --

20         THE COURT:  Well, actually, anything that's in the

21    JERS system --

22         THE DEPUTY CLERK:  Anything that goes back to the

23    jury will all be decided --

24         THE COURT:  But that's different.  His point is --

25         MS. ALBRIGHT:  In advance -- your Honor, if I may, in

1  advance we were advised that submitting on the disc drive, DVD

2  or whatever would be provided and uploaded to JERS, but would

3  not be provided to the other side before time of argument,

4  just --

5          THE DEPUTY CLERK:  Nobody sees JERS.

6          MS. ALBRIGHT:  Right, that's the understanding.

7          THE COURT:  And how JERS works is that it's basically

8  both of you give us your exhibits, we load them in and they're

9  still your exhibits, not the other side's exhibits, so the

10 other side doesn't have that.  Then as you agree to an exhibit

11 being admitted or it's admitted into evidence then it's marked

12 as such.  And it allows the jurors, if they choose to, to pull

13 the exhibits up on a 50-inch screen that's in the jury room

14 where they can sort through and look at whatever they want to

15 do.

16         That does not stop you from using other kinds of

17 exhibits as well, but either both sides have to agree to use

18 JERS or both sides are not going to be using JERS.  You can

19 talk about that.  And we need to have by Wednesday this week a

20 CD in pdf format that has your exhibits on it.  Now --

21         MR. HADDICK:  We can still use our own software then

22 during our case presentation?

23         THE DEPUTY CLERK:  You have to.

24         THE COURT:  What will happen is, we'll have your

25 exhibit list with all of your exhibits, so when you refer to

38

1   Defendant's Exhibit 25, Barbe can -- if it's admitted into

2   evidence, Barbe can mark it.  Now --

3         MR. PISANCHYN:  Admissions, I guess while --

4         THE COURT:  Yeah, that's -- let me --

5         MR. PISANCHYN:  Do you want it at the time or at the

6   end?

7         THE COURT:  Hold on, hold on, hold on, okay, hold on.

8   Yeah, normally I tell counsel when I'm not -- I won't say

9   expecting problems, but I'm going to say expecting problems,

10  and I really don't want to have problems.

11        Normally I tell counsel when they go through the case

12  that they can present their evidence, and then at the end of

13  their case if they want to move their exhibits I usually tell

14  both sides to look at it and see if you can agree upon the

15  exhibits that are admitted.

16        Normally, even in my most recent case, which was

17  relatively -- I don't know why I'm getting contentious cases,

18  but it was contentious with the lawyers, there was no problem,

19  they ultimately agreed on the exhibits.  Whether they liked it

20  or not, the bottom line is that there's a foundation that's

21  been set and it's been testified to.  You know, where that

22  comes in of particular moment is when there's a lot of records,

23  medical records, when you're only really -- not in this case,

24  but even business records where they don't come in.  Like I'm

25  putting in 12 pounds of business records, but there's a

1  reference to certain materials in there that everyone agrees

2  that these are the pages that go in, the other pages are not

3  pages that are relevant to the --

4          So, I appreciate the fact that counsel have agreed as

5  to the authenticity of each other's exhibits, and I don't have

6  any problem with the fact that, you know, we'll wait and make

7  rulings on admissibility as that becomes necessary.  You can do

8  it either way, I don't care.  You can either do it where you

9  show the exhibit, once the person has seen the exhibit.

10          Normally it's effectively the same as being in.  And

11  we can -- we'll note what number it is and then go through all

12  of the numbers you will that have been used and to make sure

13  everybody is in agreement, or if you want to have a specific

14  ruling on each one every time we can do that, but I find that

15  to be a waste of time way and a disruptive way to do it.  But

16  as I said, I'm going to let you try your case in your own way

17  unless there's a problem.  So, that's exhibits.

18          Objections, let me just throw this out.  This isn't

19  law school, and this is not pre-trial motions and filings.

20  It's the trial.  I really -- my own personal opinion, and

21  listen, you don't have to take any of my personal opinions.  My

22  own personal opinion is that people who object all the time,

23  even if they're right on every single objection, the jury

24  starts to think that they're obstructing and that it's negative

25  for them and that it breaks the flow of everything.

