1

1    IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3   BERNIE CLEMENS and NICOLE:
    CLEMENS                    :
4                              :
                               :
5       vs                     :    13-CV-2447
                               :
6                              :
                               :
7   NEW YORK CENTRAL MUTUAL  :
    FIRE INSURANCE COMPANY     :
8                              :

9

10      BEFORE:      THE HONORABLE MALACHY E. MANNION

11      PLACE:       COURTROOM NO. 3

12      PROCEEDINGS:  JURY TRIAL

13      DATE:        FRIDAY, NOVEMBER 6, 2015

14

15   APPEARANCES:

16   For the Plaintiffs:

17   MICHAEL J. PISANCHYN, JR., ESQ.
     MARSHA LEE ALBRIGHT, ESQ.
18   PISANCHYN LAW FIRM
     524 SPRUCE STREET
19   SCRANTON, PA 18503

20   For the Defendant:

21   CHARLES E. HADDICK, JR.
     BRYON R. KASTER, ESQ.
22   DICKIE, MCCAMEY & CHILCOTE, P.C.
     PLAZA 21, SUITE 302
23   425 NORTH 21ST STREET
     CAMP HILL, PA 17011

24

25

2

INDEX TO WITNESSES

| FOR DEFENDANT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSEPH CATALANO | 7 | 15 | 29 | |

3

1          THE COURT:  I want to talk about the request by the

2  defense under that Superior Court case for removal of the

3  language related to heightened.  Then do you have some other

4  question about the --

5          MS. ALBRIGHT:  On the separate charge for the opinion

6  evidence on expert witness, Your Honor.

7          THE COURT:  Okay.

8          MS. ALBRIGHT:  The reading of the same, Your Honor,

9  when we read through the first paragraph --

10          THE COURT:  What page is that?

11          MS. ALBRIGHT:  Seventeen, Your Honor.

12          THE COURT:  Okay.

13          MS. ALBRIGHT:  The second sentence says a so-called

14  expert witness.  So-called expert, Your Honor, the connotation

15  that is with so-called and reading 4.08 opinion evidence, the

16  suggested instruction doesn't have so-called within the

17  definition of the actual witness itself as far as the

18  designation of the same.  We will ask respectfully if we can

19  remove so-called from the instruction.

20          THE COURT:  What else?

21          MS. ALBRIGHT:  The second part, Your Honor, if we

22  read 408 from the jury instruction, it pertains to the second

23  full paragraph --

24          THE COURT:  You're talking about the Pennsylvania

25  standard jury instructions?

1    MS. ALBRIGHT:  The actual -- it's from the federal

2 instructions, Your Honor, that was pulled --

3    THE COURT:  Third Circuit or the --

4    MS. ALBRIGHT:  Third Circuit, Your Honor, yeah.

5    THE COURT:  Let me get those.

6    MS. ALBRIGHT:  Thank you, Your Honor.  I believe the

7 same that was utilized in the drafting of the --

8    THE COURT:  Now, you said four point --

9    MS. ALBRIGHT:  08.  I have it listed as the Third

10 Circuit.

11    THE COURT:  I don't have 4.08 in the Third Circuit.

12    MS. ALBRIGHT:  Then it would have been the regular

13 federal instructions, Your Honor.  I apologize I said -- I have

14 the copy of the instruction printed out here, Your Honor.

15    THE COURT:  Tell me what your objection is, some

16 substance so I can understand it first.  Then I will go look

17 for it.

18    MS. ALBRIGHT:  Just if we can add the additional

19 language from the proposed instruction that says in weighing

20 this opinion testimony, you may consider the witness'

21 qualifications, reasons for the witness' opinions, reliability

22 upon the information supporting the witness' opinion as well as

23 other factors discussed in these instructions for the weighing

24 of the testimony of the witnesses.

25    THE COURT:  Standard federal --

1          MS. ALBRIGHT:  Would you like to take it with you?

2          THE COURT:  No.  Is there a citing at the bottom of

3  it on the page?

4          MS. ALBRIGHT:  O'Malley Federal Rules of Evidence

5  703.  It's going to the comments, Your Honor.  It's under the

6  comment section.  It doesn't have the actual citation attached

7  to it, no.  I apologize, Your Honor.

8          THE COURT:  I have O'Malley, the Federal Jury

9  Instructions.  There's no 4.08.  So I am not sure what that is

10  referring to.

11          MS. ALBRIGHT:  Permission to approach, Your Honor.

12          THE COURT:  Sure.  It isn't exactly word for word,

13  but it seems to be a paraphrase of what we have.  Do you have

14  an objection to that?

15          MR. KASTER:  I'm fine with it, whatever they want to

16  put in.

17          THE COURT:  We can add that paragraph.  The so-called

18  -- which is what we have always used -- yeah, I am not going to

19  remove that.  I don't find it to be derogatory at all.  I find

20  it to be a modifier that lets them know someone who is

21  so-called an expert can do certain things.  So I am not -- I am

22  not reading it the same way you're reading it.  But it is meant

23  to clearly identify to the jury that this is somebody different

24  than everybody else and they have to consider it different than

25  anybody else.  The so-called I will leave.  I think that makes

6

1   perfect sense.  We will add this paragraph to page 17 which

2   will kick everything to a different page.  So we will make new

3   copies of that.  That takes care of your objections, okay.

4            Your request for the removal of the language that

5   says heightened standard, I read the case that you had

6   indicated to me.  I'm going to leave it the way that I

7   presently have it because as I said, your case is not a binding

8   case.  It's a 2006 case.

9            The Pennsylvania Standard Jury Instructions were

10  amended in 2009 related to the -- that particular provision or

11  that particular charge.  No change was made based upon that

12  case.  And the most recent revisions are 2015.  So in the

13  ensuing nine years that Superior Court case has not caused any

14  change in the suggested Pennsylvania instructions.  I don't

15  find it to be persuasive.

16           MR. KASTER:  My objection is preserved?

17           THE COURT:  Absolutely.

18           MR. KASTER:  Thank you.

19           THE COURT:  We will make that change.  In the

20  meantime, ready to go?

21           MR. PISANCHYN:  Yes, Your Honor.

22           THE COURT:  Okay.  All right.  Mr. Catalano, you can

23  come back up on the stand.  Bring the jury out.

24           (The jury entered the courtroom at this time.)

25           THE COURT:  Mr. Catalano, you're reminded you're

1  still under oath.

2  DIRECT EXAMINATION (cont'd.)

3  BY MR. KASTER:

4  Q.    Good morning, Joe.

5  A.    Good morning.

6  Q.    We left off on that April 28th, 2014 letter from my office

7  requesting employment, income information.  Pat, pull up

8  exhibit 48, please.  Can you highlight the date, please?  I'm

9  showing you, Joe, a letter of April 30th, 2014.  Pull up the

10  third paragraph, please.  Can you highlight that first sentence

11  for us?  According to this letter, what are we asking for?

12  A.    Continued responses to our discovery.

13  Q.    Including what?  What does it say?

14  A.    In the meantime if you'd like to provide meaningful

15  discovery responses, including whatever information you may

16  have to support your income loss, slash, earnings capacity

17  claim, as well as any information supporting your specific

18  allegations against my client, I would be glad to move forward

19  with your client's statements and depositions.

20  Q.    Pull up exhibit 52, Pat.  That was April 30th, 2014.

21  We're still requesting the information that was requested all

22  the way back.  We saw a letter yesterday September 20th, 2011.

23  A.    Yes.

24  Q.    Now, I am going to show you a June 16, 2014 letter.  Pat,

25  pull up the second paragraph, please.  Who is this from to?

1  A.   This is a letter from the Pisanchyn law firm directed to

2  Charles Haddick and Bryon Kaster of the law firm of Dickey

3  McCamey.

4  Q.   Okay.  Pull up the first and second paragraph, Pat.

5  According to this letter, what is plaintiff's counsel providing

6  to us?

7  A.   I'm pleased to enclose supplementary discovery responses

8  regarding the aforementioned matter.  Enclosed herein please

9  find the W. 2 information for Mr. Bernie Clemens for 2004

10 through 2013 which completes defendant's request for production

11 of documents.

12 Q.   June 16, 2014 we were finally provided with the

13 information that was requested?

14 A.   That's correct.

15 Q.   Pull up the timeline, please.  April 26, 2013 plaintiff

16 filed this lawsuit including this bad faith claim comprised of

17 the allegations you heard here today -- or this week.  After

18 that, formalities of the Court, did we send -- we sent

19 discovery requests to plaintiff, correct?

20 A.   Yes.

21 Q.   You talked about those earlier.  Those were the

22 interrogatories, request for production of documents that are

23 part -- once a lawsuit is filed that's one of the ways to

24 request things.  Is that your understanding?

25 A.   That's the normal discovery process.

1  Q.   Pat, pull up exhibit 15, please.  These are if -- if you
2  can highlight -- these are the interrogatories we saw
3  yesterday.  There's a lot of questions that we were asking.
4  That's what you testified to yesterday.  So those are those.
5  Pull up exhibit 57, please.
6       These are the request for production of documents that we
7  asked -- we showed you yesterday.  Pull up exhibit 58, please.
8  These are the interrogatories request for production of
9  documents the plaintiff set two.  We saw these yesterday.
10 These are the three requests that were sent out, correct?
11 A.   Yes, they are.
12 Q.   Pat, pull up exhibit 54, please.  Pull up the text.  We
13 heard early in trial testimony about an order of Court dated
14 June 4th, 2014 of Judge Conaboy of this very court requiring
15 plaintiff's -- requiring plaintiff to produce responses to
16 those discovery requests.  Is that what we're looking at here?
17 A.   Yes, it is.
18 Q.   June 4, 2014 the Court had to order plaintiff to produce
19 documents that were sent as part of their lawsuit on November
20 11, 2013, correct?
21 A.   That's correct.
22 Q.   We went through some of those requests yesterday, and it
23 included medical expenses, out-of-pocket expenses, tax returns,
24 any information they have regarding their wage loss claim,
25 correct?

1  A.    Yes.

2  Q.    Were there other things requested, too?

3  A.    Yes.

4  Q.    So as of June 4, 2014 the Court ordered plaintiff to

5  produce those documents?

6  A.    The Court was ordering them to produce them, yes, at that

7  point in time.

8  Q.    Pull up D. 647, please.  Can you also pull up D. 648 and

9  put them next to each other?  Pull up the paragraph at the top

10 of the page, please.  It's just a continuation on the next

11 page.  I just want to show everyone the entire paragraph.  Jim,

12 can you -- Joe, can you read the first two sentences of the

13 Court's opinion?

14 A.    The interrogatories and production requests to which the

15 defendant New York Central seeks to compel answers are with one

16 exception straightforward, unremarkable and obviously relevant.

17 Plaintiffs would be required to respond to these requests even

18 in the ordinary course of events.

19 Q.    Thank you.  On D. 649 pull up the footnote at the bottom

20 of the page.  In fairness there was one exception, correct,

21 that we were -- they were not required to produce, right?

22 A.    That's what it states, yes.

23 Q.    I will pull that up in fairness to everybody.  We need to

24 know what that is.

25 A.    The exception is the production request concerning tax

1  information sets the relevant time period as tax years 2004

2  through 2013.  The Court believes this is a reasonable time

3  frame to establish such wage loss as Bernie Clemens has

4  experienced.  Thus Bernie Clemens must provide W. 2 forms or

5  such alternative documentation as may be responsive for the

6  ten-year period from 2004 through 2013.

7  Q.    So the Court didn't require them to turn over the tax

8  returns, right?

9  A.    No, just the W. 2s.

10  Q.    Those discovery requests we looked at, those letters, we

11  were only asking for tax returns?

12  A.    No, we requested any information that would help document

13  their wage loss claim.

14  Q.    Those letters spelled out very clearly or whatever

15  information.  We looked at all those letters, right?

16  A.    Yes, we did.

17  Q.    We looked at the discovery requests.  That's not all we

18  were asking for was tax returns?

19  A.    It was not.

20  Q.    Anything in the judge's order, anything he may have?

21  A.    We were looking for any confirmation of a wage loss claim.

22  Q.    If you can pull up the next exhibit, Pat.  That's exhibit

23  63.  We just saw the cover letter.  This is the June 16th, 2014

24  supplemental discovery provided by the plaintiff pursuant to

25  that Court order.  If you could turn to page D. 622, please.

1  You see here is the W. 2 information, and there's several pages

2  of it.  That's what was provided, ten years in there of that.

3  If you can just put D. 615, D. 616 next to each other.  They

4  are requesting information -- we requested a lot of stuff, and

5  the Court's opinion addressed more than that, correct?

6  A.    Yes.

7  Q.    I am showing you the discovery responses.  You can see

8  there was a lot more they had to provide answers to.  You can

9  see it.  Take a second and allow -- those are the answers we

10  were finally able to get.  Pull up the next two pages, Pat.

11  Their answers are in bold, so you can see there's stuff written

12  down.

13      The questions are in kind of normal font, right, answers

14  -- you see there are even more answers coming.  I think -- is

15  that 617 and 618?  Pull up 619 and 620 and do the same thing,

16  Pat.  You can see discovery answers that were provided.

17  6/16/2014, first request -- on November 11th, 2013 and March

18  8th, 2014 as part of this lawsuit -- plaintiff's lawsuit

19  alleging your company of bad faith, correct?

20  A.    Yes.

21  Q.    That's June 16, 2014.  Pull up the timeline.  The judge

22  has already told you -- and I believe he will instruct the jury

23  at the end of the case that we are talking a period of time

24  June 21, 2011 until June 20th, 2014.  It's your understanding

25  is that period of time there was a supplementary underinsured

1  motorist claim being presented by plaintiffs, correct?

2  A.   That is the time frame, yes.

3  Q.   Right.  It began June 21, 2011.  It was resolved June

4  20th, 2014 for $25,000, correct?

5  A.   That's correct.

6  Q.   A lot of letters went back and forth.  But is that a fair

7  indication of what was requested in this case by New York

8  Central during that time period?

9  A.   That identifies all of the numerous requests that we were

10 trying to develop the information necessary to evaluate the

11 claim.

12 Q.   We heard a lot of talk in this case about some seat belt

13 defense, right?

14 A.   Yes.

15 Q.   Do you remember when -- did New York Central as of June

16 20th, 2014 believe they had a viable seat belt defense in this

17 case?

18 A.   June 2014?

19 Q.   Right.

20 A.   No, absolutely not.

21 Q.   I believe the testimony was -- let me ask you.  When was

22 -- when did New York Central realize they didn't have a seat

23 belt defense?

24 A.   I can't remember the exact date, but it was in, I believe,

25 2011.

1  Q.    That's consistent with what we heard here today, I

2  believe.  So in 2011, you realized it didn't apply -- no matter

3  what law applied, you determined it didn't apply, correct?

4  A.    Yes.

5  Q.    You were the supervisor on the claim.  That was something

6  you were -- that was a decision that was made, right?

7  A.    Yes.

8  Q.    Why was it -- why did you decide it didn't apply?

9  A.    Through the investigation and the initial investigation

10  conducted by Mr. Dvoracek.

11  Q.    So regardless of what law applied you determined in 2011,

12  the seat belt defense wasn't something you had, correct?

13  A.    Correct.

14  Q.    You said this timeline was all the request for

15  information.  Are there any requests after 2011 being made?

16  A.    They can be identified on the timeline as numerous

17  requests.

18  Q.    Yes.  Based on that, as of 2011 when we all knew that New

19  York Central -- the seat belt defense wasn't something we can

20  pursue, was the investigation completed at that point?

21  A.    Not even close to being completed.

22  Q.    You still needed a lot of that information, right?

23  A.    All of the information that was requested through

24  discovery with respect to damages.

25  Q.    All right.  Now, a lawsuit was filed on August 26, 2013

1  alleging that New York Central acted in bad faith, right?

2  A.    Yes.

3  Q.    You can see that on the timeline.  There's a little -- I

4  don't know how it gets there, but it's there.  It says bad

5  faith complaint filed.  That was when that lawsuit was filed

6  alleging New York Central acted in bad faith?

7  A.    Yes.

8  Q.    Did you have all the information you'd been asking for

9  since 2011?  Did you have all the information at the time that

10 you were -- your company was accused of acting in bad faith?

11 A.    That same information we were requesting long before

12 August of 2013 -- August 26th, 2013 we requested after and was

13 only provided after the judge compelled them to.

14 Q.    How many days after Mr. Clemens finally provided those

15 discovery responses in response to the Court order did this

16 claim settle?

17 A.    Four days.

18         MR. KASTER:  No further questions.  Thank you, Joe.

19         THE COURT:  You may cross-examine.

20         MR. PISANCHYN:  Thank you, Your Honor.

21 CROSS EXAMINATION

22 BY MR. PISANCHYN:

23 Q.    Good morning, Mr. Catalano.  How are you today?

24 A.    Good morning.

25 Q.    So just going over a few of the things that you said was

1 -- we can agree that at the time of your deposition, which was
2 taken on June 12th, 2014, you had said that NYCM would offer
3 $25,000 to settle this case, correct?
4 A.    That's correct.
5 Q.    And that was even before the wage loss information was
6 received, correct?
7 A.    Yes.
8 Q.    Okay.  So how then -- so you agree that that was before
9 the four days that you are saying you need the information that
10 the whole reason the case settled for?  What difference did
11 that information make in regards to the evaluation then if you
12 settled it for the same offer before you even got the
13 information?
14 A.    You ask for all of the information.  When you want -- in
15 this instance, the information that was provided had no impact
16 on the offer.  We discussed throughout the course of this trial
17 that offers are to be extended at any point in time if there's
18 an opportunity to resolve the claim.
19      At the time of my deposition, there was an opportunity to
20 try and resolve the claim.  The offer was extended.  It just so
21 happens it was accepted four days after the receipt of those
22 records.  Those records would have --
23 Q.    Increased the value?
24 A.    No, they wouldn't have.
25 Q.    In regard to the -- you agree that examiners must begin

1  base negotiation -- examiners must begin negotiations based on

2  the medicals they have received and not continue to wait until

3  all authorizations are signed.  That's one of your best

4  practices, correct?

5  A.   That's exactly what occurred right there.

6  Q.   Okay.  So you'd agree with that?

7  A.   Sure.

8  Q.   Okay.  You agree that the offers should be based on

9  information in the file, correct?

10  A.   Correct.

11  Q.   In regard to the information in the file, it was my

12  understanding there was only one, correct?

13  A.   Correct.

14  Q.   Okay.  In regard to that information, your adjustor's

15  notes had a complete summary, correct, of the medical records?

16  A.   Summary of medical records, not a complete summary of

17  medical records.

18  Q.   Now, let me ask you, Mr. Kaster said in his letter -- I

19  believe it was yesterday -- in the letter that he sent out ten

20  authorizations to be signed, correct, his office -- ten blank

21  authorizations?

22  A.   There were ten authorizations, yes.

23  Q.   When did those -- those ten authorizations were blank?

24  A.   You provided them, and they were blank, yes.

25  Q.   So they are a big firm.  They have a few hundred lawyers.

1  I would imagine they have copiers?

2  A.    You cannot use copies of medical authorizations.

3  Q.    Show me where it says that on the document on the

4  authorization.  Would you agree it says no authorization cannot

5  --

6  A.    You discussed how different hospitals require different

7  authorizations.

8  Q.    I'm only -- does the --

9  A.    You cannot use a --

10         THE COURT:  Let him answer the question.

11         THE WITNESS:  What you're saying is that it's

12  improper to use a copy of a medical authorization.

13  BY MR. PISANCHYN:

14  Q.    In Pennsylvania?  Do you know about Pennsylvania?

15  A.    I believe those are federal rules, the federal HIPAA

16  compliance.

17  Q.    Have you ever sent an authorization in this case that

18  someone sent back and said that they weren't going to comply

19  with it?

20  A.    None that I am aware of.

21  Q.    Okay.  In regard to NYCM, in fact, shortly after this --

22  in fact, the day after this incident, they began to send

23  letters to the providers, correct, requesting medical records?

24  A.    In support of your client's no fault claim.

25  Q.    Weis Pharmacy, correct?

1  A.    Yeah -- yes, sir.

2  Q.    Weis again, Weis, Weis Pharmacy again, they were sending

3  -- they were based on the authorizations that they had of

4  9/25/2009, correct?  They actually even sent a letter to Bernie

5  Clemens' employer requesting all and any information, correct?

6  A.    Yes.

7  Q.    And you also said that you needed bills, right?  Is that

8  correct, bills --

9  A.    Any bills, yes.

10 Q.    And you agree that NYCM would have the bills because you

11 said that they were paying them, correct, and they were

12 requesting the bills from Northeast Rehab?

13 A.    Requested -- and through the litigation we were requesting

14 any and all bills that were out of pocket, not bills that were

15 paid by New York Central Mutual's no-fault claim.

16 Q.    Looking at the letter of Kirsch that you said that he was

17 requesting from the Clemens certain records dated September 20,

18 2011.

19 A.    What are we looking at?

20 Q.    Attorney Kirsch's letter of September 20th, 2011 where

21 he's requesting -- he's requesting authorizations to be signed

22 that he didn't produce for certain records.

23 A.    Can I see?

24 Q.    Yeah.  You went over it yesterday.

25 A.    I just want to make sure what I'm looking at.  Is that

1 okay?

2 Q.   It's more than fine.

3 A.   Yes, Mr. Kirsch provides a list of ten specific

4 authorizations that he would like Mr. Clemens to provide.

5 Q.   Do you know how many of those that NYCM had had and

6 already summarized?  Do you want to go through it?

7 A.   No, I am not sure if they had all those records.

8 Q.   Would you agree that I put X.s here request No. 1, three,

9 four, five, six, seven, eight, nine and ten were all signed or

10 -- not all signed -- but you had those records already?  Do you

11 want to --

12 A.   They were provided under the no-fault claim, yes.

13 Q.   And they were summarized in your casualty adjustor's

14 claims notes, correct?

15 A.   That were provided through your discovery demand package

16 in 2011.

17 Q.   Now, in regard to this discovery dispute that you -- that

18 you say took some time, NYCM insurance wanted to get joint tax

19 returns, correct, from both Mr. and Mrs. Clemens, correct?

20 A.   We were requesting tax returns because of the lost wage,

21 yes.

22 Q.   We are saying our clients -- Ms. Clemens had a privacy

23 claim in that because she wasn't advancing a wage loss claim

24 and that there should not be any documents produced in regards

25 to her wages.  We believed that was fair.  That was the issue,

1  correct?

2  A.    We asked for any and all wage loss information.

3  Q.    I know you did.  We said it wasn't appropriate, your

4  request, based on the privacy interests of Mrs. Clemens because

5  she wasn't making a wage loss claim and we believed that it was

6  another hoop or another paddy wagon that you're making the

7  insureds go through in order to make a claim and punish them

8  for doing it?

9  A.    No hoops or paddy wagon.  The Court compelled you to

10 provide wage loss information for Mr. Clemens and said he

11 didn't have to provide them for Mrs. Clemens.

12 Q.    Right.

13 A.    Prior to that you could -- had the opportunity to provide

14 wage loss information for Mr. Clemens.

15 Q.    Prior to that --

16 A.    -- if there was a distinction.

17 Q.    Prior to that, sir --

18 A.    So all that period of time we did not have wage loss

19 information to complete an evaluation.

20 Q.    You worked for a plaintiff's firm before, correct?

21 A.    I did.

22 Q.    And you know yourself that the defendants or the

23 plaintiffs can if they choose once litigation ensues subpoena

24 any little record or as much records as they wish after the

25 suit is filed, correct?

1  A.    I am not sure of the rules of discovery on that.

2  Q.    So you're telling me you don't know as a litigation

3  supervisor whether or not when a case goes into litigation that

4  you can subpoena any record that you want and the Court will

5  issue a subpoena to whoever you want to say, produce that

6  document by this time?

7  A.    As I'm not an attorney, I'm not aware of how to secure all

8  these through the Court system.  That's why we hired attorneys

9  like we started with Mr. Kirsch back in 2011 to help us in this

10  process.

11  Q.    You're telling me for how many years you've been an

12  adjustor you never asked an attorney if you could just subpoena

13  the records from any little -- anyplace you choose and that

14  they have to produce them as per a judge signing a subpoena or

15  a court officer signing a subpoena saying, give us these

16  documents within 30 days.  Instead of doing that, sir, you

17  requested the Clemens instead to go to try to chase down this

18  information when you -- NYCM had the opportunity to do it

19  themselves, correct?

20  A.    The normal course of discovery as I understand it, is that

21  you make discovery demands, they are generally complied with by

22  the plaintiff.  If they are not complied with by the plaintiff,

23  then, in fact, I believe one of the alternatives for that

24  discovery process to move forward is for the courts to either

25  -- one, you file a motion to compel to force them to provide

1  it.  Or another alternative in lieu of that, I believe, is to

2  seek a subpoena for the production of those documents.

3  Q.    So here's --

4  A.    So your client would not have been providing them

5  voluntarily.  In light of that, that would be in violation of

6  the policy conditions which says they must help us provide to

7  develop that information from which to evaluate their claim.

8  Q.    Show me where in your policy it says that the plaintiff

9  has to go to the I. R. S. and request records, have to go here

10  and collect records, have to do this, have to do that.  It says

11  they have to sign authorizations.  If you sent authorizations,

12  they would have been signed for tax returns.  Instead NYCM sent

13  an authorization and demanded that joint tax returns be sent;

14  isn't that true?

15  A.    We asked for any and all documentation of a wage loss, not

16  solely W. 2 forms.  So your client, I believe, would have a

17  paycheck.  That would be a -- one means of verifying his lost

18  wages.  That could have very easily have been provided by your

19  office to us to help us assist in the evaluation of this claim.

20  Those were never provided.

21  Q.    Now, in regard to the statement under oath, it was alleged

22  that it was unilaterally scheduled, I believe, by your defense

23  counsel here, correct?

24  A.    I believe the letter stated that based on your request to

25  unilaterally set that time frame they would do so.

24

1   Q.    Right.  And then there was a letter sent March 12th, if

2   you can read this from the Pisanchyn Law Firm.  It's 899 --

3   Bates -- 899 but it doesn't need to be an exhibit.  I'm just

4   referencing it for the stenographer.  Would you agree that that

5   letter basically said that the attorney had a scheduling

6   conflict and respectfully requested that it be rescheduled.

7   It's just right where the arrow is.  So there was a scheduling

8   conflict because it was unilaterally --

9          THE COURT:  Hold on.  Let him answer.  Then you can

10  ask the next question.

11         THE WITNESS:  The question is again?

12  BY MR. PISANCHYN:

13  Q.    That letter was written back and said attorney Kaster

14  unilaterally scheduled the deposition, we have a scheduling

15  conflict, we have to be somewhere in court on that date and,

16  therefore, Ms. Albright sent the letter out asking for it to be

17  rescheduled?

18  A.    If we go back, Mr. Kaster originally requested dates from

19  you.  So Mr. Kaster requested dates to schedule an examination

20  under oath, which would have possibly -- this scheduling

21  conflict could have been possibly -- the one you're referencing

22  in this letter could have been avoided if you told Mr. Kaster

23  that indeed you had dates you couldn't work with so that then

24  when he unilaterally set that date to hold the deposition, it

25  wouldn't have conflicted with your schedule.  But you had him

1  -- you asked him -- you told him to unilaterally schedule it.

2  Q.   All I'm asking, does that letter say there was a

3  scheduling conflict for that day, yes or no?

4  A.   Yes, it does.

5  Q.   Now, the next date that the -- it was scheduled for was

6  4/14/2014.  Do you understand that?  That's what Mr. Kaster

7  told you?

8  A.   Yes.

9  Q.   Okay.  And on that date, Mr. Kaster cancelled that -- that

10 statement under oath, correct?

11 A.   I'm unaware of that.

12 Q.   I don't know if this one is it.  This is exhibit 136.  On

13 the date that attorney Kaster picked the next date --

14 unilaterally scheduled it again, right?

15 A.   I --

16 Q.   That's what you said.  You said that we told them

17 unilaterally scheduled them.  So he unilaterally scheduled

18 them?

19 A.   We were talking a completely different date.

20 Q.   Just that date.  Can you look at this letter?

21 A.   I don't know how this -- okay.  I'll look at this letter.

22 Q.   Okay.  Thank you.  On 4/14/2014 the date that NYCM

23 insurance schedules the next examination under oath, who

24 cancels it?

25 A.   Because you still not provided discovery responses and

26

1  because we have not yet received a ruling on the pending motion

2  to compel, I am constrained to cancel the examining depositions

3  we have scheduled for April 24th.

4  Q.   That's made a big issue we couldn't it because of a

5  scheduling conflict on 3/17.  Yet on 4/14 2014, a month later

6  you schedule an examination under oath.  We let our clients

7  know.  They then take off work.  All of a sudden at the last

8  minute NYCM insurance sends us a letter saying they are

9  canceling.  We will put a line through that since NYCM

10  cancelled.

11          MR. KASTER:  Objection, Your Honor.

12          THE COURT:  All the facts that were in the question

13  are stricken from the record.  You are not to consider whether

14  they took off work.  There's no testimony or evidence about

15  that, okay.  You can ask a question about the dates.  Please

16  don't incorporate things that are not in evidence in the case.

17          MR. PISANCHYN:  Sure.

18          THE COURT:  Thanks.

19  BY MR. PISANCHYN:

20  Q.   You agree that according to this letter on 4/14 NYCM said

21  they were cancelling it, correct?

22  A.   Correct.

23  Q.   And the same reason they were cancelling on 4/14 would

24  have been the same reasoning we were cancelling it on 3/17/2014

25  other than a letter trying to bring it in front of this jury

1  that it was the plaintiff's fault for this delay, correct?

2  A.    No.

3  Q.    You agree that the plaintiffs they don't get any benefit

4  for waiting to get 25,000?  In other words, if they can get

5  25,000 four years ago, it would have been beneficial for them

6  to get it then as opposed to waiting four years, correct?

7  A.    Obviously.

8  Q.    Right.  You also understand that the plaintiff's attorney

9  work on a contingent fee basis, correct?

10            MR. KASTER:  Objection, Your Honor.

11            THE COURT:  Please, please, that's -- I don't know

12  what that -- whether that's correct or incorrect or what other

13  provisions are.  That's not evidence in a case about that.  So

14  don't ask that -- that's stricken from the record.  It's not to

15  be considered by you.

16            MR. PISANCHYN:  Your Honor, may I --

17            THE COURT:  Yeah, you can approach for sure.

18            MR. PISANCHYN:  Thank you.

19            (The following discussion took place at sidebar:)

20            MR. PISANCHYN:  He said he worked for a plaintiff's

21  firm.

22            THE COURT:  Doesn't make difference.  Your free --

23  whatever your fee agreement concerning your expenses, you told

24  us -- I heard times in arguments that they have to pay $10,000

25  toward expenses for you.  When you talked about a $50,000,

1  they've paid $10,000.  I don't know what your agreement is or

2  what your arrangement is.  All right.  You can ask about

3  questions, all right.  We will not be getting into what you

4  want to tell us your fee agreement is.

5         MR. PISANCHYN:  All I was asking him, Your Honor, he

6  was --

7         THE COURT:  Inappropriate question.  It's stricken

8  from the record.  Move on to subject matter.

9         MR. PISANCHYN:  Basically this gentleman worked in

10 the industry, worked for plaintiffs.  I was asking him what the

11 standard agreement is not in regard to percentages but merely

12 about -- this goes directly to what they are saying the reason

13 for the delay.  Plaintiff's counsel would have no reason to

14 make any delay in this case, Your Honor.  Neither would the

15 plaintiffs.  It goes to the motive and who had the motive to

16 delay the case, and that's an issue.

17        THE COURT:  Okay.  That's -- it's completely

18 inadmissible and irrelevant to the case.  Move on.

19             (The discussion at sidebar concluded.)

20        THE COURT:  Anything related to counsel fees or

21 anything at all related is not for the province of the jury in

22 this case in any way, shape or form.  It's completely and

23 utterly improper.  You're to disregard everything about that

24 and give it no consideration of any kind in this case.

25 BY MR. PISANCHYN:

1  Q.    So after June 12th, 2014 when you had given your

2  deposition and said that Mr. and Mrs. Clemens -- NYCM was

3  offering Mr. and Mrs. Clemens $25,000, would you agree that

4  that offer never changed even four days before it was finally

5  accepted by the Clemens?

6  A.    No, they settled for $25,000.

7  Q.    So nothing changed?

8  A.    Nothing changed.

9  Q.    Even four days before nothing changed?

10  A.    The information that was received didn't change anything.

11        MR. PISANCHYN:  Nothing further, Your Honor.

12        THE COURT:  All right.  Redirect?

13  REDIRECT EXAMINATION

14  BY MR. KASTER:

15  Q.    Mr. Catalano, you just testified you actually previously

16  made the offer of $25,000 during your deposition in June 2014,

17  correct?

18  A.    Yes, we made that offer.

19  Q.    The plaintiff accepted it at that time?

20  A.    Not on that date, no, sir.

21  Q.    In fact, at any time prior to June 20, 2014 did plaintiff

22  ever in writing demand to New York Central anything other than

23  the policy limits in this case?

24  A.    Never.

25  Q.    The policy limits, they are actually -- they are more than

1  25,000, right?

2  A.    That's correct.

3  Q.    Did I they call you up and say we will take $25,000?

4          MR. PISANCHYN:   We will ask for open ended questions

5  in his direct.

6          MR. KASTER:   I can rephrase, Your Honor.

7          THE COURT:   The -- I'm going to sustain the

8  objection.   You can rephrase.

9  BY MR. KASTER:

10  Q.    Did you have any settlement discussions by telephone with

11  plaintiff or plaintiff's counsel?

12  A.    No.

13  Q.    I know what a hoop is.   I don't know what a paddy wagon

14  is.   I will limit my question to hoops.   We were talking about

15  subpoenas being a hoop, right?

16  A.    Yes.

17  Q.    I believe you were asked can you send a subpoena in a

18  lawsuit, right?

19  A.    Yes.

20  Q.    Pull up the timeline, please.   Lawsuit filed August 26,

21  2013.   Are there any requests for this information prior to

22  August 26th, 2013?

23  A.    Numerous requests.

24  Q.    Were those provided?

25  A.    They were never provided.

1  Q.    Who jumped through a hoop here?  That's argumentative.  I

2  withdraw it.  We talked about authorizations sent in 2009 by

3  the no-fault carrier, which is New York Central, right?

4  A.    Yes.

5  Q.    No-fault, that's some different claim, right?

6  A.    Long before the SUM claim was filed.

7  Q.    No-fault claim in 2009, if plaintiff was treating in 2011,

8  would you expect to see those records in the file?

9  A.    In 2009?

10 Q.    Right.

11 A.    Obviously not.

12 Q.    It's later, right?

13 A.    Yes, sir.

14 Q.    We saw a letter -- in 2010 what did they do with respect

15 to any and all authorizations?

16 A.    Revoked them.

17 Q.    So in 2011 -- could I get records from 2011 even if you

18 could use those authorizations that were provided in 2009?

19 A.    They were revoked and prevented me from doing so.

20         MR. KASTER:  That's all I have, Your Honor.

21         THE COURT:  All right.  Recross?

22         MR. PISANCHYN:  No, Your Honor.

23         THE COURT:  You may step down.

24         MR. KASTER:  Defendants are completed with their

25 case.

1          THE COURT:  Okay.  Any rebuttal case?

2          MR. PISANCHYN:  No, Your Honor.

3          THE COURT:  Both sides have rested; is that correct?

4          MR. PISANCHYN:  It is, Your Honor.

5          THE COURT:  We are going to take a break, ladies and

6    gentlemen of the jury.  Although you heard all of the evidence

7    in the case, you haven't heard the law in the case.  So no

8    forming any opinions, no discussions yet about the case.  We

9    will be a few minutes.  Then we will come back in, and then we

10   will begin the process of I will give you instructions on the

11   law.  You will then hear closing arguments from counsel.

12          Then I will give you some housekeeping instructions

13   on how you will perform your deliberations.  Then you will

14   receive the case for a decision.  Until you receive the case

15   for decision, no conversations or discussions about the case,

16   please.

17          (The jury left the courtroom at this time.)

18          THE COURT:  Mr. Pisanchyn, the matter of attorneys

19   fees -- we talked about this in the beginning of the case -- is

20   specifically under the statute along with interest, things I

21   told you were reserved for the Court and not to be discussed in

22   front of a jury.

23          MR. PISANCHYN:  Your Honor, I wasn't getting into the

24   bad faith.

25          THE COURT:  You asked the witness whether or not you

1  were receiving a contingency fee in the case.  That's what you

2  asked the witness.

3      MR. PISANCHYN:  What I was getting at, Your Honor,

4  was the underlying case -- when I said this case, the

5  underlying case, which would make a big difference, Your Honor,

6  which goes directly to why the plaintiff or the plaintiff's

7  attorney would not delay this case.

8      THE COURT:  Inappropriate.

9      MR. PISANCHYN:  I apologize.

10      THE COURT:  It was specifically instructed earlier

11  that that was not something for a jury to have any information

12  or knowledge about whatsoever.  It's not their prerogative in

13  any way.  All right.  The jury instruction that you had

14  submitted -- as I said, it's not identical to ours, but it's

15  clearly where we originally found ours comes from the Third

16  Circuit model jury instructions in criminal cases.

17      The experts in criminal cases are no different than

18  the experts in civil cases.  So I have added the paragraph you

19  have requested, and it's been agreed to by the parties.  Here's

20  a new -- there's a new copy of it, and we will get rid of our

21  old copies.  Do we now -- any additional exhibits that have not

22  been agreed to by the parties in the case?

23      MR. KASTER:  Your Honor, we agreed that the exhibits

24  that we showed to the jury.

25      MR. PISANCHYN:  If we didn't -- we are fine with what

34

1   --

2           MR. KASTER:  We are good.

3           THE COURT:  You will upload all the exhibits to the

4   system, okay.  And then physically we will give the jurors

5   after they leave a copy of the civil charge, a copy of the

6   verdict form which you all have and then -- what else do we

7   have?

8           MR. PISANCHYN:  Three exhibits, Your Honor.

9           THE COURT:  We will take a break now for ten minutes

10  to let you use the facilities.  We will go into the charge,

11  which I think will probably take a half an hour, 35 minutes.

12  Then we will go directly into closings, plaintiff, defendant,

13  plaintiff, rebuttal.

14          MR. PISANCHYN:  Do you mind if we set up our easel

15  there now, or do you want to do it --

16          THE COURT:  When you say set up --

17          MR. PISANCHYN:  Put the easel over --

18          THE COURT:  Don't put any documents up you will be

19  using during your closing.  You can put the easel up, all

20  right.  So we will take ten minutes, let everybody kind of get

21  yourselves ready, prepared and whatever.  And then when I ask

22  you to come up and do your closings, you will go first.  When

23  you go, you need a minute to set up anything you want, you can.

24  When you go back up, you can set up whatever you want.

25          MR. PISANCHYN:  We will take our stuff down.  I

1  imagine you --

2          MR. KASTER:  I don't care leaving any of that up to

3  be honest.

4          (A brief recess was taken.)

5          THE COURT:  All the exhibits agreed upon by the

6  parties have been uploaded.  I will explain to them how they

7  will use the system in the housekeeping instructions at the

8  very end of the case.  And then we will proceed from there,

9  okay.  You can bring them in.

10          (The jury entered the courtroom at this time.)

11          THE COURT:  You will get a copy of this when we

12  complete the case.  You will be able to take it back in with

13  you.  If you have questions, you can look to the charge itself.

14  I will be reading it because it's important that it's given

15  accurately.  This is not something one does off the top of

16  their head.  The law is to be applied exactly as it is

17  included.

18          So at the onset, I want to extend my thanks and

19  appreciation to you, members of the jury, for your

20  attentiveness and patience during this trial.  Needless to say,

21  the jury system is one of the great instruments of a free

22  society.  You serve here as representatives of the people

23  charged with the duty of participating in the administration of

24  justice.  It's a solemn and serious duty.

25          You are expected to perform this duty without bias or

1  prejudice to any party in the case.  I'm sure you understand

2  the high duty imposed upon you as citizens to consider the

3  evidence honestly, fairly and impartially and by your verdict

4  to do justice to both the plaintiff and the defendant in the

5  case.  And if in this case, members of the jury, you render a

6  fair, honest and impartial verdict, then regardless of the

7  consequences, no one connected with the case or in any way

8  interested in its outcome has a right to complain because under

9  the law, all that one can expect to achieve is a fair and

10  impartial trial.

11       Now, if a fair and honest verdict is rendered by you

12  after considering all of the evidence and following the law as

13  stated by the Court, then you have performed your duty with

14  honor.  Upon this basis only can justice be achieved.  Now,

15  although you as the jurors are the sole judges of the facts in

16  the case, you are duty bound to follow the stated instructions

17  of the Court and to apply the law so given to you to the facts

18  as you find them from the evidence that's been presented to

19  you.

20       Now, you're not to single out any single instruction

21  as stating the law but must consider the instructions as a

22  whole.  Neither are you to be concerned about the wisdom of any

23  particular rule of law regardless of any opinion you may have

24  as to what the law ought to be, it would be a violation of your

25  sworn oath as jurors to base a verdict upon any other view of

1  the law than those given to you by the Court in these

2  instructions.

3         Now, this case should be considered by you as an

4  action between persons of equal worth and holding the same or

5  similar positions in life.  A company is in entitled to the

6  same fair trial at your hands as a private individual.  All

7  persons including corporations stand equal before the law and

8  are to be dealt with as equals in a court of justice.

9         Now, it's the duty of attorneys on each side of the

10 case to object when the other side offers testimony or other

11 evidence which counsel believes is not properly admissible.

12 When the Court has sustained an objection, the jury must

13 disregard the question and may draw no inference whatsoever

14 from the wording of it or speculate what the answer would have

15 been if the witness was permitted to answer the question.

16        Upon allowing testimony or other evidence to be

17 introduced over the objection of counsel, the Court does not

18 unless expressly stated indicate any opinion as the -- as to

19 the weight or effect of that evidence.  As stated before, the

20 jurors are the sole judges of the credibility of all witnesses

21 and the weight and the effect to be given all evidence in the

22 case.

23        Now, the evidence has been carefully reviewed and

24 fully argued by counsel, so I am satisfied that you have a

25 clear picture of the factual issued in this case.  Furthermore,

38

1  if I make reference to any testimony during the case, it's

2  merely to illustrate a point in my instructions and is not to

3  be considered by you as indicating any more importance to that

4  evidence than any other evidence in the case.

5          Now, there are two types of evidence from which you

6  may find the truth of the facts of the case that are before

7  you, direct evidence and circumstantial evidence.  Direct

8  evidence is the testimony of one who asserts actual knowledge

9  of a fact such as an eyewitness.  Circumstantial evidence is

10  proof of a chain of facts and circumstances pointing to the

11  existence or the non-existence of certain facts.  The law makes

12  no distinction between the weight to be given to either direct

13  or circumstantial evidence.  Nor is there a greater degree of

14  certainty required of circumstantial evidence than of direct

15  evidence.  You should weigh all the evidence in the case both

16  direct and circumstantial.

17          Now, a jury's verdict must be based on the credible

18  evidence, testimony and exhibits.  It may not be based upon

19  speculation.  Now, members of the jury, your fundamental job in

20  this case is to find and ferret out the truth.  In other words,

21  what are the true facts, what actually happened here?  You're

22  the sole judges of the facts, and you are also the persons that

23  have to draw whatever inferences may logically be drawn from

24  the facts as you see them.

25          Now, inferences are deductions or conclusions which

1 reason and common sense leave the jury to draw from the facts

2 which have been established in the evidence in the case.  In

3 determining the truth, of course, you must consider the

4 testimony -- the testimony of the witnesses and the exhibits

5 received in evidence.

6          In doing so, again it's your recollection of the

7 testimony that governs and not the Court's, nor counsel's

8 during their closing arguments you will be hearing in a few

9 minutes.  Statements of counsel in those arguments and

10 presentations are not the evidence in the case.

11          Now, the credibility of witnesses in this case is

12 entirely for you to determine.  In passing on the credibility

13 or believability and correctness of the testimony given in the

14 case, you must pass on the correctness credibility of the

15 witness.  The law says in determining a credibility of a

16 witness, you should consider the manner of the person

17 testifying on the stand.  Did the witness appear to be an

18 honest and frank witness wanting to tell the truth and nothing

19 but the truth?  You have a right to consider the reasonableness

20 of the testimony.  That is, does it have the ring or the sound

21 of truth.  You have the right to consider, members of the jury,

22 the opportunity of the witness to observe that about which he

23 or she has testified and whether or not it is corroborated or

24 contradicted by other testimony or other circumstances in the

25 case.

1          You have a right to consider the interest of a

2   particular witness in the outcome of the case and whether or

3   not the witness because of some interest in the parties or the

4   outcome of the case has permitted or allowed that interest to

5   color or bias his or her testimony.  If there are

6   inconsistencies or corroborations in the testimony of different

7   witnesses, it's your duty to reconcile them if you can.

8          If you cannot, then you must decide who is telling

9   the truth and who is not telling the truth.  You will decide

10  the weight to be given to any or all testimony in the case.

11  Now, a witness may be discredited or impeached by contradictory

12  evidence or by evidence that at other times the witness has

13  made statements which are inconsistent with the witness'

14  present testimony on the stand.

15         If you believe any witness has been impeached and

16  thus discredited, it is your exclusive province to decide or

17  give the testimony of that witness such credibility as you may

18  think it deserves.  If a witness is shown knowingly to have

19  testified falsely concerning any material matter, you have a

20  right to distrust such witness' testimony and other

21  particulars.

22         You may reject all of the testimony of the witness or

23  give it such credibility as you think it deserves.  Now, the

24  evidence that a witness made an earlier statement inconsistent

25  with his or her testimony at the trial may be considered by you

1    not only in your evaluation of the party's credibility but also

2    as evidence of the truth of the contents of the statement

3    bearing upon the facts in issue.

4          The weight of the evidence to prove a fact does not

5    necessarily depend on the number of witnesses who testify.

6    What is more important is how believable the witnesses were and

7    how much weight you think their testimony deserves.  Now,

8    there's a great difference between factual and opinion

9    testimony.  In factual testimony, the witness testifies to a

10   fact and certifies that what he or she says is true.  In

11   opinion testimony, the witness only testifies to his or her

12   opinion that such a thing is true and certifies only to the

13   integrity of the witness' actual belief.  The witness says he

14   or she believes their opinion to be correct, but does not

15   warrant it to be true and does not pretend that it cannot be

16   mistaken.  Now, the rules of evidence normally do not permit a

17   witness to testify as to opinions or conclusions in a case.  A

18   so-called expert witness is an exception to this rule.  A

19   witness who by education and experience has become expert in

20   any art, science , profession or calling may be permitted to

21   state an opinion as to a matter in which he or she is versed

22   and which is material to the case and may also state the

23   reasons for such an opinion.

24         In weighing the opinion testimony, you may consider

25   the witness' qualifications, the reason for the witness'

opinions and the reliability of the information supporting the

witness' opinion as well as any other factors discussed in

these instructions for weighing the testimony of witnesses.

You should consider each expert opinion received in

evidence in this case and give it such weight as you believe it

deserves.  You may reject it entirely if you conclude the

reasons given in support of the opinion are not sound.

Remember an opinion is what somebody thinks about something,

and that opinion may be precisely accurate or totally

inaccurate and yet represent the absolute honest conviction of

the person who expresses that opinion.

In general, the opinion of an expert has value only

when you accept the facts upon which it is based.  This is true

whether the facts are assumed hypothetically by the expert,

come from the expert's personal knowledge or from some other

proper source or combination of these sources.  Now, any

stipulations of fact which have been offered and received in

evidence constitutes an agreement by the opposing parties

through their attorneys that these facts may be accepted as

undisputed and require no further proofs and will permit no

contradictory evidence.

They are to be accepted by you as binding and

conclusive for purposes of this trial.  Now, the rules of

evidence permit the judge to accept facts that cannot be

reasonably disputed.  This is called judicial notice.  You must

1  accept -- you must accept facts given judicial notice as true

2  for purposes of this case.

3       Now, we're going to talk -- they are what I call the

4  general instructions to a jury that occur in virtually every

5  case.  Now we are going to talk more particularly about the

6  substantive law in this particular case.

7       Now, under the law in most civil cases, the plaintiff

8  has the burden of proving a claim by a legal standard that's

9  called a preponderance of the evidence.  Sometimes that

10  describes as if you put the evidence on both sides of the

11  scale, it must tip ever so slightly in favor of the party that

12  has the burden, the plaintiff, for them to prevail on their

13  case.

14       Now, preponderance of the evidence means a fact is

15  more likely true than not true.  In this case, however, the

16  plaintiff must prove his bad faith claim by a different and

17  higher burden of proof.  The plaintiff must prove his claim by

18  clear and convincing evidence.  Clear and convincing evidence

19  means evidence that is so clear, direct and substantial that

20  you are convinced without hesitation that a fact is true.

21       Although this is a significant burden of proof, it

22  does not mean the plaintiff must prove the facts at issue

23  beyond a reasonable doubt or beyond all doubt.  Now, the

24  plaintiff asserts a claim in this case for what is known as

25  insurance bad faith.

1    Under the law an insurance company must act with the

2  utmost good faith and fair dealing towards its insured and give

3  the interest of its insured the same faithful consideration

4  that it gives its own interest.  This heightened duty arises

5  because of the special relationship between an insurer and an

6  insured and the nature of the insurance contract.

7    An insurance company acts in bad faith if it does not

8  have a reasonable basis for what it does, knows or recklessly

9  disregards its lack of a reasonable basis.  Put another way,

10  bad faith occurs if an insurer otherwise knowingly and

11  recklessly acts without a reasonable basis in handling an

12  insured's claim.  An insurance company acts recklessly if it

13  acts with conscious disregard or deliberate indifference to the

14  rights of its insured.

15    In deciding whether or not an insurance company acted

16  in bad faith toward its insured, you consider all of the

17  company's actions including its investigation of the claim.  If

18  you find the defendant knowingly and recklessly acted without a

19  reasonable basis, your verdict must be for the plaintiff.

20    Now, the relevant time frame for establishing the

21  plaintiff's bad faith claim is from June 21, 2011 when the

22  plaintiff first notified the defendant of the claim, that's the

23  SUM claim, through June 20th, 2014, when the plaintiff's

24  insurance claim was resolved.  Therefore, in determining

25  whether the defendant acted in bad faith, you may rely only --

1  you may only consider the defendant's conduct between June 21,

2  2011 and June 20th, 2014.  Now, I know you heard other

3  information, and I have allowed information before that time to

4  set up basically an understanding and background of what the

5  case was and what the case was about.

6        But the relevant time period for purposes of

7  determining whether the activities were in good faith or bad

8  faith are between June 21st, 2011 to June 20th, 2014.  Now, the

9  insurance company in this case -- the insurance policy in this

10 case imposes a duty of good faith and fair dealing upon both

11 the defendant and the plaintiffs.

12       Accordingly, because the parties are disputing a

13 claim under the insurance policy, both parties were required to

14 act in good faith toward each other by abiding by the

15 obligations set forth in the insurance policy and cooperating

16 in the investigation of the claim.

17       Now, I'm going to talk to you about damages in the

18 case.  The fact that I'm instructing you about damages does not

19 imply in any way an opinion in my part as to whether damages

20 should or should not be awarded.  If you find by clear and

21 convincing evidence that the defendant acted in bad faith,

22 Pennsylvania law provides that you may award punitive damages

23 against the defendant insurer.  Now, if you decide that the

24 plaintiff is entitled to an award of punitive damages, it's

25 your job to fix the amount of such damages.

1          In doing so, you may consider any or all the

2   following factors:  The character of the defendant's acts; the

3   nature and extent of the harm to the plaintiff that the

4   defendant caused or intended to cause; the wealth of the

5   defendant insofar as it is relevant in fixing an amount that

6   will punish it and deter it and others from like conduct in the

7   future.  The amount of punitive damages awarded must not be the

8   result of passion or prejudice against the defendant or on the

9   part of the jury.

10         The sole purpose of punitive damages is to punish the

11  defendant's conduct and to deter the defendant and others from

12  similar acts.  That's the charge on the law.  After counsel

13  have completed their closing arguments, I will give you what I

14  call those housekeeping instructions on how you will begin your

15  deliberations.

16         MR. PISANCHYN:  Your Honor, may we approach?

17         THE COURT:  Sure.

18         (The following discussion took place at sidebar:)

19         MR. PISANCHYN:  The only issue we have, Your Honor,

20  was that -- with regard to the bad faith, you said knowingly

21  and recklessly.  I don't know if you want to do it now.  I'm

22  just saying --

23         THE COURT:  You object to that --

24         MR. PISANCHYN:  You said and.

25         THE COURT:  You object to that, okay.  Do you have

1  any objection?

2         MR. KASTER:  No.

3         MR. PISANCHYN:  I'm sorry, Your Honor.  I don't mean

4  to be knit picky.

5         (The discussion at sidebar concluded.)

6         THE COURT:  Okay.  Apparently on page 23 I said --

7  you will get a written copy of the instructions.  I read a

8  sentence that says put another way bad faith occurs if an

9  insurer knowingly and recklessly.  The proper words are

10 knowingly or recklessly acts with a reasonable basis in

11 handling an insured's claim.  That is the charge, "or" not

12 "and", as is in the written instructions that will be given to

13 you.  Mr. Pisanchyn, you may continue with your closing.

14        MR. PISANCHYN:  May it please the Court, NYCM

15 insurance, Mr. Haddick, Clemens, ladies and gentlemen.  My name

16 is Mike Pisanchyn.  And I -- today is the date that we must ask

17 ourself if we have the courage to award or fully compensate the

18 Clemens' for what they have been dealing with for a substantial

19 amount of time.

20        In that regard, I first had told you there are rules

21 and there are consequences.  The general rule -- we are in the

22 United States District Court.  It's a federal court.  And as

23 the Court had said and instructed you, for the first time the

24 NYCM insurance and the Clemens' are on a level playing field.

25 The rules as I said in my opening apply no matter how much or

1  how little money you make.  And just because you have more

2  money than someone else doesn't mean that you get to push them

3  around.  When you make a promise, you're to honor that promise.

4  You cannot put the insurance company's interests before yours.

5          A company must follow the industry standards in which

6  the company is involved in.  In addition, you can't Monday

7  morning quarterback.  That's what's been happening throughout

8  this case.  Every time it's a moving target.  Every time you

9  are say, you are relying on the seat belt dense, they said, no,

10  we discontinued the seat belt defense.  But that's not in the

11  records.  It's what they are saying here today.  So that's what

12  has made the case so difficult for the Clemens' is because

13  every time we think that we have a target or at least something

14  that we can say, the rules change.

15          If you don't follow the rules, then there has to be

16  consequences.  There has to be consequences to the actions.  In

17  this case the story -- the judge had said that you're going to

18  ferret out the truth.  And I know that I was lengthy, but I was

19  doing the best I could in order to give you all of the facts

20  good and bad, more good I would hope -- but to give you all of

21  the facts so you could do that.

22          In regard to ferreting out the truth, this case

23  doesn't begin with the Clemens.  It just doesn't.  The issue is

24  that the story begins with NYCM insurance, and NYCM insurance,

25  if you recall, did not have any written policies or procedures.

1   They had no written policies and procedures despite being a

2   billion dollar -- a billion dollar company.  They have no

3   policies and procedures for their insurance adjustors in

4   writing.

5           That, as Mr. Setcavage told you, is far below

6   industry standards and unheard of.  Who does not have written

7   policies and procedures in regard to adjustors adjusting

8   claims?  In addition you would think that, okay, so what, they

9   didn't have written policies and procedures.  But my -- in the

10  plaintiff's opinion, one of the -- the semi most honest persons

11  that got on the stand to tell the truth or some of it was

12  adjustor Dvoracek and probably -- I still am pronouncing his

13  name wrong, Dvoracek, or Dvoracek basically said that if he had

14  those written policies and procedures they would have helped

15  him.

16          If would have helped him, that means the Clemens'

17  case would have been resolved early.  If it was resolved

18  earlier, we wouldn't have to be here today.  However, there are

19  other reasons, and that is, what is the motive for the Clemens

20  to wait five years or anyone else to wait five years to get

21  paid?  Why would they do that?  It makes absolutely no sense

22  other than after -- after the period of time that they were

23  waiting they could no longer wait any longer and had to accept

24  the money.  Why else wouldn't they take it?  It was offered

25  before.  Nothing had changed at all.  You are to see what makes

1   sense.  That's the beautiful part.  You have attorneys here in

2   this courtroom that focus on the law and specific little bits,

3   but the beautiful part is all of you aren't lawyers.  You are

4   normal people.  You can take and utilize all of your experience

5   -- you probably have two, three hundred -- who knows how much

6   experience amongst all you -- to look into and determine what

7   the truth is in this case.

8         And the truth is, I submit, that NYCM insurance had

9   bonuses or incentive programs.  The reason NYCM set that up was

10  so that its employees would pay less on a claim.  Bottom line.

11  It's all about the bottom line to NYCM, and it's the bottom

12  line.  That's what NYCM cares about.  This whole time they

13  cared about the bottom line.  And they put their employees in a

14  position that their interests -- their interests were greater

15  than their insured.

16        I don't blame adjustor Dvoracek for paying less on a

17  claim because at the end of the day, he has to support his

18  family, too.  And if he's going to get money for not paying the

19  claim if every time he comes in, he has a loss ratio and that

20  is over a hundred and he knows he's not getting a bonus, I

21  don't know what I would do.  I don't know what I would do

22  because I would want to make the bonus for my family.  But it's

23  not adjustor Dvoracek's fault.  It's NYCM's.  They are the

24  people that set that up in such a way to enforce it to make

25  sure that these claims were being paid less or being drug up.

1  Every corporation owes a duty to its customers or in this case

2  its insureds.  It's industry standards, and industry standards

3  demand no less.  We had an expert that testified.  NYCM

4  insurance --

5          MR. HADDICK:  Your Honor, may we approach the bench?

6          THE COURT:  No, we can approach after we're done with

7  closings.

8          MR. HADDICK:  I have an objection to --

9          THE COURT:  I understand that.  You can make your

10  objection when we are done.

11          MR. HADDICK:  Okay.

12          MR. PISANCHYN:  NYCM insurance has said that at least

13  their surplus is $466 million.  So we know that we had one

14  expert testify here today for you.  That was called by the

15  plaintiff.  I'm not sure why that is.  I'm not sure.

16          The jurors are enforcers of safety just like the cops

17  enforce laws out on the street.  The -- so when we talk about

18  the facts of this case, we need to begin to think about some

19  things that NYCM did in this case.  The first thing is at the

20  end of case, NYCM's -- when they get him for $25,000 to give

21  in, do they -- are they satisfied with that?  No, the testimony

22  was now they are trying to put more in the bargain.  We also

23  want to get rid of the bad faith case with the 25,000.  We have

24  it.  We smoked you out.  You can't wait any longer.  You are

25  going to accept 25 for both cases now, for both.  The Clemens

1 all along were suffering and were in need of money.  In regard

2 to this case, it seems like no matter what the Clemens did

3 there would be another obstacle, another hoop, something else

4 that they would have to jump through, and the insurance company

5 made them.  They would do one thing.  Then there was another

6 thing.  They would do that.  Then there was another thing.

7 Then they would do that.  And then there was another thing.

8          It's the insurance company's way to tell its insureds

9 that if you want to make a claim -- if you want to make a claim

10 as an insured that you're going to pay the price, we're going

11 to put you through the ringer, we will say you misrepresented

12 medical records, we're going to call you names, we're going to

13 put you through depositions, we're going to make you sign

14 authorizations, we're going to -- that we don't send -- we are

15 going to make you do a lot of things to make sure that you know

16 when you make a claim that it's not easy, we're going to send a

17 message.

18          Now, it might be -- the way I had thought was that --

19 well, if they had that much money, why is it they care about a

20 $25,000 claim or $50,000 or 25 or 50 if they have $466 million

21 in -- make 30 million in profits a year.  Well, every journey

22 begins with the first step.  Even $466 million, that starts at

23 one dollar.  So you have to -- that's how it is.  If you take

24 one dollar out of ten million dollar accounts it's one dollar

25 to each person, but that equals quite a bit of money.  So I

1  believe -- well, let me say that I believe the evidence showed

2  that NYCM insurance was doing this to the Clemens family.

3  First off, this case is a bad faith case.  And in regard to the

4  bad faith case, we need to prevent insurance companies to

5  continue to do the same things as they always have.  That's

6  going to be your job when you go back is to say, how -- one of

7  the elements is going to say how do we protect not only the

8  good companies -- because remember good companies -- insurance

9  good companies basically are going -- are -- that are paying

10  valid claims can be going out of business if there's a bad

11  company that is not paying the claims because they are going to

12  make more profit.

13        So in regard to the punitive damage issue, that's the

14  equalizer.  That's the equalizer and the thing that can even

15  the playing field to make sure that companies that aren't doing

16  the right thing do the right thing and also companies that

17  aren't doing the right thing get a message by reading it in the

18  paper or hearing about it to make sure -- to make sure that

19  they don't do this to others, and that's what the judge

20  instructed you the purpose of those damages are for.  That's

21  the purpose.

22        So the defendant has done everything they can to

23  escape responsibility in this case, everything.  The first

24  thing that they began to do was send letters requesting

25  authorizations.  All of the higher-ups in NYCM said, we don't

1  send authorizations, why would we send authorizations.  You

2  hear the line day.  He does it every day, day in and day out.

3  He's not that sophisticated, and I understand that.  And that's

4  probably why I believe him over the others.  Everyone else are

5  officers of the company.  So of course they are protecting the

6  company.  You heard the line guy that dealt with this case.

7  What did he tell you?  What did he tell you in regard to what

8  they do, NYCM insurance, in regard to authorizations?

9         He said, we always send authorizations, always.  In

10 regard to always sending authorizations for things they want,

11 the expert said that was industry standards.  So then what was

12 the big deal?  They paid -- how much -- and how much time did

13 their representatives at NYCM send the letters saying to

14 produce -- to give us authorizations, why didn't they just

15 produce them and send them and we would have signed them?  How

16 do we know they were wrong?  How do we know they were wrong?

17        We know they are wrong because what did they do?  At

18 the end of the day NYCM sends the authorizations, ten blank

19 authorizations.  In 29 days they are signed.  So if they were

20 right, then why did they send them?  Because they knew it was

21 the right thing to do, it was their responsibility to do it

22 under the insurance contract.

23        In regard to the bonuses, you heard evidence -- and

24 because I don't think you heard direct evidence, but you did

25 hear the judge instruct you in regard to circumstantial

1   evidence.  And he kind of told you in the beginning if you

2   recall you go to sleep, you wake up, there's snow or it can be,

3   like, you look, there was no footprints, you see footprints,

4   you following the footprints and there's a guy standing there.

5   You can say, I followed your footprints, and you're standing

6   there.  You can -- it's the same as any other evidence -- this

7   is the charge, direct and circumstantial.  Circumstantial

8   evidence, the law doesn't differentiate.

9         So if there's circumstantial evidence that this bonus

10  structure played a part and why Mr. Clemens received less

11  money, then that should be the same as direct evidence and

12  something that you must consider.  There will be exhibits when

13  you go back.  You can review those.  So you can see for

14  yourself in regard to this claim and things that happened that

15  I would ask that you go through some of the plaintiff's in the

16  beginning and you will see.

17        Why is it dangerous though for corporations -- why is

18  it dangerous to anyone -- for corporations -- why is it

19  dangerous to the Clemens or the insureds to have the insurance

20  company not send out authorizations?  Why is it dangerous for

21  an insurance company to rely on an inapplicable defense?  Why

22  is that dangerous?  It was dangerous to Mr. Clemens?  Because

23  he and his family had lived this experience.  When he should

24  have been receiving compensation, he lived this experience for

25  that amount of time.  The inapplicable seat belt defense

1  clearly in the adjustor's notes and clearly according to

2  adjustor Dvoracek he relied upon when he set his deserves at

3  $25,000.  He said but for the -- he said the seat belt defense

4  was a negligence defense.  He said but for the comparative

5  negligence defense he would have offered the whole amount

6  originally way back when in 2011 and we wouldn't be here.  At

7  first he didn't want to say it, but I played the clips.  And he

8  had no choice but to acknowledge what he had previously said in

9  his deposition testimony.

10          The statement under oath -- clearly they knew Mr.

11 Clemens had herniated discs.  Clearly they knew he had

12 problems.  And clearly they were trying to make him drive close

13 to an hour -- I apologize if I exaggerated by five or ten

14 minutes.  It was an hour and 48 minutes or something like that.

15 I am not trying to -- when I say two hours -- I will say an

16 hour and a half even.  They are making him drive to New York.

17 Somebody said they don't know what a paddy wagon is.  When I

18 was a kid, I'd get on my knees and all the kids go through.

19 And in essence, that's what that tactic was.  That's what I

20 submit to you.  That's a paddy wagon.  You want to make a claim

21 -- you want to make a claim.  We are going to put you through

22 the claims process at NYCM insurance.  That's what we are going

23 to do to you.  How do you like it?  How does it feel?  How does

24 it feel to be Bernie Clemens making 30 or 40 thousand dollars a

25 year?  How does it feel?  We have we have --

1        THE COURT:  You're standing up.  You can make your

2   objection.  Let's be careful, and this relates to before.  I

3   want to wait until the end.  I don't like to interrupt counsel.

4   You're only to talk about evidence that's been presented in the

5   case -- all right -- nothing that's not presented.  You're to

6   disregard any statements -- there's no proof of that anywhere

7   in this case.  There's no evidence.  Only things that are in

8   the case, please.

9        MR. PISANCHYN:  They asked their insured to provide a

10  statement under oath, but they required that they gave the

11  statement under oath.  NYCM insurance asked -- they have the

12  resources to send anyone they wanted to Bernie Clemens or by

13  Bernie Clemens to take this statement under oath.  So why is it

14  that they didn't especially when they hired an investigator in

15  or around Scranton, Pennsylvania to take statements?  They

16  could have done that any time, anyplace, but they refused to do

17  that.  NYCM delayed this claim and put Mr. Clemens through

18  hoops and paddy wagons.  That's dangerous.

19        In regard to the subrogation, you heard that Mr.

20  Clemens sent plenty of letters waiving the right of

21  subrogation.  You heard from adjustor Dvoracek -- he had said

22  that NYCM doesn't always waive subrogation.  He said we don't

23  always waive it.  Mr. Clemens could not accept certain portions

24  of money until he received that waiver of subrogation or he put

25  himself at risk, risk of the insurance company coming back.

1  And you heard from expert testimony both in regard to the

2  authorizations and in regard to bonuses, in regard to

3  inapplicable defenses and in regard to the statement under oath

4  and also the waiver of subrogation by an expert.  He sat here,

5  and he told you what the industry standards were.  He told you

6  the rules of the road, the rules of how insurance companies are

7  to act.  He said it.

8          And the question to you is -- I am -- did they follow

9  what the industry standards were in this case?  Arbitration.

10  So the plaintiffs finally say, okay, well, apparently we can't

11  agree, let's arbitrate, and they demand arbitration in writing.

12  Now, sometimes I think some persons or companies may learn a

13  lesson here, but sometimes when you're wrong, you have to

14  admit, could we have went to -- could the Pisanchyn law firm

15  and Ms. Albright go to a computer and click a screen?  There's

16  nothing that prevented her from doing that.  There wasn't.  You

17  heard industry standards in Pennsylvania -- which Ms. Albright

18  is a Pennsylvania lawyer -- says demand arbitration and the

19  insurance policy said, upon written demand arbitration would be

20  conducted by the American Arbitration Association.  It didn't

21  say anything about going to a computer screen and clicking on

22  things.  Could she have done it?  She could have.  No doubt

23  about that.

24          But the thing I don't understand is, that's all it

25  took, then why did NYCM send back a letter saying it was a

1  nullity?  What kind of game is this?  Is that what this is, a

2  game with someone's life?  Is that what this is?  Kind of ha-ha

3  we got them, we told them it was a nullity, they only need to

4  go to the computer screen, ha-ha.  That's the game that

5  insurance companies get to play with their insureds represented

6  or not represented?  Why wouldn't they just say that?  What's

7  the big deal?  That's dangerous.  That's dangerous.

8           In regard to policies and procedures, started out

9  there, no written policies and procedures.  How dangerous is

10  that?  You know how many employees they probably have and how

11  many of those employees don't know what they are doing or

12  adjusting claims incorrectly?  That's dangerous in regard to

13  not having policies and procedures in writing so that you know

14  how to do your job.  How about answering questions of your

15  insured?  When your insured asks a question, the only evidence

16  that came in in regard to industry standards is you give them

17  answers.  There's been testimony -- and you will see exhibits

18  -- that the plaintiff asked questions for years asking what law

19  applies to this case so we know.  What law applies?   Is it New

20  York or Pennsylvania?  What rules are we applying?

21           But basically what had happened throughout the whole

22  process is that one person would tell us New York.  So then the

23  other person would tell us it's Pennsylvania.  So Catalano says

24  it's Pennsylvania.  Dvoracek says it's New York.  And it's kind

25  of like a ping-pong ball.  When we start doing it this way, no,

1  no, it's Pennsylvania, okay, no, no, no, it's New York.

2  Basically they do this all day.  This is basically what I get.

3  That's in essence what the insurance company required us to do

4  because they didn't make -- and as industry standards require

5  -- at least making a decision in the beginning in regard to

6  what law applied.

7          If they were going to play that game, they should

8  have filed, as the expert said, a dec action with the Court

9  that could have made that determination and would have laid out

10 the rules of the playing field to Mr. Clemens.  When an

11 insurance company doesn't answer its insureds and that's an

12 industry standard or rule, that's dangerous.  It's also

13 dangerous to leverage.  You heard Mr. Pylinski, yeah, we are a

14 plus rating, we love that, and that's great because we have

15 leverage.  It's nice to have leverage.  It's nice to be an

16 insurance company who has leverage.

17         I submit it's not nice for the other party to not

18 have that leverage.  In regard to credibility, there's

19 something Your Honor instructed in regard to false in one,

20 false in all.  And you heard the testimony -- I am not going to

21 say who did what or when because you just sat here.  It's not

22 like it was two weeks ago.  It was this week.  But the

23 witnesses that testified you heard on several occasions that

24 they may have made false statements.  We talked to the line guy

25 that's not a corporation looking after the corporation so much,

1  not as savvy.  That's okay.  He comes in here and tells us his

2  honest opinion.  What does he say?  He says Wildey was his

3  supervisor, they work together all the time, I never saw them

4  do any type of special treatment.  So which is it?  In regard

5  to adjustor Catalano, he never had a note in the adjustor's

6  notes that we received, not one despite him being the

7  supervisor.  So in regard to why Catalano, Dvoracek, Pylinski

8  -- you will have to review that jury instruction and take their

9  testimony for whatever you feel it's worth.  I can't say what

10 to do.  I don't know what you're thinking.

11          However, also the judge instructed you the witness on

12 the stand -- you will hear things such as the ring of truth.  I

13 am not sure what that means.  I think I know what it means.

14 Sometimes you know when someone is up there and being honest

15 and not telling you what you want to hear like a witness I

16 recall -- do you know Pennsylvania -- I asked him if he knew

17 anything about Pennsylvania law.  He said no.  Then when his

18 attorney came up and asked him something about Pennsylvania

19 law, he agreed yes, that's Pennsylvania law.  I said, how do

20 you know that you if don't anything about Pennsylvania law.  He

21 said, well, I guess that's true.  In regard to the credibility

22 of witnesses though, I would submit to you that the expert that

23 came here was honest, truthful, respectful and basically said

24 what the industry standards were.  I asked questions that he

25 told me that I was wrong as well.  So he wasn't just coming in

1   here and saying whatever I wanted him to.  He is an industry

2   expert.  He stated that he's nationally recognized.  He travels

3   to all over the state testifying in regard to these issues

4   because that's what he owes.  That's what he knows, and that's

5   the only expert that we had which means that's the only

6   industry standards you can consider.

7            If there was other industry standards, we would have

8   heard about them.  In regard to bad faith and why, we are -- we

9   believe we proved our case in regard to a number of issues.

10  Policies and procedures.  There is no arbitration issue, they

11  never answered the questions of our insureds.  They required

12  that both be settled.  Statement under oath, not sending

13  authorizations and based on the fact they admit they always

14  send them.  The expert said -- went on to say all the industry

15  standard violations there were.  So when you go back to the

16  jury room, the first question you're going to have to ask or

17  answer -- I think the first one the judge will tell you later

18  is you're going to have to select a jury foreman.

19           But after you -- after that question is asked, then

20  you are going to get a verdict form.  And when you get this

21  verdict form, this is what is going to look like.  And it's --

22  it basically -- the first question on it is going to ask has

23  the plaintiff established by clear and convincing evidence that

24  the defendants acted in bad faith in handling his underinsured

25  motorist claim.  And I would suggest -- obviously it's up to

1  you, but I would suggest that during this period of time a

2  five-day trial that the plaintiffs have proven that by clear

3  and convincing evidence without a doubt.  We don't even have to

4  prove it beyond a reasonable doubt, only by clear and

5  convincing.  It is more than a preponderance.  You heard the

6  testimony, and we don't have to do that in regard to all these

7  issues.  It's only in regard to one.

8         You heard Mr. Setcavage basically say these are the

9  industry standards, if they were breached, they would be bad

10  faith.  It's not like if you say, well, it's arbitration -- no,

11  you have to move on to the next issue and determine if there

12  was bad faith with the authorizations.  It if there was bad

13  faith with the authorizations, that's bad faith.  You can go on

14  and so forth in regard to all of the issues.  If you find bad

15  faith was committed, it's a yes.  The next issue that you would

16  then be deciding is damages.  It's really important.  This case

17  is about their actions.

18         The award of damages is going to change their

19  actions.  That's the whole point.  That's the whole point of

20  the trial in regard to the plaintiff's side is to make sure

21  they change the way they act and other insurance companies

22  change the way they act.  That's the point.

23         I'm just telling you.  That's point of the

24  plaintiff's side that the Clemens had or deal -- sat through

25  and done this for this many years, this principle.  When you

1  make a decision, you are going to make a decision for the

2  community.  You're the voice of the community.  Right now, in

3  about -- once we all close -- and I -- you are going to be the

4  eight more -- eight most powerful people not only in this

5  courthouse but in Scranton because there's no other jury trial

6  at least that I know.  In fact, the judge is going to make,

7  maybe Barbie -- raise her hand and swear her in and have her

8  take you to place that no one has access to, not even the judge

9  -- not even the judge can go back there.  And you ask anything

10 you want.  And you would be deciding this case.  When you speak

11 though, you're speaking for the community.  You're going to be

12 telling people about the community attitudes.  You're the

13 conscience of the community.  That's in essence what a jury is.

14         And you're going to say whether or not the

15 defendant's conduct was acceptable in this community.  What is

16 the attitudes of the community, and is the defendant's actions

17 acceptable?  That's what you're going to be deciding.  I

18 understand that you've been taken away from your family to make

19 a decision in regard to a case that you probably never wanted

20 to have any part of and also that, you know, you don't know the

21 parties.  But that's what the law provides.

22         The law provides, and I ask you render a verdict

23 that's meaningful.  We sat here for five days.  Five days.  And

24 whatever your verdict is, I don't care as long as it's

25 meaningful to tell the parties and -- any party what they

1  should or should not be expecting from the other side.  The

2  judge said in regard to all other parties -- his instruction

3  was that a corporation and Mr. Clemens are both on the level

4  playing field.  They are both the same.  Even though they are a

5  corporation and they have all that money, that means nothing.

6  When you go back in that room -- that means nothing.  They lose

7  all of that power.  They lose all that leverage with you eight

8  going back there.  All that power is gone.

9          It's in your hands.  Now, in regards to punitive

10  damages, there are three factors you are to consider.  The

11  first is you must consider the defendant's acts.  You have to

12  look at all of the things they did and did not do.  Okay.  You

13  will get those back -- it's my understanding the Court will

14  give you these instructions.  I pull them up so I make sure I

15  read them correctly.  But you're going to consider the

16  character of the defendant's acts.  You're going to consider

17  the nature and extent of harm to the plaintiff that the

18  defendant caused or that he intended to cause.  By he I mean

19  NYCM insurance.  What did NYCM insurance intend to cause the

20  Clemens family?

21          What did they intend to cause the Clemens family when

22  they continually requested authorizations?  What did NYCM

23  insurance intend to cause when they were trying to require Mr.

24  and Mrs. -- Mr. Clemens at least to travel to Liberty, New

25  York?  What did they intend to cause the Clemens family when

1  they decided not to arbitrate?  What did they intend to cause?

2  They intended to cause bad credit.

3      MR. HADDICK:  Your Honor -- I apologize.  There's

4  been no testimony of bad credit or family strife in this case.

5      MR. PISANCHYN:  It's what they intended to cause,

6  Your Honor.

7      THE COURT:  No.  You're not allowed to talk about

8  things that are not in evidence in the case, and that is

9  stricken.  Please talk about whatever the evidence was and

10  reasonable arguments related to that.  You're not allowed to

11  talk about things that there has been no evidence in the case

12  about.

13      MR. PISANCHYN:  I will move forward, Your Honor.  In

14  regard to -- the biggest reason for punitive damages is -- the

15  biggest factor in this case is going to be the extent of the

16  damages they intended to cause, and also -- you're going to

17  also be considering -- and the judge will instruct you, you are

18  to consider or you may consider the wealth of the defendant

19  insofar as relevant in fixing an amount that will punish and

20  deter others and others from like conduct in the future.

21      So basically we deterred this insurance company from

22  doing this to its insureds and also to make sure other

23  insurance companies know not to do this to its insureds.  So

24  that's where the $466 million comes in.  The only best way I

25  can explain it to you is this.  If I have a hundred dollars --

1  that's how much I have.  We're out in a restaurant, and I don't

2  like you and I punch you in the face, and you punish me by

3  taking one dollar or one percent from me, would that deter my

4  future conduct?

5          So I have a hundred dollars, and you were at a

6  restaurant, and I came over and knocked you off the stool, and

7  I had a hundred dollars and you took one dollar from me, you

8  think that would prevent me from doing that again?  Would it?

9  There's no difference here.  We have a hundred dollars, one

10 percent.  I understand they make more money.  That's we're

11 they're here, because of leverage.  That goes away when you go

12 in that room there.  The issue here is that they have

13 $466,433,113 of surplus.  That means if they pay all their

14 expenses, that's how much they have left over.

15         Even though that they were a mutual company and they

16 say that they pass that on -- the savings on to their -- their

17 insureds apparently, they still make $30 million was the

18 testimony in 2012, I think -- and they have $466,000 (sic) in

19 surplus.  If I wanted, we can get into -- it says the net

20 worth.  You can get into this number, one billion -- one

21 billion dollars.  I am not asking -- because it's my

22 understanding it says that you will assess in regard to net

23 worth.

24         But if -- if we don't take net worth instead of on

25 this side -- if we took percentages to deter future conduct,

1   even at one percent, it would be that number.  That one

2   percent.  Again, this is important to deter future conduct not

3   only for NYCM but for all insurance companies so when they look

4   and say, hey, you think we should mess with Mr. Clemens, and

5   you think we should mess with Joe, you think we should mess

6   with Mrs. So and so or Mr. So and so, it sends them a message,

7   no, it's not going to be worth it.  Do the things you're

8   supposed to do.  There's something called justice and

9   injustice.

10          Justice means fully awarding someone the right amount

11  of money.  Injustice means giving them too much or too little.

12  That's going to be a decision you're going to have to make.

13  But if you give too little, that's injustice.  If you give too

14  much, it's injustice.  You're going to have to look at these

15  numbers, figure out in regards to the percentage and what type

16  of message has to be sent to be sure NYCM stops doing what you

17  heard about in this courtroom.

18          When you return your verdict, we hope that regardless

19  of what you come to that you return a verdict without fear,

20  without favor, without prejudice.  We don't want sympathy.

21  Sympathy is a form of charity, and I can tell you Mr. -- I can

22  tell you that Mr. Clemens does not want any charity in this

23  case.  He has pride, and he has the right to continue to have

24  that pride.

25          However, if he had to go through this experience,

1  then the evidence will show -- or the evidence did show that

2  your award should be just and fair.  Now, there's also going to

3  be a transcript of this proceeding.  And, in fact, I get an

4  e-mail every day when I am on my way home that basically said

5  there's a transcript that's been filed of record in this case

6  of all of the testimony.  At some point -- at any point

7  actually, Mr. Haddick may have -- people can get that, anyone

8  -- someone's kid child can get these transcripts, and they are

9  going to read some day about Mr. Clemens, eventually

10 grandfather Mr. Clemens, who knows.  When they read the

11 transcript, they are going to hear that the attorneys were in

12 essence saying Mr. Clemens misrepresented -- a fancy word for

13 saying he lied, he lied about his injuries.

14        That's what's on this record from a person such as

15 her that is typing and being filed in a federal courthouse that

16 anyone can have access to.  That's important because some day

17 the Clemens family may -- somebody may look into this, and

18 they'll want to know whether or not Bernie Clemens, in fact,

19 did misrepresent.  And it's going to be up to you to determine

20 No. 1, in regard to did NYCM committed bad faith.  No. 2,

21 amount of award that will prevent them from doing this again.

22 I normally would say I would not have another chance to talk to

23 you.  However, the federal rules provide -- the defense

24 attorney will go next.  And then I get a chance to rebut what

25 he says.  Thank you.  You've been very kind with your time.

1      THE COURT:  Mr. Haddick?

2      MR. HADDICK:  Would it be appropriate to ask for a

3  five-minute bathroom break?  In the meantime I would like to

4  approach.

5      THE COURT:  Sure.  We will take a five-minute break.

6  We will come back out.  No conversations or discussions yet.

7  You're not starting your deliberations.  No review of anything.

8  Do not touch the screen inside at all at this stage, and then

9  we will see you in a couple minutes.

10      (The jury left the courtroom at this time.)

11      MR. HADDICK:  Would you like me to give the

12  objections at once or --

13      THE COURT:  Go ahead.

14      MR. HADDICK:  No. 1, I don't believe it's appropriate

15  for Mr. Pisanchyn to ask the jury for a specific amount of

16  money.  I would like to request that that chart be marked as an

17  exhibit and retained by the Court as evidence of what I believe

18  is an improper request for a specific sum of money.  My second

19  objection is that plaintiff's counsel misunderstood, misused

20  and misrepresented the word leverage as talked by Mr. Pylinski.

21  Mr. Pylinski was speaking of credit leverage which goes into

22  the A. M. Best Rating.  He converted the use of that word and I

23  believe misrepresented the evidence to suggest that somehow Mr.

24  Pylinski was talking about leverage over insureds.  I object to

25  reference by plaintiff's counsel that New York Central Mutual

1 required or conditioned the plaintiff to settle two cases at

2 one time.  Mr. Setcavage donated all of two lines in his

3 report, and I don't believe he did testify in support of that.

4 I asked him what evidence he was aware of.  He pointed to no

5 evidence which specifically said that settlement was

6 conditioned on settlement of two cases rather than one.  I

7 object to --

8               THE COURT:  Maybe we have to --

9               MR. HADDICK:  Two more.  I object to Mr. Pisanchyn's

10 reference to item two of the punitive damages criteria

11 regarding harm to the plaintiff.  There has been no evidence in

12 this case of any harm to the plaintiff.  The plaintiffs have

13 not testified.  Finally, in direct disobedience to the ruling

14 the Court made earlier in the case, Mr. Pisanchyn yet again

15 referred to sending a message to other insurance companies.

16 Under State Farm versus Campbell and the Phillip Morris case,

17 that is impermissible argument.

18               I intend to file a motion for contempt later in the

19 case, and those are the objections I have.

20               THE COURT:  Let me go through.  As to the last one

21 the, the standard charge in Pennsylvania does refer to other,

22 and so that is the standard charge in Pennsylvania.  And -- I

23 don't believe that violates the confines of the Phillip Morris

24 case which had a different -- that was the United States was

25 bringing the action against Phillip Morris.  That was a

1  different connotation there.  The Pennsylvania law has not

2  changed in that regard as far as I know in terms of that

3  charge.  Going back to your first one, the question of the --

4  the exhibit, the Court keeps no exhibits.  So you know, you're

5  all responsible to keep your own exhibits, and you're

6  responsible to keep your own exhibits for purposes of appeals

7  by either side.  So you can make a copy of that.

8         You can take a photo of that.  You can do whatever

9  else you want to do with that.  Mr. Pisanchyn will, of course,

10  have to keep them.  I don't think the argument that was made

11  asked for a specific amount.  I think it referred to the net

12  worth, and then he was talking about what he thought

13  percentages would indicate punishment.  But I don't have a

14  recollection of him saying that I want one million, four

15  million, 462,000 or anything of that nature.  So that's kind of

16  walking that fence, and although -- I don't know that it's

17  anything that requires any kind of other activity.  Your second

18  argument was?

19         MR. HADDICK:  Misuse of the term leverage as given by

20  Mr. Pylinski.

21         THE COURT:  As I said to the jury , that the

22  statements of counsel during closing arguments are not evidence

23  in the case, so you will have an opportunity if you want to

24  address that to address that.  Third one?

25         MR. HADDICK:  Third one was the statement about

1  conditioning of settlement on two cases on the offer.

2           THE COURT:  Where was there any evidence in this case

3  about that?  I don't recollect any of that.

4           MR. PISANCHYN:  Your Honor, we went up and, in fact,

5  he objected.  I had show you where in his report where he said

6  it.  Do you recall?  I actually had to show you in the report

7  where he said it in order to get it in because he objected and

8  said, remember nowhere in his report does it say --

9           THE COURT:  Where is the report?  I remember looking

10 at the report for a specific argument.

11          MR. PISANCHYN:  That's what we were looking at.

12          THE COURT:  Give me the report.

13          MR. HADDICK:  While he's looking for that, Judge, I

14 believe the report said that the conditioning of settlement of

15 the U. I. M. claim.

16          THE COURT:  I remember that --

17          MR. HADDICK:  The general proposition.

18          THE COURT:  So then -- that objection is overruled as

19 well.  It's argument of counsel based upon some discussion of

20 whether that -- whether the settlement of both would violate

21 good principles and practice in the law.  What was the fourth

22 one?

23          MR. PISANCHYN:  You discussed them all.

24          MR. HADDICK:  I don't have anything else .

25          THE COURT:  You need a bathroom break?

1          MR. HADDICK:  Yes, thank you.

2          (A brief recess was taken.)

3          MR. HADDICK:  Ladies and gentlemen, my mother likes

4   to tell people that when I was eight she knew I was going to be

5   a lawyer because I talked my way out of getting stood in the

6   corner.  She also told me -- sometimes I can be a little

7   stringent.  And so right about the time I graduated law school,

8   she said you should always do two things if you are going to

9   talk to juries.  You should, first of all, thank them for their

10  time, and second of all, you should apologize if you offended

11  them in any way in the course of defending your client.

12          So I ask you if I have in any way offended any of

13  you, please not hold it against New York Central Insurance

14  Company and chalk it up to just a zealous advocate.  A federal

15  United States courthouse is not a slot machine.  It is not a

16  casino.  All of the things that we see here, the wood,

17  ceilings, the large windows, the judge elevated on the bench,

18  those are symbols of important things.  It's why we don't have

19  trials on the street.

20          The symbols are meant to remind us that you are here

21  for a serious duty and that justice is to be done here.  Not

22  wagering, not gambling, not hoping to strike it rich.  This is

23  not a slot machine.  In the last four or five days, what you

24  have seen, is you have seen a lawyer attempt to turn a

25  courtroom into a slot machine.  It takes a tremendous amount of

1  fortitude to stand up without even putting your clients on the

2  stand so you can hear them and hear me cross-examine them.  It

3  takes a tremendous amount of gumption to put up figures like

4  one percent of a hundred billion dollars or one percent of

5  $467,000.  That's an insult to you.  It's an insult to your

6  intelligence, and it's an insult to this process.  You should

7  not tolerate it.  Pat, exhibit 82.  Go back to the cover page.

8  At the beginning of this case I told that you we would prove

9  that this claim resolved in four days of the plaintiff turning

10  over what New York Central had been asking for for three years.

11         We proved that.  We have proved it not by what I

12  said, not by speech.  I have proved it by showing you the

13  documents, and Mr. Kaster has proved it by walking you

14  yesterday and very briefly this morning through a series of

15  documents which leave no question that New York Central Mutual

16  acted reasonably and attempted for three years to get these

17  people to cooperate.  This is not a slot machine.

18         Those dates up on the screen in front of you, we have

19  showed you the documentation and told you the date of the case

20  settlement as determined by Court order.  There are another

21  four -- there is another four-day period I want to talk to you

22  about.  That is the four days of our lives which has just been

23  wasted.  Mr. Pisanchyn came into this courtroom and thought he

24  would wonder around for four days asking witnesses questions,

25  showing clips of deposition testimony that was consistent with

1  the witness' testimony in the hopes that something, something

2  in four days might stick to a wall.  That is not what this

3  place is for.  This place is not for test trying cases.  This

4  place is to come here with real grievance, real evidence, and

5  real proof.  It's not a place to come and test theories out and

6  waste the jurors' time.  It was a case presented by Mr.

7  Pisanchyn which was extremely scattered.  And it was in the end

8  about nothing but stick figures, smoke and mirrors.

9          You don't have to take my word for it.  I have a copy

10 of the promises Mr. Pisanchyn made in his opening statement.

11 I'm going to read you some of those promises.  I want you to

12 decide now -- as part of your deliberations I want you to

13 decide whether or not Mr. Pisanchyn kept his promises to you.

14 During the claims process Mr. Pisanchyn said when Mr. Clemens

15 is trying to get paid, he's injured, he's hurt, his family

16 needs money because he can't work.  Do any of you remember a

17 single piece of paper, a single exhibit or any testimony from

18 Mr. Clemens himself that he's trying to get paid, injured, his

19 family needs money or because he can't work?  Did we hear any

20 evidence in support of that claim?

21         Mr. Pisanchyn told you during the period of time of

22 the claim even -- all the way up until just recently he said,

23 New York Central Mutual continued to say that New York law

24 applied the evidence will show.  Did the evidence in this case

25 show that up until very recently New York law applied the seat

1  belt defense?  Was that ever, ever a factor after December

2  30th, 2011, three years before they turned over wage records we

3  had been seeking for the same amount of time?  Mr. Pisanchyn

4  said, his client's responsibility to give an examination under

5  oath, so they asked for a statement.  We have to provide a

6  statement, and there is no dispute about that.  Well, if you

7  agree -- and there's no dispute about having to provide a

8  statement -- why did you avoid two separate attempts to

9  schedule your examination under oath?  Even Mr. Pisanchyn

10  agrees they have a responsibility to do it.  Why wasn't it ever

11  done?  Pat, the timeline, please.

12          We have showed you at the beginning of the case the

13  timeline.  They were meaningless -- not meaningless, there was

14  diamonds on it with dates.  Mr. Kaster with Mr. Catalano

15  yesterday and today showed you a piece of paper on your

16  monitors supporting every single diamond on that timeline.

17  Now, Mr. Kaster didn't spend hardly as much time as Mr.

18  Pisanchyn.  But Mr. Pisanchyn proceeded to tell you about what

19  something said and not show you.  With all this marvelous

20  technology, with the giant staff he has here in court today, he

21  didn't show you a lot of evidence.  He told you a ton of

22  things.

23          But as the judge told you, your verdict must be based

24  on the evidence.  You have to ask yourself, of the two parties

25  in this case who showed you what happened and who simply try to

1  tell you what they happened or what they would like to have

2  thought happened.  We will get into that more in a minute.  Mr.

3  Pisanchyn during his opening statement told you he was going to

4  prove that Jim Dvoracek had over 250 claims.  Mr. Dvoracek

5  rather clearly yesterday testified he had between 150 and 250.

6  I will have a little more to say about Mr. Dvoracek in a

7  moment.

8          Mr. Pisanchyn told you in his opening statement you

9  will see that the plaintiff sent over 10 to 15 letters asking

10  that to the point where they put in a yes or no and asked that

11  NYCM just circle the answer and despite that no answers were

12  given.  How many letters did Mr. Pisanchyn actually show you?

13  I don't know how many, if any, one, maybe two.  Have you seen

14  10 or 15 letters?

15          Mr. Pisanchyn said he was going to prove to you that

16  NYCM knew that they had Clemens where they wanted them and so

17  what they do -- what NYCM does is they require that Clemens

18  settle both cases, settle the SUM claim and the bad faith case

19  as one.  What evidence did we see with that?  Isn't the fact

20  that we settled the U. I. M. claim a year ago and the fact

21  we're here in a bad faith trial the best possible proof that my

22  client did not condition the settlement of one claim upon

23  another?  We didn't condition the settlement of the bad faith

24  case upon the money we paid in the SUM claim because if we did

25  and they took it, we would not be here.

1            I asked Mr. Setcavage, who was paid a mind numbing

2   $32,000 to come in here -- I asked Mr. Setcavage to show me

3   where he saw evidence of that particular claim of wrongdoing.

4   You will recall Mr. Setcavage was unavailable to point to

5   anything, although he certainly paid -- was paid to review a

6   lot of documentation.  Mr. Pisanchyn told you all the documents

7   say that Mr. Clemens would do that, meaning give a statement

8   under oath at any point at a reasonable distance of where he

9   lived in Pennsylvania at a reasonable time.  Scranton,

10  Pennsylvania, is by judicial order in this case 45.7 miles from

11  Stroudsburg.

12            You saw through Mr. Kaster's questioning of Mr.

13  Catalano an attempt by my client to take an examination under

14  oath here in Scranton.  If New York was too far, why couldn't

15  you come to Scranton?  Why can't you propose alternative

16  locations?  I'll explain a little more about that in a moment.

17  First off, the evidence will show Mr. Pisanchyn said the

18  Clemens family had experienced bad credit, that they had family

19  stress and anxiety.  This case has been going on now for years.

20            They have transcript fees, attorney's fees.  And as

21  anyone knows, when you lose enough money at this point it

22  translates over quite some time.  Do you remember any evidence

23  that the Clemens' family experienced bad credit?  Do you

24  remember any evidence that the Clemens had family stress and

25  anxiety?  Do you remember any evidence of that, ladies and

80

1  gentlemen?  You are not to take what Mike Pisanchyn tells you

2  as evidence.

3         You are to take what you hear or heard from that

4  stand and saw on your monitors as the evidence in the case.

5  What evidence have we heard about the change in life quality to

6  the Clemens?  What evidence have we heard about Mr. Clemens'

7  current salary?  Mr. Pisanchyn talked about that.  We have

8  heard no evidence of that.  Those are broken promises.  If you

9  want to talk about broken promises, perhaps New York Central

10  Mutual shouldn't be the party on trial here.  Mr. Pisanchyn

11  made a ton of promises in his opening remarks, and he failed to

12  deliver on those.  It's my job to tell you he failed to deliver

13  on those.

14         The case that Mr. Pisanchyn gave you in his summation

15  exists but in one place, and that is Mr. Pisanchyn's own mind.

16  Because if it existed elsewhere, you would have seen it.  You

17  would have heard it.  This place is not a slot machine.  I

18  spent some time discussing what Mr. Pisanchyn has not talked

19  about.  Now I am going to discuss with you some of the topics

20  which have consumed the last four days of your lives.

21  Pronunciation of names, the living arrangements of witnesses,

22  New York Central Mutual's organizational charts, software

23  including Lotus Notes, how files are kept, the merits of Skype,

24  the family history of the Robinson family, New York Central

25  Mutual's credit rating.  None of that -- none of that has

1  anything to do with why we are here.  It's an insult to your

2  time and my time and to the Court's time.

3          Pat, if you could please go to the bullet points from

4  exhibit 82.  Bullet points are generally not good unless you

5  prove what is in the bullet points.  Don't give more than three

6  or four.  The entirety of Mr. Pisanchyn's summation was bullet

7  points.  He's telling you -- he's not showing you.  We have

8  shown you that the plaintiff refused or ignored 16 requests for

9  medical records.  Next please.  Plaintiff ignored or refused

10  three requests for medical bills.  The plaintiff refused at

11  least two requests for examination under oath.  The plaintiff

12  comes in here and blames New York Central for delaying the

13  claim when the plaintiff is responsible for all but four days

14  of this claim, a thousand days -- almost 1,100 days.

15          You recall hopefully Mr. Setcavage who had to justify

16  a fee, tried to tell me that it would not necessarily have been

17  helpful if the plaintiffs had turned over the ten year wage

18  history we asked for in 2011.  I don't understand how he could

19  have answered that question that way.  Actually I can

20  understand why he could possibly answer the question that way.

21  There are 32,000 reasons why he would answer the question that

22  way.  Mr. Setcavage's opinion was bought.  It was purchased.

23  It was not earned.

24          Pat, go back to the documents.  I am not going to

25  torture you by going back over the documents.  I'm just going

1  to show you in very quick fashion the request for medical

2  records and authorizations, the requests for work records, the

3  correspondence seeking examinations under oath.  I didn't just

4  tell you about those.  Mr. Kaster and Mr. Catalano showed you

5  those, which by the way was not a necessarily captivating

6  presentation.  And Mr. Kaster did go through as quickly as he

7  could.  The importance of those documents, however, require

8  that we show them to you because that is essentially our

9  defense in this case that we tried and tried and tried and

10 tried.  We tried and tried again to get the information from

11 the Clemens and their lawyer which would help us evaluate the

12 claim.  Pat, please turn to exhibit 54.

13          I will not bore you again with reading the provision.

14 I just want to remained you we saw earlier, this is from the

15 insurance policy which governs this case.  This policy says --

16 you can call them hoops or call them whatever you want.  This

17 policy says if you want money because you're hurt, you have to

18 prove you were hurt.  That's not unreasonable.  You recall Mr.

19 Setcavage admitted that it was not unreasonable for an

20 insurance company to investigate a claim.

21          That's part of what you will discuss and deliberate

22 in the jury room.  Is it reasonable to try to obtain these

23 records?  Well, the insurance agreement says it's reasonable

24 because that's the agreement.  New York Central Mutual

25 Insurance Company is not obligated to Mike Pisanchyn's word for

1  it.  That's not how this works.  It's not how it works here

2  either.  One of the things the judge talked to you about in his

3  instructions to you was the issue of whether or not the

4  insurance company had a reasonable basis to question the claim.

5  I'm going to show you some exhibits now which are in the case,

6  and I want you to in your mind -- not necessarily right now.

7  When you go back to deliberate, I want you to remember these

8  exhibits and ask yourself is there a reasonable basis to look

9  into this claim further, is this a straightforward consistent,

10  well documented proven claim, or is there a right on the part

11  of the insurance company to scratch its head, if you will, to

12  sort of say, maybe we should look at this further.  Pat,

13  exhibit 61.  These are documents, by the way, provided by the

14  plaintiffs initially.  Page D. 590.

15         You were shown that despite -- that's a great idea.

16  You were shown that despite Mr. Pisanchyn's claim -- I can't

17  say Mr. Clemens' claim because he did not testify.  Despite Mr.

18  Pisanchyn's claim of catastrophic vertebral injuries, Mr.

19  Clemens on the night of the accident was out of the hospital in

20  one hour and 19 minutes.  Next slide.  Page 597.  D. 597.  I

21  apologize.

22         I showed you this earlier.  Getting out of the

23  hospital in 98 or so minutes, it's consistent with that

24  diagnosis, nasal contusion.  The Clemens' family medical bills

25  have been paid by the first party carrier.  Wage loss have been

1  reimbursed.  He's been given 25 grand for a bump on his nose.

2  This is gravy, this case.  This is the shocker.  This is the

3  pull on the handle of the slot machine.  Mr. Pisanchyn is

4  looking for three cherries to come up.  This isn't a matter of

5  compensation.  If it was, we wouldn't be here.  Compensation

6  had been paid.  They agreed 25,000 was sufficient compensation

7  for his injuries.  Pat, exhibit 70, please, page D. 805.  If I

8  tell you -- if I stand here -- no, if I tell a doctor my neck

9  was fractured, the doctor won't just take my word for it

10 especially if I am upright in no apparent distress.  The doctor

11 will do studies.

12          There was a study done on the night of the accident,

13 a radiology study on Mr. Clemens' nose.  History -- Pat,

14 highlight history.  Pain.  Pain is a subjective symptom.  I'm

15 in pain.  I'm not questioning on the night of the accident Mr.

16 Clemens was in pain.  He reported his nose hurt.  So he took a

17 picture of it, and the conclusion -- Pat, if you can highlight

18 that -- simply negative study.  No nasal fractures.  Mr.

19 Pisanchyn never once showed you a confirmed official diagnosis

20 of either a cervical fracture or compression fracture.

21          Pat, exhibit 71, please.  Page D. 806.  In fairness

22 to Mr. Setcavage he said sometimes multiple vertebral fractures

23 go undiagnosed.  That's fair.  I am showing you exhibit 71.  It

24 is a full body scan.  It's a diagnostic study.  History,

25 shoulder and neck pain.  Now, a full body scan is that which it

1 says it is.  It is a full body scan.  With due deference, Pat,

2 pull the date up on that.  If you go to the bottom, I think the

3 date is on the bottom, transcription dates.  Dictated September

4 18th, 2009, transcribed September 18th, 2009.  The date of the

5 bone scan September 18th, 2009.  Nine days later, the time when

6 Mr. Setcavage said you might not notice it until later, there

7 was a study done.  The doctor looked.  The doctor found a

8 normal bone scan.  No cervical fracture, no compression

9 fracture, nothing.

10        Now, if a man comes to an insurance company and said,

11 I broke my back in a car accident and the insurance company

12 gets records which state this, is it reasonable to question the

13 nature and extent of the injury?  Of course it is.  Pat, if you

14 could please do -- exhibit 65 and 66.  I asked Mr. Setcavage

15 about red flags.  Ladies and gentlemen, why would somebody

16 describe his injuries from the same automobile accident

17 different in two different claim forms?  How does that happen?

18        Well, perhaps it happens because the first party

19 process really all you're going to get paid is medical bills

20 and wage loss.  The first description -- or one description is

21 that the injuries include but not limited to shoulder, back,

22 nose, head, whiplash and cuts.  The word neck appears nowhere

23 in there.  The second time a claim form is submitted the injury

24 changes.  Now all of a sudden there's an odontoid fracture,

25 neck fracture, break, whiplash, neck, shoulder pain, L. 5

1   compression, compression fracture.  Mr. Setcavage who was paid

2   $32,000 could not tell me when I asked him whether or not the

3   notice of intent to submit claim form indicating neck fracture

4   was submitted before or after Mr. Clemens consulted with an

5   attorney.  Next please, Pat, exhibit 6, page D. 392 in a side

6   by side with exhibit 74, D. 809.  Please -- if you're not

7   paying attention to my remarks -- which I don't know how you

8   could not be because it's so enthralling I am sure.  If you pay

9   attention to nothing else, pay attention to something I am

10  about to show you.  It's about the reasonableness of

11  questioning this accident.  Exhibit 61.  Page D. 392.  Exhibit

12  74, page D. 809.  Pat, I am looking for the emergency room

13  notes on the left-had side -- I will blow these up in a second.

14  I want to give Pat a moment to get exhibit 74 D., page 809.

15  Take your time.  All right, ladies and gentlemen.  Pardon me

16  for moving.

17          The document on the left is the history Mr. Clemens

18  gave to the hospital personnel in Pocono Emergency Center

19  emergency room the night of the accident.  If you go to the

20  notes, please, Pat, middle of the page -- patient presents

21  after he was an unbelted passenger in a head on collision with

22  another car.  His hit and broke the windshield.  He denies L.

23  O. C., loss of consciousness, he has multiple small abrasions

24  on his face and forehead, initially bleeding from the left

25  nose.  He self extricated and was ambulatory at the scene.

1          MR. PISANCHYN:  Your Honor, after -- is that when we

2    are doing it?

3          MR. HADDICK:  You can take the highlight --

4          THE COURT:  The objection is?

5          MR. PISANCHYN:  It's clearly precluded --

6          THE COURT:  What?

7          MR. PISANCHYN:  Precluded.

8          THE COURT:  This is not in evidence.

9          MR. HADDICK:  It's in evidence.

10         MR. PISANCHYN:  Not in an unredacted form.

11         MR. HADDICK:  It's an excerpt from an emergency room

12   note, Judge.  It's an exhibit.

13         MR. PISANCHYN:  Your Honor, can I approach --

14         THE COURT:  Sure.

15         (The following discussion took place at sidebar:)

16         MR. PISANCHYN:  No evidence -- sorry to interrupt.

17         THE COURT:  Are you ready?

18         MR. PISANCHYN:  Your Honor, it's saying he was an

19   unbelted driver.  Specifically precluded -- it's specifically

20   has been precluded by this Court.  That record -- I am just

21   telling you -- unbelted driver --

22         MR. HADDICK:  I will not comment on that.

23         MR. PISANCHYN:  You are showing it to them.

24         THE COURT:  Hold on.  Hold on.  The exhibit is in

25   evidence.  The use of the --

1            MR. PISANCHYN:  Unbelted.  I mean, that was --

2            THE COURT:  I am just going to tell them that has no

3    relevance to the case and not to be considered by them.

4            MR. PISANCHYN:  I say we move forward.  I didn't want

5    to continue to leave it up.

6            THE COURT:  I don't know.  You can --

7            MR. HADDICK:  I am talking about loss of

8    consciousness and the --

9            THE COURT:  You want to leave the exhibit up?  He has

10   to black out the --

11           MR. PISANCHYN:  Just take it down.

12           (The discussion at sidebar concluded.)

13           THE COURT:  The statement of whether he was belted or

14   unbelted doesn't have any bearing on this particular case here.

15   This is different than the issue that's been discussed before

16   about what law applies.  At the end of the day, that has to

17   relevance to your determination.  We will have that word

18   excluded, and then we can look at the rest of note.

19           MR. HADDICK:  If we can look at those documents side

20   by side without reference to the materials that are not part of

21   the case.  The last three lines, Pat, the -- yes, exactly,

22   thank you.  All right.  On the night of accident, he denies L.

23   O. C., small abrasions on face and forehead, self extricated

24   and ambulatory at the scene.  That's what he told the emergency

25   room staff within hours of the accident.  On the right there's

1   a report dated much later.

2           The evidence will certainly reflect that the evidence

3   -- that this date -- pull the date of the report, Pat, first,

4   please.  March 3, 2010.  Now, this is -- we can agree I believe

5   that certainly on the night of accident Mr. Clemens hadn't

6   gotten himself a lawyer yet.  By March 2010 he had.  And I am

7   going to show you how the evidence may have changed or at least

8   his relation of the accident may have changed.  Pat, middle

9   beginning with he then noted loss of consciousness.  About five

10  lines down, he then noted loss of consciousness.  Now, on the

11  night of the accident, he told the emergency room people he

12  didn't lose consciousness.  By the time March 10th rolled

13  around, he added to his doctor that the car was going 50 miles

14  an hour and he lost consciousness.  Those two records, ladies

15  and gentlemen, are not consistent.  On the night of accident he

16  didn't lose consciousness.  Several months later all of a

17  sudden he did.

18          You have to examine and contemplate why his story may

19  have changed.  I'm simply pointing out that his story had

20  changed, and I don't even -- it's not an obligation for me at

21  this point to convince you of one side or the other.  You can

22  take that down.  Thank you.  My obligation is to show you that

23  there were reasonable questions about this claim something was

24  not fitting.  There is a trial lawyer's trick I will let you in

25  on.  It is the secret of switching out quality and quantity.

1          We can all agree that Mr. Pisanchyn has won the case

2    if it is a case about quantity of time, of paper, shelves and

3    shelves of paper.  Quantity is intended to make up in your

4    minds for the lack of quality, and the judge has instructed you

5    on the weight of the evidence and the significance of it.  I am

6    not going to interfere in that instruction.  For all the

7    quantity, for all of the binders, perhaps 30 or 40, you have

8    not seen a piece of paper with a confirmed diagnosis of

9    fracture.  You have not seen, for example, any preaccident

10   M.R.I.s or studies or records showing that Mr. Clemens didn't

11   have disk herniations before the accident.

12          You saw evidence that was desiccation.  That word was

13   used.  I believe it was Mr. Catalano based on his experience

14   adjusting claims three different companies in 30 years, he knew

15   desiccation was a dehydration or degenerative process.  Well, I

16   don't know a lot about biomechanics or medicine.  But I do know

17   car accidents don't cause degenerative conditions.  They cause

18   trauma.  You have not seen any evidence that any of those

19   medical records ever said the condition seen, the disk

20   herniations or the compressions were related to a trauma as

21   opposed to a degenerative process.

22          An insurance company is not required to be perfect.

23   An insurance company is required to be reasonable.  An

24   insurance company is not required to place Mr. Clemens'

25   interests above its own interests.  It can keep Mr. Clemens

1   interests and insurance companies interests on the same level

2   playing field, one that Mr. Pisanchyn advocated for earlier.

3   Honest mistakes are not bad faith.  I'm not sure there have

4   been mistakes.  But even if there were mistakes, it's not bad

5   faith which brings us to Jim Dvoracek.  Jim Dvoracek is a good

6   man.  He's a simple man who does his job as a claim adjustor as

7   best he can.  He told you especially during the early stages of

8   his testimony that the investigation included requests for

9   information which they did not have.

10          He admitted to you that in a vacuum of which state

11  law applied, he looked into for a brief period during the life

12  of the claim the seat belt defense.  He didn't hide it.  He

13  owned it.  And he said ultimately it was not applicable.  It

14  discontinued three years before the claim settled.  It

15  certainly was discontinued before the plaintiffs ever agreed to

16  take $25,000 or ever settled the claim.  It was considered, and

17  Mr. Setcavage said the investigation of that particular aspect

18  was discontinued.  I told you at the outset of the Mr.

19  Setcavage said the case changed almost daily if I am

20  remembering his testimony correctly.

21          Choice of laws is incredibly hard.  I don't envy

22  judges for a lot of reasons.  One of the reasons is choice of

23  law.  It's very difficult.  It's very difficult.  I should say

24  I don't envy the judge's job.  I am not criticizing the judge

25  at all.  I am simply do not envy those intricacies that have to

1   be ruled on.  Pat, exhibit 61, the initial disclosures, please.

2   Pages D. 557, 558 and 559.  You will recall that during my

3   cross examination in which will forever be known as Mr. Kaster

4   as the time machine question.  I asked Mr. Setcavage -- can you

5   pull them up side by side or just go to the second and third

6   pages?  You recall that -- at the bottom of page -- thanks,

7   Pat.  I appreciate it.

8         We asked for -- in December 2013 you see the date on

9   the bottom right document, December 5th, 2013.  We asked for a

10  computation of damages and the disclosure -- second paragraph

11  on the second page, Pat, plaintiffs are not in possession --

12  December of 2013, Mr. Clemens and his lawyers, themselves did

13  not know what their damages were and, therefore, what the claim

14  was worth.  And I asked Mr. Setcavage a simple question, which

15  I ask you now, and I ask you to remember when you go back to

16  your jury deliberations.  How is it that the plaintiffs expect

17  my client to know the value of an injury in 2011 when they

18  don't know it in 2013?  That's not reasonable.

19        It's not fair.  Doesn't even make sense.  If they

20  don't know -- and by the way still haven't turned over the

21  documents as of that time on the wage -- if they don't know,

22  why are we expected to know?  That opinion I would submit to

23  you -- that opinion is an opinion which can only be purchased,

24  and it was and it was given to you.  You're entitled to

25  consider any of it, none of it.  And the judge did tell you

1   that you're entitled to weigh the credibility of all witnesses

2   certainly including Mr. Setcavage.  I admit and concede there

3   are some weird questions in the case such as why -- exhibits 37

4   and 39.  Why would Mr. Clemens' lawyers request that we

5   unilaterally schedule the deposition?  Why would they ask that

6   when Mr. Setcavage said the industry standard is to swap dates?

7   Referencing exhibit 37 now, Mr. Kaster pointed out and we -- we

8   would prefer -- since you indicated you prefer to unilaterally

9   schedule these events, that substantiates what I said about

10  unilateral scheduling -- he said above that, we prefer your

11  office provided dates to ensure your client's convenience.  Why

12  would that happen?  Exhibit 305.  Why would that happen only

13  for Ms. Albright to cancel the deposition she said we could

14  pick any date?  The reason why it happened is that slot machine

15  require coins and that the excuse of our unilaterally

16  scheduling a deposition or examination under oath is worth more

17  to Mr. Pisanchyn in this courtroom than had he simply brought

18  his client to Scranton to complete the examination under oath.

19          It's an odd, odd request to say take any date you

20  want and then cancel it.  This is important.  The excuse of

21  trying to claim that we unilaterally scheduled the deposition

22  is worth more to Mr. Pisanchyn than actually simply getting the

23  examination under oath completed.  It is what is required to be

24  put into the machine before the handle is pulled.  The excuse.

25  I'm going to exhibit 63.  Pat, please call up the wage

1   transcript.

2        Late in the day -- or late in the case today, Mr.

3   Pisanchyn attempted to make some hay with respect to, why did

4   you ask for joint tax returns.  I don't know how many of you

5   are married.  But married couples file tax returns jointly.

6   It's permitted by the I. R. S.  If the Clemens filed jointly,

7   then the only place there would be for income information would

8   be the joint tax return.  There is also, however, consistent

9   with the judge's order -- and I agree that Mr. Pisanchyn was

10   not required to turn over joint tax returns.  There is,

11   however, an Internal Revenue Service wage and income

12   transcript.

13        I'm not going through every page of that.  I simply

14   want to say -- you will have access to it if you wish -- we

15   finally got ten years of worth earnings history so we can take

16   a look at the loss of earnings claim on June 16, 2014.  The

17   case was settled four days later.  Why did Mr. Pisanchyn never

18   take a position on the seat belt defense?  These weren't

19   qualified to take a position on the seat belt defense than Jim

20   Dvoracek.  Why would he never take the position on that?  Why

21   wouldn't he say, I disagree that the seat belt defense applies,

22   I think you are applying the wrong law?  Why would he not

23   simply state his position?  Because slot machine require coins.

24   And the excuse that this good, simple man, this claims adjustor

25   applied the wrong law is far more valuable to Mr. Pisanchyn

1  than him simply saying, I disagree with you, Pennsylvania law

2  applies.   Another chance to pull on the handle.

3       Mr. Pisanchyn showed you the jury instruction about

4  false in one, false in all which means if you don't believe a

5  witness is telling you the truth on one item, you're free to

6  consider the entirety of his testimony is not worthy of belief.

7  It may have seemed a strange question to you when the first

8  question I asked Mr. Setcavage was, you heard of the saying you

9  can't be trusted in small things, you can't be trusted in big

10  ones?  That's essentially a rip off of the false in one, false

11  in all jury instruction.  Mr. Setcavage came in here, sat

12  himself down and without any basis at all told you that he

13  thought he had more continuing legal education than any lawyer

14  in this courtroom.  How believable is that?  How little regard

15  does this man have for your intelligence to sit up there and

16  presume?

17       I want to show you two small pieces of Mr.

18  Setcavage's deposition testimony.  Pat -- I believe these two

19  small snippets, although you are to consider his whole

20  testimony, of course, are very important about his approach to

21  this case.  Pat, page 40 of my cross examination, lines 12

22  through 16.  Question, do you know why it took a United States

23  federal district judge to order Mr. Pisanchyn to turn over ten

24  years of wage history instead of him simply just turning it

25  over to help his claim.  Answer, excuse me, no, that was not

1   part of my analysis then.   Next page, Pat, 41, lines 2 through

2   9.   Are you aware that Mr. Pisanchyn and his office did not

3   provide a ten year wage history so that New York Central could

4   not do an analysis of his loss of earning capacity claim until

5   June 16, 2014.   Answer, that was really not part of my

6   analysis, no.   The 30 thousand, maybe 50 thousand bucks, that

7   wasn't part of your analysis.   And Mr. Setcavage was very clear

8   in pointing out it was 32,000 and I am paid up until I am done

9   here today.   It's easy I supposed to come with opinions when

10  you can pick and choose those facts that you want to consider

11  and those facts which you don't.   I suppose if you overlook the

12  fact that my beard is gray and my face is a little tired, an

13  expert can say I'm 16.   It's all matter of how much you're able

14  to ignore and tolerate.   It's all a matter of what you will do

15  for 32 grand.   You're entitled to consider that.

16          I submit to you that in this case, Mr. Setcavage was

17  not the only expert to testify.   He was the only legally

18  qualified expert.   But witnesses, lay witnesses are entitled to

19  talk about things they know.   And if you don't know anything

20  else about Joe Catalano, you know that that man knows about

21  insurance.   Thirty years experience, three separate companies,

22  not one like Mr. Setcavage, 30 years' experience, three

23  companies, big and small.   You're entitled to weigh Mr.

24  Setcavage's testimony any way you wish.   You are entitled to

25  weigh Mr. Catalano's testimony any way you wish.   It's a matter

1  of who you find more believable, who you find more honest,

2  trustworthy, credible.  A very quick note about burden of proof

3  in this case.  The judge talked to you about clear and

4  convincing evidence.  He told you that the clear and convincing

5  burden of proof is a burden of proof where you find that the

6  evidence is so direct, substantial and weighty that without

7  hesitation -- without any hesitation you find that my client

8  committed bad faith with respect to the handling of this

9  insurance claim.

10           Can any of you honestly say that there's not large

11  amounts of hesitation about whether or not my client acted in

12  good faith or bad faith?  My client made every attempt to get

13  any information.  If you have any hesitation about that, the

14  instructions tell you to find for my client.  I suggest to you

15  there's almost no evidence of bad faith in this case other than

16  what Mr. Setcavage was paid to deliver.  You saw the documents.

17  You saw what actually happened.  I don't enjoy writing letters.

18  There's a reason those letters were written.  Those letters

19  were written so that in the inevitable day when Mr. Pisanchyn

20  decides to try to ring the bell and make the lights go off on

21  the slot machine we have something to show you.  Halloween was

22  last week.

23           Mr. Pisanchyn presented you with several ghosts.  I

24  am just going to discuss them briefly.  I discussed seat belt

25  issue.  I am not go over that again.  I have another question

1    about the authorizations.  If it was so onerous for Mr.

2    Pisanchyn to provide his own authorizations, why haven't you

3    seen a letter from Mr. Pisanchyn to the insurance company

4    saying, hey, I don't want to do my own forms, send me your

5    forms, or hey, I don't want to go through the pain on the back

6    side of doing those forms?  Why wouldn't he just say that?  And

7    the reason why he wouldn't say that is because the slot machine

8    requires coins.  He needs the excuse that you didn't send me

9    the authorizations far more than he would be able to come in

10   here and say, well, they didn't send them, I followed up and

11   asked them to send them.  The excuse is far more valuable to

12   Mr. Pisanchyn than had he actually tried to work it out or send

13   his own authorizations which Mr. Setcavage said can be found on

14   legalzoom.com and certainly any law office.

15            Mr. Setcavage talked about written guidelines.  I

16   wish to tell you that proving of bad faith requires so much

17   more than not following a regulation, not following a guideline

18   or a written procedure.  That's not bad faith.  Bad faith

19   requires much more recklessness, indifference.  Failure to

20   follow a procedure is not bad faith.  Mr. Catalano told you,

21   and Mr. Setcavage failed to show you -- Mr. Catalano told you

22   that -- Mr. Kaster asked, where can I do, where is the book

23   where all the insurance industry standards and practices are?

24   There is no book.  And Mr. Dvoracek with all his honestly and

25   simplicity -- wasn't his first year.  He had been with the

1 company for ten years, I believe.

2 Ladies and gentlemen, have you seen a single piece of

3 evidence in this case indicating that New York Central Mutual

4 pays bonuses based on how little the claims department pays

5 out?  Have you seen a single piece of paper?  Has that

6 accusation ever become anything more than an accusation in Mr.

7 Pisanchyn's mind?  What has he shown you?  His case consisted

8 of four people from New York Central Mutual, all honest

9 believable people and a paid expert.  They all told you our

10 bonuses are not tied to what we pay out in claims.  Secretaries

11 get bonuses.  Custodial staff gets bonuses.  The C. E. O.'s

12 percentage of the bonus is the same percentage as the custodial

13 staff bonuses and it's not tied to claim results.  Mr. Pylinski

14 testified very honestly I submit that that's not how the

15 bonuses work at New York Central.  When asked about incentives,

16 which is different than bonus, Mr. Pylinski said, our company

17 pays incentives for health and wellness.  That's an incentive.

18 You didn't hear one witness, see one piece of paper

19 that said New York Central Mutual, a company that's been in

20 business for a hundred plus years pays its claim staff based on

21 how little they pay out.  An insurance company who did that

22 would not be in business for a hundred plus years.  Now, Mr.

23 Pisanchyn knows that his case on bonuses is weak.  He has

24 trotted out the snow in the morning versus the snow in the

25 evening.  I will concede, Mr. Pisanchyn, that if I go to bed

1  and there's no snow on the ground at night and I wake up and

2  there's snow on the ground in the morning, I look and see that

3  it has snowed overnight if Mr. Pisanchyn will concede that if I

4  get up in the morning and Mr. Pisanchyn is standing on a brown

5  lawn telling me it snowed, that is not circumstantial proof.

6  There is no snow here.  Mr. Pisanchyn is standing on the ground

7  telling you there's snow.  That's not circumstantial evidence.

8  That's no evidence.  The most candid and believable thing Mr.

9  Pisanchyn said he said a few moments ago, he said -- with

10  respect to the arbitration, we could have done it the right

11  way.  We could have.  Ms. Albright could have.  If you've been

12  listening, you know the next question I'm going to be asking

13  you.  Why -- if they knew they could have made an arbitration

14  demand the right way, why didn't they?  Because coins are

15  required for slot machines.  And because the excuse that an

16  arbitration did not take place in this case is worth far more

17  to Mr. Pisanchyn than had he simply done something the right

18  way, a way in which he said they could have done it right.  He

19  said that.  I made a note.  The excuse of not going to

20  arbitration is another chance of pulling the lever.

21         Who took advantage of who in this case, ladies and

22  gentlemen?  A man gets paid $25,000, misses three days of work.

23  He's not satisfied with that.  He drags a small mutual

24  insurance company into court.  Who is taking advantage of who?

25  Who is being put through the ringer now?  After watching the

1  case put on by Mr. Pisanchyn, is it a mystery to anyone has to

2  how New York Central Mutual was required to pay $17,000 to

3  defend itself?  If you look over at that shelf of binders, you

4  can see why New York Central Mutual was forced to spend $17,000

5  on lawyers to defend itself.  They are still --

6          MR. PISANCHYN:  Your Honor, that's -- I will object,

7  and I will ask --

8          THE COURT:  I don't remember any evidence whatsoever

9  about cost of lawyers and -- hold on.  Only one of us can speak

10 at a time.  You made your objection.  I sustain the objection.

11 It's stricken from the record.  You are not to consider it.

12 There's no evidence related to it.

13         MR. HADDICK:  I do apologize.  I thought there was

14 testimony about legal fees required to be paid by my client.

15 Mr. Pisanchyn has another opportunity to get up and speak with

16 you.  That's a good thing because I will place in your minds

17 some questions to ask yourself while you listen to him talk for

18 the final time in this case.  Why has he pled for his client's

19 day in court only to leave them sitting over there and not for

20 a minute putting them over there?  He's right.  This was their

21 day in court.  They didn't show, and they didn't talk to you.

22 They didn't tell you a thing.

23         Mr. Pisanchyn cannot testify in their place.  Why

24 were there inconsistent injury descriptions given in the claims

25 forms?  Why withhold wage history for ten months after the bad

1  faith suit was filed?  Does anybody know why they would do

2  something like that?  Slot machines need coins.  Had he turned

3  the wage information over, the case could have settled earlier

4  and he wouldn't have been able to come into court claiming bad

5  faith.  Perhaps he should answer that for you.  Why did the

6  plaintiff obstruct and delay for three years providing simple

7  wage information and come into this courtroom and try to tell

8  you it was New York Central Mutual's fault?  Ask that question

9  in your mind.  Discuss it if you wish.  Mr. Clemens are not the

10 only people that will have to live with what decision is going

11 to be made in this case.  This afternoon or this evening or

12 tomorrow, Joe Catalano has a two hour drive back home.  What

13 you say about how he did his job is important to him.  He will

14 have to live with your decision.

15        You -- each of you will wake up tomorrow morning

16 perhaps relieved it's all over, and you will have to live with

17 the decision you make.  One of the reasons we have large

18 windows in courtrooms is to remind us of something.  It reminds

19 us that the sunshine should be let into this place and that you

20 should be shown any evidence either party wants to submit in

21 support of their case.  Ask yourself who has shown more.  I was

22 candidly -- I don't know how to put this.  I was candidly sad

23 perhaps that this case got this far.

24        But then I heard Judge Mannion on Monday say

25 something, and I want to read it because it changed the way I

1  felt about why we were here.  Judge Mannion said, jury service

2  is the highest form of duty an American citizen can perform

3  outside of defending your country in a time of war.  When he

4  said that, I thought there's no better place for this case than

5  this courtroom because now you have the power.  The United

6  States federal courthouse and in this courtroom he courtroom

7  are not slot machines.  This place means something.  Your job

8  that you're going to do in a few moments means something.  What

9  New York Central did, how it acted was reasonable.  Perhaps it

10  might be more appropriate for this jury to tell Mike Pisanchyn

11  to change the way he acts.  Thank you.

12          THE COURT:  Mr. Pisanchyn.

13          MR. PISANCHYN:  Your Honor, I can go but does the --

14          THE COURT:  Go, please.  All right.

15          MR. PISANCHYN:  Mr. Haddick and Mr. Kaster are good

16  men, especially Mr. Haddick.

17          MR. HADDICK:  Your Honor, he's hovering.

18          THE COURT:  He can stand anywhere he wants in the

19  courtroom.  Okay.  Go ahead.

20          MR. HADDICK:  Mr. Haddick is a good person.  He and I

21  are both attorneys, and we're cordial to each other.  The

22  question I have is why has he mentioned my name over 40 times

23  during his summation when it's not my case?  Who is making him

24  do this knowing he's a good person?  What person?  What entity?

25  What company is forcing the person like Mr. Haddick to mention

1  Mr. Pisanchyn's name, my name, over 40 times?  Mr. Haddick has

2  the audacity to accuse Mr. and Mrs. Clemens to wait five years

3  to pull a slot machine handle?  Is that what he just said on

4  the record?  Is that what he just said?  Are you kidding me?

5  That's what his argument is on a record that Mr. Clemens and

6  Mrs. Clemens' children will read?  That's what he just accused

7  them of?  That's what he just accused them of.  I don't have a

8  case.  Look at the caption.  I never had a case.  I never had a

9  case here.  I never even was involved in this case.

10          I handle bigger cases, cases that change industries,

11  and that's why I am here.  That's why I decided to take the

12  case.  The correspondence came from Ms. Albright and Mr. Figure

13  in my office.  I take cases that change industries, and this

14  industry needs to be changed.  This is disgusting.  It is

15  disgusting this long we had to wait three years if not longer

16  the Clemens had to wait to get paid when adjustor Dvoracek said

17  he would have paid it in 2011.  That's disgusting.  Mr.

18  Pisanchyn, Mr. Pisanchyn, Mr. Pisanchyn has enough tokens to

19  put in any slot machine.  It's not about me.  You know what?

20  It's not even about Mr. Clemens.  It's about NYCM insurance.

21  That's what this case is about, their actions.

22          And that's what they are trying to do is blame

23  everyone else but themselves, and it's ridiculous.  The Clemens

24  are heros.  They had to get through and put through questioning

25  and depositions that were the most insulting things I ever

1   heard about lying and adultery and things of that nature.

2            MR. HADDICK:  Your Honor --

3            THE COURT:  That's stricken from the record.  There's

4   no evidence about that in the case.  That's been discussed

5   before.  Don't consider anything related to that statement.

6   Let's try to stay on focus and what the evidence is, please,

7   from everybody's side.

8            MR. PISANCHYN:  It's my understanding NYCM insurance

9   brings up the timeline.  Didn't seem scary when I saw it,

10  especially when all those things were coming down.  The dots

11  were pretty neat.  We have these.  We have addressed these.

12  You will have the documents back there.  If you want to go

13  through them and look, please.  I don't like hiding anything

14  from people.  This timeline when I saw it in opening was the

15  most ridiculous thing I ever seen ever because how you only put

16  your position in front of a jury?  How do you do that and have

17  credibility?  That's the only thing I ask.  How do you just put

18  your dots and not everyone else's dots?  Is that fair?  Is that

19  -- is this a fair representation of the evidence you heard?  Is

20  it?  You will have to decide.  Is this fair though ?

21           Maybe it is.  Maybe according to Mr. Pisanchyn it is.

22  In regard to the letters that we sent on there, they are back

23  there on the system.  I don't know how to show you them.  Look

24  at them.  NYCM insurance -- NYCM insurance subpoenaed my

25  clients to be here.  They had to sit through this whole trial

1  instead of going to other places.  Then he says I didn't call

2  them.  I didn't call them?  NYCM insurance could have called

3  them any time they chose.  They subpoenaed them from Monday

4  through Friday.  That's why they have been sitting here not as

5  a spectacle, not because they wanted to.  They subpoenaed them.

6         They could have called them any time they wanted, any

7  time.  Then they are going to say we didn't call them.  Why?

8  So they have the paddy wagon again?  Is that what they wanted?

9  If they wanted to put them through the paddy wagon, he could

10  have called them.  He's going to tell me I didn't call them.

11  That's fair?  That's fair?  Sounds fair?  In regard to

12  organizational charts, yeah, I did raise a fact about that

13  because if you look into the organizational charts the

14  reasonable inference you will see is the Robinsons owned four

15  companies underneath, and so the small little mutual company --

16  do you remember -- little bump on the nose -- then we have a

17  small mutual company that's worth over a billion dollars,

18  small, that's small, itsy bitsy, tiny little baby mutual

19  company that's worth a billion dollars, poor them -- I

20  understand.  That's Mr. Pisanchyn saying it.  That will be up

21  to you.

22         You heard about Mr. -- NYCM talks about NYCM's credit

23  rating.  You heard from Pylinski how important that was.  You

24  heard during this period of time when they were adjusting the

25  claims they had two major storms.  The issue is during that

1  period of time they weren't making money.  So when you are not

2  making money as an insurance company, you have to sustain

3  yourself.  How do you do that?  I asked Mr. Pylinski how you do

4  that.  If you recall I asked him how insurance companies make

5  $32 million a year.  What he told me was they set premiums.

6  That's set.  They have adjusting -- adjustment expenses that go

7  out.  That's set.  They have expenses that is set just like any

8  other company.

9          So there's only one variable in this equation, is

10  there not?  We know this is set.  We have to pay the adjustor.

11  Catalano gets paid no matter what as well as everybody else.  I

12  am not saying he shouldn't.  He earns his money just the same

13  as anyone that works, okay.  I am not saying he shouldn't get

14  it.  But it's set.  The expenses are set.  So what's the factor

15  that goes into profit?  The bottom line.  What's the only thing

16  that a company can change?  And why is it that the number three

17  guy in the billion dollar company is having meetings with the

18  vice president who is Mr. Catalano's supervisor -- or maybe not

19  -- I am not sure -- but calls down to the adjustors.  Am I

20  standing on a red carpet or standing in snow?  I don't know.

21  All I can tell you is that in a billion dollar company I never

22  heard of the number three guy talking to the guy way down in

23  claims to tell them to talk to their adjustors.  And I never

24  heard of somebody like Mr. Catalano's supervisor every month

25  reviewing settlements.  Remember adjustor Dvoracek said we

1  review settlements to see how much I pay, if I don't pay -- if

2  I pay too much, I might get into a little trouble.  Sixteen

3  requests, two requests for exams.  I have been hearing this for

4  five years.  Five years I've been hearing this stuff.  You have

5  the timeline.  Go through it.  You'll see five years this is

6  the same dance, same dance.  Setcavage's opinion is bought.  I

7  don't care if you probably -- whatever -- look at the documents

8  he has to go through to review.

9         And Ms. Albright in my office is creating all those

10  documents to pull a slot machine?  I hope not.  If that's the

11  case, we have a little bit more things better to be doing in my

12  office -- I can assure you of that -- than to not get our

13  clients paid.  So we have -- according to NYCM insurance we

14  have this thing mapped out from the beginning.  That's what we

15  wanted to do.  The plaintiffs wanted to -- let's hope they

16  don't give us the money, let's hope, and then we will get in

17  front of a jury and maybe get a chance, maybe we will get a

18  chance.  But the thing that I don't get is that he's still

19  referring to Mr. Clemens' injuries as a nasal contusion.  He

20  said that in the opening, and I thought -- I did everything I

21  could put to just jump, but I didn't.

22         Then I figured, okay, he must have caught his mistake

23  when we were going through all this stuff.  During closing he

24  again tells you that there was a nasal contusion, that's it.  I

25  don't know if I'm dreaming.  I'm not sure.  But I can swear I

1    showed -- I think he was in the courtroom -- maybe I'm wrong.

2    But I thought I show this exhibit.  It's marked 6 A.  Now, does

3    Mr. Clemens, a regular person -- does he get to rely upon what

4    his doctor is telling him, or does he say, no, Doc, you're

5    crazy, you're crazy?  Is that what Mr. Clemens gets to do?  If

6    someone told you you had this, would you believe your doctor?

7    You have the right to believe your doctor.  I would hope so.

8         Then in regard to the M.R.I.s, the M.R.I.s -- this

9    will be in JERS as 6 H. and 6 E.  The M.R.I. show there is

10   herniated discs.  They have this information, okay.  Now,

11   here's the thing.  It's funny how predictable an insurance

12   company that doesn't do the right thing is.  Mr. Haddick

13   immediately started talking immediately about to you when we

14   mentioned herniations -- what was the word he used?  Starts

15   with a D., degeneration.  Now, isn't it funny how I asked

16   adjustor Dvoracek, when you hear the word generation, what's

17   the first thing you tell every attorney?  What's the first

18   thing you tell them?  How were you trained?  Oh, no, nobody

19   trained me.  Joe played the clip.  Yeah, he was trained.  He

20   was trained by NYCM insurance -- this gentleman here, the guy

21   that's watching over Mr. Haddick and Mr. Kaster the whole trial

22   making sure he continually says Mr. Pisanchyn, Mr. Pisanchyn,

23   Mr. Pisanchyn, okay.  Mr. Pisanchyn, Joe, right there -- you

24   see him -- he's been looking at him the whole time, okay.

25         $28,000 for a nasal contusion.  $28,000 worth of

1  medical bills, little itsy bitsy contusion?  They showed you

2  X-rays -- even in closing -- it's just, like, I don't have a

3  pen, I don't have a pen.  They show you in closing an X-ray of

4  a nose and then say that Mr. Clemens didn't have a broken neck

5  at the emergency room.  I don't have a pen.  Yeah, you have

6  taken an X-ray of the nose.  It doesn't show if you have a

7  broken neck, okay.  It doesn't show if you have a broken neck.

8          I can tell you the documents where there was a test

9  according to Mr. Clemens' doctors say findings consistent with

10  a recent fracture as noted.  It also says due to trauma.

11  Haddick and NYCM insurance -- I shouldn't refer to him because

12  he's only doing his job, Mr. Haddick.  NYCM insurance says that

13  Mr. Clemens' story changed.  That's where you talk to me about

14  misrepresentation.  Where I come from when I say misrepresent,

15  you know what I am telling you?  You're a damn liar.  That's

16  what it means, okay.  That's where I come from.  Somebody --

17  drinking at a bar and says you're misrepresenting, what they

18  are telling you is you're a damn liar.  He said it again today.

19  His story is changing.  The important part though is where is

20  this in the insurance adjustor 's notes?  Talking about red

21  flags.  Adjustor Dvoracek doesn't know what a red flag is.

22          Are they Monday morning quarterbacking you to death

23  or not?  I feel they are, but that's me.  That's not you.

24  You'll have to decide that for yourself.  Can we put up --

25  level the playing field.  We live in a civilized society which

1  solves disputes in a civilized manner.  We don't call attorneys

2  names.  We don't call other attorneys.  We talk about clients.

3  It a client's case.  It has nothing to do with me.  We cannot

4  always play -- level the playing field on our playgrounds.  But

5  we must level the playing field in our courts.  The reality is

6  the Court may be the only place where such rules that guarantee

7  a level playing field are strictly enforced.  The only place

8  because of this.  This is why we have courts.  This is why we

9  have jurors.

10       This is why there's not eight attorneys sitting up

11  there that might know me or might know Mr. Haddick that might

12  say, maybe we will give it to Pisanchyn, we like him better.

13  You don't know the parties.  This is a level playing field.

14  The seat belt they say wasn't considered -- do you have the

15  next clip?  They said the seat belt wasn't considered.  Why is

16  that in the notes?  Again, five years later I know what they

17  are going to say.  I know that.  Where is it in the notes that

18  the seat belt defense was discontinued?

19       I know they couldn't find any evidence he was wearing

20  a seat belt based on their investigators.  The medical records

21  said it.  We saw that.  The issue is, is that they didn't --

22  never discontinued the defense even at the time of the

23  deposition.  They were still raising that New York law has a

24  seat belt defense.  Pennsylvania law does not.  Pennsylvania

25  law does not have a seat belt defense.  You cannot bring that

1   into court.  You cannot bring into court in a civil case

2   whether or not someone was wearing a seat belt.  They didn't

3   know that until I went up to New York and told them.  That's

4   why they were paying less on this claim.  That's why they were

5   paying less on this claim because of the comparative negligence

6   issue.

7           They say choice of law could be difficult.  For a

8   billion dollar company I don't know how much can be difficult.

9   They could have hired an attorney.  They did talk to an

10  attorney.  The attorney told them it was Pennsylvania, but they

11  didn't like that because it wasn't favorable to them.  So they

12  didn't follow it.  Is that the rules of the game?  Is that the

13  rules of the game?  Is that dangerous?  Is that dangerous for

14  every insurance company to follow?  Punitive damages are

15  something -- the only type of justice available to deter

16  powerful entities from using their position of strength to

17  defeat the lesser party, the lesser party only because that

18  party cannot compete on the same level as the giant.

19          It is the epitome of leveling the unbalanced playing

20  field.  This is why -- this is why your verdict is going to

21  matter.  That's why it is because eight people from all over

22  the middle district are going to come to a decision that is

23  going to make sure this industry -- the insurance industry

24  knows how to treat their insureds.  They talk about lost

25  earnings.  They say he only lost three days but he needed lost

1  earnings for four.  He missed three days of work, but five

2  years they are still waiting for the wage report.  Which is it?

3  If you go back for wage reports, the wage report will tell you

4  he did lose $12,000.  I don't want to quote a specific figure.

5  The year after -- everything is consistent until a year after

6  this collision, okay.  So when you are back there, look at

7  that.  If they reserve that at 25 and settled it four years

8  after that, then you think they would have at least added that

9  money on there, right.  They only always said that the limits

10  are 35 and the dec page is 50.  So why are they telling their

11  insured the policy limits are 35 when their dec page says it's

12  50?

13          He said the C.O.O. makes the same amount of money

14  that the NYCM C. E. O. makes.  I can swear when I asked him he

15  said he makes up to 40 percent and sometimes 50 percent.  That

16  was his bonus.  The line guys get two to ten.  So I don't know

17  -- maybe I fell asleep and dreamt.  I am not sure.  It's just

18  my version of the testimony.  Yours is what counts.  Your

19  Honor, can I approach for one second in regard to this issue

20  here?

21          (The following discussion took place at sidebar:)

22          MR. PISANCHYN:  He said they were paid $17,000.  They

23  were paid over $300,000 --

24          THE COURT:  No, I struck that from the record.

25          MR. PISANCHYN:  Doesn't help him.

1          THE COURT:  I said there was no -- no discussion of

2     that by any side.  I struck that from the jury's mind.

3          MR. HADDICK:  One thing he mentioned -- I believe the

4     legal bills, SUM claim for $17,000.  I am putting my --

5          MR. PISANCHYN:  You kept saying for this case, in

6     other words this case, it was 17 which this was 300 --

7          (The discussion at sidebar concluded.)

8          MR. PISANCHYN:  Hello, I see here, what happened the

9     jury -- the jury sent a message?  Oh, what did they say?  What?

10    What?  That means we have to change the way we do business?

11    Oh, lord, all right.  Well, I will call Joe Catalano, call Ms.

12    Wildey, we will make sure that we immediately start doing

13    things differently and paying our insureds the amount of money

14    they deserve.

15          Ladies and gentlemen, I have lived with the Clemens

16    case and Mr. and Mrs. Clemens for years, and I am really scared

17    to turn it over to you.  Maybe that's why my presentation was

18    so long.  But right now I really do believe that you have

19    enough evidence.

20          I believe you know the ratio in regard to one percent

21    equals one percent, and what I would ask you do is send a

22    message to NYCM so they can hear all the way out in New York to

23    make sure that they step messing with their insurance.  Thank

24    you.

25          THE COURT:  Thank you, Mr. Pisanchyn.  All right,

1  ladies and gentlemen.  Here's your closing instructions.  Your

2  first duty, members of the jury, is to select among yourselves

3  a foreperson.

4          Now, the foreperson will be charged with

5  administering your deliberations.  It is important to

6  understand that the foreperson has no more authority or power

7  than any other juror in the case.  The vote of foreperson is

8  equal to any other person in the case.  If during the course of

9  your deliberations you need to communicate with us, you will do

10  so in writing.  It should be in the form of a question reduced

11  to writing and signed by the foreperson.

12          Place the written question in an envelope which are

13  inside the jury room.  Hand it to the court officer who will be

14  out here in the courtroom.  They'll bring it to me.  I'll

15  discuss it with counsel, and we will either send back a written

16  response, or if necessary we will bring you in courtroom to

17  give a response to that question.  In any questions or

18  communications you have with the Court, the jury should never

19  indicate how it stands numerically on any of the issues which

20  have been submitted for your determination.

21          Now, I had Barbie forward down Court Exhibit No. 2.

22  That's the verdict slip.  You're to answer the questions in

23  order.  Answer the first question first, and after you answered

24  it, follow the instructions below that to see whether you

25  answer the second or sign and come in.  Once you've answered

1   all the questions that need to be answered in the case, the

2   jury foreman will sign it, date it, put it in an envelope,

3   knock on the door, tell the Court officer that you have come to

4   a verdict.

5         They will advise us of that.  We will bring you back

6   in order for you to give us your verdict.  Now, your verdict

7   must be unanimous as to each of the questions that are

8   presented on the jury form.  Once you have reached a unanimous

9   verdict and your verdict slip has been signed by the foreperson

10  -- as I said, you are to place it in an envelope, knock on the

11  door, and then we will bring you back to return your verdict.

12        I made the mistake of assuming we'd be done an hour

13  ago.  So your lunch has been sitting in there for about an

14  hour, all right.  So with that being said, when you leave now

15  to deliberate.  You may, in fact, and should discuss the case

16  among yourselves.  One final matter, all the exhibits are on

17  the system called JERS.  It's that large T.V. screen.  Right

18  next to it there's a touch screen.  When you go in there, on

19  the touch screen on the bottom right-hand side, it says menu of

20  exhibits.  Push that.  The touch screen is all you need to do.

21        Touch that touch screen.  It will bring up on a large

22  screen and on the touch screen whatever the exhibits are.  If

23  you want to see an exhibit, you just touch it on the screen.

24  It will come up, and you can scroll on the screen just like you

25  would with anything else.  The only difference is you're used

1  to scrolling on a computer or Ipad -- you need a much firmer

2  touch on that control panel.  You have to push it hard to make

3  it scroll up and down.  If you finish with the exhibit, you can

4  see -- you will see on the bottom there's a menu, close the

5  exhibit.  You can push the back button to find any other

6  exhibit you want to do.

7          Anything you want, everything that has been admitted

8  is there.  It's on that 50-inch screen.  You can pull it up and

9  look at anything you want, okay.  Thank you very much.

10          (The jury left to deliberate at 1:12. p.m.)

11          THE COURT:  We received what -- a note from the jury.

12  It is not signed by the jury foreman or dated as the

13  instructions were given to them.  It's actually not a question.

14  It's more of a statement.  It says, need elaboration on

15  parameters to charge we're considering.  I will show it to

16  counsel.

17          I am going to bring them back in and again describe

18  for them procedurally they are to -- if they have a question, a

19  very specific question in the form of a question, signed by the

20  foreperson and dated unlike what this is.  And then secondly, I

21  am going to tell them that if it's a question as to the charge,

22  the law in the case, all I am going to read what I have given

23  them.  That's no other explanation.  A question beyond that,

24  I'll say -- put it very specifically in the form of a question,

25  date and sign it and then we will review it at that point in

1  time.  We will mark this Court Exhibit 3.  One is the charge.

2  Two is the verdict slip.  Three is the question.

3               (The jury entered the courtroom at this time.)

4          THE COURT:  We have a note from the jury.  And I need

5  to remind you because we have very particular procedures for

6  our records, if the jury is going to give us a note, it has to

7  be in the form of a question.  It has to be signed by the

8  foreperson, and it has to be dated.

9          I got a piece of paper that has a statement on there

10 but really not that.  So what we will do in the future is it

11 will be in the form of a question, very specific question

12 signed by the foreperson and dated.  Now, I have already read

13 this to counsel.  It reads, need elaboration on parameters to

14 charge we are considering.  I am not sure I know what that

15 means.  I will tell you this that if it's a question concerning

16 the law as I have given you, all I would be doing is rereading

17 you exactly what I have given you.

18         So there wouldn't be anything additional in that

19 regard.  The law is the law as it has been given to you, and

20 you have a copy of that charge.  So I would be rereading that

21 to you.  If there's a more specific question that you have when

22 you say need elaboration, I don't know on what.  If there's a

23 more specific question, you can ask that question, and I can

24 figure out whether we can answer it.  You should understand

25 that once you get the case, there is no other evidence or

1  testimony or anything that occurs in the case.  You've heard it

2  all, and so we don't offer anything other than what is there.

3  The law is what has been given to you.  All of that being said,

4  we will let you go back.  You can mull over that a bit.  And

5  then if you have any further questions -- as I said, they

6  should be very specific and written in the form of a question

7  so we can give a dispositive answer if we can, date it and

8  signed by the foreperson, okay.  Thank you.

9          (The jury left to continue to deliberate at this

10  time.)

11          (The following verdict was reached by the jury:)

12          THE CLERK:  Ladies and gentlemen, have you reached a

13  verdict?

14          THE JURY:  Yes, we have.

15          THE CLERK:  United States District Court in the

16  Middle District of Pennsylvania, Bernie Clemens versus New York

17  Central Mutual Fire Insurance Company, civil action No.

18  3:13-2447.  Has the plaintiff established by clear and

19  convincing evidence that the defendant acted in bad faith in

20  the handling of his uninsured motorist claim.  The answer is

21  yes.  If yes, please proceed to two.  Please state the amount

22  of damages you award the plaintiff Bernie Clemens, $100,000.

23  It's signed by the jury foreperson, and it's dated today.  Is

24  this your verdict so say you all?

25          THE JURY:  Yes.

120

1       THE COURT:  We appreciate your time.  It took a week,

2 certainly not unreasonable.  What I will do is when you go back

3 please leave all your notes and whatever you have there.  We

4 will shred all of that material.  And then I will see you back

5 in my chambers to have some conversation with you about what

6 things we can do better for you in the future.  All right.  See

7 you in a few minutes.  Thank you very much.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

121

REPORTER'S CERTIFICATE

I, LAURA BOYANOWSKI, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

_____
Laura Boyanowski, RMR, CRR
Official Court Reporter

REPORTED BY:

    LAURA BOYANOWSKI, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    Scranton, PA  18503

       (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

## $

**$10,000** [2] - 27:24, 28:1
**$100,000** [1] - 119:22
**$12,000** [1] - 113:4
**$17,000** [4] - 101:2, 101:4, 113:22, 114:4
**$25,000** [11] - 13:4, 16:3, 29:3, 29:6, 29:16, 30:3, 51:20, 52:20, 56:3, 91:16, 100:22
**$28,000** [2] - 109:25
**$30** [1] - 67:17
**$300,000** [1] - 113:23
**$32** [1] - 107:5
**$32,000** [2] - 79:2, 86:2
**$466** [4] - 51:13, 52:20, 52:22, 66:24
**$466,000** [1] - 67:18
**$466,433,113** [1] - 67:13
**$467,000** [1] - 75:5
**$50,000** [2] - 27:25, 52:20

## 0

**08** [1] - 4:9

## 1

**1** [3] - 20:8, 69:20, 70:14
**1,100** [1] - 81:14
**10** [2] - 78:9, 78:14
**10th** [1] - 89:12
**11** [1] - 9:20
**11th** [1] - 12:17
**12** [1] - 95:21
**12th** [3] - 16:2, 24:1, 29:1
**13-CV-2447** [1] - 1:5
**136** [1] - 25:12
**15** [4] - 2:5, 9:1, 78:9, 78:14
**150** [1] - 78:5
**16** [8] - 7:24, 8:12, 12:21, 81:8, 94:16, 95:22, 96:5, 96:13
**16th** [1] - 11:23
**17** [2] - 6:1, 114:6
**17011** [1] - 1:23
**18503** [2] - 1:19, 121:19
**18th** [3] - 85:4, 85:5
**19** [1] - 83:20
**1:12** [1] - 117:10

## 2

**2** [7] - 8:9, 11:4, 12:1, 23:16, 69:20, 96:1, 115:21
**20** [2] - 19:17, 29:21
**2004** [3] - 8:9, 11:1, 11:6
**2006** [1] - 6:8
**2009** [8] - 6:10, 31:2, 31:7, 31:9, 31:18, 85:4, 85:5
**2010** [3] - 31:14, 89:4, 89:6
**2011** [24] - 7:22, 12:24, 13:3, 13:25, 14:2, 14:11, 14:15, 14:18, 15:9, 19:18, 19:20, 20:16, 22:9, 31:7, 31:17, 44:21, 45:2, 45:8, 56:6, 77:2, 81:18, 92:17, 104:17
**2012** [1] - 67:18
**2013** [15] - 8:10, 8:15, 9:20, 11:2, 11:6, 12:17, 14:25, 15:12, 30:21, 30:22, 92:8, 92:9, 92:12, 92:18
**2014** [25] - 7:6, 7:9, 7:20, 7:24, 8:12, 9:14, 9:18, 10:4, 11:23, 12:18, 12:21, 12:24, 13:4, 13:16, 13:18, 16:2, 26:5, 29:1, 29:16, 29:21, 44:23, 45:2, 45:8, 94:16, 96:5
**2015** [2] - 1:13, 6:12
**20th** [8] - 7:22, 12:24, 13:4, 13:16, 19:20, 44:23, 45:2, 45:8
**21** [5] - 1:22, 12:24, 13:3, 44:21, 45:1
**21st** [1] - 45:8
**21ST** [1] - 1:23
**23** [1] - 47:6
**24th** [1] - 26:3
**25** [4] - 51:25, 52:20, 84:1, 113:7
**25,000** [5] - 27:4, 27:5, 30:1, 51:23, 84:6
**250** [2] - 78:4, 78:5
**26** [3] - 8:15, 14:25, 30:20
**26th** [2] - 15:12, 30:22
**28** [1] - 121:5
**28th** [1] - 7:6
**29** [2] - 2:5, 54:19
**2s** [1] - 11:9

## 3

**3** [3] - 1:11, 89:4, 118:1
**3/17** [1] - 26:5
**3/17/2014** [1] - 26:24
**30** [7] - 22:16, 52:21, 56:24, 90:7, 90:14, 96:6, 96:22
**300** [1] - 114:6
**302** [1] - 1:22
**305** [1] - 93:12
**30th** [3] - 7:9, 7:20, 77:2
**32** [1] - 96:15
**32,000** [2] - 81:21, 96:8
**35** [3] - 34:11, 113:10, 113:11
**37** [2] - 93:3, 93:7
**39** [1] - 93:4
**392** [2] - 86:5, 86:11
**3:13-2447** [1] - 119:18

## 4

**4** [2] - 9:18, 10:4
**4.08** [3] - 3:15, 4:11, 5:9
**4/14** [3] - 26:5, 26:20, 26:23
**4/14/2014** [1] - 25:6, 25:22
**40** [6] - 56:24, 90:7, 95:21, 103:22, 104:1, 113:15
**408** [1] - 3:22
**41** [1] - 96:1
**425** [1] - 1:23
**45.7** [1] - 79:10
**462,000** [1] - 72:15
**48** [2] - 7:8, 56:14
**4th** [1] - 9:14

## 5

**5** [1] - 85:25
**50** [6] - 52:20, 89:13, 96:6, 113:10, 113:12, 113:15
**50-inch** [1] - 117:8
**52** [1] - 7:20
**524** [1] - 1:18
**54** [2] - 9:12, 82:12
**557** [1] - 92:2
**558** [1] - 92:2
**559** [1] - 92:2
**57** [1] - 9:5
**58** [1] - 9:7
**590** [1] - 83:14

**597** [2] - 83:20
**5th** [1] - 92:9

## 6

**6** [5] - 1:13, 86:5, 109:2, 109:9
**6/16/2014** [1] - 12:17
**61** [3] - 83:13, 86:11, 92:1
**615** [1] - 12:3
**616** [1] - 12:3
**617** [1] - 12:15
**618** [1] - 12:15
**619** [1] - 12:15
**620** [1] - 12:15
**622** [1] - 11:25
**63** [2] - 11:23, 93:25
**647** [1] - 10:8
**648** [1] - 10:8
**649** [1] - 10:19
**65** [1] - 85:14
**66** [1] - 85:14

## 7

**7** [1] - 2:5
**70** [1] - 84:7
**703** [1] - 5:5
**71** [2] - 84:21, 84:23
**74** [3] - 86:6, 86:12, 86:14
**753** [1] - 121:6

## 8

**805** [1] - 84:7
**806** [1] - 84:21
**809** [3] - 86:6, 86:12, 86:14
**82** [2] - 75:7, 81:4
**899** [2] - 24:2, 24:3
**8th** [1] - 12:18

## 9

**9** [1] - 96:2
**9/25/2009** [1] - 19:4
**98** [1] - 83:23

## A

**abiding** [1] - 45:14
**able** [5] - 12:10, 35:12, 96:13, 98:9, 102:4
**above-mentioned** [1] - 121:8
**abrasions** [2] - 86:23, 88:23
**absolute** [1] - 42:10
**absolutely** [3] - 6:17,

**13:20, 49:21
**accept** [7] - 42:13, 42:24, 43:1, 49:23, 51:25, 57:23
**acceptable** [2] - 64:15, 64:17
**accepted** [5] - 16:21, 29:5, 29:19, 42:19, 42:22
**access** [3] - 64:8, 69:16, 94:14
**accident** [14] - 83:19, 84:12, 84:15, 85:11, 85:16, 86:11, 86:19, 88:22, 88:25, 89:5, 89:8, 89:11, 89:15, 90:11
**accidents** [1] - 90:17
**according** [7] - 7:11, 8:5, 26:20, 56:1, 105:21, 108:13, 110:9
**accordingly** [1] - 45:12
**accounts** [1] - 52:24
**accurate** [1] - 42:9
**accurately** [1] - 35:15
**accusation** [2] - 99:6
**accuse** [1] - 104:2
**accused** [3] - 15:10, 104:6, 104:7
**achieve** [1] - 36:9
**achieved** [1] - 36:14
**acknowledge** [1] - 56:8
**act** [5] - 44:1, 45:14, 58:7, 63:21, 63:22
**acted** [1] - 15:1, 15:6, 44:15, 44:18, 44:25, 45:21, 62:24, 75:16, 97:11, 103:9, 119:19
**acting** [1] - 15:10
**action** [4] - 37:4, 60:8, 71:25, 119:17
**actions** [6] - 44:17, 48:16, 63:17, 63:19, 64:16, 104:21
**activities** [1] - 45:7
**activity** [1] - 72:17
**acts** [10] - 44:7, 44:11, 44:12, 44:13, 46:2, 46:12, 47:10, 65:11, 65:16, 103:11
**actual** [5] - 3:17, 4:1, 5:6, 38:8, 41:13
**add** [3] - 4:18, 5:17, 6:1
**added** [3] - 33:18, 89:13, 113:8
**addition** [2] - 48:6,

49:8
**additional** [3] - 4:18, 33:21, 118:18
**address** [2] - 72:24
**addressed** [2] - 12:5, 105:11
**adjusting** [5] - 49:7, 59:12, 90:14, 106:24, 107:6
**adjustment** [1] - 107:6
**adjustor** [15] - 22:12, 49:12, 50:16, 50:23, 56:2, 57:21, 61:5, 91:6, 94:24, 104:16, 107:10, 107:25, 109:16, 110:20, 110:21
**adjustor's** [4] - 17:14, 20:13, 56:1, 61:5
**adjustors** [4] - 49:3, 49:7, 107:19, 107:23
**administering** [1] - 115:5
**administration** [1] - 35:23
**admissible** [1] - 37:11
**admit** [3] - 58:14, 62:13, 93:2
**admitted** [3] - 82:19, 91:10, 117:7
**adultery** [1] - 105:1
**advancing** [1] - 20:23
**advantage** [2] - 100:21, 100:24
**advise** [1] - 116:5
**advocate** [1] - 74:14
**advocated** [1] - 91:2
**aforementioned** [1] - 8:8
**afternoon** [1] - 102:11
**ago** [5] - 27:5, 60:22, 78:20, 100:9, 116:13
**agree** [17] - 16:1, 16:8, 16:25, 17:6, 17:8, 18:4, 19:10, 20:8, 24:4, 26:20, 27:3, 29:3, 58:11, 77:7, 89:4, 90:1, 94:9
**agreed** [7] - 33:19, 33:22, 33:23, 35:5, 61:19, 84:6, 91:15
**agreement** [7] - 27:23, 28:1, 28:4, 28:11, 42:18, 82:23, 82:24
**agrees** [1] - 77:10
**ahead** [2] - 70:13, 103:19
**ALBRIGHT** [15] - 1:17, 3:5, 3:8, 3:11, 3:13, 3:21, 4:1, 4:4, 4:6,

4:9, 4:12, 4:18, 5:1, 5:4, 5:11
**Albright** [7] - 24:16, 58:15, 58:17, 93:13, 100:11, 104:12, 108:9
**allegations** [2] - 7:18, 8:17
**alleged** [1] - 23:21
**alleging** [3] - 12:19, 15:1, 15:6
**allow** [1] - 12:9
**allowed** [4] - 40:4, 45:3, 66:7, 66:10
**allowing** [1] - 37:16
**almost** [3] - 81:14, 91:19, 97:15
**alternative** [3] - 11:5, 23:1, 79:15
**alternatives** [1] - 22:23
**ambulatory** [2] - 86:25, 88:24
**amended** [1] - 6:10
**American** [2] - 58:20, 103:2
**amount** [17] - 45:25, 46:5, 46:7, 47:19, 55:25, 56:5, 66:19, 68:10, 69:21, 70:15, 72:11, 74:25, 75:3, 77:3, 113:13, 114:13, 119:21
**amounts** [1] - 97:11
**analysis** [4] - 96:1, 96:4, 96:6, 96:7
**answer** [18] - 18:10, 24:9, 37:14, 37:15, 60:11, 62:17, 78:11, 81:20, 81:21, 95:25, 96:5, 102:5, 115:22, 115:23, 115:25, 118:24, 119:7, 119:20
**answered** [5] - 62:11, 81:19, 115:23, 115:25, 116:1
**answering** [1] - 59:14
**answers** [9] - 10:15, 12:8, 12:9, 12:11, 12:13, 12:14, 12:16, 59:17, 78:11
**anxiety** [2] - 79:19, 79:25
**anyplace** [2] - 22:13, 57:16
**apologize** [8] - 4:13, 5:7, 33:9, 56:13, 66:3, 74:10, 83:21, 101:13

**apparent** [1] - 84:10
**appeals** [1] - 72:6
**appear** [1] - 39:17
**APPEARANCES** [1] - 1:15
**applicable** [1] - 91:13
**applied** [8] - 14:3, 14:11, 35:16, 60:6, 76:24, 76:25, 91:11, 94:25
**applies** [5] - 59:19, 88:16, 94:21, 95:2
**apply** [6] - 14:2, 14:3, 14:8, 36:17, 47:25, 121:21
**applying** [2] - 59:20, 94:22
**appointed** [1] - 121:5
**appreciate** [2] - 92:7, 120:1
**appreciation** [1] - 35:19
**approach** [9] - 5:11, 27:17, 46:16, 51:5, 51:6, 70:4, 87:13, 95:20, 113:19
**appropriate** [4] - 21:3, 70:2, 70:14, 103:10
**April** [5] - 7:6, 7:9, 7:20, 8:15, 26:3
**arbitrate** [2] - 58:11, 66:1
**arbitration** [10] - 58:9, 58:11, 58:18, 58:19, 62:10, 63:10, 100:10, 100:13, 100:16, 100:20
**Arbitration** [1] - 58:20
**argued** [1] - 37:24
**argument** [6] - 71:17, 72:10, 72:18, 73:10, 73:19, 104:5
**argumentative** [1] - 31:1
**arguments** [7] - 27:24, 32:11, 39:8, 39:9, 46:13, 66:10, 72:22
**arises** [1] - 44:4
**arrangement** [1] - 28:2
**arrangements** [1] - 80:21
**arrow** [1] - 24:7
**art** [1] - 41:20
**asleep** [1] - 113:17
**aspect** [1] - 91:17
**asserts** [2] - 38:8, 43:24
**assess** [1] - 67:22
**assist** [1] - 23:19

**Association** [1] - 58:20
**assumed** [1] - 42:14
**assuming** [1] - 116:12
**assure** [1] - 108:12
**attached** [1] - 5:6
**attempt** [3] - 74:24, 79:13, 97:12
**attempted** [2] - 75:16, 94:3
**attempts** [1] - 77:8
**attention** [3] - 86:7, 86:9
**attentiveness** [1] - 35:20
**attitudes** [2] - 64:12, 64:16
**attorney** [15] - 19:20, 22:7, 22:12, 24:5, 24:13, 25:13, 27:8, 33:7, 61:18, 69:24, 86:5, 109:17, 112:9, 112:10
**attorney's** [1] - 79:20
**attorneys** [10] - 22:8, 32:18, 37:9, 42:19, 50:1, 69:11, 103:21, 111:1, 111:2, 111:10
**audacity** [1] - 104:2
**August** [5] - 14:25, 15:12, 30:20, 30:22
**authority** [1] - 115:6
**authorization** [5] - 18:4, 18:12, 18:17, 23:13
**authorizations** [36] - 17:3, 17:20, 17:21, 17:22, 17:23, 18:2, 18:7, 19:3, 19:21, 20:4, 23:11, 31:2, 31:15, 31:18, 52:14, 53:25, 54:1, 54:8, 54:9, 54:10, 54:14, 54:18, 54:19, 55:20, 58:2, 62:13, 63:12, 63:13, 65:22, 82:2, 98:1, 98:2, 98:9, 98:13
**automobile** [1] - 85:16
**available** [1] - 112:15
**avoid** [1] - 77:8
**avoided** [1] - 24:22
**award** [7] - 45:22, 45:24, 47:17, 63:18, 69:2, 69:21, 119:22
**awarded** [2] - 45:20, 46:7
**awarding** [1] - 68:10
**aware** [4] - 18:20, 22:7, 71:4, 96:2

# B

**baby** [1] - 106:18
**background** [1] - 45:4
**bad** [50] - 8:16, 12:19, 15:1, 15:4, 15:6, 15:10, 32:24, 43:16, 43:25, 44:7, 44:10, 44:16, 44:21, 44:25, 45:7, 45:21, 46:20, 47:8, 48:20, 51:23, 53:3, 53:4, 53:10, 62:8, 62:24, 63:9, 63:12, 63:13, 63:14, 66:2, 66:4, 69:20, 78:18, 78:21, 78:23, 79:18, 79:23, 91:3, 91:4, 97:8, 97:12, 97:15, 98:16, 98:18, 98:20, 101:25, 102:4, 119:19
**ball** [1] - 59:25
**bar** [1] - 110:17
**Barbie** [2] - 64:7, 115:21
**bargain** [1] - 51:22
**base** [2] - 17:1, 36:25
**based** [17] - 6:11, 14:18, 17:1, 17:8, 19:3, 21:4, 23:24, 38:17, 38:18, 42:13, 62:13, 73:19, 77:23, 90:13, 99:4, 99:20, 111:20
**basis** [10] - 27:9, 36:14, 44:8, 44:9, 44:11, 44:19, 47:10, 83:4, 83:8, 95:12
**Bates** [1] - 24:3
**bathroom** [2] - 70:3, 73:25
**beard** [1] - 96:12
**bearing** [2] - 41:3, 88:14
**beautiful** [2] - 50:1, 50:3
**become** [2] - 41:19, 99:6
**bed** [1] - 99:25
**BEFORE** [1] - 1:10
**began** [3] - 13:3, 18:22, 53:24
**begin** [6] - 16:25, 17:1, 32:10, 46:14, 48:23, 51:18
**beginning** [8] - 32:19, 55:1, 55:16, 60:5, 75:8, 77:12, 89:9, 108:14
**begins** [2] - 48:24,

52:22
**belief** [2] - 41:13, 95:6
**believability** [1] - 39:13
**believable** [5] - 41:6, 95:14, 97:1, 99:9, 100:8
**believes** [3] - 11:2, 37:11, 41:14
**bell** [1] - 97:20
**below** [2] - 49:5, 115:24
**belt** [22] - 13:12, 13:16, 13:23, 14:12, 14:19, 48:9, 48:10, 55:25, 56:3, 77:1, 91:12, 94:18, 94:19, 94:21, 97:24, 111:14, 111:15, 111:18, 111:20, 111:24, 111:25, 112:2
**belted** [1] - 88:13
**bench** [2] - 51:5, 74:17
**beneficial** [1] - 27:5
**benefit** [1] - 27:3
**Bernie** [10] - 8:9, 11:3, 11:4, 19:4, 56:24, 57:12, 57:13, 69:18, 119:16, 119:22
**BERNIE** [1] - 1:3
**best** [5] - 17:3, 48:19, 66:24, 78:21, 91:7
**Best** [1] - 70:22
**better** [4] - 103:4, 108:11, 111:12, 120:6
**between** [7] - 37:4, 38:12, 41:8, 44:5, 45:1, 45:8, 78:5
**beyond** [4] - 43:23, 63:4, 117:23
**bias** [2] - 35:25, 40:5
**big** [7] - 17:25, 26:4, 33:5, 54:12, 59:7, 95:9, 96:23
**bigger** [1] - 104:10
**biggest** [2] - 66:14, 66:15
**billion** [10] - 49:2, 67:20, 67:21, 75:4, 106:17, 106:19, 107:17, 107:21, 112:8
**bills** [12] - 19:7, 19:8, 19:9, 19:10, 19:12, 19:14, 81:10, 83:24, 85:19, 110:1, 114:4
**binders** [1] - 90:7,

101:3
**binding** [2] - 6:7, 42:22
**biomechanics** [1] - 90:16
**bit** [3] - 52:25, 108:11, 119:4
**bits** [1] - 50:2
**bitsy** [2] - 106:18, 110:1
**black** [1] - 88:10
**blame** [2] - 50:16, 104:22
**blames** [1] - 81:12
**blank** [4] - 17:20, 17:23, 17:24, 54:18
**bleeding** [1] - 86:24
**blow** [1] - 86:13
**body** [3] - 84:24, 84:25, 85:1
**bold** [1] - 12:11
**bone** [2] - 85:5, 85:8
**bonus** [6] - 50:20, 50:22, 55:9, 99:12, 99:16, 113:16
**bonuses** [10] - 50:9, 54:23, 58:2, 99:4, 99:10, 99:11, 99:13, 99:15, 99:23
**book** [2] - 98:22, 98:24
**bore** [1] - 82:13
**bottom** [13] - 5:2, 10:19, 50:10, 50:11, 50:13, 85:2, 85:3, 92:6, 92:9, 107:15, 116:19, 117:4
**bought** [2] - 81:22, 108:6
**bound** [1] - 36:16
**Boyanowski** [1] - 121:14
**BOYANOWSKI** [2] - 121:3, 121:17
**breached** [1] - 63:9
**break** [6] - 32:5, 34:9, 70:3, 70:5, 73:25, 85:25
**brief** [3] - 35:4, 74:2, 91:11
**briefly** [2] - 75:14, 97:24
**bring** [11] - 6:23, 26:25, 35:9, 111:25, 112:1, 115:14, 115:16, 116:5, 116:11, 116:21, 117:17
**bringing** [1] - 71:25
**brings** [1] - 91:5,

105:9
**broke** [2] - 85:11, 86:22
**broken** [5] - 80:8, 80:9, 110:4, 110:7
**brought** [1] - 93:17
**brown** [1] - 100:4
**BRYON** [1] - 1:21
**Bryon** [1] - 8:2
**bucks** [1] - 96:6
**bullet** [4] - 81:3, 81:4, 81:5, 81:6
**bump** [2] - 84:1, 106:16
**burden** [7] - 43:8, 43:12, 43:17, 43:21, 97:2, 97:5
**business** [4] - 53:10, 99:20, 99:22, 114:10
**button** [1] - 117:5
**BY** [9] - 7:3, 15:22, 18:13, 24:12, 26:19, 28:25, 29:14, 30:9, 121:16

# C

**C.O.O** [1] - 113:13
**CAMP** [1] - 1:23
**Campbell** [1] - 71:16
**cancel** [3] - 26:2, 93:13, 93:20
**canceling** [1] - 26:9
**cancelled** [2] - 25:9, 26:10
**cancelling** [3] - 26:21, 26:23, 26:24
**cancels** [1] - 25:24
**candid** [1] - 100:8
**candidly** [2] - 102:22
**cannot** [12] - 18:2, 18:4, 18:9, 40:8, 41:15, 42:24, 48:4, 101:23, 111:3, 111:25, 112:1, 112:18
**capacity** [2] - 7:16, 96:4
**caption** [1] - 104:8
**captivating** [1] - 82:5
**car** [4] - 85:11, 86:22, 89:13, 90:17
**care** [5] - 6:3, 35:2, 52:19, 64:24, 108:7
**cared** [1] - 50:13
**careful** [1] - 57:2
**carefully** [1] - 37:23
**cares** [1] - 50:12
**carpet** [1] - 107:20
**carrier** [2] - 31:3,

83:25
**case** [177] - 3:2, 6:5, 6:7, 6:8, 6:12, 6:13, 12:23, 13:7, 13:12, 13:17, 16:3, 16:10, 18:17, 22:3, 26:16, 27:13, 28:14, 28:16, 28:18, 28:22, 28:24, 29:23, 31:25, 32:1, 32:7, 32:8, 32:14, 32:15, 32:19, 33:1, 33:4, 33:5, 33:7, 33:22, 35:8, 35:12, 36:1, 36:5, 36:7, 36:16, 37:3, 37:10, 37:22, 37:25, 38:1, 38:4, 38:6, 38:15, 38:20, 39:2, 39:10, 39:11, 39:14, 39:25, 40:2, 40:4, 40:10, 41:17, 41:22, 42:5, 43:2, 43:5, 43:6, 43:13, 43:15, 43:24, 45:5, 45:9, 45:10, 45:18, 48:8, 48:12, 48:17, 48:22, 49:17, 50:7, 51:1, 51:18, 51:19, 51:20, 51:23, 52:2, 53:3, 53:4, 53:23, 54:6, 57:5, 57:7, 57:8, 58:9, 59:19, 62:9, 63:16, 64:10, 64:19, 66:4, 66:8, 66:11, 66:15, 68:23, 69:5, 71:12, 71:14, 71:16, 71:19, 71:24, 72:23, 73:2, 75:8, 75:19, 76:6, 76:24, 77:12, 77:25, 78:18, 78:24, 79:10, 79:19, 80:4, 80:14, 82:9, 82:15, 83:5, 84:2, 88:3, 88:14, 88:21, 90:1, 90:2, 91:19, 93:3, 94:2, 94:17, 95:21, 96:16, 97:3, 97:15, 99:3, 99:7, 99:23, 100:16, 100:21, 101:1, 101:18, 102:3, 102:11, 102:21, 102:23, 103:4, 103:23, 104:8, 104:9, 104:12, 104:21, 105:4, 108:11, 111:3, 112:1, 114:5, 114:6, 114:16, 115:7, 115:8, 116:1, 116:15, 117:22, 118:25, 119:1

**cases** [13] - 33:16, 33:17, 33:18, 43:7, 51:25, 71:1, 71:6, 73:1, 76:3, 78:18, 104:10, 104:13
**casino** [1] - 74:16
**casualty** [1] - 20:13
**Catalano** [17] - 6:22, 6:25, 15:23, 29:15, 59:23, 61:5, 61:7, 77:14, 79:13, 82:4, 90:13, 96:20, 98:20, 98:21, 102:12, 107:11, 114:11
**CATALANO** [1] - 2:5
**Catalano's** [3] - 96:25, 107:18, 107:24
**catastrophic** [1] - 83:18
**caught** [1] - 108:22
**caused** [2] - 6:13, 46:4, 65:18
**ceilings** [1] - 74:17
**Center** [1] - 86:18
**Central** [30] - 10:15, 13:8, 13:15, 13:22, 14:19, 15:1, 15:6, 19:15, 29:22, 31:3, 70:25, 74:13, 75:10, 75:15, 76:23, 80:9, 80:22, 80:24, 81:12, 82:24, 96:3, 99:3, 99:8, 99:15, 99:19, 101:2, 101:4, 102:8, 103:9, 119:17
**CENTRAL** [1] - 1:7
**certain** [5] - 5:21, 19:17, 19:22, 38:11, 57:23
**certainly** [7] - 79:5, 89:2, 89:5, 91:15, 93:2, 98:14, 120:2
**certainty** [1] - 38:14
**CERTIFICATE** [1] - 121:1
**certificate** [1] - 121:20
**certifies** [2] - 41:10, 41:12
**certify** [2] - 121:6, 121:10
**certifying** [1] - 121:21
**cervical** [2] - 84:20, 85:8
**chain** [1] - 38:10
**chalk** [1] - 74:14
**chambers** [1] - 120:5
**chance** [6] - 69:22, 69:24, 95:2, 100:20, 108:17, 108:18
**change** [14] - 6:11,

6:14, 6:19, 29:10,
48:14, 63:18, 63:21,
63:22, 80:5, 103:11,
104:10, 104:13,
107:16, 114:10
**changed** [14] - 29:4,
29:7, 29:8, 29:9,
49:25, 72:2, 89:7,
89:8, 89:19, 89:20,
91:19, 102:25,
104:14, 110:13
**changes** [1] - 85:24
**changing** [1] - 110:19
**character** [2] - 46:2,
65:16
**charge** [16] - 3:5, 6:11,
34:5, 34:10, 35:13,
46:12, 47:11, 55:7,
71:21, 71:22, 72:3,
117:15, 117:21,
118:1, 118:14,
118:20
**charged** [2] - 35:23,
115:4
**charity** [2] - 68:21,
68:22
**Charles** [1] - 8:2
**CHARLES** [1] - 1:21
**chart** [1] - 70:16
**charts** [3] - 80:22,
106:12, 106:13
**chase** [1] - 22:17
**cherries** [1] - 84:4
**CHILCOTE** [1] - 1:22
**child** [1] - 69:8
**children** [1] - 104:6
**choice** [4] - 56:8,
91:21, 91:22, 112:7
**choose** [3] - 21:23,
22:13, 96:10
**chose** [1] - 106:3
**circle** [1] - 78:11
**Circuit** [5] - 4:3, 4:4,
4:10, 4:11, 33:16
**circumstances** [2] -
38:10, 39:24
**circumstantial** [11] -
38:7, 38:9, 38:13,
38:14, 38:16, 54:25,
55:7, 55:9, 100:5,
100:7
**citation** [1] - 5:6
**citing** [1] - 5:2
**citizen** [1] - 103:2
**citizens** [1] - 36:2
**civil** [5] - 33:18, 34:5,
43:7, 112:1, 119:17
**civilized** [2] - 110:25,
111:1
**claim** [87] - 7:17, 8:16,

9:24, 11:13, 11:21,
13:1, 13:11, 14:5,
15:16, 16:18, 16:20,
18:24, 19:15, 20:12,
20:23, 21:5, 21:7,
23:7, 23:19, 31:5,
31:6, 31:7, 43:8,
43:16, 43:17, 43:24,
44:12, 44:17, 44:21,
44:22, 44:23, 44:24,
45:13, 45:16, 47:11,
50:10, 50:17, 50:19,
52:9, 52:16, 52:20,
55:14, 56:20, 56:21,
57:17, 62:25, 73:15,
75:9, 76:20, 76:22,
78:18, 78:20, 78:22,
78:24, 79:3, 81:13,
81:14, 82:12, 82:20,
83:4, 83:9, 83:10,
83:16, 83:17, 83:18,
85:17, 85:23, 86:3,
89:23, 91:6, 91:12,
91:14, 91:16, 92:13,
93:21, 94:16, 95:25,
96:4, 97:9, 99:13,
99:20, 112:4, 112:5,
114:4, 119:20
**claiming** [1] - 102:4
**claims** [16] - 20:14,
49:8, 50:25, 53:10,
53:11, 56:22, 59:12,
76:14, 78:4, 90:14,
94:24, 99:4, 99:10,
101:24, 106:25,
107:23
**clear** [12] - 37:25,
43:18, 43:19, 45:20,
62:23, 63:2, 63:4,
96:7, 97:3, 97:4,
119:18
**clearly** [10] - 5:23,
11:14, 33:15, 56:1,
56:10, 56:11, 56:12,
78:5, 87:5
**CLEMENS** [2] - 1:3,
1:3
**Clemens** [77] - 8:9,
11:3, 11:4, 15:14,
19:17, 20:4, 20:19,
20:22, 21:4, 21:10,
21:11, 21:14, 22:17,
29:2, 29:3, 29:5,
47:15, 48:23, 49:19,
51:25, 52:2, 53:2,
55:10, 55:19, 55:22,
56:11, 56:24, 57:12,
57:13, 57:17, 57:20,
57:23, 60:10, 63:24,
65:3, 65:20, 65:21,

65:24, 65:25, 68:4,
68:22, 69:9, 69:10,
69:12, 69:17, 69:18,
76:14, 76:18, 78:16,
78:17, 79:7, 79:18,
79:24, 80:6, 82:11,
83:19, 84:16, 86:4,
86:17, 89:5, 90:10,
90:25, 92:12, 94:6,
102:9, 104:2, 104:5,
104:16, 104:20,
104:23, 109:3,
109:5, 110:4,
114:15, 114:16,
119:16, 119:22
**Clemens'** [16] - 19:5,
47:18, 47:24, 48:12,
49:16, 79:23, 80:6,
83:17, 83:24, 84:13,
90:24, 93:4, 104:6,
108:19, 110:9,
110:13
**CLERK** [2] - 119:12,
119:15
**click** [1] - 58:15
**clicking** [1] - 58:21
**client** [13] - 7:18, 23:4,
23:16, 74:11, 78:22,
79:13, 92:17, 93:18,
97:7, 97:11, 97:12,
97:14, 101:14
**client's** [6] - 7:19,
18:24, 77:4, 93:11,
101:18, 111:3
**clients** [6] - 20:22,
26:6, 75:1, 105:25,
108:13, 111:2
**clip** [2] - 109:19,
111:15
**clips** [2] - 56:7, 75:25
**close** [4] - 14:21,
56:12, 64:3, 117:4
**closing** [10] - 32:11,
34:19, 39:8, 46:13,
47:13, 72:22,
108:23, 110:2,
110:3, 115:1
**closings** [3] - 34:12,
34:22, 51:7
**Code** [1] - 121:6
**coins** [5] - 93:15,
94:23, 98:8, 100:14,
102:2
**collect** [1] - 23:10
**collision** [2] - 86:21,
113:6
**color** [1] - 40:5
**combination** [1] -
42:16
**coming** [4] - 12:14,

57:25, 61:25, 105:10
**comment** [2] - 5:6,
87:22
**comments** [1] - 5:5
**committed** [3] - 63:15,
69:20, 97:8
**common** [1] - 39:1
**communicate** [1] -
115:9
**communications** [1] -
115:18
**community** [7] - 64:2,
64:11, 64:12, 64:13,
64:15, 64:16
**companies** [19] - 53:4,
53:8, 53:9, 53:15,
53:16, 58:6, 58:12,
59:5, 63:21, 66:23,
68:3, 71:15, 90:14,
91:1, 96:21, 96:23,
106:15, 107:4
**company** [49] - 12:19,
15:10, 37:5, 44:1,
44:7, 44:12, 44:15,
45:9, 48:5, 48:6,
49:2, 52:4, 53:11,
54:5, 54:6, 55:20,
55:21, 57:25, 60:3,
60:11, 60:16, 66:21,
67:15, 82:20, 83:4,
83:11, 85:10, 85:11,
90:22, 90:23, 90:24,
98:3, 99:1, 99:16,
99:19, 99:21,
100:24, 103:25,
106:15, 106:17,
106:19, 107:2,
107:8, 107:16,
107:17, 107:21,
109:12, 112:8,
112:14
**Company** [3] - 74:14,
82:25, 119:17
**COMPANY** [1] - 1:7
**company's** [3] -
44:17, 48:4, 52:8
**comparative** [2] -
56:4, 112:5
**compel** [3] - 10:15,
22:25, 26:2
**compelled** [2] - 15:13,
21:9
**compensate** [1] -
47:17
**compensation** [4] -
55:24, 84:5, 84:6
**compete** [1] - 112:18
**complain** [1] - 36:8
**complaint** [1] - 15:5
**complete** [5] - 17:15,

17:16, 21:19, 35:12,
93:18
**completed** [5] - 14:20,
14:21, 31:24, 46:13,
93:23
**completely** [3] -
25:19, 28:17, 28:22
**completes** [1] - 8:10
**compliance** [1] -
18:16
**complied** [2] - 22:21,
22:22
**comply** [1] - 18:18
**compression** [4] -
84:20, 85:8, 86:1
**compressions** [1] -
90:20
**comprised** [1] - 8:16
**computation** [1] -
92:10
**computer** [4] - 58:15,
58:21, 59:4, 117:1
**Conaboy** [1] - 9:14
**concede** [3] - 93:2,
99:25, 100:3
**concerned** [1] - 36:22
**concerning** [4] -
10:25, 27:23, 40:19,
118:15
**conclude** [1] - 42:6
**concluded** [4] - 28:19,
47:5, 88:12, 114:7
**conclusion** [1] - 84:17
**conclusions** [2] -
38:25, 41:17
**conclusive** [1] - 42:23
**condition** [3] - 78:22,
78:23, 90:19
**conditioned** [2] - 71:1,
71:6
**conditioning** [2] -
73:1, 73:14
**conditions** [2] - 23:6,
90:17
**conduct** [8] - 45:1,
46:6, 46:11, 64:15,
66:20, 67:4, 67:25,
68:2
**conducted** [2] - 14:10,
58:20
**confines** [1] - 71:23
**confirmation** [1] -
11:21
**confirmed** [2] - 84:19,
90:8
**conflict** [6] - 24:6,
24:8, 24:15, 24:21,
25:3, 26:5
**conflicted** [1] - 24:25
**connected** [1] - 36:7

**connotation** [2] - 3:14, 72:1
**conscience** [1] - 64:13
**conscious** [1] - 44:13
**consciousness** [7] - 86:23, 88:8, 89:9, 89:10, 89:12, 89:14, 89:16
**consequences** [4] - 36:7, 47:21, 48:16
**consider** [30] - 4:20, 5:24, 26:13, 36:2, 36:21, 39:3, 39:16, 39:19, 39:21, 40:1, 41:24, 42:4, 44:16, 45:1, 46:1, 55:12, 62:6, 65:10, 65:11, 65:15, 65:16, 66:18, 92:25, 95:6, 95:19, 96:10, 96:15, 101:11, 105:5
**consideration** [2] - 28:24, 44:3
**considered** [8] - 27:15, 37:3, 38:3, 40:25, 88:3, 91:16, 111:14, 111:15
**considering** [4] - 36:12, 66:17, 117:15, 118:14
**consisted** [1] - 99:7
**consistent** [8] - 14:1, 75:25, 83:9, 83:23, 89:15, 94:8, 110:9, 113:5
**constitutes** [1] - 42:18
**constrained** [1] - 26:2
**consulted** [1] - 86:4
**consumed** [1] - 80:20
**cont'd** [1] - 7:2
**contemplate** [1] - 89:18
**contempt** [1] - 71:18
**contents** [1] - 41:2
**contingency** [1] - 33:1
**contingent** [1] - 27:9
**continually** [2] - 65:22, 109:22
**continuation** [1] - 10:10
**continue** [6] - 17:2, 47:13, 53:5, 68:23, 88:5, 119:9
**continued** [2] - 7:12, 76:23
**continuing** [1] - 95:13
**contract** [2] - 44:6, 54:22
**contradicted** [1] -

39:24
**contradictory** [2] - 40:11, 42:21
**control** [2] - 117:2, 121:21
**contusion** [5] - 83:24, 108:19, 108:24, 109:25, 110:1
**convenience** [1] - 93:11
**conversation** [1] - 120:5
**conversations** [2] - 32:15, 70:6
**converted** [1] - 70:22
**conviction** [1] - 42:10
**convince** [1] - 89:21
**convinced** [1] - 43:20
**convincing** [9] - 43:18, 45:21, 62:23, 63:3, 63:5, 97:4, 119:19
**cooperate** [1] - 75:17
**cooperating** [1] - 45:15
**copiers** [1] - 18:1
**copies** [3] - 6:3, 18:2, 33:21
**cops** [1] - 51:16
**copy** [10] - 4:14, 18:12, 33:20, 34:5, 35:11, 47:7, 72:7, 76:9, 118:20
**cordial** [1] - 103:21
**corner** [1] - 74:6
**corporation** [5] - 51:1, 60:25, 65:3, 65:5
**corporations** [3] - 37:7, 55:17, 55:18
**correct** [51] - 8:14, 8:19, 9:10, 9:20, 9:21, 9:25, 10:20, 12:5, 12:19, 13:1, 13:4, 13:5, 14:3, 16:4, 16:6, 17:4, 17:9, 17:10, 17:12, 17:13, 17:15, 17:20, 18:23, 18:25, 19:4, 19:5, 19:8, 19:11, 20:14, 20:19, 21:1, 21:20, 21:25, 22:19, 23:23, 25:10, 26:21, 26:22, 27:1, 27:6, 27:9, 27:12, 29:17, 30:2, 32:3, 41:14, 121:7
**correctly** [2] - 65:15, 91:20
**correctness** [2] -

39:13, 39:14
**correspondence** [2] - 82:3, 104:12
**corroborated** [1] - 39:23
**corroborations** [1] - 40:6
**cost** [1] - 101:9
**counsel** [8] - 8:5, 23:23, 28:13, 28:20, 30:11, 32:11, 37:11, 37:17, 37:24, 39:9, 46:12, 57:3, 70:19, 70:25, 72:22, 73:19, 115:15, 117:16, 118:13
**counsel's** [1] - 39:7
**country** [1] - 103:3
**counts** [1] - 113:18
**couple** [1] - 70:9
**couples** [1] - 94:5
**courage** [1] - 47:17
**course** [10] - 10:18, 16:16, 22:20, 39:3, 54:5, 72:9, 74:11, 92:13, 95:20, 115:8
**Court** [41] - 3:2, 6:13, 8:18, 9:13, 9:18, 10:4, 10:6, 11:2, 11:7, 11:25, 15:15, 21:9, 22:4, 22:8, 32:21, 36:13, 36:17, 37:1, 37:12, 37:17, 47:14, 47:22, 47:23, 60:8, 65:13, 70:17, 71:14, 72:4, 75:20, 87:20, 111:6, 115:18, 115:21, 116:3, 118:1, 119:15, 121:3, 121:4, 121:15, 121:17, 121:18
**court** [13] - 9:14, 22:15, 24:15, 37:8, 47:22, 77:20, 100:24, 101:19, 101:21, 102:4, 112:1, 115:13
**COURT** [90] - 1:1, 3:1, 3:7, 3:10, 3:12, 3:20, 3:24, 4:3, 4:5, 4:8, 4:11, 4:15, 4:25, 5:2, 5:8, 5:12, 5:17, 6:17, 6:19, 6:22, 6:25, 15:19, 18:10, 24:9, 26:12, 26:18, 27:11, 27:17, 27:22, 28:7, 28:17, 28:20, 29:12, 30:7, 31:21, 31:23, 32:1, 32:3, 32:5,

32:18, 32:25, 33:8, 33:10, 34:3, 34:9, 34:16, 34:18, 35:5, 35:11, 46:17, 46:23, 46:25, 47:6, 51:6, 51:9, 57:1, 66:7, 70:1, 70:5, 70:13, 71:8, 71:20, 72:21, 73:2, 73:9, 73:12, 73:16, 73:18, 73:25, 87:4, 87:6, 87:8, 87:14, 87:17, 87:24, 88:2, 88:6, 88:9, 88:13, 101:8, 103:12, 103:14, 103:18, 105:3, 113:24, 114:1, 114:25, 117:11, 118:4, 120:1
**Court's** [4] - 10:13, 12:5, 39:7, 81:2
**courthouse** [4] - 64:5, 69:15, 74:15, 103:6
**COURTROOM** [1] - 1:11
**courtroom** [19] - 6:24, 32:17, 35:10, 50:2, 68:17, 70:10, 74:25, 75:23, 93:17, 95:14, 102:7, 103:5, 103:6, 103:19, 109:1, 115:14, 115:16, 118:3
**courtrooms** [1] - 102:18
**courts** [3] - 22:24, 111:5, 111:8
**cover** [2] - 11:23, 75:7
**crazy** [2] - 109:5
**creating** [1] - 108:9
**credibility** [12] - 37:20, 39:11, 39:12, 39:14, 39:15, 40:17, 40:23, 41:1, 60:18, 61:21, 93:1, 105:17
**credible** [2] - 38:17, 97:2
**credit** [7] - 66:2, 66:4, 70:21, 79:18, 79:23, 80:25, 106:22
**criminal** [2] - 33:16, 33:17
**criteria** [1] - 71:10
**criticizing** [1] - 91:24
**cross** [4] - 15:19, 75:2, 92:3, 95:21
**CROSS** [2] - 2:4, 15:21
**cross-examine** [2] - 15:19, 75:2

**CRR** [2] - 121:14, 121:17
**current** [1] - 80:7
**custodial** [2] - 99:11, 99:12
**customers** [1] - 51:1
**cuts** [1] - 85:22

**D**

**daily** [1] - 91:19
**damage** [1] - 53:13
**damages** [20] - 14:24, 45:17, 45:18, 45:19, 45:22, 45:24, 45:25, 46:7, 46:10, 53:20, 63:16, 63:18, 65:10, 66:14, 66:16, 71:10, 92:10, 92:13, 112:14, 119:22
**damn** [2] - 110:15, 110:18
**dance** [2] - 108:6
**dangerous** [15] - 55:17, 55:18, 55:19, 55:20, 55:22, 57:18, 59:7, 59:9, 59:12, 60:12, 60:13, 112:13
**date** [26] - 7:8, 13:24, 24:15, 24:24, 25:5, 25:9, 25:13, 25:19, 25:20, 25:22, 29:20, 47:16, 75:19, 85:2, 85:3, 85:4, 89:3, 92:8, 93:14, 93:19, 116:2, 117:25, 119:7, 121:9
**DATE** [1] - 1:13
**dated** [8] - 9:13, 19:17, 89:1, 117:12, 117:20, 118:8, 118:12, 119:23
**dates** [10] - 24:18, 24:19, 24:23, 26:15, 75:18, 77:14, 85:3, 93:6, 93:11, 121:9
**days** [24] - 15:14, 15:17, 16:9, 16:21, 22:16, 29:4, 29:9, 54:19, 64:23, 74:23, 75:9, 75:22, 75:24, 76:2, 80:20, 81:13, 81:14, 85:5, 94:17, 100:22, 112:25, 113:1
**deal** [3] - 54:12, 59:7, 63:24
**dealing** [3] - 44:2, 45:10, 47:18
**dealt** [2] - 37:8, 54:6

**death** [1] - 110:22
**dec** [3] - 60:8, 113:10, 113:11
**December** [4] - 77:1, 92:8, 92:9, 92:12
**decide** [9] - 14:8, 40:8, 40:9, 40:16, 45:23, 76:12, 76:13, 105:20, 110:24
**decided** [2] - 66:1, 104:11
**decides** [1] - 97:20
**deciding** [4] - 44:15, 63:16, 64:10, 64:17
**decision** [12] - 14:6, 32:14, 32:15, 60:5, 64:1, 64:19, 68:12, 102:10, 102:14, 102:17, 112:22
**deductions** [1] - 38:25
**defeat** [1] - 112:17
**defend** [2] - 101:3, 101:5
**DEFENDANT** [1] - 2:4
**defendant** [17] - 10:15, 34:12, 36:4, 44:18, 44:22, 44:25, 45:11, 45:21, 45:23, 46:4, 46:5, 46:8, 46:11, 53:22, 65:18, 66:18, 119:19
**Defendant** [1] - 1:20
**defendant's** [8] - 8:10, 45:1, 46:2, 46:11, 64:15, 64:16, 65:11, 65:16
**defendants** [3] - 21:22, 31:24, 62:24
**defending** [2] - 74:11, 103:3
**defense** [24] - 3:2, 13:13, 13:16, 13:23, 14:12, 14:19, 23:22, 48:10, 55:21, 55:25, 56:3, 56:4, 56:5, 69:23, 77:1, 82:9, 91:12, 94:18, 94:19, 94:21, 111:18, 111:22, 111:24, 111:25
**defenses** [1] - 58:3
**deference** [1] - 85:1
**definition** [1] - 3:17
**degeneration** [1] - 109:15
**degenerative** [3] - 90:15, 90:17, 90:21
**degree** [1] - 38:13
**dehydration** [1] - 90:15

**delay** [6] - 27:1, 28:13, 28:14, 28:16, 33:7, 102:6
**delayed** [1] - 57:17
**delaying** [1] - 81:12
**deliberate** [6] - 44:13, 82:21, 83:7, 116:15, 117:10, 119:9
**deliberations** [7] - 32:13, 46:15, 70:7, 76:12, 92:16, 115:5, 115:9
**deliver** [3] - 80:12, 97:16
**demand** [7] - 20:15, 29:22, 51:3, 58:11, 58:18, 58:19, 100:14
**demanded** [1] - 23:13
**demands** [1] - 22:21
**denies** [2] - 86:22, 88:22
**dense** [1] - 48:9
**department** [1] - 99:4
**deposition** [14] - 16:1, 16:19, 24:14, 24:24, 29:2, 29:16, 56:9, 75:25, 93:5, 93:13, 93:16, 93:21, 95:18, 111:23
**depositions** [4] - 7:19, 26:2, 52:13, 104:25
**derogatory** [1] - 5:19
**describe** [2] - 85:16, 117:17
**describes** [1] - 43:10
**description** [2] - 85:20
**descriptions** [1] - 101:24
**deserve** [1] - 114:14
**deserves** [5] - 40:18, 40:23, 41:7, 42:6, 56:2
**desiccation** [2] - 90:12, 90:15
**designation** [1] - 3:18
**despite** [6] - 49:1, 61:6, 78:11, 83:15, 83:16, 83:17
**deter** [7] - 46:6, 46:11, 66:20, 67:3, 67:25, 68:2, 112:15
**determination** [3] - 60:9, 88:17, 115:20
**determine** [4] - 39:12, 50:6, 63:11, 69:19
**determined** [3] - 14:3, 14:11, 75:20
**determining** [4] - 39:3, 39:15, 44:24, 45:7

**deterred** [1] - 66:21
**develop** [2] - 13:10, 23:7
**diagnosis** [3] - 83:24, 84:19, 90:8
**diagnostic** [1] - 84:24
**diamond** [1] - 77:16
**diamonds** [1] - 77:14
**Dickey** [1] - 8:2
**DICKIE** [1] - 1:22
**dictated** [1] - 85:3
**difference** [6] - 16:10, 27:22, 33:5, 41:8, 67:9, 116:25
**different** [17] - 5:23, 5:24, 6:2, 18:6, 25:19, 31:5, 33:17, 40:6, 43:16, 71:24, 72:1, 85:17, 88:15, 90:14, 99:16
**differentiate** [1] - 55:8
**differently** [1] - 114:13
**difficult** [5] - 48:12, 91:23, 112:7, 112:8
**DIRECT** [2] - 2:4, 7:2
**direct** [13] - 30:5, 38:7, 38:12, 38:14, 38:16, 43:19, 54:24, 55:7, 55:11, 71:13, 97:6, 121:21
**directed** [1] - 8:1
**directly** [3] - 28:12, 33:6, 34:12
**disagree** [2] - 94:21, 95:1
**disclosure** [1] - 92:10
**disclosures** [1] - 92:1
**discontinued** [6] - 48:10, 91:14, 91:15, 91:18, 111:18, 111:22
**discovery** [20] - 7:12, 7:15, 8:7, 8:19, 8:25, 9:16, 11:10, 11:17, 11:24, 12:7, 12:16, 14:24, 15:15, 20:15, 20:17, 22:1, 22:20, 22:21, 22:24, 25:25
**discredited** [2] - 40:11, 40:16
**discs** [2] - 56:11, 109:10
**discuss** [6] - 80:19, 82:21, 97:24, 102:9, 115:15, 116:15
**discussed** [9] - 4:23, 16:16, 18:6, 32:21, 42:2, 73:23, 88:15, 97:24, 105:4
**discussing** [1] - 80:18

**discussion** [10] - 27:19, 28:19, 46:18, 47:5, 73:19, 87:15, 88:12, 113:21, 114:1, 114:7
**discussions** [4] - 30:10, 32:8, 32:15, 70:6
**disgusting** [3] - 104:14, 104:15, 104:17
**disk** [2] - 90:11, 90:19
**disobedience** [1] - 71:13
**dispositive** [1] - 119:7
**dispute** [3] - 20:17, 77:6, 77:7
**disputed** [1] - 42:25
**disputes** [1] - 111:1
**disputing** [1] - 45:12
**disregard** [4] - 28:23, 37:13, 44:13, 57:6
**disregards** [1] - 44:9
**distance** [1] - 79:8
**distinction** [2] - 21:16, 38:12
**distress** [1] - 84:10
**district** [2] - 95:23, 112:22
**DISTRICT** [2] - 1:1, 1:1
**District** [7] - 47:22, 119:15, 119:16, 121:4, 121:18, 121:18
**distrust** [1] - 40:20
**Doc** [1] - 109:4
**doctor** [9] - 84:8, 84:9, 84:10, 85:7, 89:13, 109:4, 109:6, 109:7
**doctors** [1] - 110:9
**document** [5] - 11:12, 18:3, 22:6, 86:17, 92:9
**documentation** [4] - 11:5, 23:15, 75:19, 79:6
**documented** [1] - 83:10
**documents** [24] - 8:11, 8:22, 9:6, 9:9, 9:19, 10:5, 20:24, 22:16, 23:2, 34:18, 75:13, 75:15, 79:6, 81:24, 81:25, 82:7, 83:13, 88:19, 92:21, 97:16, 105:12, 108:7, 108:10, 110:8
**dollar** [11] - 49:2, 52:23, 52:24, 67:3, 67:7, 107:17,

**107:21, 112:8
**dollars** [9] - 56:24, 66:25, 67:5, 67:7, 67:9, 67:21, 75:4, 106:17, 106:19
**donated** [1] - 71:2
**done** [15] - 51:6, 51:10, 53:22, 57:16, 58:22, 63:25, 74:21, 77:11, 84:12, 85:7, 96:8, 100:10, 100:17, 100:18, 116:12
**door** [2] - 116:3, 116:11
**dots** [3] - 105:10, 105:18
**doubt** [5] - 43:23, 58:22, 63:3, 63:4
**down** [13] - 12:12, 22:17, 31:23, 34:25, 88:11, 89:10, 89:22, 95:12, 105:10, 107:19, 107:22, 115:21, 117:3
**drafting** [1] - 4:7
**drags** [1] - 100:23
**draw** [3] - 37:13, 38:23, 39:1
**drawn** [1] - 38:23
**dreaming** [1] - 108:25
**dreamt** [1] - 113:17
**drinking** [1] - 110:17
**drive** [3] - 56:12, 56:16, 102:12
**driver** [2] - 87:19, 87:21
**drug** [1] - 50:25
**due** [2] - 85:1, 110:10
**during** [19] - 13:8, 29:16, 34:19, 35:20, 38:1, 39:8, 63:1, 72:22, 76:14, 76:21, 78:3, 91:7, 91:11, 92:2, 103:23, 106:24, 106:25, 108:23, 115:8
**duty** [14] - 35:23, 35:24, 35:25, 36:2, 36:13, 36:16, 37:9, 40:7, 44:4, 45:10, 51:1, 74:21, 103:2, 115:2
**Dvoracek** [20] - 14:10, 49:12, 49:13, 50:16, 56:2, 57:21, 59:24, 61:7, 78:4, 78:6, 91:5, 94:20, 98:24, 104:16, 107:25, 109:16, 110:21

**Dvoracek's** [1] - 50:23

## E

**e-mail** [1] - 69:4
**early** [3] - 9:13, 49:17, 91:7
**earned** [1] - 81:23
**earning** [1] - 96:4
**earnings** [5] - 7:16, 94:15, 94:16, 112:25, 113:1
**earns** [1] - 107:12
**easel** [3] - 34:14, 34:17, 34:19
**easily** [1] - 23:18
**easy** [2] - 52:16, 96:9
**education** [2] - 41:19, 95:13
**effect** [2] - 37:19, 37:21
**eight** [7] - 20:9, 64:4, 65:7, 74:4, 111:10, 112:21
**either** [7] - 22:24, 38:12, 72:7, 83:2, 84:20, 102:20, 115:15
**elaboration** [3] - 117:14, 118:13, 118:22
**elements** [1] - 53:7
**elevated** [1] - 74:17
**elsewhere** [1] - 80:16
**emergency** [6] - 86:12, 86:19, 87:11, 88:24, 89:11, 110:5
**Emergency** [1] - 86:18
**employees** [4] - 50:10, 50:13, 59:10, 59:11
**employer** [1] - 19:5
**employment** [1] - 7:7
**enclose** [1] - 8:7
**enclosed** [1] - 8:8
**end** [8] - 12:23, 35:8, 50:17, 51:20, 54:18, 57:3, 76:7, 88:16
**ended** [1] - 30:4
**enforce** [2] - 50:24, 51:17
**enforced** [1] - 111:7
**enforcers** [1] - 51:16
**enjoy** [1] - 97:17
**ensues** [1] - 21:23
**ensuing** [1] - 6:13
**ensure** [1] - 93:11
**entered** [3] - 6:24, 35:10, 118:3
**enthralling** [1] - 86:8
**entire** [1] - 10:11

**entirely** [2] - 39:12, 42:6
**entirety** [2] - 81:6, 95:6
**entities** [1] - 112:16
**entitled** [8] - 37:5, 45:24, 92:24, 93:1, 96:15, 96:18, 96:23, 96:24
**entity** [1] - 103:24
**envelope** [3] - 115:12, 116:2, 116:10
**envy** [3] - 91:21, 91:24, 91:25
**epitome** [1] - 112:19
**equal** [3] - 37:4, 37:7, 115:8
**equalizer** [1] - 53:14
**equals** [3] - 37:8, 52:25, 114:21
**equation** [1] - 107:9
**escape** [1] - 53:23
**especially** [5] - 57:14, 84:10, 91:7, 103:16, 105:10
**ESQ** [3] - 1:17, 1:17, 1:21
**essence** [4] - 56:19, 60:3, 64:13, 69:12
**essentially** [2] - 82:8, 95:10
**establish** [1] - 11:3
**established** [3] - 39:2, 62:23, 119:18
**establishing** [1] - 44:20
**evaluate** [3] - 13:10, 23:7, 82:11
**evaluation** [4] - 16:11, 21:19, 23:19, 41:1
**evening** [2] - 99:25, 102:11
**events** [2] - 10:18, 93:9
**eventually** [1] - 69:9
**Evidence** [1] - 5:4
**evidence** [114] - 3:6, 3:15, 26:14, 26:16, 27:13, 32:6, 36:3, 36:12, 36:18, 37:11, 37:16, 37:19, 37:21, 37:23, 38:4, 38:5, 38:7, 38:8, 38:9, 38:13, 38:14, 38:15, 38:18, 39:2, 39:5, 39:10, 40:12, 40:24, 41:2, 41:4, 41:16, 42:5, 42:18, 42:21, 42:24, 43:9, 43:10, 43:14, 43:18, 43:19,

45:21, 53:1, 54:23, 54:24, 55:1, 55:6, 55:8, 55:9, 55:11, 57:4, 57:7, 59:15, 62:23, 63:3, 66:8, 66:9, 66:11, 69:1, 70:17, 70:23, 71:4, 71:5, 71:11, 72:22, 73:2, 76:4, 76:20, 76:24, 77:21, 77:24, 78:19, 79:3, 79:17, 79:22, 79:24, 79:25, 80:2, 80:4, 80:5, 80:6, 80:8, 87:8, 87:9, 87:16, 87:25, 89:2, 89:7, 90:5, 90:12, 90:18, 97:4, 97:6, 97:15, 99:3, 100:7, 100:8, 101:8, 101:12, 102:20, 105:4, 105:6, 105:19, 111:19, 114:19, 118:25, 119:19
**exact** [1] - 13:24
**exactly** [5] - 5:12, 17:5, 35:16, 88:21, 118:17
**exaggerated** [1] - 56:13
**examination** [12] - 24:19, 25:23, 26:6, 77:4, 77:9, 79:13, 81:11, 92:3, 93:16, 93:18, 93:23, 95:21
**EXAMINATION** [3] - 7:2, 15:21, 29:13
**examinations** [1] - 82:3
**examine** [3] - 15:19, 75:2, 89:18
**examiners** [2] - 16:25, 17:1
**examining** [1] - 26:2
**example** [1] - 90:9
**exams** [1] - 108:3
**exception** [4] - 10:16, 10:20, 10:25, 41:18
**excerpt** [1] - 87:11
**excluded** [1] - 88:18
**exclusive** [1] - 40:16
**excuse** [9] - 93:15, 93:20, 93:24, 94:24, 95:25, 98:8, 98:11, 100:15, 100:19
**exhibit** [38] - 7:8, 7:20, 9:1, 9:5, 9:7, 9:12, 11:22, 24:3, 25:12, 70:17, 72:4, 75:7, 76:17, 81:4, 82:12,

83:13, 84:7, 84:21, 84:23, 85:14, 86:5, 86:6, 86:11, 86:14, 87:12, 87:24, 88:9, 92:1, 93:7, 93:12, 93:25, 109:2, 116:23, 117:3, 117:5, 117:6
**Exhibit** [2] - 115:21, 118:1
**exhibits** [18] - 33:21, 33:23, 34:3, 34:8, 35:5, 38:18, 39:4, 55:12, 59:17, 72:4, 72:5, 72:6, 83:5, 83:8, 93:3, 116:16, 116:20, 116:22
**existed** [1] - 80:16
**existence** [2] - 38:11
**exists** [1] - 80:15
**expect** [4] - 31:8, 36:9, 92:16
**expected** [2] - 35:25, 92:22
**expecting** [1] - 65:1
**expenses** [8] - 9:23, 27:23, 27:25, 67:14, 107:6, 107:7, 107:14
**experience** [9] - 41:19, 50:4, 50:6, 55:23, 55:24, 68:25, 90:13, 96:21, 96:22
**experienced** [3] - 11:4, 79:18, 79:23
**expert** [23] - 3:6, 3:14, 5:21, 41:18, 41:19, 42:4, 42:12, 42:14, 51:3, 51:14, 54:11, 58:1, 58:4, 60:8, 61:22, 62:2, 62:5, 62:14, 96:13, 96:17, 96:18, 99:9
**expert's** [1] - 42:15
**experts** [2] - 33:17, 33:18
**explain** [3] - 35:6, 66:25, 79:16
**explanation** [1] - 117:23
**expresses** [1] - 42:11
**expressly** [1] - 37:18
**extend** [1] - 35:18
**extended** [2] - 16:17, 16:20
**extent** [4] - 46:3, 65:17, 66:15, 85:13
**extremely** [1] - 76:7
**extricated** [2] - 86:25, 88:23
**eyewitness** [1] - 38:9

## F

**face** [4] - 67:2, 86:24, 88:23, 96:12
**facilities** [1] - 34:10
**fact** [21] - 18:21, 18:22, 22:23, 29:21, 38:9, 41:4, 41:10, 42:17, 43:14, 43:20, 45:18, 62:13, 64:6, 69:3, 69:18, 73:4, 78:19, 78:20, 96:12, 106:12, 116:15
**factor** [3] - 66:15, 77:1, 107:14
**factors** [4] - 4:23, 42:2, 46:2, 65:10
**facts** [22] - 26:12, 36:15, 36:17, 38:6, 38:10, 38:11, 38:21, 38:22, 38:24, 39:1, 41:3, 42:13, 42:14, 42:19, 42:24, 43:1, 43:22, 48:19, 48:21, 51:18, 96:10, 96:11
**factual** [3] - 37:25, 41:8, 41:9
**failed** [3] - 80:11, 80:12, 98:21
**failure** [1] - 98:19
**fair** [17] - 13:6, 20:25, 36:6, 36:9, 36:11, 37:6, 44:2, 45:10, 69:2, 84:23, 92:19, 105:18, 105:19, 105:20, 106:11
**fairly** [1] - 36:3
**fairness** [3] - 10:20, 10:23, 84:21
**faith** [49] - 8:16, 12:19, 15:1, 15:5, 15:6, 15:10, 32:24, 43:16, 43:25, 44:2, 44:7, 44:10, 44:16, 44:21, 44:25, 45:7, 45:8, 45:10, 45:14, 45:21, 46:20, 47:8, 51:23, 53:3, 53:4, 62:8, 62:24, 63:10, 63:12, 63:13, 63:15, 69:20, 78:18, 78:21, 78:23, 91:3, 91:5, 97:8, 97:12, 97:15, 98:16, 98:18, 98:20, 102:1, 102:5, 119:19
**faithful** [1] - 44:3
**false** [7] - 60:19, 60:20, 60:24, 95:4, 95:10
**falsely** [1] - 40:19

**family** [19] - 50:18, 50:22, 53:2, 55:23, 64:18, 65:20, 65:21, 65:25, 66:4, 69:17, 76:15, 76:19, 79:18, 79:23, 79:24, 80:24, 83:24
**fancy** [1] - 69:12
**far** [9] - 3:17, 49:5, 72:2, 79:14, 94:25, 98:9, 98:11, 100:16, 102:23
**Farm** [1] - 71:16
**fashion** [1] - 82:1
**fault** [9] - 18:24, 19:15, 20:12, 27:1, 31:3, 31:5, 31:7, 50:23, 102:8
**favor** [2] - 43:11, 68:20
**favorable** [1] - 112:11
**fear** [1] - 68:19
**federal** [11] - 4:1, 4:13, 4:25, 18:15, 47:22, 69:15, 69:23, 74:14, 95:23, 103:6
**Federal** [2] - 5:4, 5:8
**fee** [5] - 27:9, 27:23, 28:4, 33:1, 81:16
**fees** [5] - 28:20, 32:19, 79:20, 101:14
**fell** [1] - 113:17
**felt** [1] - 103:1
**fence** [1] - 72:16
**ferret** [2] - 38:20, 48:18
**ferreting** [1] - 48:22
**few** [7] - 15:25, 17:25, 32:9, 39:8, 100:9, 103:8, 120:7
**field** [11] - 47:24, 53:15, 60:10, 65:4, 91:2, 110:25, 111:4, 111:5, 111:7, 111:13, 112:20
**figure** [4] - 68:15, 104:12, 113:4, 118:24
**figured** [1] - 108:22
**figures** [2] - 75:3, 76:8
**file** [6] - 17:9, 17:11, 22:25, 31:8, 71:18, 94:5
**filed** [13] - 8:16, 8:23, 14:25, 15:5, 21:25, 30:20, 31:6, 60:8, 69:5, 69:15, 94:6, 102:1
**files** [1] - 80:23
**final** [2] - 101:18,

116:16
**finally** [7] - 8:12, 12:10, 15:14, 29:4, 58:10, 71:13, 94:15
**findings** [1] - 110:9
**fine** [3] - 5:15, 20:2, 33:25
**finish** [1] - 117:3
**FIRE** [1] - 1:7
**Fire** [1] - 119:17
**FIRM** [1] - 1:18
**Firm** [1] - 24:2
**firm** [6] - 8:1, 8:2, 17:25, 21:20, 27:21, 58:14
**firmer** [1] - 117:1
**first** [33] - 3:9, 4:16, 7:10, 8:4, 10:12, 12:17, 34:22, 44:22, 47:20, 47:23, 51:19, 52:22, 53:3, 53:23, 56:7, 62:16, 62:17, 62:22, 65:11, 72:3, 74:9, 79:17, 83:25, 85:18, 85:20, 89:3, 95:7, 98:25, 109:17, 115:2, 115:23
**fitting** [1] - 89:24
**five** [17] - 20:9, 49:20, 56:13, 63:2, 64:23, 70:3, 70:5, 74:23, 89:9, 104:2, 108:4, 108:5, 111:16, 113:1
**five-day** [1] - 63:2
**five-minute** [2] - 70:3, 70:5
**fix** [1] - 45:25
**fixing** [2] - 46:5, 66:19
**flag** [1] - 110:21
**flags** [2] - 85:15, 110:21
**focus** [2] - 50:2, 105:6
**follow** [8] - 36:16, 48:5, 48:15, 58:8, 98:20, 112:12, 112:14, 115:24
**followed** [2] - 55:5, 98:10
**following** [10] - 27:19, 36:12, 46:2, 46:18, 55:4, 87:15, 98:17, 113:21, 119:11
**font** [1] - 12:13
**footnote** [1] - 10:19
**footprints** [1] - 55:3, 55:4, 55:5
**FOR** [2] - 1:1, 2:4
**force** [1] - 22:25
**forced** [1] - 101:4
**forcing** [1] - 103:25

**foregoing** [3] - 121:7, 121:10, 121:20
**forehead** [2] - 86:24, 88:23
**foreman** [3] - 62:18, 116:2, 117:12
**foreperson** [11] - 115:3, 115:4, 115:6, 115:7, 115:11, 116:9, 117:20, 118:8, 118:12, 119:8, 119:23
**forever** [1] - 92:3
**form** [16] - 28:22, 34:6, 62:20, 62:21, 68:21, 85:23, 86:3, 87:10, 103:2, 115:10, 116:8, 117:19, 117:24, 118:7, 118:11, 119:6
**formalities** [1] - 8:18
**forming** [1] - 32:8
**forms** [7] - 11:4, 23:16, 85:17, 98:4, 98:5, 98:6, 101:25
**forth** [4] - 13:6, 45:15, 63:14, 121:9
**fortitude** [1] - 75:1
**forward** [5] - 7:18, 22:24, 66:13, 88:4, 115:21
**four** [25] - 4:8, 15:17, 16:9, 16:21, 20:9, 27:5, 27:6, 29:4, 29:9, 72:14, 74:23, 75:9, 75:21, 75:22, 75:24, 76:2, 80:20, 81:6, 81:13, 94:17, 99:8, 106:14, 113:1, 113:7
**four-day** [1] - 75:21
**fourth** [1] - 73:21
**fracture** [10] - 84:20, 85:8, 85:9, 85:24, 85:25, 86:1, 86:3, 90:9, 110:10
**fractured** [1] - 84:9
**fractures** [2] - 84:18, 84:22
**frame** [4] - 11:3, 13:2, 23:25, 44:20
**frank** [1] - 39:18
**free** [3] - 27:22, 35:21, 95:5
**Friday** [1] - 106:4
**FRIDAY** [1] - 1:13
**front** [5] - 26:25, 32:22, 75:18, 105:16, 108:17
**full** [4] - 3:23, 84:24,

84:25, 85:1
**fully** [3] - 37:24, 47:17, 68:10
**fundamental** [1] - 38:19
**funny** [2] - 109:11, 109:15
**furthermore** [1] - 37:25
**future** [7] - 46:7, 66:20, 67:4, 67:25, 68:2, 118:10, 120:6

**G**

**gambling** [1] - 74:22
**game** [6] - 59:1, 59:2, 59:4, 60:7, 112:12, 112:13
**general** [4] - 42:12, 43:4, 47:21, 73:17
**generally** [2] - 22:21, 81:4
**generation** [1] - 109:16
**gentleman** [2] - 28:9, 109:20
**gentlemen** [12] - 32:6, 47:15, 74:3, 80:1, 85:15, 86:15, 89:15, 99:2, 100:22, 114:15, 115:1, 119:12
**ghosts** [1] - 97:23
**giant** [2] - 77:20, 112:18
**given** [22] - 29:1, 35:14, 36:17, 37:1, 37:21, 38:12, 39:13, 40:10, 42:7, 43:1, 47:12, 72:19, 78:12, 84:1, 92:24, 101:24, 117:13, 117:22, 118:16, 118:17, 118:19, 119:3
**glad** [1] - 7:18
**governs** [2] - 39:7, 82:15
**graduated** [1] - 74:7
**grand** [2] - 84:1, 96:15
**grandfather** [1] - 69:10
**gravy** [1] - 84:2
**gray** [1] - 96:12
**great** [4] - 35:21, 41:8, 60:14, 83:15
**greater** [2] - 38:13, 50:14
**grievance** [1] - 76:4
**ground** [3] - 100:1,

100:2, 100:6
**guarantee** [1] - 111:6
**guess** [1] - 61:21
**guideline** [1] - 98:17
**guidelines** [1] - 98:15
**gumption** [1] - 75:3
**guy** [7] - 54:6, 55:4, 60:24, 107:17, 107:22, 109:20
**guys** [1] - 113:16

**H**

**ha-ha** [1] - 59:2, 59:4
**Haddick** [14] - 8:2, 47:15, 69:7, 70:1, 103:15, 103:16, 103:20, 103:25, 104:1, 109:12, 109:21, 110:11, 110:12, 111:11
**HADDICK** [27] - 1:21, 51:5, 51:8, 51:11, 66:3, 70:2, 70:11, 70:14, 71:9, 72:19, 72:25, 73:13, 73:17, 73:24, 74:1, 74:3, 87:3, 87:9, 87:11, 87:22, 88:7, 88:19, 101:13, 103:17, 103:20, 105:2, 114:3
**half** [2] - 34:11, 56:16
**Halloween** [1] - 97:21
**hand** [3] - 64:7, 115:13, 116:19
**handle** [5] - 84:3, 93:24, 95:2, 104:3, 104:10
**handling** [5] - 44:11, 47:11, 62:24, 97:8, 119:20
**hands** [2] - 37:6, 65:9
**hard** [2] - 91:21, 117:2
**hardly** [1] - 77:17
**harm** [4] - 46:3, 65:17, 71:11, 71:12
**hay** [1] - 94:3
**head** [4] - 35:16, 83:11, 85:22, 86:21
**health** [1] - 99:17
**hear** [13] - 32:11, 54:2, 54:25, 61:12, 61:15, 69:11, 75:2, 76:19, 80:3, 99:18, 109:16, 114:22
**heard** [37] - 8:17, 9:13, 13:12, 14:1, 27:24, 32:6, 32:7, 45:2, 54:6, 54:23, 54:24, 57:19, 57:21, 58:1,

58:17, 60:13, 60:20, 60:23, 62:8, 63:5, 63:8, 68:17, 80:3, 80:5, 80:6, 80:8, 80:17, 95:8, 102:24, 105:1, 105:19, 106:22, 106:23, 106:24, 107:22, 107:24, 119:1

**hearing** [4] - 39:8, 53:18, 108:3, 108:4

**heightened** [3] - 3:3, 6:5, 44:4

**hello** [1] - 114:8

**help** [7] - 11:12, 22:9, 23:6, 23:19, 82:11, 95:25, 113:25

**helped** [2] - 49:14, 49:16

**helpful** [1] - 81:17

**hereby** [1] - 121:6

**herein** [1] - 8:8

**hereinbefore** [1] - 121:9

**herniated** [2] - 56:11, 109:10

**herniations** [3] - 90:11, 90:20, 109:14

**heros** [1] - 104:24

**hesitation** [5] - 43:20, 97:7, 97:11, 97:13

**hide** [1] - 91:12

**hiding** [1] - 105:13

**high** [1] - 36:2

**higher** [2] - 43:17, 53:25

**higher-ups** [1] - 53:25

**highest** [1] - 103:2

**highlight** [6] - 7:8, 7:10, 9:2, 84:14, 84:17, 87:3

**HILL** [1] - 1:23

**himself** [4] - 57:25, 76:18, 89:6, 95:12

**HIPAA** [1] - 18:15

**hired** [3] - 22:8, 57:14, 112:9

**history** [10] - 80:24, 81:18, 84:13, 84:14, 84:24, 86:17, 94:15, 95:24, 96:3, 101:25

**hit** [1] - 86:22

**hold** [6] - 24:9, 24:24, 74:13, 87:24, 101:9

**holding** [1] - 37:4

**home** [2] - 69:4, 102:12

**honest** [12] - 35:3, 36:6, 36:11, 39:18, 42:10, 49:10, 61:2,

61:14, 61:23, 91:3, 97:1, 99:8

**honestly** [4] - 36:3, 97:10, 98:24, 99:14

**Honor** [48] - 3:6, 3:8, 3:11, 3:14, 3:21, 4:2, 4:4, 4:6, 4:13, 4:14, 5:5, 5:7, 5:11, 6:21, 15:20, 26:11, 27:10, 27:16, 28:5, 28:14, 29:11, 30:6, 31:20, 31:22, 32:2, 32:4, 32:23, 33:3, 33:5, 33:23, 34:8, 46:16, 46:19, 47:3, 51:5, 60:19, 66:3, 66:6, 66:13, 73:4, 87:1, 87:13, 87:18, 101:6, 103:13, 103:17, 105:2, 113:19

**honor** [2] - 36:14, 48:3

**HONORABLE** [1] - 1:10

**hoop** [5] - 21:6, 30:13, 30:15, 31:1, 52:3

**hoops** [4] - 21:9, 30:14, 57:18, 82:16

**hope** [6] - 48:20, 68:18, 108:10, 108:15, 108:16, 109:7

**hopefully** [1] - 81:15

**hopes** [1] - 76:1

**hoping** [1] - 74:22

**hospital** [3] - 83:19, 83:23, 86:18

**hospitals** [1] - 18:6

**hour** [9] - 34:11, 56:13, 56:14, 56:16, 83:20, 89:14, 102:12, 116:12, 116:14

**hours** [2] - 56:15, 88:25

**housekeeping** [3] - 32:12, 35:7, 46:14

**hovering** [1] - 103:17

**hundred** [10] - 17:25, 50:5, 50:20, 66:25, 67:5, 67:7, 67:9, 75:4, 99:20, 99:22

**hurt** [4] - 76:15, 82:17, 82:18, 84:16

**hypothetically** [1] - 42:14

**I**

**idea** [1] - 83:15

**identical** [1] - 33:14

**identified** [1] - 14:16

**identifies** [1] - 13:9

**identify** [1] - 5:23

**ignore** [1] - 96:14

**ignored** [2] - 81:8, 81:9

**illustrate** [1] - 38:2

**imagine** [2] - 18:1, 35:1

**immediately** [3] - 109:13, 114:12

**impact** [1] - 16:15

**impartial** [2] - 36:6, 36:10

**impartially** [1] - 36:3

**impeached** [2] - 40:11, 40:15

**impermissible** [1] - 71:17

**imply** [1] - 45:19

**importance** [2] - 38:3, 82:7

**important** [12] - 35:14, 41:6, 63:16, 68:2, 69:16, 74:18, 93:20, 95:20, 102:13, 106:23, 110:19, 115:5

**imposed** [1] - 36:2

**imposes** [1] - 45:10

**improper** [3] - 18:12, 28:23, 70:18

**IN** [1] - 1:1

**inaccurate** [1] - 42:10

**inadmissible** [1] - 28:18

**inapplicable** [3] - 55:21, 55:25, 58:3

**inappropriate** [2] - 28:7, 33:8

**incentive** [2] - 50:9, 99:17

**incentives** [2] - 99:15, 99:17

**incident** [1] - 18:22

**include** [1] - 85:21

**included** [3] - 9:23, 35:17, 91:8

**including** [7] - 7:13, 7:15, 8:16, 37:7, 44:17, 80:23, 93:2

**income** [4] - 7:7, 7:16, 94:7, 94:11

**inconsistencies** [1] - 40:6

**inconsistent** [3] - 40:13, 40:24, 101:24

**incorporate** [1] - 26:16

**incorrect** [1] - 27:12

**incorrectly** [1] - 59:12

**increased** [1] - 16:23

**incredibly** [1] - 91:21

**indeed** [1] - 24:23

**INDEX** [1] - 2:2

**indicate** [3] - 37:18, 72:13, 115:19

**indicated** [2] - 6:6, 93:8

**indicating** [3] - 38:3, 86:3, 99:3

**indication** [1] - 13:7

**indifference** [2] - 44:13, 98:19

**individual** [1] - 37:6

**industries** [2] - 104:10, 104:13

**industry** [23] - 28:10, 48:5, 49:6, 51:2, 54:11, 58:5, 58:9, 58:17, 59:16, 60:4, 60:12, 61:24, 62:1, 62:6, 62:7, 62:14, 63:9, 93:6, 98:23, 104:14, 112:23

**inevitable** [1] - 97:19

**inference** [2] - 37:13, 106:14

**inferences** [2] - 38:23, 38:25

**information** [49] - 4:22, 7:7, 7:15, 7:17, 7:21, 8:9, 8:13, 9:24, 11:1, 11:12, 11:15, 12:1, 12:4, 13:10, 14:15, 14:22, 14:23, 15:8, 15:9, 15:11, 16:5, 16:9, 16:11, 16:13, 16:14, 16:15, 17:9, 17:11, 17:14, 19:5, 21:2, 21:10, 21:14, 21:19, 22:18, 23:7, 29:10, 30:21, 33:11, 42:1, 45:3, 82:10, 91:9, 94:7, 97:13, 102:3, 102:7, 109:10

**initial** [2] - 14:9, 92:1

**injured** [2] - 76:15, 76:18

**injuries** [6] - 69:13, 83:18, 84:7, 85:16, 85:21, 108:19

**injury** [1] - 85:13, 85:23, 92:17, 101:24

**injustice** [4] - 68:9, 68:11, 68:13, 68:14

**inside** [2] - 70:8, 115:13

**insofar** [2] - 46:5,

66:19

**instance** [1] - 16:15

**instead** [6] - 22:16, 22:17, 23:12, 67:24, 95:24, 106:1

**instruct** [1] - 12:22, 54:25, 66:17

**instructed** [6] - 33:10, 47:23, 53:20, 60:19, 61:11, 90:4

**instructing** [1] - 45:18

**instruction** [12] - 3:16, 3:19, 3:22, 4:14, 4:19, 33:13, 36:20, 61:8, 65:2, 90:6, 95:3, 95:11

**instructions** [24] - 3:25, 4:2, 4:13, 4:23, 6:14, 32:10, 32:12, 33:16, 35:7, 36:16, 36:21, 37:2, 38:2, 42:3, 43:4, 46:14, 47:7, 47:12, 65:14, 83:3, 97:14, 115:1, 115:24, 117:13

**Instructions** [2] - 5:9, 6:9

**instruments** [1] - 35:21

**insult** [4] - 75:5, 75:6, 81:1

**insulting** [1] - 104:25

**insurance** [82] - 20:18, 25:23, 26:8, 43:25, 44:1, 44:6, 44:7, 44:12, 44:15, 44:24, 45:9, 45:13, 45:15, 47:15, 47:24, 48:4, 48:24, 49:3, 50:8, 51:4, 51:12, 52:4, 52:8, 53:2, 53:4, 53:8, 54:8, 54:22, 55:19, 55:21, 56:22, 57:11, 57:25, 58:6, 58:19, 59:5, 60:3, 60:11, 60:16, 63:21, 65:19, 65:23, 66:21, 66:23, 68:3, 71:15, 82:15, 82:20, 82:23, 83:4, 83:11, 85:10, 85:11, 90:22, 90:23, 90:24, 91:1, 96:21, 97:9, 98:3, 98:23, 99:21, 100:24, 104:20, 105:8, 105:24, 106:2, 107:2, 107:4, 108:13, 109:11, 109:20, 110:11, 110:12, 110:20,

112:14, 112:23, 114:23
**INSURANCE** [1] - 1:7
**Insurance** [3] - 74:13, 82:25, 119:17
**insured** [11] - 44:2, 44:3, 44:6, 44:14, 44:16, 50:15, 52:10, 57:9, 59:15, 113:11
**insured's** [2] - 44:12, 47:11
**insureds** [13] - 21:7, 51:2, 52:8, 55:19, 59:5, 60:11, 62:11, 66:22, 66:23, 67:17, 70:24, 112:24, 114:13
**insurer** [4] - 44:5, 44:10, 45:23, 47:9
**integrity** [1] - 41:13
**intelligence** [2] - 75:6, 95:15
**intend** [6] - 65:19, 65:21, 65:23, 65:25, 66:1, 71:18
**intended** [6] - 46:4, 65:18, 66:2, 66:5, 66:16, 90:3
**intent** [1] - 86:3
**interest** [6] - 32:20, 40:1, 40:3, 40:4, 44:3, 44:4
**interested** [1] - 36:8
**interests** [8] - 21:4, 48:4, 50:14, 90:25, 91:1
**interfere** [1] - 90:6
**Internal** [1] - 94:11
**interrogatories** [4] - 8:22, 9:2, 9:8, 10:14
**interrupt** [2] - 57:3, 87:16
**intricacies** [1] - 91:25
**introduced** [1] - 37:17
**investigate** [1] - 82:20
**investigation** [7] - 14:9, 14:20, 44:17, 45:16, 91:8, 91:17
**investigator** [1] - 57:14
**investigators** [1] - 111:20
**involved** [2] - 48:6, 104:9
**Ipad** [1] - 117:1
**irrelevant** [1] - 28:18
**issue** [20] - 20:25, 22:5, 26:4, 28:16, 41:3, 43:22, 46:19, 48:23, 53:13, 62:10,

63:11, 63:15, 67:12, 83:3, 88:15, 97:25, 106:25, 111:21, 112:6, 113:19
**issued** [1] - 37:25
**issues** [5] - 62:3, 62:9, 63:7, 63:14, 115:19
**item** [2] - 71:10, 95:5
**itself** [4] - 3:17, 35:13, 101:3, 101:5
**itsy** [2] - 106:18, 110:1

## J

**JERS** [2] - 109:9, 116:17
**Jim** [5] - 10:11, 78:4, 91:5, 94:19
**job** [10] - 38:19, 45:25, 53:6, 59:14, 80:12, 91:6, 91:24, 102:13, 103:7, 110:12
**Joe** [10] - 7:4, 7:9, 10:12, 15:18, 68:5, 96:20, 102:12, 109:19, 109:23, 114:11
**joint** [5] - 20:18, 23:13, 94:4, 94:8, 94:10
**jointly** [2] - 94:5, 94:6
**JOSEPH** [1] - 2:5
**journey** [1] - 52:21
**JR** [2] - 1:17, 1:21
**judge** [22] - 12:21, 15:13, 22:14, 42:24, 48:17, 53:19, 54:25, 61:11, 62:17, 64:6, 64:8, 64:9, 65:2, 66:17, 74:17, 77:23, 83:2, 90:4, 91:24, 92:25, 95:23, 97:3
**Judge** [5] - 9:14, 73:13, 87:12, 102:24, 103:1
**judge's** [3] - 11:20, 91:24, 94:9
**judges** [4] - 36:15, 37:20, 38:22, 91:22
**judicial** [2] - 42:25, 43:1, 79:10
**jump** [2] - 52:4, 108:21
**jumped** [1] - 31:1
**June** [25] - 7:24, 8:12, 9:14, 9:18, 10:4, 11:23, 12:21, 12:24, 13:3, 13:15, 13:18, 16:2, 29:1, 29:16, 29:21, 44:21, 44:23,

45:1, 45:2, 45:8, 94:16, 96:5
**juries** [1] - 74:9
**juror** [1] - 115:7
**jurors** [6] - 34:4, 36:15, 36:25, 37:20, 51:16, 111:9
**jurors'** [1] - 76:6
**jury** [57] - 3:22, 3:25, 5:23, 6:23, 6:24, 12:22, 26:25, 28:21, 32:6, 32:17, 32:22, 33:11, 33:13, 33:16, 33:24, 35:10, 35:19, 35:21, 36:5, 37:12, 38:19, 39:1, 39:21, 43:4, 46:9, 61:8, 62:16, 62:18, 64:5, 64:13, 70:10, 70:15, 72:21, 82:22, 92:16, 95:3, 95:11, 103:1, 103:10, 105:16, 108:17, 114:9, 115:2, 115:13, 115:18, 116:2, 116:8, 117:10, 117:11, 117:12, 118:3, 118:4, 118:6, 119:9, 119:11, 119:23
**Jury** [2] - 5:8, 6:9
**JURY** [3] - 1:12, 119:14, 119:25
**jury's** [2] - 38:17, 114:2
**justice** [8] - 35:24, 36:4, 36:14, 37:8, 68:8, 68:10, 74:21, 112:15
**justify** [1] - 81:15

## K

**Kaster** [19] - 8:2, 17:18, 24:13, 24:18, 24:19, 24:22, 25:6, 25:9, 25:13, 75:13, 77:14, 77:17, 82:4, 82:6, 92:3, 93:7, 98:22, 103:15, 109:21
**KASTER** [17] - 1:21, 5:15, 6:16, 6:18, 7:3, 15:18, 26:11, 27:10, 29:14, 30:6, 30:9, 31:20, 31:24, 33:23, 34:2, 35:2, 47:2
**Kaster's** [1] - 79:12
**keep** [4] - 72:5, 72:6, 72:10, 90:25

**keeps** [1] - 72:4
**kept** [3] - 76:13, 80:23, 114:5
**kick** [1] - 6:2
**kid** [2] - 56:18, 69:8
**kidding** [1] - 104:4
**kids** [1] - 56:18
**kind** [10] - 12:13, 28:24, 34:20, 55:1, 59:1, 59:2, 59:24, 69:25, 72:15, 72:17
**Kirsch** [3] - 19:16, 20:3, 22:9
**Kirsch's** [1] - 19:20
**knees** [1] - 56:18
**knit** [1] - 47:4
**knock** [2] - 116:3, 116:10
**knocked** [1] - 67:6
**knowing** [1] - 103:24
**knowingly** [6] - 40:18, 44:10, 44:18, 46:20, 47:9, 47:10
**knowledge** [3] - 33:12, 38:8, 42:15
**known** [2] - 43:24, 92:3
**knows** [9] - 44:8, 50:5, 50:20, 62:4, 69:10, 79:21, 96:20, 99:23, 112:24

## L

**lack** [2] - 44:9, 90:4
**ladies** [12] - 32:5, 47:15, 74:3, 79:25, 85:15, 86:15, 89:14, 99:2, 100:21, 114:15, 115:1, 119:12
**laid** [1] - 60:9
**language** [3] - 3:3, 4:19, 6:4
**large** [5] - 74:17, 97:10, 102:17, 116:17, 116:21
**last** [6] - 26:7, 71:20, 74:23, 80:20, 88:21, 97:22
**late** [2] - 94:2
**LAURA** [2] - 121:3, 121:17
**Laura** [1] - 121:14
**Law** [1] - 24:2
**LAW** [1] - 1:18
**law** [55] - 8:1, 8:2, 14:3, 14:11, 32:7, 32:11, 35:16, 36:9, 36:12, 36:17, 36:21,

36:23, 36:24, 37:1, 37:7, 38:11, 39:15, 43:6, 43:7, 44:1, 45:22, 46:12, 50:2, 55:8, 58:14, 59:18, 59:19, 60:6, 61:17, 61:19, 61:20, 64:21, 64:22, 72:1, 73:21, 74:7, 76:23, 76:25, 88:16, 91:11, 91:23, 94:22, 94:25, 95:1, 98:14, 111:23, 111:24, 111:25, 112:7, 117:22, 118:16, 118:19, 119:3
**lawn** [1] - 100:5
**laws** [2] - 51:17, 91:21
**lawsuit** [9] - 8:16, 8:23, 9:19, 12:18, 14:25, 15:5, 30:18, 30:20
**lawyer** [6] - 58:18, 74:5, 74:24, 82:11, 89:6, 95:13
**lawyer's** [1] - 89:24
**lawyers** [6] - 17:25, 50:3, 92:12, 93:4, 101:5, 101:9
**lay** [1] - 96:18
**learn** [1] - 58:12
**least** [8] - 48:13, 51:12, 60:5, 64:6, 65:24, 81:11, 89:7, 113:8
**leave** [10] - 5:25, 6:6, 34:5, 39:1, 75:15, 88:5, 88:9, 101:19, 116:14, 120:3
**leaving** [1] - 35:2
**LEE** [1] - 1:17
**left** [9] - 7:6, 32:17, 67:14, 70:10, 86:13, 86:17, 86:24, 117:10, 119:9
**left-had** [1] - 86:13
**legal** [4] - 43:8, 95:13, 101:14, 114:4
**legally** [1] - 96:17
**legalzoom.com** [1] - 98:14
**lengthy** [1] - 48:18
**less** [7] - 50:10, 50:16, 50:25, 51:3, 55:10, 112:4, 112:5
**lesser** [2] - 112:17
**lesson** [1] - 58:13
**letter** [28] - 7:6, 7:9, 7:11, 7:22, 7:24, 8:1, 8:5, 11:23, 17:18,

17:19, 19:4, 19:16, 19:20, 23:24, 24:1, 24:5, 24:13, 24:16, 24:22, 25:2, 25:20, 25:21, 26:8, 26:20, 26:25, 31:14, 58:25, 98:3

**letters** [15] - 11:10, 11:14, 11:15, 13:6, 18:23, 53:24, 54:13, 57:20, 78:9, 78:12, 78:14, 97:17, 97:18, 105:22

**level** [9] - 47:24, 65:3, 91:1, 110:25, 111:4, 111:5, 111:7, 111:13, 112:18

**leveling** [1] - 112:19

**lever** [1] - 100:20

**leverage** [11] - 60:13, 60:15, 60:16, 60:18, 65:7, 67:11, 70:20, 70:21, 70:24, 72:19

**liar** [2] - 110:15, 110:18

**Liberty** [1] - 65:24

**lied** [2] - 69:13

**lieu** [1] - 23:1

**life** [4] - 37:5, 59:2, 80:5, 91:11

**light** [1] - 23:5

**lights** [1] - 97:20

**likely** [1] - 43:15

**limit** [1] - 30:14

**limited** [1] - 85:21

**limits** [4] - 29:23, 29:25, 113:9, 113:11

**line** [10] - 26:9, 50:10, 50:11, 50:12, 50:13, 54:2, 54:6, 60:24, 107:15, 113:16

**lines** [5] - 71:2, 88:21, 89:10, 95:21, 96:1

**list** [1] - 20:3

**listed** [1] - 4:9

**listen** [1] - 101:17

**listening** [1] - 100:12

**litigation** [4] - 19:13, 21:23, 22:2, 22:3

**live** [4] - 102:10, 102:14, 102:16, 110:25

**lived** [4] - 55:23, 55:24, 79:9, 114:15

**lives** [2] - 75:22, 80:20

**living** [1] - 80:21

**locations** [1] - 79:16

**logically** [1] - 38:23

**look** [25] - 4:16, 25:20, 25:21, 35:13, 50:6,

---

55:3, 62:21, 65:12, 68:3, 68:14, 69:17, 83:8, 83:12, 88:18, 88:19, 94:16, 100:2, 101:3, 104:8, 105:13, 105:23, 106:13, 108:7, 113:6, 117:9

**looked** [5] - 11:10, 11:15, 11:17, 85:7, 91:11

**looking** [12] - 9:16, 11:21, 19:16, 19:19, 19:25, 60:25, 73:9, 73:11, 73:13, 84:4, 86:12, 109:24

**lord** [1] - 114:11

**lose** [6] - 65:6, 65:7, 79:21, 89:12, 89:16, 113:4

**loss** [22] - 7:16, 9:24, 11:3, 11:13, 11:21, 16:5, 20:23, 21:2, 21:5, 21:10, 21:14, 21:18, 23:15, 50:19, 83:25, 85:20, 86:23, 88:7, 89:9, 89:10, 94:16, 96:4

**lost** [6] - 20:20, 23:17, 89:14, 112:24, 112:25

**Lotus** [1] - 80:23

**love** [1] - 60:14

**lunch** [1] - 116:13

**lying** [1] - 105:1

---

## M

**M.R.I** [1] - 109:9

**M.R.I.s** [3] - 90:10, 109:8

**machine** [15] - 74:15, 74:23, 74:25, 75:17, 80:17, 84:3, 92:4, 93:14, 93:24, 94:23, 97:21, 98:7, 104:3, 104:19, 108:10

**machines** [3] - 100:15, 102:2, 103:7

**mail** [1] - 69:4

**major** [1] - 106:25

**MALACHY** [1] - 1:10

**man** [7] - 85:10, 91:6, 94:24, 95:15, 96:20, 100:22

**manner** [2] - 39:16, 111:1

**MANNION** [1] - 1:10

**Mannion** [2] - 102:24, 103:1

---

**mapped** [1] - 108:14

**March** [5] - 12:17, 24:1, 89:4, 89:6, 89:12

**mark** [1] - 118:1

**marked** [2] - 70:16, 109:2

**married** [2] - 94:5

**MARSHA** [1] - 1:17

**marvelous** [1] - 77:19

**material** [3] - 40:19, 41:22, 120:4

**materials** [1] - 88:20

**matter** [15] - 8:8, 14:2, 28:8, 32:18, 40:19, 41:21, 47:25, 52:2, 84:4, 96:13, 96:14, 96:25, 107:11, 112:21, 116:16

**MCCAMEY** [1] - 1:22

**McCamey** [1] - 8:3

**mean** [5] - 43:22, 47:3, 48:2, 65:18, 88:1

**meaning** [1] - 79:7

**meaningful** [3] - 7:14, 64:23, 64:25

**meaningless** [2] - 77:13

**means** [19] - 23:17, 43:14, 43:19, 49:16, 61:13, 62:5, 65:5, 65:6, 67:13, 68:10, 68:11, 95:4, 103:7, 103:8, 110:16, 114:10, 118:15, 121:21

**meant** [5] - 5:22, 74:20

**meantime** [3] - 6:20, 7:14, 70:3

**medical** [16] - 9:23, 17:15, 17:16, 17:17, 18:2, 18:12, 18:23, 52:12, 81:9, 81:10, 82:1, 83:24, 85:19, 90:19, 110:1, 111:20

**medicals** [1] - 17:2

**medicine** [1] - 90:16

**meetings** [1] - 107:17

**members** [5] - 35:19, 36:5, 38:19, 39:21, 115:2

**men** [1] - 103:16

**mention** [1] - 103:25

**mentioned** [5] - 103:22, 109:14, 114:3, 121:8

**menu** [2] - 116:19, 117:4

**merely** [2] - 28:11,

---

38:2

**merits** [1] - 80:23

**mess** [3] - 68:4, 68:5

**message** [7] - 52:17, 53:17, 68:6, 68:16, 71:15, 114:9, 114:22

**messing** [1] - 114:23

**MICHAEL** [1] - 1:17

**Middle** [3] - 119:16, 121:4, 121:18

**MIDDLE** [1] - 1:1

**middle** [3] - 86:20, 89:8, 112:22

**might** [8] - 52:18, 76:2, 85:6, 103:10, 108:2, 111:11

**Mike** [4] - 47:16, 80:1, 82:25, 103:10

**miles** [2] - 79:10, 89:13

**million** [10] - 51:13, 52:20, 52:21, 52:22, 52:24, 66:24, 67:17, 72:14, 72:15, 107:5

**mind** [7] - 34:14, 79:1, 80:15, 83:6, 99:7, 102:9, 114:2

**minds** [2] - 90:4, 101:16

**minute** [6] - 26:8, 34:23, 70:3, 70:5, 78:2, 101:20

**minutes** [11] - 32:9, 34:9, 34:11, 34:20, 39:9, 56:14, 70:9, 83:20, 83:23, 120:7

**mirrors** [1] - 76:8

**misrepresent** [2] - 69:19, 110:14

**misrepresentation** [1] - 110:14

**misrepresented** [4] - 52:11, 69:12, 70:20, 70:23

**misrepresenting** [1] - 110:17

**missed** [1] - 113:1

**misses** [1] - 100:22

**mistake** [2] - 108:22, 116:12

**mistaken** [1] - 41:16

**mistakes** [3] - 91:3, 91:4

**misunderstood** [1] - 70:19

**misuse** [1] - 72:19

**misused** [1] - 70:19

**model** [1] - 33:16

**modifier** [1] - 5:20

**moment** [3] - 78:7,

---

79:16, 86:14

**moments** [2] - 100:9, 103:8

**Monday** [4] - 48:6, 102:24, 106:3, 110:22

**money** [26] - 48:1, 48:2, 49:24, 50:18, 52:1, 52:19, 52:25, 55:11, 57:24, 65:5, 67:10, 68:11, 70:16, 70:18, 76:16, 76:19, 78:24, 79:21, 82:17, 107:1, 107:2, 107:12, 108:16, 113:9, 113:13, 114:13

**monitors** [2] - 77:16, 80:4

**month** [2] - 26:5, 107:24

**months** [2] - 89:16, 101:25

**morning** [11] - 7:4, 7:5, 15:23, 15:24, 48:7, 75:14, 99:24, 100:2, 100:4, 102:15, 110:22

**Morris** [3] - 71:16, 71:23, 71:25

**most** [6] - 6:12, 43:7, 49:10, 64:4, 100:8, 104:25, 105:15

**mother** [1] - 74:3

**motion** [3] - 22:25, 26:1, 71:18

**motive** [1] - 28:15, 49:19

**motorist** [3] - 13:1, 62:25, 119:20

**move** [7] - 7:18, 22:24, 28:8, 28:18, 63:11, 66:13, 88:4

**moving** [2] - 48:8, 86:16

**MR** [99] - 5:15, 6:16, 6:18, 6:21, 7:3, 15:18, 15:20, 15:22, 18:13, 24:12, 26:11, 26:17, 26:19, 27:10, 27:16, 27:18, 27:20, 28:5, 28:9, 28:25, 29:11, 29:14, 30:4, 30:6, 30:9, 31:20, 31:22, 31:24, 32:2, 32:4, 32:23, 33:3, 33:9, 33:23, 33:25, 34:2, 34:8, 34:14, 34:17, 34:25, 35:2, 46:16, 46:19, 46:24,

47:2, 47:3, 47:14, 51:5, 51:8, 51:11, 51:12, 57:9, 66:3, 66:5, 66:13, 70:2, 70:11, 70:14, 71:9, 72:19, 72:25, 73:4, 73:11, 73:13, 73:17, 73:23, 73:24, 74:1, 74:3, 87:1, 87:3, 87:5, 87:7, 87:9, 87:10, 87:11, 87:13, 87:16, 87:18, 87:22, 87:23, 88:1, 88:4, 88:7, 88:11, 88:19, 101:6, 101:13, 103:13, 103:15, 103:17, 103:20, 105:2, 105:8, 113:22, 113:25, 114:3, 114:5, 114:8

**MS** [14] - 3:5, 3:8, 3:11, 3:13, 3:21, 4:1, 4:4, 4:6, 4:9, 4:12, 4:18, 5:1, 5:4, 5:11

**mull** [1] - 119:4

**multiple** [2] - 84:22, 86:23

**must** [27] - 11:4, 16:25, 17:1, 23:6, 36:21, 37:12, 38:17, 39:3, 39:14, 40:8, 42:25, 43:1, 43:11, 43:16, 43:17, 43:22, 44:1, 44:19, 46:7, 47:16, 48:5, 55:12, 65:11, 77:23, 108:22, 111:5, 116:7

**Mutual** [1] - 70:25, 75:15, 76:23, 80:10, 82:24, 99:3, 99:8, 99:19, 101:2, 101:4, 119:17

**MUTUAL** [1] - 1:7

**mutual** [5] - 67:15, 100:23, 106:15, 106:17, 106:18

**Mutual's** [4] - 19:15, 80:22, 80:25, 102:8

**mystery** [1] - 101:1

## N

**name** [5] - 47:15, 49:13, 103:22, 104:1

**names** [3] - 52:12, 80:21, 111:2

**nasal** [5] - 83:24, 84:18, 108:19, 108:24, 109:25

**nationally** [1] - 62:2

**nature** [6] - 44:6, 46:3, 65:17, 72:15, 85:13, 105:1

**neat** [1] - 105:11

**necessarily** [4] - 41:5, 81:16, 82:5, 83:6

**necessary** [2] - 13:10, 115:16

**neck** [9] - 84:8, 84:25, 85:22, 85:25, 86:3, 110:4, 110:7

**need** [18] - 10:23, 16:9, 24:3, 34:23, 51:18, 52:1, 53:4, 59:3, 73:25, 102:2, 115:9, 116:1, 116:20, 117:1, 117:14, 118:4, 118:13, 118:22

**needed** [3] - 14:22, 19:7, 112:25

**needless** [1] - 35:20

**needs** [4] - 76:16, 76:19, 98:8, 104:14

**negative** [1] - 84:18

**negligence** [3] - 56:4, 56:5, 112:5

**negotiation** [1] - 17:1

**negotiations** [1] - 17:1

**net** [4] - 67:19, 67:22, 67:24, 72:11

**never** [19] - 22:12, 23:20, 29:4, 29:24, 30:25, 61:3, 61:5, 62:11, 64:19, 84:19, 94:17, 94:20, 104:8, 104:9, 107:21, 107:23, 111:22, 115:18

**New** [42] - 10:15, 13:7, 13:15, 13:22, 14:18, 15:1, 15:6, 19:15, 29:22, 31:3, 56:16, 59:19, 59:22, 59:24, 60:1, 65:24, 70:25, 74:13, 75:10, 75:15, 76:23, 76:25, 79:14, 80:9, 80:22, 80:24, 81:12, 82:24, 96:3, 99:3, 99:8, 99:15, 99:19, 101:2, 101:4, 102:8, 103:9, 111:23, 112:3, 114:22, 119:16

**NEW** [1] - 1:7

**new** [3] - 6:2, 33:20

**next** [19] - 10:9, 10:10, 11:22, 12:3, 12:10, 24:10, 25:5, 25:13, 25:23, 63:11, 63:15,

69:24, 81:9, 83:20, 86:5, 96:1, 100:12, 111:15, 116:18

**nice** [3] - 60:15, 60:17

**NICOLE** [1] - 1:3

**night** [9] - 83:19, 84:12, 84:15, 86:19, 88:22, 89:5, 89:11, 89:15, 100:1

**nine** [3] - 6:13, 20:9, 85:5

**NO** [1] - 1:11

**no-fault** [5] - 19:15, 20:12, 31:3, 31:5, 31:7

**nobody** [1] - 109:18

**non** [1] - 38:11

**non-existence** [1] - 38:11

**none** [4] - 18:20, 80:25, 92:25

**normal** [5] - 8:25, 12:13, 22:20, 50:4, 85:8

**normally** [2] - 41:16, 69:22

**NORTH** [1] - 1:23

**Northeast** [1] - 19:12

**nose** [8] - 84:1, 84:13, 84:16, 85:22, 86:25, 106:16, 110:4, 110:6

**note** [6] - 61:5, 87:12, 88:18, 97:2, 100:19, 117:11, 118:4, 118:6

**noted** [3] - 89:9, 89:10, 110:10

**notes** [10] - 17:15, 20:14, 56:1, 61:6, 86:13, 86:20, 110:20, 111:16, 111:17, 120:3

**Notes** [1] - 80:23

**nothing** [14] - 29:7, 29:8, 29:9, 29:11, 39:18, 49:25, 57:5, 58:16, 65:5, 65:6, 76:8, 85:9, 86:9, 111:3

**notice** [4] - 42:25, 43:1, 85:6, 86:3

**notified** [1] - 44:22

**NOVEMBER** [1] - 1:13

**November** [2] - 9:19, 12:17

**nowhere** [2] - 73:8, 85:22

**nullity** [2] - 59:1, 59:3

**number** [6] - 41:5, 62:9, 67:20, 68:1, 107:16, 107:22

**numbered** [1] - 121:9

**numbers** [1] - 68:15

**numbing** [1] - 79:1

**numerically** [1] - 115:19

**numerous** [3] - 13:9, 14:16, 30:23

**NYCM** [54] - 16:2, 18:21, 19:10, 20:5, 20:18, 22:18, 23:12, 25:22, 26:8, 26:9, 26:20, 29:2, 47:14, 47:24, 48:24, 50:8, 50:9, 50:11, 50:12, 51:3, 51:12, 51:19, 53:2, 53:25, 54:8, 54:13, 54:18, 56:22, 57:11, 57:17, 57:22, 58:25, 65:19, 65:22, 68:3, 68:16, 69:20, 78:11, 78:16, 78:17, 104:20, 105:8, 105:24, 106:2, 106:22, 108:13, 109:20, 110:11, 110:12, 113:14, 114:22

**NYCM's** [3] - 50:23, 51:20, 106:22

## O

**O'Malley** [2] - 5:4, 5:8

**O.'s** [1] - 99:11

**oath** [22] - 7:1, 23:21, 24:20, 25:10, 25:23, 26:6, 36:25, 56:10, 57:10, 57:11, 57:13, 58:3, 62:12, 77:5, 77:9, 79:8, 79:14, 81:11, 82:3, 93:16, 93:18, 93:23

**object** [7] - 37:10, 46:23, 46:25, 70:24, 71:7, 71:9, 101:6

**objected** [2] - 73:5, 73:7

**objection** [17] - 4:15, 5:14, 6:16, 26:11, 27:10, 30:8, 37:12, 37:17, 47:1, 51:8, 51:10, 57:2, 70:19, 73:18, 87:4, 101:10

**objections** [3] - 6:3, 70:12, 71:19

**obligated** [1] - 82:25

**obligation** [2] - 89:20, 89:22

**obligations** [1] - 45:15

**observe** [1] - 39:22

**obstacle** [1] - 52:3

**obstruct** [1] - 102:6

**obtain** [1] - 82:22

**obviously** [4] - 10:16, 27:7, 31:11, 62:25

**occasions** [1] - 60:23

**occur** [1] - 43:4

**occurred** [1] - 17:5

**occurs** [3] - 44:10, 47:8, 119:1

**odd** [2] - 93:19

**odontoid** [1] - 85:24

**OF** [1] - 1:1

**offended** [2] - 74:10, 74:12

**offer** [9] - 16:2, 16:12, 16:16, 16:20, 29:4, 29:16, 29:18, 73:1, 119:2

**offered** [3] - 42:17, 49:24, 56:5

**offering** [1] - 29:3

**offers** [3] - 16:17, 17:8, 37:10

**office** [9] - 7:6, 17:20, 23:19, 93:11, 96:2, 98:14, 104:13, 108:9, 108:12

**officer** [3] - 22:15, 115:13, 116:3

**officers** [1] - 54:5

**official** [1] - 84:19

**Official** [3] - 1:3, 121:15, 121:17

**old** [1] - 33:21

**once** [8] - 8:23, 21:23, 64:3, 70:12, 84:19, 115:25, 116:8, 118:25

**one** [71] - 8:23, 10:15, 10:20, 17:3, 17:12, 22:23, 22:25, 23:17, 24:21, 25:12, 35:15, 35:21, 36:7, 36:9, 38:8, 49:10, 51:13, 52:5, 52:23, 52:24, 53:6, 59:22, 60:19, 61:6, 62:17, 63:7, 64:8, 67:3, 67:7, 67:9, 67:20, 68:1, 71:2, 71:6, 71:20, 72:3, 72:14, 72:24, 72:25, 73:22, 75:4, 78:13, 78:19, 78:22, 80:15, 83:2, 83:20, 85:20, 89:21, 91:2, 91:22, 95:4, 95:5, 95:10, 96:22, 99:18, 101:9, 102:17, 107:9, 113:19,

114:3, 114:20,
114:21, 116:16,
118:1
**onerous** [1] - 98:1
**ones** [1] - 95:10
**onset** [1] - 35:18
**open** [1] - 30:4
**opening** [7] - 47:25,
76:10, 78:3, 78:8,
80:11, 105:14,
108:20
**opinion** [30] - 3:5,
3:15, 4:20, 4:22,
10:13, 12:5, 36:23,
37:18, 41:8, 41:11,
41:12, 41:14, 41:21,
41:23, 41:24, 42:2,
42:4, 42:7, 42:8,
42:9, 42:11, 42:12,
45:19, 49:10, 61:2,
81:22, 92:22, 92:23,
108:6
**opinions** [5] - 4:21,
32:8, 41:17, 42:1,
96:9
**opportunity** [7] -
16:18, 16:19, 21:13,
22:18, 39:22, 72:23,
101:15
**opposed** [2] - 27:6,
90:21
**opposing** [1] - 42:18
**order** [14] - 9:13, 9:18,
11:20, 11:25, 15:15,
21:7, 48:19, 73:7,
75:20, 79:10, 94:9,
95:23, 115:23, 116:6
**ordered** [1] - 10:4
**ordering** [1] - 10:6
**ordinary** [1] - 10:18
**organizational** [3] -
80:22, 106:12,
106:13
**originally** [3] - 24:18,
33:15, 56:6
**otherwise** [1] - 44:10
**ought** [1] - 36:24
**ourself** [1] - 47:17
**out-of-pocket** [1] -
9:23
**outcome** [3] - 36:8,
40:2, 40:4
**outset** [1] - 91:18
**outside** [1] - 103:3
**overlook** [1] - 96:11
**overnight** [1] - 100:3
**overruled** [1] - 73:18
**owes** [2] - 51:1, 62:4
**own** [8] - 44:4, 72:5,
72:6, 80:15, 90:25,

98:2, 98:4, 98:13
**owned** [2] - 91:13,
106:14

**P**

**P.C** [1] - 1:22
**p.m** [1] - 117:10
**PA** [3] - 1:19, 1:23,
121:19
**package** [1] - 20:15
**paddy** [8] - 21:6, 21:9,
30:13, 56:17, 56:20,
57:18, 106:8, 106:9
**page** [26] - 3:10, 5:3,
6:1, 6:2, 10:10,
10:11, 10:20, 11:25,
47:6, 75:7, 83:14,
83:20, 84:7, 84:21,
86:5, 86:11, 86:12,
86:14, 86:20, 92:6,
92:11, 94:13, 95:21,
96:1, 113:10, 113:11
**pages** [4] - 12:1,
12:10, 92:2, 92:6
**paid** [26] - 19:15, 28:1,
49:21, 50:25, 54:12,
76:15, 76:18, 78:24,
79:1, 79:5, 83:25,
84:6, 85:19, 86:1,
96:8, 97:16, 99:9,
100:22, 101:14,
104:16, 104:17,
107:11, 108:13,
113:22, 113:23
**pain** [7] - 84:14, 84:15,
84:16, 84:25, 85:25,
98:5
**panel** [1] - 117:2
**paper** [9] - 53:18,
76:17, 77:15, 90:2,
90:3, 90:8, 99:5,
99:18, 118:9
**paragraph** [11] - 3:9,
3:23, 5:17, 6:1, 7:10,
7:25, 8:4, 10:9,
10:11, 33:18, 92:10
**parameters** [2] -
117:15, 118:13
**paraphrase** [1] - 5:13
**pardon** [1] - 86:15
**part** [18] - 3:21, 8:23,
9:19, 12:18, 45:19,
46:9, 50:1, 50:3,
55:10, 64:20, 76:12,
82:21, 83:10, 88:20,
96:1, 96:5, 96:7,
110:19
**participating** [1] -
35:23

**particular** [9] - 6:10,
6:11, 36:23, 40:2,
43:6, 79:3, 88:14,
91:17, 118:5
**particularly** [1] - 43:5
**particulars** [1] - 40:21
**parties** [12] - 33:19,
33:22, 35:6, 40:3,
42:18, 45:12, 45:13,
64:21, 64:25, 65:2,
77:24, 111:13
**party** [11] - 36:1,
43:11, 60:17, 64:25,
80:10, 83:25, 85:18,
102:20, 112:17,
112:18
**party's** [1] - 41:1
**pass** [2] - 39:14, 67:16
**passenger** [1] - 86:21
**passing** [1] - 39:12
**passion** [1] - 46:8
**Pat** [32] - 7:20, 7:24,
8:4, 9:1, 9:12, 11:22,
12:10, 12:16, 75:7,
81:24, 82:12, 83:12,
84:7, 84:13, 84:17,
84:21, 85:1, 85:13,
86:5, 86:12, 86:14,
86:20, 88:21, 89:3,
89:8, 92:1, 92:7,
92:11, 93:25, 95:18,
95:21, 96:1
**pat** [3] - 7:7, 77:11,
81:3
**patience** [1] - 35:20
**patient** [1] - 86:20
**pay** [9] - 27:24,
50:10, 52:10, 67:13,
86:8, 86:9, 99:10,
99:21, 101:2,
107:10, 108:1, 108:2
**paycheck** [1] - 23:17
**paying** [9] - 19:11,
50:16, 50:18, 53:9,
53:11, 86:7, 112:4,
112:5, 114:13
**pays** [4] - 99:4, 99:17,
99:20
**pen** [3] - 110:3, 110:5
**pending** [1] - 26:1
**Pennsylvania** [30] -
3:24, 6:9, 6:14,
18:14, 45:22, 57:15,
58:17, 58:18, 59:20,
59:23, 59:24, 60:1,
61:16, 61:17, 61:18,
61:19, 61:20, 71:21,
71:22, 72:1, 79:9,
79:10, 95:1, 111:24,
112:10, 119:16,

121:5, 121:18
**PENNSYLVANIA** [1] -
1:1
**people** [14] - 35:22,
50:4, 50:24, 64:4,
64:12, 69:7, 74:4,
75:17, 89:11, 99:8,
99:9, 102:10,
105:14, 112:21
**per** [1] - 22:14
**percent** [10] - 67:3,
67:10, 68:1, 68:2,
75:4, 113:15,
114:20, 114:21
**percentage** [3] -
68:15, 99:12
**percentages** [3] -
28:11, 67:25, 72:13
**perfect** [2] - 6:1, 90:22
**perform** [3] - 32:13,
35:25, 103:2
**performed** [1] - 36:13
**perhaps** [7] - 80:9,
85:18, 90:7, 102:5,
102:16, 102:23,
103:9
**period** [14] - 11:1,
11:6, 12:23, 12:25,
13:8, 21:18, 45:6,
49:22, 63:1, 75:21,
76:21, 91:11,
106:24, 107:1
**permission** [1] - 5:11
**permit** [3] - 41:16,
42:20, 42:24
**permitted** [4] - 37:15,
40:4, 41:20, 94:6
**person** [12] - 39:16,
42:11, 52:25, 59:22,
59:23, 69:14,
103:20, 103:24,
103:25, 109:3, 115:8
**personal** [1] - 42:15
**personnel** [1] - 86:18
**persons** [5] - 37:4,
37:7, 38:22, 49:10,
58:12
**persuasive** [1] - 6:15
**pertains** [1] - 3:22
**Pharmacy** [2] - 18:25,
19:2
**Phillip** [3] - 71:16,
71:23, 71:25
**photo** [1] - 72:8
**physically** [1] - 34:4
**pick** [2] - 93:14, 96:10
**picked** [1] - 25:13
**picky** [1] - 47:4
**picture** [2] - 37:25,
84:17

**piece** [7] - 76:17,
77:15, 90:8, 99:2,
99:5, 99:18, 118:9
**pieces** [1] - 95:17
**ping** [1] - 59:25
**ping-pong** [1] - 59:25
**PISANCHYN** [59] -
1:17, 1:18, 6:21,
15:20, 15:22, 18:13,
24:12, 26:17, 26:19,
27:16, 27:18, 27:20,
28:5, 28:9, 28:25,
29:11, 30:4, 31:22,
32:2, 32:4, 32:23,
33:3, 33:9, 33:25,
34:8, 34:14, 34:17,
34:25, 46:16, 46:19,
46:24, 47:3, 47:14,
51:12, 57:9, 66:5,
66:13, 73:4, 73:11,
73:23, 87:1, 87:5,
87:7, 87:10, 87:13,
87:16, 87:18, 87:23,
88:1, 88:4, 88:11,
101:6, 103:13,
103:15, 105:8,
113:22, 113:25,
114:5, 114:8
**Pisanchyn** [71] - 8:1,
24:2, 32:18, 47:13,
47:16, 58:14, 70:15,
71:14, 72:9, 75:23,
76:7, 76:10, 76:13,
76:14, 76:21, 77:3,
77:9, 77:18, 78:3,
78:8, 78:12, 78:15,
79:6, 79:17, 80:1,
80:7, 80:10, 80:14,
80:18, 84:3, 84:19,
90:1, 91:2, 93:17,
93:22, 94:3, 94:9,
94:17, 94:25, 95:3,
95:23, 96:2, 97:19,
97:23, 98:2, 98:3,
98:12, 99:23, 99:25,
100:3, 100:4, 100:6,
100:9, 100:17,
101:1, 101:15,
101:23, 103:10,
103:12, 104:18,
105:21, 106:20,
109:22, 109:23,
111:12, 114:25
**Pisanchyn's** [8] -
71:9, 80:15, 81:6,
82:25, 83:16, 83:18,
99:7, 104:1
**place** [23] - 27:19,
46:18, 64:8, 76:3,
76:4, 76:5, 80:15,

80:17, 87:15, 90:24, 94:7, 100:16, 101:16, 101:23, 102:19, 103:4, 103:7, 111:6, 111:7, 113:21, 115:12, 116:10
**PLACE** [1] - 1:11
**places** [1] - 106:1
**plaintiff** [45] - 8:15, 8:19, 9:9, 9:15, 9:18, 10:4, 11:24, 22:22, 23:8, 29:19, 29:21, 30:11, 31:7, 33:6, 34:12, 34:13, 36:4, 43:7, 43:12, 43:16, 43:17, 43:22, 43:24, 44:19, 44:22, 45:24, 46:3, 51:15, 59:18, 62:23, 65:17, 71:1, 71:11, 71:12, 75:9, 78:9, 81:8, 81:9, 81:10, 81:11, 81:13, 102:6, 119:18, 119:22
**plaintiff's** [18] - 8:5, 9:15, 12:18, 21:20, 27:1, 27:8, 27:20, 28:13, 30:11, 33:6, 44:21, 44:23, 49:10, 55:15, 63:20, 63:24, 70:19, 70:25
**Plaintiffs** [1] - 1:16
**plaintiffs** [16] - 10:1, 13:1, 21:23, 27:3, 28:10, 28:15, 45:11, 58:10, 63:2, 71:12, 81:17, 83:14, 91:15, 92:11, 92:16, 108:15
**play** [3] - 59:5, 60:7, 111:4
**played** [3] - 55:10, 56:7, 109:19
**playgrounds** [1] - 111:4
**playing** [11] - 47:24, 53:15, 60:10, 65:4, 91:2, 110:25, 111:4, 111:5, 111:7, 111:13, 112:19
**PLAZA** [1] - 1:22
**pleased** [1] - 8:7
**pled** [1] - 101:18
**plenty** [1] - 57:20
**plus** [3] - 60:14, 99:20, 99:22
**pocket** [2] - 9:23, 19:14
**Pocono** [1] - 86:18
**point** [17] - 4:8, 10:7,

14:20, 16:17, 38:2, 63:19, 63:22, 63:23, 69:6, 78:10, 79:4, 79:8, 79:21, 89:21, 117:25
**pointed** [2] - 71:4, 93:7
**pointing** [3] - 38:10, 89:19, 96:8
**points** [4] - 81:3, 81:4, 81:5, 81:7
**policies** [10] - 48:25, 49:1, 49:3, 49:7, 49:9, 49:14, 59:8, 59:9, 59:13, 62:10
**policy** [12] - 23:6, 23:8, 29:23, 29:25, 45:9, 45:13, 45:15, 58:19, 82:15, 82:17, 113:11
**pong** [1] - 59:25
**poor** [1] - 106:19
**portions** [1] - 57:23
**position** [7] - 50:14, 94:18, 94:19, 94:20, 94:23, 105:16, 112:16
**positions** [1] - 37:5
**possession** [1] - 92:11
**possible** [1] - 78:21
**possibly** [3] - 24:20, 24:21, 81:20
**power** [4] - 65:7, 65:8, 103:5, 115:6
**powerful** [2] - 64:4, 112:16
**practice** [1] - 73:21
**practices** [2] - 17:4, 98:23
**preaccident** [1] - 90:9
**precisely** [1] - 42:9
**precluded** [4] - 87:5, 87:7, 87:19, 87:20
**predictable** [1] - 109:11
**prefer** [3] - 93:8, 93:10
**prejudice** [3] - 36:1, 46:8, 68:20
**premiums** [1] - 107:5
**prepared** [2] - 34:21, 121:11
**preponderance** [3] - 43:9, 43:14, 63:5
**prerogative** [1] - 33:12
**present** [1] - 40:14
**presentation** [2] - 82:6, 114:17
**presentations** [1] - 39:10

**presented** [7] - 13:1, 36:18, 57:4, 57:5, 76:6, 97:23, 116:8
**presently** [1] - 6:7
**presents** [1] - 86:20
**preserved** [1] - 6:16
**president** [1] - 107:18
**presume** [1] - 95:16
**pretend** [1] - 41:15
**pretty** [1] - 105:11
**prevail** [1] - 43:12
**prevent** [3] - 53:4, 67:8, 69:21
**prevented** [2] - 31:19, 58:16
**previously** [2] - 29:15, 56:8
**price** [1] - 52:10
**pride** [2] - 68:23, 68:24
**principle** [1] - 63:25
**principles** [1] - 73:21
**printed** [1] - 4:14
**privacy** [2] - 20:22, 21:4
**private** [1] - 37:6
**problems** [1] - 56:12
**procedurally** [1] - 117:18
**procedure** [2] - 98:18, 98:20
**procedures** [11] - 48:25, 49:1, 49:3, 49:7, 49:9, 49:14, 59:8, 59:9, 59:13, 62:10, 118:5
**proceed** [2] - 35:8, 119:21
**proceeded** [1] - 77:18
**proceeding** [1] - 69:3
**proceedings** [1] - 121:8
**PROCEEDINGS** [1] - 1:12
**process** [11] - 8:25, 22:10, 22:24, 32:10, 56:22, 59:22, 75:6, 76:14, 85:19, 90:15, 90:21
**produce** [10] - 9:15, 9:18, 10:5, 10:6, 10:21, 19:22, 22:5, 22:14, 54:14, 54:15
**produced** [1] - 20:24
**production** [7] - 8:10, 8:22, 9:6, 9:8, 10:14, 10:25, 23:2
**profession** [1] - 41:20
**profit** [2] - 53:12, 107:15

**profits** [1] - 52:21
**programs** [1] - 50:9
**promise** [2] - 48:3
**promises** [6] - 76:10, 76:11, 76:13, 80:8, 80:9, 80:11
**pronouncing** [1] - 49:12
**pronunciation** [1] - 80:21
**proof** [10] - 38:10, 43:17, 43:21, 57:6, 76:5, 78:21, 97:2, 97:5, 100:5
**proofs** [1] - 42:20
**proper** [2] - 42:16, 47:9
**properly** [1] - 37:11
**propose** [1] - 79:15
**proposed** [1] - 4:19
**proposition** [1] - 73:17
**protect** [1] - 53:7
**protecting** [1] - 54:5
**prove** [10] - 41:4, 43:16, 43:17, 43:22, 63:4, 75:8, 78:4, 78:15, 81:5, 82:18
**proved** [5] - 62:9, 75:11, 75:12, 75:13
**proven** [2] - 63:2, 83:10
**provide** [5] - 7:14, 11:4, 12:8, 20:4, 21:10, 21:11, 21:13, 22:25, 23:6, 57:9, 69:23, 77:5, 77:7, 96:3, 98:2
**provided** [18] - 8:12, 11:24, 12:2, 12:16, 15:13, 15:14, 16:15, 17:24, 20:12, 20:15, 23:18, 23:20, 25:25, 30:24, 30:25, 31:18, 83:13, 93:11
**providers** [1] - 18:23
**provides** [4] - 20:3, 45:22, 64:21, 64:22
**providing** [3] - 8:5, 23:4, 102:6
**province** [2] - 28:21, 40:16
**proving** [2] - 43:8, 98:16
**provision** [2] - 6:10, 82:13
**provisions** [2] - 27:13, 121:5
**pull** [30] - 7:7, 7:9, 7:20, 7:25, 8:4, 8:15,

9:1, 9:5, 9:7, 9:12, 10:8, 10:9, 10:19, 10:23, 11:22, 12:10, 12:15, 12:21, 30:20, 65:14, 84:3, 85:2, 89:3, 92:5, 95:2, 104:3, 108:10, 117:8
**pulled** [2] - 4:2, 93:24
**pulling** [1] - 100:20
**punch** [1] - 67:2
**punish** [5] - 21:7, 46:6, 46:10, 66:19, 67:2
**punishment** [1] - 72:13
**punitive** [9] - 45:22, 45:24, 46:7, 46:10, 53:13, 65:9, 66:14, 71:10, 112:14
**purchased** [2] - 81:22, 92:23
**purpose** [3] - 46:10, 53:20, 53:21
**purposes** [4] - 42:23, 43:2, 45:6, 72:6
**pursuant** [2] - 11:24, 121:5
**pursue** [1] - 14:20
**push** [4] - 48:2, 116:20, 117:2, 117:5
**put** [34] - 5:16, 10:9, 12:3, 20:8, 26:9, 34:17, 34:18, 34:19, 43:10, 44:9, 47:8, 48:4, 50:13, 51:22, 52:11, 52:13, 56:21, 57:17, 57:24, 75:3, 78:10, 93:24, 100:25, 101:1, 102:22, 104:19, 104:24, 105:15, 105:17, 106:9, 108:21, 110:24, 116:2, 117:24
**putting** [3] - 75:1, 101:20, 114:4
**pylinski** [1] - 99:13
**Pylinski** [9] - 60:13, 61:7, 70:20, 70:21, 70:24, 72:20, 99:16, 106:23, 107:3

# Q

**qualifications** [2] - 4:21, 41:25
**qualified** [2] - 94:19, 96:18
**quality** [3] - 80:5, 89:25, 90:4

**quantity** [4] - 89:25, 90:2, 90:3, 90:7
**quarterback** [1] - 48:7
**quarterbacking** [1] - 110:12
**questioning** [4] - 79:12, 84:15, 86:11, 104:24
**questions** [19] - 9:3, 12:13, 15:18, 28:3, 30:4, 35:13, 59:14, 59:18, 61:24, 62:11, 75:24, 89:23, 93:3, 101:17, 115:17, 115:22, 116:1, 116:7, 119:5
**quick** [2] - 82:1, 97:2
**quickly** [1] - 82:6
**quite** [2] - 52:25, 79:22
**quote** [1] - 113:4

**R**

**radiology** [1] - 84:13
**raise** [2] - 64:7, 106:12
**raising** [1] - 111:23
**rather** [2] - 71:6, 78:5
**rating** [3] - 60:14, 80:25, 106:23
**Rating** [1] - 70:22
**ratio** [2] - 50:19, 114:20
**ray** [2] - 110:3, 110:6
**rays** [1] - 110:2
**reached** [3] - 116:8, 119:11, 119:12
**read** [14] - 3:9, 3:22, 6:5, 10:12, 24:2, 47:7, 65:15, 69:9, 69:10, 76:11, 102:25, 104:6, 117:22, 118:12
**reading** [7] - 3:8, 3:15, 5:22, 35:14, 53:17, 82:13
**reads** [1] - 118:13
**ready** [3] - 6:20, 34:21, 87:17
**real** [3] - 76:4, 76:5
**reality** [1] - 111:5
**realize** [1] - 13:22
**realized** [1] - 14:2
**really** [6] - 63:16, 85:19, 96:5, 114:16, 114:18, 118:10
**reason** [11] - 16:10, 26:23, 28:12, 28:13, 39:1, 41:25, 50:9, 66:14, 93:14, 97:18,

98:7
**reasonable** [21] - 11:2, 43:23, 44:8, 44:9, 44:11, 44:19, 47:10, 63:4, 66:10, 79:8, 79:9, 82:22, 82:23, 83:4, 83:8, 85:12, 89:23, 90:23, 92:18, 103:9, 106:14
**reasonableness** [2] - 39:19, 86:10
**reasonably** [2] - 42:25, 75:16
**reasoning** [1] - 26:24
**reasons** [8] - 4:21, 41:23, 42:7, 49:19, 81:21, 91:22, 102:17
**rebut** [1] - 69:24
**rebuttal** [2] - 32:1, 34:13
**receipt** [1] - 16:21
**receive** [2] - 32:14
**received** [11] - 16:6, 17:2, 26:1, 29:10, 39:5, 42:4, 42:17, 55:10, 57:24, 61:6, 117:11
**receiving** [2] - 33:1, 55:24
**recent** [2] - 6:12, 110:10
**recently** [2] - 76:22, 76:25
**recess** [2] - 35:4, 74:2
**recklessly** [7] - 44:8, 44:11, 44:12, 44:18, 46:21, 47:9, 47:10
**recklessness** [1] - 98:19
**recognized** [1] - 62:2
**recollect** [1] - 73:3
**recollection** [2] - 39:6, 72:14
**reconcile** [1] - 40:7
**record** [13] - 21:24, 22:4, 26:13, 27:14, 28:8, 69:5, 69:14, 87:20, 101:11, 104:4, 104:5, 105:3, 113:24
**records** [29] - 16:22, 17:15, 17:16, 17:17, 18:23, 19:17, 19:22, 20:7, 20:10, 21:24, 22:13, 23:9, 23:10, 31:8, 31:17, 48:11, 52:12, 77:2, 81:9, 82:2, 82:23, 85:12, 89:14, 90:10, 90:19, 111:20, 118:6

**RECROSS** [1] - 2:4
**recross** [1] - 31:21
**red** [4] - 85:15, 107:20, 110:20, 110:21
**REDIRECT** [2] - 2:4, 29:13
**redirect** [1] - 29:12
**reduced** [1] - 115:10
**refer** [2] - 71:21, 110:11
**reference** [4] - 38:1, 70:25, 71:10, 88:20
**referencing** [3] - 24:4, 24:21, 93:7
**referred** [2] - 71:15, 72:11
**referring** [2] - 5:10, 108:19
**reflect** [1] - 89:2
**refused** [4] - 57:16, 81:8, 81:9, 81:10
**regard** [54] - 16:25, 17:11, 17:14, 18:21, 20:17, 23:21, 28:11, 46:20, 47:20, 48:22, 49:7, 52:1, 53:3, 53:13, 54:7, 54:8, 54:10, 54:23, 54:25, 55:14, 57:19, 58:1, 58:2, 58:3, 59:8, 59:12, 59:16, 60:5, 60:18, 60:19, 61:4, 61:7, 61:21, 62:3, 62:8, 62:9, 63:6, 63:7, 63:14, 63:20, 64:19, 65:2, 66:14, 67:22, 69:20, 72:2, 95:14, 105:22, 106:11, 109:8, 113:19, 114:20, 118:19
**regarding** [3] - 8:8, 9:24, 71:11
**regardless** [4] - 14:11, 36:6, 36:23, 68:18
**regards** [4] - 16:11, 20:24, 65:9, 68:15
**regular** [4] - 4:12, 109:3
**regulation** [1] - 98:17
**Rehab** [1] - 19:12
**reimbursed** [1] - 84:1
**reject** [2] - 40:22, 42:6
**related** [8] - 3:3, 6:10, 28:20, 28:21, 66:10, 90:20, 101:12, 105:5
**relates** [1] - 57:2
**relation** [1] - 89:8
**relationship** [1] - 44:5

**relevance** [2] - 88:3, 88:17
**relevant** [6] - 10:16, 11:1, 44:20, 45:6, 46:5, 66:19
**reliability** [2] - 4:21, 42:1
**relied** [1] - 56:2
**relieved** [1] - 102:16
**rely** [3] - 44:25, 55:21, 109:3
**relying** [1] - 48:9
**remained** [1] - 82:14
**remarks** [2] - 80:11, 86:7
**remember** [16] - 13:15, 13:24, 42:8, 53:8, 73:8, 73:9, 73:16, 76:16, 79:22, 79:24, 79:25, 83:7, 92:15, 101:8, 106:16, 107:25
**remembering** [1] - 91:20
**remind** [3] - 74:20, 102:18, 118:5
**reminded** [1] - 6:25
**reminds** [1] - 102:18
**removal** [2] - 3:2, 6:4
**remove** [2] - 3:19, 5:19
**render** [2] - 36:5, 64:22
**rendered** [1] - 36:11
**rephrase** [2] - 30:6, 30:8
**report** [12] - 71:3, 73:5, 73:6, 73:8, 73:9, 73:10, 73:12, 73:14, 89:1, 89:3, 113:2, 113:3
**reported** [1] - 84:16
**REPORTED** [1] - 121:16
**Reporter** [3] - 121:3, 121:15, 121:17
**reporter** [1] - 121:22
**REPORTER'S** [1] - 121:1
**reports** [1] - 113:3
**represent** [1] - 42:10
**representation** [1] - 105:19
**representatives** [2] - 35:22, 54:13
**represented** [2] - 59:5, 59:6
**reproduction** [1] - 121:21
**request** [19] - 3:1, 6:4,

8:10, 8:22, 8:24, 9:6, 9:8, 10:25, 12:17, 14:14, 20:8, 21:4, 23:9, 23:24, 70:16, 70:18, 82:1, 93:4, 93:19
**requested** [15] - 7:21, 8:13, 10:2, 11:12, 12:4, 13:7, 14:23, 15:12, 19:13, 22:17, 24:6, 24:18, 24:19, 33:19, 65:22
**requesting** [13] - 7:7, 7:21, 14:5, 15:11, 18:23, 19:5, 19:12, 19:13, 19:17, 19:21, 20:20, 53:24
**requests** [20] - 8:19, 9:10, 9:16, 9:22, 10:14, 10:17, 11:10, 11:17, 13:9, 14:15, 14:17, 30:21, 30:23, 81:8, 81:10, 81:11, 82:2, 91:8, 108:3
**require** [9] - 11:7, 18:6, 42:20, 60:4, 65:23, 78:17, 82:7, 93:15, 94:23
**required** [16] - 10:17, 10:21, 38:14, 45:13, 57:10, 60:3, 62:11, 71:1, 90:22, 90:23, 90:24, 93:23, 94:10, 100:15, 101:2, 101:14
**requires** [4] - 72:17, 98:8, 98:16, 98:19
**requiring** [2] - 9:14, 9:15
**rereading** [2] - 118:16, 118:20
**rescheduled** [2] - 24:6, 24:17
**reserve** [1] - 113:7
**reserved** [1] - 32:21
**resolve** [2] - 16:18, 16:20
**resolved** [5] - 13:3, 44:24, 49:17, 75:9
**resources** [1] - 57:12
**respect** [5] - 14:24, 31:14, 94:3, 97:8, 100:10
**respectful** [1] - 61:23
**respectfully** [2] - 3:18, 24:6
**respond** [1] - 10:17
**response** [5] - 15:15, 115:16, 115:17
**responses** [7] - 7:12,

7:15, 8:7, 9:15, 12:7,
15:15, 25:25
**responsibility** [4] -
53:23, 54:21, 77:4,
77:10
**responsible** [3] - 72:5,
72:6, 81:13
**responsive** [1] - 11:5
**rest** [1] - 88:18
**restaurant** [2] - 67:1,
67:6
**rested** [1] - 32:3
**result** [1] - 46:8
**results** [1] - 99:13
**retained** [1] - 70:17
**return** [4] - 68:18,
68:19, 94:8, 116:11
**returns** [11] - 9:23,
11:8, 11:11, 11:18,
20:19, 20:20, 23:12,
23:13, 94:4, 94:5,
94:10
**Revenue** [1] - 94:11
**review** [4] - 55:13,
61:8, 70:7, 79:5,
108:1, 108:8, 117:25
**reviewed** [1] - 37:23
**reviewing** [1] - 107:25
**revisions** [1] - 6:12
**revoked** [2] - 31:16,
31:19
**rich** [1] - 74:22
**rid** [2] - 33:20, 51:23
**ridiculous** [2] -
104:23, 105:15
**right-hand** [1] -
116:19
**rights** [1] - 44:14
**ring** [3] - 39:20, 61:12,
97:20
**ringer** [2] - 52:11,
100:25
**rip** [1] - 95:10
**risk** [2] - 57:25
**RMR** [2] - 121:14,
121:17
**road** [1] - 58:6
**Robinson** [1] - 80:24
**Robinsons** [1] -
106:14
**rolled** [1] - 89:12
**room** [11] - 62:16,
65:6, 67:12, 82:22,
86:12, 86:19, 87:11,
88:25, 89:11, 110:5,
115:13
**rule** [4] - 36:23, 41:18,
47:21, 60:12
**ruled** [1] - 92:1
**rules** [16] - 18:15,

22:1, 41:16, 42:23,
47:20, 47:25, 48:14,
48:15, 58:6, 59:20,
60:10, 69:23, 111:6,
112:12, 112:13
**Rules** [1] - 5:4
**ruling** [2] - 26:1, 71:13

**S**

**sad** [1] - 102:22
**safety** [1] - 51:16
**salary** [1] - 80:7
**sat** [5] - 58:4, 60:21,
63:24, 64:23, 95:11
**satisfied** [3] - 37:24,
51:21, 100:23
**savings** [1] - 67:16
**savvy** [1] - 61:1
**saw** [16] - 7:22, 9:2,
9:9, 11:23, 31:14,
61:3, 79:3, 79:12,
80:4, 82:14, 90:12,
97:16, 97:17, 105:9,
105:14, 111:21
**scale** [1] - 43:11
**scan** [5] - 84:24,
84:25, 85:1, 85:5,
85:8
**scared** [1] - 114:16
**scary** [1] - 105:9
**scattered** [1] - 76:7
**scene** [2] - 86:25,
88:24
**schedule** [7] - 24:19,
24:25, 25:1, 26:6,
77:9, 93:5, 93:9
**scheduled** [8] - 23:22,
24:14, 25:5, 25:14,
25:17, 26:3, 93:21
**schedules** [1] - 25:23
**scheduling** [8] - 24:5,
24:7, 24:14, 24:20,
25:3, 26:5, 93:10,
93:16
**school** [1] - 74:7
**science** [1] - 41:20
**Scranton** [7] - 57:15,
64:5, 79:9, 79:14,
79:15, 93:18, 121:19
**SCRANTON** [1] - 1:19
**scratch** [1] - 83:11
**screen** [15] - 58:15,
58:21, 59:4, 70:8,
75:18, 116:17,
116:18, 116:19,
116:20, 116:21,
116:22, 116:23,
116:24, 117:8
**scroll** [2] - 116:24,

117:3
**scrolling** [1] - 117:1
**seat** [22] - 13:12,
13:16, 13:22, 14:12,
14:19, 48:9, 48:10,
55:25, 56:3, 76:25,
91:12, 94:18, 94:19,
94:21, 97:24,
111:14, 111:15,
111:18, 111:20,
111:24, 111:25,
112:2
**second** [5] - 3:13,
3:21, 3:22, 7:25, 8:4,
12:9, 70:18, 72:17,
74:10, 85:23, 86:13,
92:5, 92:10, 92:11,
113:19, 115:25
**secondly** [1] - 117:20
**secret** [1] - 89:25
**secretaries** [1] - 99:10
**Section** [1] - 121:6
**section** [1] - 5:6
**secure** [1] - 22:7
**see** [34] - 12:1, 12:7,
12:9, 12:11, 12:14,
12:16, 15:3, 19:23,
31:8, 38:24, 49:25,
55:3, 55:13, 55:16,
59:17, 70:9, 74:16,
78:9, 78:19, 92:8,
99:18, 100:2, 101:4,
106:14, 108:1,
108:5, 109:24,
114:8, 115:24,
116:23, 117:4,
120:4, 120:6
**seek** [1] - 23:2
**seeking** [2] - 77:3,
82:3
**seeks** [1] - 10:15
**seem** [1] - 105:9
**select** [2] - 62:18,
115:2
**self** [2] - 86:25, 88:23
**semi** [1] - 49:10
**send** [23] - 8:18,
18:22, 30:17, 52:14,
52:16, 53:24, 54:1,
54:9, 54:13, 54:15,
54:20, 55:20, 57:12,
58:25, 62:14, 98:4,
98:8, 98:10, 98:11,
98:12, 114:21,
115:15
**sending** [4] - 19:2,
54:10, 62:12, 71:15
**sends** [3] - 26:8,
54:18, 68:6
**sense** [5] - 6:1, 39:1,

49:21, 50:1, 92:19
**sent** [18] - 8:18, 9:10,
9:19, 17:19, 18:17,
18:18, 19:4, 23:11,
23:12, 23:13, 24:1,
24:16, 31:2, 57:20,
68:16, 78:9, 105:22,
114:9
**sentence** [3] - 3:13,
7:10, 47:8
**sentences** [1] - 10:12
**separate** [3] - 3:5,
77:8, 96:21
**September** [6] - 7:22,
19:17, 19:20, 85:3,
85:4, 85:5
**series** [1] - 75:14
**serious** [2] - 35:24,
74:21
**serve** [1] - 35:22
**service** [1] - 103:1
**Service** [1] - 94:11
**set** [20] - 9:9, 23:25,
24:24, 34:14, 34:16,
34:23, 34:24, 45:4,
45:15, 50:9, 50:24,
56:2, 107:5, 107:6,
107:7, 107:10,
107:14, 121:9
**Setcavage** [20] - 63:8,
71:2, 79:1, 79:2,
79:4, 81:15, 82:19,
84:22, 85:6, 91:17,
92:4, 92:14, 93:2,
93:6, 95:11, 96:7,
96:22, 98:13, 98:16,
98:21
**setcavage** [7] - 49:5,
85:14, 86:1, 91:19,
95:8, 96:16, 97:16
**Setcavage's** [4] -
81:22, 95:18, 96:24,
108:6
**sets** [1] - 11:1
**settle** [5] - 15:16, 16:3,
71:1, 78:18
**settled** [10] - 16:10,
16:12, 29:6, 62:12,
78:20, 91:14, 91:16,
94:17, 102:3, 113:7
**settlement** [9] - 30:10,
71:5, 71:6, 73:1,
73:14, 73:20, 75:20,
78:22, 78:23
**settlements** [2] -
107:25, 108:1
**seven** [1] - 20:9
**seventeen** [1] - 3:11
**several** [4] - 12:1,
60:23, 89:16, 97:23

**shape** [1] - 28:22
**shelf** [1] - 101:3
**shelves** [2] - 90:2,
90:3
**shocker** [1] - 84:2
**shortly** [1] - 18:21
**shoulder** [3] - 84:25,
85:21, 85:25
**show** [32] - 7:24,
10:11, 18:3, 23:8,
69:1, 73:5, 73:6,
76:24, 76:25, 77:19,
77:21, 78:12, 79:2,
79:17, 82:1, 82:8,
83:5, 86:10, 89:7,
89:22, 95:17, 97:21,
98:21, 101:21,
105:23, 109:2,
109:9, 110:3, 110:6,
110:7, 117:15
**showed** [13] - 9:7,
33:24, 53:1, 75:19,
77:12, 77:15, 77:25,
82:4, 83:22, 84:19,
95:3, 109:1, 110:1
**showing** [8] - 7:9,
12:7, 75:12, 75:25,
81:7, 84:23, 87:23,
90:10
**shown** [7] - 40:18,
81:8, 83:15, 83:16,
99:7, 102:20, 102:21
**shred** [1] - 120:4
**sic** [1] - 67:18
**side** [19] - 37:9, 37:10,
63:20, 63:24, 65:1,
67:25, 72:7, 86:5,
86:6, 86:13, 88:19,
88:20, 89:21, 92:5,
98:6, 105:7, 114:2,
116:19
**sidebar** [8] - 27:19,
28:19, 46:18, 47:5,
87:15, 88:12,
113:21, 114:7
**sides** [2] - 32:3, 43:10
**sign** [5] - 23:11, 52:13,
115:25, 116:2,
117:25
**signed** [16] - 17:3,
17:20, 19:21, 20:9,
20:10, 23:12, 54:15,
54:19, 115:11,
116:9, 117:12,
117:19, 118:7,
118:12, 119:8,
119:23
**significance** [1] - 90:5
**significant** [1] - 43:21
**signing** [2] - 22:14,

22:15
**similar** [2] - 37:5, 46:12
**simple** [4] - 91:6, 92:14, 94:24, 102:6
**simplicity** [1] - 98:25
**simply** [11] - 77:25, 84:18, 89:19, 91:25, 93:17, 93:22, 94:13, 94:23, 95:1, 95:24, 100:17
**single** [7] - 36:20, 76:17, 77:16, 99:2, 99:5
**sit** [2] - 95:15, 105:25
**sitting** [4] - 101:19, 106:4, 111:10, 116:13
**six** [1] - 20:9
**sixteen** [1] - 108:2
**Skype** [1] - 85:24
**slash** [1] - 7:16
**sleep** [1] - 55:2
**slide** [1] - 83:20
**slightly** [1] - 43:11
**slip** [3] - 115:22, 116:9, 118:2
**slot** [16] - 74:15, 74:23, 74:25, 75:17, 80:17, 84:3, 93:14, 94:23, 97:21, 98:7, 100:15, 102:2, 103:7, 104:3, 104:19, 108:10
**small** [11] - 86:23, 88:23, 95:9, 95:17, 95:19, 96:23, 100:23, 106:15, 106:17, 106:18
**smoke** [1] - 76:8
**smoked** [1] - 51:24
**snippets** [1] - 95:19
**snow** [8] - 55:2, 99:24, 100:1, 100:2, 100:6, 100:7, 107:20
**snowed** [2] - 100:3, 100:5
**so-called** [9] - 3:13, 3:14, 3:15, 3:16, 3:19, 5:17, 5:21, 5:25, 41:18
**society** [2] - 35:22, 110:25
**software** [1] - 80:22
**sole** [4] - 36:15, 37:20, 38:22, 46:10
**solely** [1] - 23:16
**solemn** [1] - 35:24
**solves** [1] - 111:1
**someone** [7] - 5:20,

18:18, 48:2, 61:14, 68:10, 109:6, 112:2
**sometimes** [7] - 43:9, 58:12, 58:13, 61:14, 74:6, 84:22, 113:15
**somewhere** [1] - 24:15
**sophisticated** [1] - 54:3
**sorry** [2] - 47:3, 87:16
**sort** [1] - 83:12
**sound** [2] - 39:20, 42:7
**sounds** [1] - 106:11
**source** [1] - 42:16
**sources** [1] - 42:16
**speaking** [2] - 64:11, 70:21
**special** [2] - 44:5, 61:4
**specific** [13] - 7:17, 20:3, 50:2, 70:15, 70:18, 72:11, 73:10, 113:4, 117:19, 118:11, 118:21, 118:23, 119:6
**specifically** [6] - 32:20, 33:10, 71:5, 87:19, 117:24
**spectacle** [1] - 106:5
**speculate** [1] - 37:14
**speculation** [1] - 38:19
**speech** [1] - 75:12
**spelled** [1] - 11:14
**spend** [2] - 77:17, 101:4
**spent** [1] - 80:18
**SPRUCE** [1] - 1:18
**staff** [5] - 77:20, 88:25, 99:11, 99:13, 99:20
**stage** [1] - 70:8
**stages** [1] - 91:7
**stand** [11] - 6:23, 37:7, 39:17, 40:14, 49:11, 61:12, 75:1, 75:2, 80:4, 84:8, 103:18
**standard** [10] - 3:25, 4:25, 6:5, 28:11, 43:8, 60:12, 62:15, 71:21, 71:22, 93:6
**Standard** [1] - 6:9
**standards** [10] - 48:5, 49:6, 51:2, 54:11, 58:5, 58:9, 58:17, 59:16, 60:4, 61:24, 62:6, 62:7, 63:9, 98:23
**standing** [7] - 55:4, 55:5, 57:1, 100:4,

100:6, 107:20
**stands** [1] - 115:19
**start** [2] - 59:25, 114:12
**started** [3] - 22:9, 59:8, 109:13
**starting** [1] - 70:7
**starts** [2] - 52:22, 109:14
**State** [1] - 71:16
**state** [7] - 41:21, 41:22, 62:3, 85:12, 91:10, 94:23, 119:21
**statement** [22] - 23:21, 25:10, 40:24, 41:2, 56:10, 57:10, 57:11, 57:13, 58:3, 62:12, 72:25, 76:10, 77:5, 77:6, 77:8, 78:3, 78:8, 79:7, 88:13, 105:5, 117:14, 118:9
**statements** [7] - 7:19, 39:9, 40:13, 57:6, 57:15, 60:24, 72:22
**states** [1] - 10:22
**STATES** [1] - 1:1
**States** [9] - 47:22, 71:24, 74:15, 95:22, 103:6, 119:15, 121:4, 121:6, 121:18
**stating** [1] - 36:21
**statute** [1] - 32:20
**stay** [1] - 105:6
**stenographer** [1] - 24:4
**step** [3] - 31:23, 52:22, 114:23
**stick** [2] - 76:2, 76:8
**still** [11] - 7:1, 7:21, 14:22, 25:25, 49:12, 67:17, 92:20, 101:5, 108:18, 111:23, 113:2
**stipulations** [1] - 42:17
**stood** [1] - 74:5
**stool** [1] - 67:6
**stops** [1] - 68:16
**storms** [1] - 106:25
**story** [6] - 48:17, 48:24, 89:18, 89:19, 110:13, 110:19
**straightforward** [2] - 10:16, 83:9
**strange** [1] - 95:7
**street** [2] - 51:17, 74:19
**STREET** [2] - 1:18, 1:23
**strength** [1] - 112:16

**stress** [2] - 79:19, 79:24
**stricken** [6] - 26:13, 27:14, 28:7, 66:9, 101:11, 105:3
**strictly** [1] - 111:7
**strife** [1] - 66:4
**strike** [1] - 74:22
**stringent** [1] - 74:7
**Stroudsburg** [1] - 79:11
**struck** [2] - 113:24, 114:2
**structure** [1] - 55:10
**studies** [2] - 84:11, 90:10
**study** [5] - 84:12, 84:13, 84:18, 84:24, 85:7
**stuff** [5] - 12:4, 12:11, 34:25, 108:4, 108:23
**subject** [1] - 28:8
**subjective** [1] - 84:14
**submit** [9] - 50:8, 56:20, 60:17, 61:22, 86:3, 92:22, 96:16, 99:14, 102:20
**submitted** [4] - 33:14, 85:23, 86:4, 115:20
**subpoena** [8] - 21:23, 22:4, 22:5, 22:12, 22:14, 22:15, 23:2, 30:17
**subpoenaed** [3] - 105:24, 106:3, 106:5
**subpoenas** [1] - 30:15
**subrogation** [5] - 57:19, 57:21, 57:22, 57:24, 58:4
**substance** [1] - 4:16
**substantial** [3] - 43:19, 47:18, 97:6
**substantiates** [1] - 93:9
**substantive** [1] - 43:6
**sudden** [3] - 26:7, 85:24, 89:17
**suffering** [1] - 52:1
**sufficient** [1] - 84:6
**suggest** [4] - 62:25, 63:1, 70:23, 97:14
**suggested** [2] - 3:16, 6:14
**suit** [2] - 21:25, 102:1
**SUITE** [1] - 1:22
**sum** [1] - 70:18
**SUM** [5] - 31:6, 44:23, 78:18, 78:24, 114:4
**summarized** [2] - 20:6, 20:13

**summary** [3] - 17:15, 17:16
**summation** [3] - 80:14, 81:6, 103:23
**sunshine** [1] - 102:19
**Superior** [2] - 3:2, 6:13
**supervision** [2] - 121:11, 121:21
**supervisor** [6] - 14:5, 22:3, 61:3, 61:7, 107:18, 107:24
**supplemental** [1] - 11:24
**supplementary** [2] - 8:7, 12:25
**support** [7] - 7:16, 18:24, 42:7, 50:17, 71:3, 76:20, 102:21
**supporting** [4] - 4:22, 7:17, 42:1, 77:16
**suppose** [1] - 96:11
**supposed** [2] - 68:8, 96:9
**surplus** [1] - 51:13, 67:13, 67:19
**sustain** [3] - 30:7, 101:10, 107:2
**sustained** [1] - 37:12
**swap** [1] - 93:6
**swear** [3] - 64:7, 108:25, 113:14
**switching** [1] - 89:25
**sworn** [1] - 36:25
**symbols** [2] - 74:18, 74:20
**sympathy** [2] - 68:20, 68:21
**symptom** [1] - 84:14
**system** [6] - 22:8, 34:4, 35:7, 35:21, 105:23, 116:17

**T**

**T.V** [1] - 116:17
**tactic** [1] - 56:19
**talks** [1] - 106:22
**target** [2] - 48:8, 48:13
**tax** [14] - 9:23, 10:25, 11:1, 11:7, 11:11, 11:18, 20:18, 20:20, 23:12, 23:13, 94:4, 94:5, 94:8, 94:10
**technology** [1] - 77:20
**telephone** [1] - 30:10
**ten** [20] - 11:6, 12:2, 17:19, 17:20, 17:22, 17:23, 20:3, 20:9, 34:9, 34:20, 52:24,

54:18, 56:13, 81:17, 94:15, 95:23, 96:3, 99:1, 101:25, 113:16
**ten-year** [1] - 11:6
**term** [1] - 72:19
**terms** [1] - 72:2
**test** [3] - 76:3, 76:5, 110:8
**testified** [9] - 9:4, 29:15, 39:23, 40:19, 51:3, 60:23, 71:13, 78:5, 99:14
**testifies** [2] - 41:9, 41:11
**testify** [7] - 41:5, 41:17, 51:14, 71:3, 83:17, 96:17, 101:23
**testifying** [2] - 39:17, 62:3
**testimony** [53] - 4:20, 4:24, 9:13, 13:21, 26:14, 37:10, 37:16, 38:1, 38:8, 38:18, 39:4, 39:7, 39:13, 39:20, 39:24, 40:5, 40:6, 40:10, 40:14, 40:17, 40:20, 40:22, 40:25, 41:7, 41:9, 41:11, 41:24, 42:3, 51:21, 56:9, 58:1, 59:17, 60:20, 61:9, 63:6, 66:4, 67:18, 69:6, 75:25, 76:1, 76:17, 91:8, 91:20, 95:6, 95:18, 95:20, 96:24, 96:25, 101:14, 113:18, 119:1
**text** [1] - 9:12
**THE** [98] - 1:1, 1:1, 1:10, 3:1, 3:7, 3:10, 3:12, 3:20, 3:24, 4:3, 4:5, 4:8, 4:11, 4:15, 4:25, 5:2, 5:8, 5:12, 5:17, 6:17, 6:19, 6:22, 6:25, 15:19, 18:10, 18:11, 24:9, 24:11, 26:12, 26:18, 27:11, 27:17, 27:22, 28:7, 28:17, 28:20, 29:12, 30:7, 31:21, 31:23, 32:1, 32:3, 32:5, 32:18, 32:25, 33:8, 33:10, 34:3, 34:9, 34:16, 34:18, 35:5, 35:11, 46:17, 46:23, 46:25, 47:6, 51:6, 51:9, 57:1, 66:7, 70:1, 70:5, 70:13, 71:8, 71:20,

72:21, 73:2, 73:9, 73:12, 73:16, 73:18, 73:25, 87:4, 87:6, 87:8, 87:14, 87:17, 87:24, 88:2, 88:6, 88:9, 88:13, 101:8, 103:12, 103:14, 103:18, 105:3, 113:24, 114:1, 114:25, 117:11, 118:4, 119:12, 119:14, 119:15, 119:25, 120:1
**themselves** [3] - 22:19, 92:12, 104:23
**theories** [1] - 76:5
**therefore** [3] - 24:16, 44:24, 92:13
**they've** [1] - 28:1
**thinking** [1] - 61:10
**thinks** [1] - 42:8
**Third** [5] - 4:3, 4:4, 4:9, 4:11, 33:15
**third** [4] - 7:10, 72:24, 72:25, 92:5
**thirty** [1] - 96:21
**thousand** [4] - 56:24, 81:14, 96:6
**three** [24] - 9:10, 20:8, 34:8, 50:5, 65:10, 75:10, 75:16, 77:2, 81:5, 81:10, 84:4, 88:21, 90:14, 91:14, 96:21, 96:22, 100:22, 102:6, 104:15, 107:16, 107:22, 112:25, 113:1, 118:2
**throughout** [3] - 16:16, 48:7, 59:21
**tied** [2] - 99:10, 99:13
**timeline** [12] - 8:15, 12:21, 14:14, 14:16, 15:3, 30:20, 77:11, 77:13, 77:16, 105:9, 105:14, 108:5
**tiny** [1] - 106:18
**tip** [1] - 43:11
**tired** [1] - 96:12
**Title** [1] - 121:5
**TO** [1] - 2:2
**today** [13] - 8:17, 14:1, 15:23, 47:16, 48:11, 49:18, 51:14, 77:15, 77:20, 94:2, 96:9, 110:18, 119:23
**together** [1] - 61:3
**tokens** [1] - 104:18
**tolerate** [2] - 75:7, 96:14

**tomorrow** [2] - 102:12, 102:15
**ton** [2] - 77:21, 80:11
**took** [14] - 20:18, 26:14, 27:19, 46:18, 58:25, 67:7, 67:25, 78:25, 84:16, 87:15, 95:22, 100:21, 113:21, 120:1
**top** [2] - 10:9, 35:15
**topics** [1] - 80:19
**torture** [1] - 81:25
**totally** [1] - 42:9
**touch** [9] - 70:8, 116:18, 116:19, 116:20, 116:21, 116:22, 116:23, 117:2
**toward** [3] - 27:25, 44:16, 45:14
**towards** [1] - 44:2
**trained** [4] - 109:18, 109:19, 109:20
**transcribed** [1] - 85:4
**transcript** [9] - 69:3, 69:5, 69:11, 79:20, 94:1, 94:12, 121:7, 121:10, 121:20
**transcription** [1] - 85:3
**transcripts** [1] - 69:8
**translates** [1] - 79:22
**trauma** [3] - 90:18, 90:20, 110:10
**travel** [1] - 65:24
**travels** [1] - 62:2
**treat** [1] - 112:24
**treating** [1] - 31:7
**treatment** [1] - 61:4
**tremendous** [2] - 74:25, 75:3
**trial** [15] - 9:13, 16:16, 35:20, 36:10, 37:6, 40:25, 42:23, 63:2, 63:20, 64:5, 78:21, 80:10, 89:24, 105:25, 109:21
**TRIAL** [1] - 1:12
**trials** [1] - 74:19
**trick** [1] - 89:24
**tried** [8] - 81:16, 82:9, 82:10, 98:12
**trotted** [1] - 99:24
**trouble** [1] - 108:2
**true** [12] - 23:14, 38:21, 41:10, 41:12, 41:15, 42:13, 43:1, 43:15, 43:20, 61:21, 121:7
**trusted** [2] - 95:9

**trustworthy** [1] - 97:2
**truth** [16] - 38:6, 38:20, 39:3, 39:18, 39:19, 39:21, 40:9, 41:2, 48:18, 48:22, 49:11, 50:7, 50:8, 61:12, 95:5
**truthful** [1] - 61:23
**try** [7] - 16:20, 22:17, 77:25, 82:22, 97:20, 102:7, 105:6
**trying** [11] - 13:10, 26:25, 51:22, 56:12, 56:15, 65:23, 76:3, 76:15, 76:18, 93:21, 104:22
**turn** [7] - 11:7, 11:25, 74:24, 82:12, 94:10, 95:23, 114:17
**turned** [4] - 77:2, 81:17, 92:20, 102:2
**turning** [2] - 75:9, 95:24
**two** [28] - 9:9, 10:12, 12:10, 38:5, 50:5, 56:15, 60:22, 71:1, 71:2, 71:6, 71:9, 71:10, 73:1, 74:8, 77:8, 77:24, 78:13, 81:11, 85:17, 89:14, 95:17, 95:18, 102:12, 106:25, 108:3, 113:16, 118:2, 119:21
**type** [3] - 61:4, 68:15, 112:15
**types** [1] - 38:5
**typing** [1] - 69:15

## U

**ultimately** [1] - 91:13
**unanimous** [2] - 116:7, 116:8
**unavailable** [1] - 79:4
**unaware** [1] - 25:11
**unbalanced** [1] - 112:19
**unbelted** [5] - 86:21, 87:19, 87:21, 88:1, 88:14
**under** [33] - 3:2, 5:5, 7:1, 20:12, 23:21, 24:20, 25:10, 25:23, 26:6, 32:20, 36:8, 43:7, 44:1, 45:13, 54:22, 56:10, 57:10, 57:11, 57:13, 58:3, 62:12, 71:16, 77:4, 77:9, 79:8, 79:13,

81:11, 82:3, 93:16, 93:18, 93:23, 121:11, 121:21
**underinsured** [2] - 12:25, 62:24
**underlying** [2] - 33:4, 33:5
**underneath** [1] - 106:15
**undiagnosed** [1] - 84:23
**undisputed** [1] - 42:20
**unheard** [1] - 49:6
**unilateral** [1] - 93:10
**unilaterally** [13] - 23:22, 23:25, 24:8, 24:14, 24:24, 25:1, 25:14, 25:17, 93:5, 93:8, 93:15, 93:21
**uninsured** [1] - 119:20
**UNITED** [1] - 1:1
**United** [9] - 47:22, 71:24, 74:15, 95:22, 103:5, 119:15, 121:4, 121:6, 121:18
**unless** [3] - 37:18, 81:4, 121:21
**unlike** [1] - 117:20
**unreasonable** [3] - 82:18, 82:19, 120:2
**unredacted** [1] - 87:10
**unremarkable** [1] - 10:16
**up** [75] - 6:23, 7:7, 7:9, 7:20, 7:25, 8:4, 8:15, 9:1, 9:5, 9:7, 9:12, 10:8, 10:9, 10:19, 10:23, 11:22, 12:10, 12:15, 12:21, 30:3, 30:20, 34:14, 34:16, 34:18, 34:19, 34:22, 34:23, 34:24, 35:2, 45:4, 50:9, 50:24, 50:25, 55:2, 57:1, 61:14, 61:18, 62:25, 65:14, 69:19, 73:4, 74:14, 75:1, 75:3, 75:18, 76:22, 76:25, 84:4, 85:2, 86:13, 88:5, 88:9, 90:3, 92:5, 93:25, 95:15, 96:8, 98:10, 100:1, 100:4, 101:15, 102:15, 105:9, 106:20, 110:24, 111:10, 112:3, 113:15, 116:21, 116:24, 117:3, 117:8
**upload** [1] - 34:3
**uploaded** [1] - 35:6

**upright** [1] - 84:10
**ups** [1] - 53:25
**utilize** [1] - 50:4
**utilized** [1] - 4:7
**utmost** [1] - 44:2
**utterly** [1] - 28:23

**V**

**vacuum** [1] - 91:10
**valid** [1] - 53:10
**valuable** [2] - 94:25,
98:11
**value** [3] - 16:23,
42:12, 92:17
**variable** [1] - 107:9
**verdict** [26] - 34:6,
36:3, 36:6, 36:11,
36:25, 38:17, 44:19,
62:20, 62:21, 64:22,
64:24, 68:18, 68:19,
77:23, 112:20,
115:22, 116:4,
116:6, 116:9,
116:11, 118:2,
119:11, 119:13,
119:24
**verifying** [1] - 23:17
**versed** [1] - 41:21
**version** [1] - 113:18
**versus** [3] - 71:16,
99:24, 119:16
**vertebral** [2] - 83:18,
84:22
**viable** [1] - 13:16
**vice** [1] - 107:18
**view** [1] - 36:25
**violate** [1] - 73:20
**violates** [1] - 71:23
**violation** [2] - 23:5,
36:24
**violations** [1] - 62:15
**virtually** [1] - 43:4
**voice** [1] - 64:2
**voluntarily** [1] - 23:5
**vote** [1] - 115:7
**vs** [1] - 1:5

**W**

**wage** [28] - 9:24, 11:3,
11:13, 11:21, 16:5,
20:20, 20:23, 21:2,
21:5, 21:10, 21:14,
21:18, 23:15, 77:2,
81:17, 83:25, 85:20,
92:21, 93:25, 94:11,
95:24, 96:3, 101:25,
102:3, 102:7, 113:2,
113:3

**wagering** [1] - 74:22
**wages** [2] - 20:25,
23:18
**wagon** [7] - 21:6, 21:9,
30:13, 56:17, 56:20,
106:8, 106:9
**wagons** [1] - 57:18
**wait** [9] - 17:2, 49:20,
49:23, 51:24, 57:3,
104:2, 104:15,
104:16
**waiting** [4] - 27:4,
27:6, 49:23, 113:2
**waive** [2] - 57:22,
57:23
**waiver** [2] - 57:24,
58:4
**waiving** [1] - 57:20
**wake** [3] - 55:2, 100:1,
102:15
**walking** [2] - 72:16,
75:13
**wall** [1] - 76:2
**wants** [2] - 102:20,
103:18
**war** [1] - 103:3
**warrant** [1] - 41:15
**waste** [1] - 76:6
**wasted** [1] - 75:23
**watching** [2] - 100:25,
109:21
**ways** [1] - 8:23
**weak** [1] - 99:23
**wealth** [2] - 46:4,
66:18
**wearing** [2] - 111:19,
112:2
**week** [4] - 8:17, 60:22,
97:22, 120:1
**weeks** [1] - 60:22
**weigh** [4] - 38:15,
93:1, 96:23, 96:25
**weighing** [4] - 4:19,
4:23, 41:24, 42:3
**weight** [8] - 37:19,
37:21, 38:12, 40:10,
41:4, 41:7, 42:5,
90:5
**weighty** [1] - 97:6
**weird** [1] - 93:3
**Weis** [4] - 18:25, 19:2
**wellness** [1] - 99:17
**whatsoever** [3] -
33:12, 37:13, 101:8
**whiplash** [2] - 85:22,
85:25
**whole** [11] - 16:10,
36:22, 50:12, 56:5,
59:21, 63:19, 95:19,
105:25, 109:21,

109:24
**Wildey** [2] - 61:2,
114:12
**windows** [2] - 74:17,
102:18
**windshield** [1] - 86:22
**wisdom** [1] - 36:22
**wish** [6] - 21:24,
94:14, 96:24, 96:25,
98:16, 102:9
**withdraw** [1] - 31:2
**withhold** [1] - 101:25
**within-mentioned** [1]
- 121:8
**witness** [30] - 3:6,
3:14, 3:17, 32:25,
33:2, 37:15, 39:15,
39:16, 39:17, 39:18,
39:22, 40:2, 40:3,
40:11, 40:12, 40:15,
40:17, 40:18, 40:22,
40:24, 41:9, 41:11,
41:13, 41:17, 41:18,
41:19, 61:11, 61:15,
95:5, 99:18
**WITNESS** [2] - 18:11,
24:11
**witness'** [10] - 4:20,
4:21, 4:22, 40:13,
40:20, 41:13, 41:25,
42:2, 76:1
**WITNESSES** [1] - 2:2
**witnesses** [15] - 4:24,
37:20, 39:4, 39:11,
40:7, 41:5, 41:6,
42:3, 60:23, 61:22,
75:24, 80:21, 93:1,
96:18
**won** [1] - 90:1
**wonder** [1] - 75:24
**wood** [1] - 74:16
**word** [13] - 5:12,
69:12, 70:20, 70:22,
76:9, 82:25, 84:9,
85:22, 88:17, 90:12,
109:14, 109:16
**wording** [1] - 37:14
**words** [4] - 27:4,
38:20, 47:9, 114:6
**works** [3] - 83:1,
107:13
**worth** [15] - 37:4, 61:9,
67:20, 67:23, 67:24,
68:7, 72:12, 92:14,
93:16, 93:22, 94:15,
100:16, 106:17,
106:19, 109:25
**worthy** [1] - 95:6
**writing** [7] - 29:22,
49:4, 58:11, 59:13,

97:17, 115:10,
115:11
**written** [18] - 12:11,
24:13, 47:7, 47:12,
48:25, 49:1, 49:6,
49:9, 49:14, 58:19,
59:9, 97:18, 97:19,
98:15, 98:18,
115:12, 115:15,
119:6
**wrongdoing** [1] - 79:3

**X**

**X-ray** [2] - 110:3,
110:6
**X-rays** [1] - 110:2
**X.s** [1] - 20:8

**Y**

**year** [10] - 11:6, 52:21,
56:25, 78:20, 81:17,
96:3, 98:25, 107:5,
113:5
**years** [32] - 6:13, 11:1,
12:2, 22:11, 27:5,
27:6, 49:20, 59:18,
63:25, 75:10, 75:16,
77:2, 79:19, 90:14,
91:14, 94:15, 95:24,
96:21, 99:1, 99:20,
99:22, 102:6, 104:2,
104:15, 108:4,
108:5, 111:16,
113:2, 113:7, 114:16
**years'** [1] - 96:22
**yesterday** [11] - 7:22,
9:3, 9:4, 9:7, 9:9,
9:22, 17:19, 19:24,
75:14, 77:15, 78:5
**YORK** [1] - 1:7
**York** [42] - 10:15, 13:7,
13:15, 13:22, 14:19,
15:1, 15:6, 19:15,
29:22, 31:3, 56:16,
59:20, 59:22, 59:24,
60:1, 65:25, 70:25,
74:13, 75:10, 75:15,
76:23, 76:25, 79:14,
80:9, 80:22, 80:24,
81:12, 82:24, 96:3,
99:3, 99:8, 99:15,
99:19, 101:2, 101:4,
102:8, 103:9,
111:23, 112:3,
114:22, 119:16
**yourself** [8] - 21:22,
55:14, 77:24, 83:8,
101:17, 102:21,
107:3, 110:24

**yourselves** [3] -
34:21, 115:2, 116:16

**Z**

**zealous** [1] - 74:14