1          In the sense of really getting the information out to
2   the jury, I can tell you as a Judge when there's a legitimate
3   objection I get that.  When there's just objections that I'm
4   objecting because it's leading and all the person is going to
5   do is rephrase it and get the same information out a second
6   later, but we've done all that time, I just think that's -- I
7   personally don't think that's the best way for professionals to
8   try a case.  But that being said, I am giving you freedom to
9   try the case in what you want.

10          I will ask -- I don't mind speaking objections, as
11  long as the speaking in the objection is not something that's
12  designed to somehow poison the jury or get across what you
13  think you're not going to get across because I'm going to rule
14  on it in there.  Nothing like that.  I won't take any of that
15  stuff.  So if you need to give me some information about it,
16  you can give me that.  I'm usually halfway smart in picking up
17  what's going on and what's being said.

18          Occasionally we may need to have side-bars on things,
19  that's also something that I don't want to regularly do.  I
20  mean, the bottom line is that I want to try to be courteous to
21  the jury and move the case forward and not have us all running
22  up every five minutes to have some objection.  That's not
23  something that we ought to be doing.  So I would appreciate it
24  if you would try to work within that framework in your
25  presentations.

1          What else?  Let me start, first, Mr. Pisanchyn, you

2     had originally talked that you were concerned about some

3     motions in limine that you wanted to have referenced.  If we

4     haven't covered those, which ones are they?

5          MR. PISANCHYN:  No. 5 your Honor is --

6          THE COURT:  The relevant timeframe of June 21, 2011

7     to June 20, 2014.

8          MR. PISANCHYN:  It is, your Honor, there's a few

9     issues in regard to that.  No. 1 is, first off, the Judge, I

10    know he was inundated with documents, Judge Conaboy, when he

11    had made the decision, but I would like to direct the Court to

12    some testimony which shows that NYCM began to investigate this

13    claim as a underinsured motorist claim when they received the

14    first letter.  In fact, the --

15         THE COURT:  This has to do when they first received

16    the letter saying what potentially it could be or possibly

17    could be?

18         MR. PISANCHYN:  So what our position is if the Court,

19    after hearing all of the testimony, they could instruct the

20    jury saying this is the relevant time periods.  However, no

21    matter what time period we start, the NYCM people do know all

22    of this before that date.  So it is relevant to show as of that

23    date what they knew.  But if you looked at, for instance,

24    Catalano, the corporate designee's deposition, on page 60 --

25         THE COURT:  Well, I'm not so concerned about the

42

1   individual depositions, what they say.  So your point is

2   that -- let me go to you Mr. Haddick, what's your position on

3   that?

4           MR. HADDICK:  My position is that Judge Conaboy's

5   ruling is fairly clear that under New York law this claim could

6   only have started on June 21, 2011.  Whatever they knew on June

7   21, 2011, is fine, but anything before that seems me to be

8   precluded by Judge Conaboy's order.  There was a car accident

9   in 2009, but --

10          THE COURT:  I know that.

11          MR. PISANCHYN:  But also, your Honor, like I said, I

12  just -- I have Bates stamped documents that basically show

13  that -- for instance -- and so what I was intending on doing, I

14  believe it's relevant evidence regardless.  Once your Honor

15  hears the evidence then he can instruct the jury, look, you've

16  heard evidence of things that occurred on these dates.  The

17  relevant time period for the bad faith would have had to occur

18  between these dates.

19          But regardless, whatever that start date is, they

20  would have had to know -- how else would I say there's an

21  accident on -- whenever it was before, because they would have

22  never known -- do you see what I mean?  I have to get to bring

23  that relevance --

24          THE COURT:  No, that's a different animal.  Factually

25  that there was an accident in 2009 is something that's not

1  precluded -- his statement in that motion in limine as to the

2  relevant timeframe was the timeframe for which the allegations

3  related to bad faith apply, not as to, well, you can't say

4  there was an accident in 2009.

5          MR. PISANCHYN:  Right.  But for instance, even with

6  regard to the April 1st letter, we understand that we put them

7  on notice of a possible underinsured motorist claim, that's

8  relevant.  It's not -- I'm not saying they were put on notice

9  of a claim, and I don't intend on ever saying that.  But that

10 letter that we put him on notice of a possible underinsured

11 motorist claim, and then you'll see, and Mr. Catalano is here

12 -- from his deposition, you'll see that they agreed that once

13 they received that letter they were under a duty to evaluate

14 the claim, at which point in time --

15         THE COURT:  And that may be the case, but Judge

16 Conaboy has ruled otherwise.

17         MR. PISANCHYN:  Well, but he also -- at the back of

18 it -- but at the back of it he said that the Court would

19 obviously take testimony and if the rulings -- I think because

20 of the length of the documents -- and again, if you would just

21 look at one page, and I just want to even just put it for the

22 record to preserve, and that is 6112, lines 14 to 19.  And in

23 addition, there's a letter that was --

24         THE COURT:  Hold on, hold on, hold on.  Now, are you

25 talking about his ruling on motion in limine, the 5th one?

44

1    MR. PISANCHYN:  Yes, your Honor.

2    THE COURT:  That's on pages five and six of Document

3 No. 160?

4    MR. PISANCHYN:  It is, your Honor.

5    THE COURT:  What are you referring to?

6    MR. PISANCHYN:  Well, he doesn't refer to it in

7 there, and I think that's why --

8    THE COURT:  He doesn't refer to what?

9    MR. PISANCHYN:  He doesn't refer to the 320-page

10 Adjuster Catalano deposition, which I'm referring to just three

11 lines.  And in addition, he doesn't refer to Plaintiff's 231,

12 which the plaintiffs in fact submitted the notice of intent to

13 make a claim.  So --

14    THE COURT:  So, I understand your argument, your

15 argument is that because he didn't put specifically that item

16 into his opinion that he --

17    MR. PISANCHYN:  Twofold, your Honor.  One is that

18 regardless -- the dates -- and the letters --

19    THE COURT:  Regardless is not one that I'm interested

20 in right now.  What I want to know is he's ruled on this issue.

21 Whether I agree or don't agree with his ruling, it's the law of

22 the case, he's ruled on the issue.  So my question is what in

23 that particular determination of five, what is the language in

24 there that you want to cite to me that would be indicative of

25 the fact that the timeframe you should be allowed to present

1  evidence is different than June 21?

2         MR. PISANCHYN:  For the proposition that the bad

3  faith may not be predicated on the insurer's actions or lax of

4  being notified of a claim.  And what he had said is that they

5  were put on notice of a possible claim.  And if you look at

6  Bates stamp 231, it's actually -- and that's the letter of

7  November 21, 2012.

8         THE COURT:  I mean, I want to stay with what Judge

9  Conaboy has determined.  So you're reading on page six where he

10 says halfway down there --

11        MR. PISANCHYN:  Makes clear that plaintiff's

12 counsel's allusion to a potential sum claim in his letter dated

13 -- or letter of April 12, 2010, was insufficient to trigger any

14 duty to act on defendant's part.

15        THE COURT:  Okay.

16        MR. PISANCHYN:  And so my argument is of course it

17 didn't trigger a duty, but they did know that their insured was

18 making a possible claim first off, so that goes to the weight

19 of the evidence --

20        THE COURT:  You have made your record.  Judge

21 Conaboy's ruling stands.  The timeframe is June 21, 2011 to

22 June 20, 2014, unless there's something else that's brought in

23 that would allow you either on rebuttal or during some cross to

24 challenge somebody's credibility related to that.

25        MR. HADDICK:  Your Honor, just one question, and I

1 want to just place this on the record.  It's my understanding

2 then is that the jury will be told that there was an accident

3 in August of 2000- --

4          THE COURT:  Right, there's no doubt -- listen, the

5 concern here is Judge Conaboy clearly was ruling on whether or

6 not what activities somebody had a duty to do and when that

7 began, and he's made a determination in this case that on June

8 21, 2011, that's when the defendants had a duty at that point

9 to in this particular claim, because it was actually made, in

10 order to act in good faith.  So, that's where we're going to

11 stay; that's the law of the case.  Okay?

12          But that's not to say the fact there's an accident in

13 2009 is irrelevant, or the fact that -- you know, I don't know

14 what else might be relevant.

15          MR. PISANCHYN:  Well, for instance, your Honor, a day

16 after -- the big argument in this case is they never had

17 authorizations.

18          THE COURT:  The authorizations, no, that's a

19 different animal.

20          MR. PISANCHYN:  Okay.  The day after --

21          THE COURT:  That's a different animal.  My

22 recollection is you argue that they had authorizations from

23 prior counsel; they argue that you revoked all those

24 authorizations.  So I don't know how that's going to play out.

25 But if there's an argument made that says they didn't give us

1  authorizations until 2013, you can certainly offer evidence to

2  rebut that indicating it was at some other time.  There's

3  nothing wrong with that.  That's directly -- that's different

4  than proving the time period for which bad faith is, that's

5  challenging a fact that's being offered by somebody else, and

6  you're allowed to do that.

7         MR. HADDICK:  And I just want to make it clear that

8  the jury will be told, at least by me, that the claim started

9  on June 11, 2011, or whatever that date was.

10        THE COURT:  That's fine.

11        MR. PISANCHYN:  The only thing in regard to that, I

12 don't -- and I'm going to be asking your Honor at the end of

13 the case, in light of all of the testimony, because like I

14 said, I do have -- we submitted a notice of claim on June 21.

15 I don't want him to make that representation, and your Honor

16 then later on say you can't instruct him on a different period

17 based on the evidence you heard, because according to Judge

18 Conaboy's opinion the last page clearly says depending on the

19 evidence the Court may decide different issues.

20        THE COURT:  Oh, oh, you're talking about the end of

21 his memorandum?

22        MR. PISANCHYN:  Yes.

23        THE COURT:  Right.  What he was saying there, in all

24 honesty -- let me translate that for everybody.  He was saying

25 that he was very unhappy with all of your activities, and if

48

1  anybody were to try to sneak something in that was violative of

2  his order he may then open the door in a way that's very

3  negative to that person.  He wasn't saying, well, we'll kind of

4  just see how things -- he made his ruling and was basically

5  saying stick by them, gentlemen, or else you're going to be

6  sorry because you're going to open up a door that's going to

7  hurt your own client.  That's what he was saying.

8          MR. PISANCHYN:  And one last thing, your Honor.  I

9  know you made your ruling, and please, I'm not trying to --

10         THE COURT:  If I have made my ruling then you don't

11  have to speak to it further; it's done.

12         MR. PISANCHYN:  But I just -- for -- it's extremely

13  important.

14         THE COURT:  Go ahead, put it on the record.

15         MR. PISANCHYN:  It's 231, 232, 233, 234 and 235.

16         THE COURT:  I don't have any idea of what they are.

17         MR. PISANCHYN:  Of Plaintiff's exhibits that will be

18  submitted.  What we normally do --

19         THE COURT:  That I don't have?

20         MR. PISANCHYN:  Yeah, we've submitted them.  They're

21  uploaded to the system, your Honor.

22         THE COURT:  Okay.  But I don't have them.  You

23  submitted to me something with pages 232, 233 and 234 and 235?

24         MS. ALBRIGHT:  They're the previously submitted Bates

25  stamped documents provided by plaintiff's counsel.  I believe

1  defense counsel provided, and that's what he's referring to, is

2  Plaintiff's Bates stamps, your Honor.

3          THE COURT:  Okay.  And so what is it that you want to

4  put on the record?

5          MR. PISANCHYN:  In essence, your Honor, all I just

6  wanted to do is merely say that that's a letter.  According to

7  NYCM, they require that a notice of intention to make a claim

8  be submitted to make a sum claim.  The sum claim, according to

9  the letter and fax that was received was made on November 21,

10 2012, on their documentation saying that we are making a sum

11 claim.  So that -- and that's all, I just wanted to make sure,

12 because I mean --

13         THE COURT:  I'm not sure what you wanted to make sure

14 of.  Tell me --

15         MR. PISANCHYN:  I want to make sure that at some

16 point if your Honor or the Court were to read to the jury that

17 this is an applicable time period, according to Judge Conaboy's

18 opinion, that this is marked on the transcript, because if you

19 look at that document, your Honor, there's no doubt as of that

20 date that anyone at all can ever say that the claim wasn't made

21 as of that date.

22         THE COURT:  What date?  November what?

23         MR. PISANCHYN:  November 21, 2012.

24         THE COURT:  That's even after.

25         MR. PISANCHYN:  That's even after, okay, I'm sorry,

1  okay.

2        THE COURT:  But we're saying that you can go from

3  June 21, 2011, a year and a half earlier.

4        MR. PISANCHYN:  Eleven.  Okay, so I'm sorry, okay

5  then.  Then my record is horribly done, by my own admission.  I

6  apologize, but I thought it was afterwards.

7        THE COURT:  Anything else from the plaintiff?

8        MR. PISANCHYN:  In regard to -- let's see, 11 -- No.

9  11.

10       THE COURT:  That's the seatbelt one?

11       MR. PISANCHYN:  Yes.  That was our motion, your

12 Honor, and Attorney Haddick and myself had agreed yesterday

13 that that was merely to go -- that they can't bring in evidence

14 that he was not wearing his seatbelt.  However, of course, they

15 relied on an inapplicable defense which was the seatbelt

16 defense.  It hurts I have to bring in that they were relying on

17 that defense, but it's throughout all of the documents and also

18 the --

19       THE COURT:  I get your argument.  Go ahead.

20       MR. HADDICK:  I don't disagree that the judge's

21 ruling precludes us from putting on evidence in the seatbelt

22 defense.  I'm not sure what Mr. Pisanchyn is going to say about

23 the seatbelt defense.

24       THE COURT:  I think what he's going to say is that

25 according to the records that your client in New York sent some

1  correspondence or whatever that indicated we're not going to

2  pay because we may rely on this seatbelt defense, and so that's

3  a reason why they would have delayed in their mind.  So the

4  question becomes I read this decision to be it doesn't make any

5  difference whether he had or didn't have a seatbelt for

6  liability purposes related to the underlying accident that

7  occurred there, that's irrelevant.  It is probably relevant as

8  to whether or not there was either a legitimate reason or not a

9  legitimate reason to delay payment in the case.  And so in that

10  regard I'll allow it for that purpose, but not for purposes of

11  injuries or damages or things like that.

12           MR. HADDICK:  And my client would be able to explain

13  whether it did or did not rely --

14           THE COURT:  Yeah.  They're going to explain that they

15  had no reason to believe that, and you're going to explain we

16  thought it was reasonable to do it and the jury is going to

17  decide who they like.  Okay, what else?

18           MR. PISANCHYN:  Your Honor, I think that's it.  We've

19  been very thorough.  Thank you.

20           MR. HADDICK:  Your Honor, I brought my client with me

21  today.  I wanted to know if the Court might entertain private

22  discussion concerning settlement.

23           THE COURT:  Well, have we --

24           MR. PISANCHYN:  Your Honor, it's -- you know, I mean,

25  it's time to play the game.  I think the practice has been over

1   on our end.  We're ready to really go, and you know, they've

2   never really made --

3           THE COURT:  So you don't want to discuss settlement?

4           MR. PISANCHYN:  No, your Honor, we've discussed it on

5   the telephone yesterday for about a half hour, and they're at

6   someplace around where I have to pay my expert rate now.  So

7   it's not going anywhere.  I think it's just going to be futile.

8           THE COURT:  I'm not going to entertain settlement

9   discussions unless I have a belief that both sides, at least in

10  good faith, are going to want to make an effort to get it

11  resolved.  If it turns out that we're really in different

12  universes then, I'm just not -- I've got other things that I've

13  got to do.  I mean, there's a lot of other cases and I'm not

14  going to spend time on what was originally, you know, as Judge

15  Conaboy put in here, a relatively simple $35,000 case or

16  whatever it may be.

17          I think it's foolish, I think it's foolish for sides

18  not to want to try to work it out.  But you know what?  That's

19  completely your prerogatives to do that, but --

20          MR. HADDICK:  Judge, I just want to place on the

21  record that Mr. and Mrs. Clemens are not here, and I believe

22  that they're entitled to hear my client's best offer.  And if

23  no discussions are held I'm not sure whether or not that

24  will --

25          THE COURT:  Well, they weren't here.  There was

1   correspondence that I think you received based upon the fact

2   that the prior settlement discussions were so diverse in the

3   positions of the parties that there was no realistic chance of

4   them being here, so the request was made that since -- you

5   know, it's certainly the plaintiff's prerogative to settle a

6   case.  Now, I will say this, have you made a more recent offer

7   to the plaintiff?

8        MR. HADDICK:  My client is prepared to make an offer

9   this morning which is new and different, and that's why I

10  enlisted your Court's help, your Honor's help in the hopes that

11  it would be communicated to Mr. and Mrs. Clemens.

12       MR. PISANCHYN:  Here is your Honor, first off, as I

13  told Attorney Haddick, I'm under an ethical obligation, your

14  Honor, to refer all and any offers to my clients and give them

15  a reasonable opportunity to decide what they want to do.  I

16  don't decide whether they settle their case.  I certainly

17  talked to them about what the pluses and minuses are.  The last

18  offer was $50,000.  Mr. Sincavage's bill is close to that, your

19  Honor, and he said he might get to a hundred.  Okay, well I --

20  my clients will get nothing for that.  So we're not willing to

21  settle a case when they're going to owe me money to do it.

22  We'd rather take the opportunity to try the case.

23       So I told him where he needed to be in order to get a

24  realistic settlement demand, and if he wants to get there, he's

25  willing to do that, and I will relay it to my client.  If he

1  released $50,001 I'll relay that to my client as well.  We

2  don't need the Court's time.

3      But my -- offering $50,000 and my expert's bill is

4  $50,000, in essence is something that I don't think you want to

5  deal with and I have lots of work to do on this case as well to

6  make sure the Court doesn't have to deal with it.

7      THE COURT:  I appreciate the defendant's position,

8  and I normally at a final pre-trial conference do want to try

9  to figure out if we do can get a case resolved, but I'm not

10  going to force recalcitrant parties to -- you know, and I said,

11  I've got a ton of other cases that I've got to work through and

12  get on, so --

13      MR. HADDICK:  Would your Honor mind if I made an

14  offer on the record?

15      THE COURT:  No.  In fact, sure, you can make an offer

16  on the record.

17      MR. HADDICK:  My client is prepared today to pay

18  $75,000.  The UIM claim at issue is worth $25,000.  Under Third

19  Circuit precedent, the case is called Jurinko v. Medical

20  Protective Company, the ratio for punitive damages has been

21  expressed in that case as one to one.

22      Mr. Pisanchyn's demand is currently expressing a

23  ratio of 360 to one, nine million dollars, and we believe that

24  three times what the claim is worth is a more accurate,

25  reasonable offer.

55

1          THE COURT:  Let me -- let me just say, are you

2    demanding nine million dollars?

3          MR. PISANCHYN:  When they are at 15, yes, your Honor.

4    And to be honest with you, let me --

5          THE COURT:  Gentlemen, you know what --

6          MR. PISANCHYN:  But here's --

7          THE COURT:  No, no, excuse me, I'm speaking now.

8          MR. PISANCHYN:  Yes, your Honor.

9          THE COURT:  We're done.  There's no discussions here

10   worth having.  That's -- that -- that's -- that's --

11         MR. PISANCHYN:  But your Honor --

12         THE COURT:  That's flabbergasting.  No, we're done.

13         MR. PISANCHYN:  But your Honor, for the record --

14         THE COURT:  Mr. Pisanchyn, we're done.  Do you

15   understand what "we're done" means?  Do you understand what

16   that means?

17         MR. PISANCHYN:  I do, your Honor.

18         THE COURT:  Okay.  We're done.

19         MR. PISANCHYN:  But my concern, your Honor, is the

20   records --

21         THE COURT:  I guess you're not hearing what I said.

22   I said we're done --

23         MR. PISANCHYN:  Your Honor --

24         THE COURT:  -- in that regard.  That's it.

25         MR. PISANCHYN:  -- may I speak?

56

1          THE COURT:  No.  You're done.  That's it.  Gentlemen,

2   we finished all the things we needed to do in the final

3   pre-trial conference, all right.  I encourage you strongly to

4   have some sort of conversations.  I do, by the way, require, as

5   I said, that you fill out your joint verdict slip and that you

6   go through your requests to charge, but it -- I encourage

7   you -- listen, I understand you may not get to a place where

8   the both of you agree, but there is something that's just

9   called good faith in terms of counsel dealing with each other.

10          So now we're at the end of the road, maybe it will be

11   a good time for both sides to really tell the other side what

12   it is they really need to get the case resolved.  Have a good

13   day gentleman.

14              (12:10 p.m., court adjourned.)

15

16

17

18

19

20

21

22

23

24

25

57

1            REPORTER'S CERTIFICATE

2

3      I, DIANA L. GILBRIDE, Official Court Reporter for the

4  United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of Title 28,

6  United States Code, Section 753, do hereby certify that the

7  foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                          /s/ Diana L. Gilbride
                            Diana L. Gilbride, RMR, FCRR
15                          Official Court Reporter

16  REPORTED BY:

17      DIANA L. GILBRIDE, RPR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      P.O. Box G
        Scranton, PA  18501-0090
20

21          (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
22  the direct control and/or supervision of the certifying
    reporter.)
23

24

25