1

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3   BERNIE CLEMENS and            :
    NICOLE CLEMENS,
4   Plaintiffs                    :

5       VS                        :   NO. 3:13-CV-02447

6   NEW YORK CENTRAL MUTUAL       :
    FIRE INSURANCE COMPANY,
7   Defendant                     :

8

9

10      BEFORE:      HONORABLE MALACHY E. MANNION
                     UNITED STATES DISTRICT JUDGE

11      PLACE:       SCRANTON, PENNSYLVANIA

12      PROCEEDINGS: JURY TRIAL

13      DATE:        MONDAY, NOVEMBER 2, 2015

14

15  APPEARANCES:

16  For the Plaintiffs:     MICHAEL J. PISANCHYN, JR., ESQ.
                            MARSHA LEE ALBRIGHT, ESQ.
17                          Pisanchyn Law Firm
                            524 Spruce Street
18                          Scranton, PA  18503

19

20  For the Defendant:      CHARLES E. HADDICK, JR., ESQ.
                            BRYON R. KASTER, ESQ.
21                          Dickie, McCamey & Chilcote, P.C.
                            Plaza 21, Suite 302
22                          425 North 21st Street
                            Camp Hill, PA  17011

23

24

25

2

## WITNESS INDEX

| FOR THE PLAINTIFF: | DIRECT | CROSS |
|---|---|---|
| Diane Wildey | 3 | -- |

3

1    (At this time, opening statements were made.)

2            THE COURT:  Mr. Pisanchyn, are you ready to proceed?

3            MR. PISANCHYN:  I am, Your Honor.

4            THE COURT:  You can call your first witness.

5            At this time, I would call Diane Wildey, the vice

6    press of NYCM.

7    DIANE WILDEY, having been duly sworn or affirmed according to

8    law, testified as follows:

9                        DIRECT EXAMINATION

10   BY MR. PISANCHYN:

11   Q.   Good afternoon, Miss Wildey.  How are you today?

12   A.   Good.

13   Q.   Good to see you again.  We had met in a deposition

14   previously.

15        You previously gave your deposition testimony, correct?

16   A.   Correct.

17   Q.   And that was in Edmeston, New York?

18   A.   Correct.

19   Q.   You just drove that.  How far was that?

20   A.   It's about two and a half hours.

21   Q.   And you've lived at the same place for 18 years, is that

22   correct?

23   A.   I do.

24   Q.   And during the deposition testimony, I elicited, and you

25   had the answer, that you actually lived with a co-employee at

**4**

1  NYCM?

2  A.    I do.

3      MR. HADDICK:   Your Honor, objection.   I'm not sure what

4  relevance that has.

5          MR. PISANCHYN:   It goes directly to bias, Your Honor.

6  It's going to be our position that the reason that

7  Mr. Catalano, who Miss Wildey is his supervisor, gets to do

8  what he did was because they have been significant others for

9  18 years.

10          THE COURT:   It's overruled.

11  MR. BY PISANCHYN:

12  Q.    So, ma'am, again, during my deposition, I had elicited

13  that you have lived with Mr. Catalano for 18 years?

14  A.    Yes.

15  Q.    And that's Mr. Catalano that is sitting here today?

16  A.    Yes.

17  Q.    And he would be below you at NYCM Insurance in terms of

18  the hierarchy, correct?

19  A.    No.

20  Q.    It's my understanding there is an insurance adjuster, is

21  that correct?

22  A.    Correct.

23  Q.    And then above the insurance adjuster is a supervisor,

24  correct?

25  A.    Correct.

5

1  Q.    And then above the supervisor is the vice president,

2  correct?

3  A.    Correct.

4  Q.    And then above the vice president is somebody called Ken

5  Trueworthy, correct?

6  A.    Correct.

7  Q.    And Mr. Catalano was a supervisor, correct?

8  A.    Yes.

9  Q.    And you would also agree, ma'am, that you are the vice

10 president?

11 A.    Yes.

12 Q.    Now, let me ask you, getting into your employment, you

13 have only worked at one place, and that is NYCM Insurance,

14 correct?

15 A.    Yes, I work at New York Central Mutual.

16 Q.    So you would have graduated in around 1983, and then you

17 would began working for NYCM in 1984, correct?

18 A.    Correct.

19 Q.    And you eventually were promoted as the assistant

20 vice-president of NYCM casualty claims?

21 A.    Correct.

22 Q.    And at the time of the deposition, you were the assistant

23 vice president and casually manager, correct?

24 A.    Correct.

25 Q.    Do you still hold those positions?

1  A.    I hold the position of assistant vice president.

2  Q.    Before you began your employment at NYCM, you had no

3  experience in adjusting claims, correct?

4  A.    Correct.

5  Q.    And when you first were hired, you were not able to adjust

6  claims properly before you received training, is that correct?

7  A.    Correct.

8  Q.    You manage people at NYCM Insurance Company, correct, or

9  you did at the time of the deposition?

10  A.    I do.

11  Q.    And you did at the time of the deposition?

12  A.    Yes.

13  Q.    And you would agree that you are the supervisor of the

14  whole casualty unit?

15  A.    No.

16  Q.    Can you play Clip 6549, 5 through 6?

17          MR. KASTER:  I would like to see it before.

18          MR. PISANCHYN:  We have provided Bates stamped

19  documents to you.  It's 6549, which is Adjuster Catalano's

20  deposition, Paragraphs 5 through 6.  If you need a translation

21  in regard to that number, I can ask my co-counsel to help.

22          MR. HADDICK:  Would not Mr. Catalano's testimony be

23  more appropriate to impeach Mr. Catalano, Judge, and not a

24  different witness?

25          MR. PISANCHYN:  Your Honor, I can impeach her any way

1  I can.  Oh, I'm sorry.  This actually isn't Catalano's.  This

2  is her testimony.  I apologize.

3          MR. HADDICK:  I withdraw the objection, Judge.

4  BY MR. PISANCHYN:

5  Q.   Play the clip, please.

6  A.   (At this time, an audio recording was played.)

7          MR. PISANCHYN:  Do we have the volume turned up on

8  it?  You might have mute on that, Your Honor.

9          THE COURT:  There is no mute on.

10  BY MR. PISANCHYN:

11  Q.   Ma'am, would you agree that you supervise the entire unit?

12  A.   With the exception of Joe Catalano.

13  Q.   We are going to get into that, but you did tell me that

14  you supervise the whole unit, correct?

15  A.   With the exception of Joe Catalano.  I'm certain I told

16  you that.

17  Q.   Did you work with Joe?

18  A.   Pardon me?

19  Q.   Did you work with Joe?

20  A.   Do I work with Joe?

21  Q.   Did you work with Joe?

22       I asked you the specific question at the deposition.

23       Did you work with Joe, yes or no.

24  A.   I don't work with Joe.  Joe reports to Mr. Trueworthy.

25  Q.   Did you work with an Adjuster Dvoracek?

1  A.    I do.

2  Q.    Do you recall did you work with Adjuster Dvoracek at the

3  time of the deposition?

4  A.    He's part of that specific unit.

5  Q.    Again, I'm asking you a specific question, and my question

6  to you specifically is, ma'am, do you work with Adjuster

7  Dvoracek, yes or no.

8  A.    Not one on one.

9  Q.    So the answer is no?

10 A.    Correct.

11 Q.    And that is what you told me at the time of the

12 deposition?

13 A.    Correct.

14 Q.    And at the time of the deposition, I told you that you are

15 under oath, the same oath that would be given in front of this

16 Judge and jury?

17 A.    Absolutely.

18 Q.    Now, you have never worked or been Mr. Catalano's

19 supervisor or Adjuster Dvoracek's, correct?

20 A.    No.

21 Q.    Now I would like to play a clip to see why someone would

22 be saying that that is false, if that's okay.

23       That would be Question 900, Joe.

24             MR. KASTER:  Can you let us know a page number?

25             MR. PISANCHYN:  Sure.  Page No. 6849 in the Bates.

1          MR. KASTER:  Objection, Your Honor.

2          THE COURT:  Let me ask you this, only one lawyer

3   handles a witness.  So, from what I can gather, it was

4   Mr. Haddick originally had the --

5          MR. HADDICK:  I actually need to cease control.  This

6   is Mr. Kaster's witness, Judge.  I appreciate that courtesy.

7   Thank you.

8          THE COURT:  Go ahead, Mr. Kaster.

9          MR. KASTER:  Are we cross-examining her with a prior

10   statement of another witness?  I understand you can use prior

11   inconsistent statements of the witness, but a different

12   witness?

13          MR. PISANCHYN:  Yes, Your Honor.

14          THE COURT:  So what would be the evidentiary basis of

15   you can either show a prior sworn statement as being a past

16   recollection recorded or as a prior inconsistent statement of

17   this witness.

18          Why would we be reading or showing another witness'

19   statement who hasn't testified?

20          MR. PISANCHYN:  Two reasons, Your Honor.

21          First off, the Federal Rules do provide that I can

22   use a deposition video transcript for any purpose.

23          THE COURT:  Any purpose means any purpose under the

24   rules.

25          MR. PISANCHYN:  Right.

1          Second off, to first off impeach her, unless she

2     wants to wait -- my understanding is she has other things to

3     do -- if she wants to wait until after Adjuster Dvoracek.

4          So my objection then -- the reason I would play it is

5     to refresh her recollection, Your Honor, not for the truth of

6     the matter asserted.

7          THE COURT:  I'm going to sustain the objection.

8          I don't remember her saying that she doesn't

9     remember.  Now, this doesn't mean you can't ask her a question,

10    but the truth is that --

11         MR. PISANCHYN:  Well --

12         THE COURT:  No.  Let me finish, please.

13         The reason is that you can challenge a witness with a

14    prior inconsistent statement of that witness' testimony.

15         You can ask her a question about something that

16    somebody else said and see what her response is, but it would

17    be improper for you to be offering the sworn testimony of a

18    different witness as if that is somehow a prior inconsistent

19    statement of this witness.

20         So the objection is sustained.  You can ask her a

21    question, or you can ask her if she doesn't remember and you

22    wish to try to refresh her recollection.  If she says she

23    doesn't remember, then that's okay.

24    BY PISANCHYN:

25    Q.   Ma'am, do you know that Adjuster Dvoracek and Catalano

1  both said that they worked with you in this case -- not in this

2  case, but at NYCM Insurance?

3  A.   They work in the unit.

4  Q.   No.   My question is specific, and that is that they both

5  said that -- Adjuster Dvoracek and Catalano both said that you

6  were their supervisor.

7       Do you have a reason to disbelieve that?

8  A.   Jim's supervisor is Mr. Catalano, and Mr. Catalano's

9  supervisor is Mr. Trueworthy.

10 Q.   I understand what you're saying on the stand.

11      My question to you is, and I can play a clip for you.

12      Do you need something to refresh your recollection about

13 whether or not you were a supervisor of Adjuster Dvoracek and

14 Catalano?

15 A.   No, I am not.

16 Q.   So you're saying that you're not.

17      What I'm telling you, though, is that if Adjuster Dvoracek

18 stated that you are his supervisor and Adjuster Catalano's

19 supervisor, would that be a lie?

20 A.   I don't know exactly what context he was referring to, so

21 I would not want to respond to that.

22           MR. PISANCHYN:   Based on that, Your Honor, she would

23 like to put it in context, I would like to play the clip.

24           THE COURT:   That objection is sustained.   Nothing has

25 changed that.

1        If you want to ask that question ultimately of

2  whoever those people are when they get on, but it's not a prior

3  statement of her, and it's just clearly not admissible.

4  BY MR. PISANCHYN:

5  Q.    You would agree that Adjuster Dvoracek is in the casualty

6  unit?

7  A.    Yes.

8  Q.    And you would also agree that -- well, you're saying you

9  don't supervise -- just so I'm clear when Adjuster Dvoracek

10  gets on the stand, you're saying you never supervised him,

11  correct?

12  A.    I have not supervised him.

13  Q.    You would agree that at the end of the day you are in

14  charge of the whole unit there?

15  A.    With the exception of Mr. Catalano.

16  Q.    And would you agree that if something bad happens in the

17  unit, it's your responsibility?

18  A.    Yes.

19  Q.    Do you recall giving a different answer at the time of the

20  deposition?

21  A.    It sounds reasonable to me.  I would have said es, I would

22  think.

23  Q.    Can we play, it would be 6550, 1 through 5?

24        Ma'am, you would agree that at the time of the deposition,

25  I told you only to answer questions that you both heard and

**13**

1  understood?

2  A.   Yes.

3  Q.   And you did that?

4  A.   Yes.

5  Q.   And there would be no reason for you to change what you're

6  saying here today from what you said before, correct?

7  A.   Unless something new popped into my mind in the meantime.

8  Q.   That's true.  Are we ready for the clip?  Play the clip,

9  please.

10  A.   (At this time, an audio recording was played.)

11  Q.   So but here in front of the jury, it would be your

12  responsibility?

13  A.   It would depend upon what specifically you were referring

14  to.

15  Q.   Okay.  Before a person begins working at NYCM, would you

16  agree that they have to understand the policies of the company,

17  the policy itself and industry standards?

18  A.   Yes.

19  Q.   And you would agree that adjusting a claim in essence is

20  an expertise?

21  A.   Yes.

22  Q.   In other words, when you adjust a claim, it's not like you

23  wake up one day and say that I know how to adjust a claim.

24      Someone has to teach you how to do that, correct?

25  A.   Correct.

**14**

1  Q.   Since you oversee the whole casualty unit, according to

2  you now, except for your significant other, that would go for

3  the whole unit at NYCM Insurance, correct, the whole casualty

4  unit?

5  A.   I'm sorry.  What was the question?

6  Q.   So, since you oversee the whole casualty unit, that would

7  go for the whole unit at NYCM Insurance, that meaning they

8  would have to be taught how to adjust the claim?

9  A.   Yes.

10  Q.   You would agree that at NYCM Insurance, the adjusters have

11  to understand the actual policy itself -- well, I think I just

12  asked that -- and comply with industry standards?

13  A.   Correct.

14  Q.   Now, at the time of the claim, you would agree that there

15  was no written industry standards or policies and procedures?

16  A.   Correct.

17  Q.   And by the claim, I mean the Clemens claim we are here for

18  today?

19  A.   That's correct.  There was nothing in writing.

20  Q.   And how long had the insurance company been in business

21  before the Clemens claims?

22  A.   1989 -- or 1899, I'm sorry.

23  Q.   So a long time?

24  A.   Correct.

25  Q.   At least I consider it a long time.

1    Would you consider it a long time?

2  A.   I would.

3  Q.   And despite that, in the initiation of the Clemens claim

4  through quite some time, there was nothing in writing in regard

5  to guide an insurance adjuster in NYCM how to correctly adjust

6  a claim, correct?

7  A.   For the casualty unit, correct.

8  Q.   That's the claim we're talking about here, casualty, the

9  underinsured motorist?

10  A.   Correct.

11  Q.   Now, at the time of the deposition that I had spoken to

12  you, you said that NYCM had enacted policies and procedures and

13  you considered them, what were they called?

14  A.   Our best claim practices.

15  Q.   And they were in place since when?

16  A.   They were in place -- we began them in March of 2013, and

17  rolled out the comprehensive best practice by June of 2013 or

18  July of 2013.

19  Q.   June or July of '13, correct?

20  A.   Correct.

21  Q.   And it was actually your recommendation to put the best

22  practices in place, right?

23  A.   Yes.

24  Q.   And one reason we can agree that you decided to put that

25  in place is so examiners would have one consistent document?

1  A.    Correct.

2  Q.    And in regard to the best practices -- can we pull up --

3  you created the best practices, is that correct?

4  A.    Yes, I did.

5  Q.    The reason you decided to do the best practices is because

6  you thought it would help adjusters adjust claims?

7  A.    No.   The reason was, we're moving the entire company

8  towards a more corporate image, for lack of a better word.

9        We also had a branch team of casualty adjusters that was

10 going to join us in April, and we were also going to be

11 responsible for a branch out in Buffalo, New York.

12 Q.    So you're pretty sure of the time that these best

13 practices were put in place, correct?

14       It's on the document?

15 A.    I believe it is.

16 Q.    Can we pull that up?

17       Ma'am, looking here, can you tell me, first off, is this

18 the best practice handling for casualty examiners?

19 A.    Yes, it does look like it.

20 Q.    Can you read the bottom portion?

21       There's several versions of these best practices, correct?

22       They're all the same.   They're just in different formats.

23 A.    They're all the same, but it's a living document.

24       So as something new might come up, we might add to it as

25 an addendum at the back.

1  Q.    All of the documents that I have been given are exactly

2  the same, except for the format, and I think I have only had

3  them up to, like, 2015.

4        Do you have any reason to dispute that?

5  A.    No.

6  Q.    But can you tell me then what it says on the bottom of

7  that?

8        First off, looking at the top, can you tell me what it

9  says?

10 A.    Best practices.

11 Q.    No.  No.  The top, very top.

12 A.    NYCM, Diane Wildey.

13 Q.    That's who?

14 A.    Me.

15 Q.    Then it says, best practices, right?

16 A.    Correct.

17 Q.    And on the bottom, what does it say?

18 A.    A comprehensive detailed list that supplements the best

19 practice summary information provided on March 12th, 2013.

20 Q.    Now, would NYCM ever lie and say something that wasn't

21 true?

22 A.    About?

23 Q.    About this document.

24 A.    No.  Why?

25 Q.    The reason I ask is because it said it was provided on

1  3/12/2013.

2      That would be accurate then, correct?

3  A.    No.  It was provided on 3/12/13 was a memo.

4  Q.    So there would have been something in writing?

5  A.    It was a memo.

6  Q.    It would be in writing, though?

7  A.    Yes.

8  Q.    A memo is in writing?

9  A.    Yes.

10 Q.    You had said, and I asked you twice, June or July this

11 definitely would have been in place by?

12 A.    Correct.

13 Q.    And by this, I mean, these written policies and

14 procedures, correct?

15 A.    Yes.

16 Q.    So then let me ask you, why is it that you would tell --

17 would you ever tell someone that there was no written policies

18 and procedures?

19 A.    The casualty unit didn't have any prior to this.

20 Q.    No.  No.

21      When this was in place, so, say, in July, would you ever

22 tell anyone -- you would never tell someone there was nothing

23 in writing when the memo was sent out on 3/12, correct?

24 A.    The memo wasn't the actual best practices.  I may not be

25 understanding your question, sir.

1  Q.   You would agree that you, on behalf of NYCM, would never

2  tell anyone that there was no written documentation in regard

3  to adjusting claims after 3/12/2013, because there was

4  something in writing, correct?

5  A.   It was in writing in June, though, June or July.

6  Q.   So it was in writing in June or July?

7  A.   Correct.

8  Q.   And, thereafter, you would never tell anyone that it

9  wasn't in writing, correct?

10 A.   I shouldn't have.

11 Q.   Right, especially when you're under oath?

12 A.   Correct.

13 Q.   Can we pull up 775?  This is cross examination.

14      Ma'am, this is a deposition of you.  It was taken, you can

15 see, July 26, 2013.  Do you see that?  The screens are a little

16 bit --

17 A.   No, I don't see it.  I'm sorry.

18 Q.   Is it on your screen?

19      MR. KASTER:  Your Honor, could I at least get a copy

20 of whatever he's showing the witness?  I don't believe I've

21 ever been provided a copy.

22      MR. PISANCHYN:  She would have previous deposition

23 transcripts.  I have asked her about it during her deposition.

24      THE COURT:  That's not the question.

25      MR. KASTER:  I haven't been provided anything.

1      THE COURT:  Have you shown the exhibits that you're

2 going to be using?

3      MR. PISANCHYN:  No.  These are cross examination for

4 impeachment only, Your Honor.

5      MR. KASTER:  Your Honor, under the prior inconsistent

6 statement rule, I'm entitled to see that document before it is

7 shown to my witness.

8      MR. PISANCHYN:  It will be -- for the Court, it will

9 be Bates stamped 775.

10      THE COURT:  Have counsel supplied me with a copy of

11 your exhibit list?

12      MS. SEMPA:  We have an exhibit list, but it's not by

13 1, 2, 3, 4.

14      MR. PISANCHYN:  Right.  Everyone is 1, 2, 3, 4.  I

15 think in JERS we submitted it.

16      MS. SEMPA:  But that's in JERS.  That has nothing to

17 do with in court.

18      THE COURT:  We have a local rule that everyone should

19 have followed that requires you're to give the Court copies of

20 an exhibit list with particular markings so we can note when

21 things are in or not in.

22      Maybe you could do that this evening and get us a

23 copy -- that's listed in the local rules and was in the trial

24 practice order that went out -- that complies with that.  I

25 would appreciate that.  Thank you.

1            In the meantime, any documents that you want to show

2  the witness, make sure counsel is aware of those documents

3  first.

4            MR. KASTER:  This has never been provided to me.

5            I mean, I think I should have a copy before he asks

6  the question.

7            Your Honor, I'm just asking to keep a copy to put it

8  in context if he's going to ask her a question.

9            THE COURT:  Let me ask you, he's required to show you

10  what it is.

11            MR. KASTER:  That's fine.

12            MR. PISANCHYN:  The problem is, it's not coming up on

13  the screen as clear as I would like it, and that's why I was

14  just going to show the witness it.

15            THE COURT:  Make sure you show it to counsel first,

16  and then you can show it to the witness.

17            MR. PISANCHYN:  Even if he would like to come up

18  and --

19            THE COURT:  Hold on.  This is not difficult.  Show it

20  to counsel first.

21            MR. KASTER:  I only saw one of those.

22            THE COURT:   MR. PISANCHYN, that's not counsel.

23  That's counsel.  Show it to counsel first.

24            MR. KASTER:  Your Honor --

25            THE COURT:  Hold on.  Look at the document.  Is there

1 another document?

2        MR. KASTER:  I wanted to ask you about that one at a

3 side conference.

4        THE COURT:  First let's look at the document that

5 you've got, and then MR. PISANCHYN can ask his questions that

6 he wants.

7        If there's a second document that you've got a

8 question with, we can address that.

9        MR. KASTER:  I'm going to object to this, Your Honor,

10 as they are not inconsistent statements is my position.

11        THE COURT:  Objection is overruled.  You could ask

12 the witness a question based on prior statements.

13        MR. PISANCHYN:  Can we pull up 776?  I know it's a

14 little blurry.  775 first.  I'm sorry.

15 BY MR. PISANCHYN:

16 Q.   So this deposition, ma'am, you can see at the top it says

17 deposition of Diane Wildey.  That would be you, correct?

18 A.   Um-hum.

19 Q.   It says July 26, 2013 on it, is that correct?

20 A.   Correct.

21 Q.   And if I read along, would you be able to read it?

22 A.   I cannot read that.  It's far too blurry for me.

23 Q.   So the question says, and there is, for lack of a better

24 term -- and if I'm using an incorrect term, let me know, but a

25 manual that is maintained by New York Central with regard to

1  claims handling practices for their first line adjusters.

2      For litigation adjusters?  Correct.

3      What is your answer?

4  A.   No.

5  Q.   And it says, are there any documents, aside from a binder

6  or something like that, that New York Central maintains

7  regarding its policies and practices and procedures regarding

8  claims handling?

9      That's for litigation adjusters?

10     All of these litigation adjusters, all of these questions.

11     What's your answer?

12  A.   No.

13     Was that specific to a specific time period?

14  Q.   Yes.

15  A.   What claim was that?

16         MR. PISANCHYN:  The first page on that, Doug, of this

17  deposition taken July 26th.  It would be in cross examination.

18  BY MR. PISANCHYN:

19  Q.   Do you remember what claim it was?

20  A.   No.  I'm asking you, because there were several claims.

21  There was a very specific period of time that they were asking

22  questions for.

23  Q.   Right.

24  A.   And the questions were for?

25  Q.   THIS claim was for what type of case.

1  A.   I don't know without seeing the rest of the deposition.

2  Q.   We'll get it.  I will tell you the name, and I can tell

3  you the name of the deposition in a second.

4      You had just told us previously will that there would be

5  something in writing at this time, correct?

6  A.   Correct.

7  Q.   And you were telling another attorney under oath that

8  there wasn't, correct?

9  A.   For whatever time period he was asking me about.

10 Q.   I think I can clear that up.

11 A.   Okay.

12 Q.   It says, is there any documents, aside from a binder or

13 something like that, that New York maintains regarding

14 policies, practices and procedures regarding claims handling ?

15     He's asking you that question on this date; July 26th,

16 2013, correct?

17 A.   Yes, he is.

18 Q.   And you're telling him no?

19 A.   Because he may have already given me a very specific time

20 frame depending upon the claim.

21 Q.   Well, there's previous pages.  There's 57 and 58.

22 A.   Well, if I had the whole document, I would be able to see

23 that.

24         MR. KASTER:  You gave me the cover page.

25         MR. PISANCHYN:  Did you see the cover page?

1          MR. KASTER:   I don't know what information, other

2    than the case name.   Whatever is proceeding there, the time

3    frame listed is in the question, but I don't know what I'm

4    supposed to do with that.

5    BY MR. PISANCHYN:

6    Q.    Ma'am, this is CE 761.   Can you tell me who the claimant

7    was?

8    A.    Quincy Mutual.

9    Q.    Do you remember that claim?

10   A.    I do.

11   Q.    What type of claim was it?

12   A.    That's the excess insurance carrier.

13   Q.    What type of claim?

14   A.    An excess insurance carrier.

15   Q.    Was it a bad faith claim?

16   A.    It was an interest claim.

17         They alleged bad faith, but also the bone of contention

18   was interest.

19   Q.    On 676, Page 61 -- this is a multi that was sent to by a

20   multi transcript.   There's different pages.   So the Bates stamp

21   is CE 776.   This is Page 61.

22         What about general claims handling practices, what do you

23   say?

24   A.    No.

25   Q.    And then it says, that's part of what they do in their

1  job, correct, they adjust claims, value claims and settle

2  claims, correct?

3  A.   Correct.

4  Q.   So from these documents, at least that I was just showing

5  you, you're telling another attorney in a bad faith claim --

6          THE COURT:  Okay.  Hold on a minute.  Let me see

7  counsel for a second.

8    (At this time, the following colloquy occurred on the

9  record at sidebar.)

10          THE COURT:  You were specifically instructed there

11  was no discussion or conversation about any other claims.

12          Now twice you said in this other bad faith claim.  It

13  was specifically in the order.

14          Now it's easy for me to see what's going on.  You

15  don't do it.  You got that?

16          MR. PISANCHYN:  I promise, Your Honor.

17          THE COURT:  Or I will castigate you in front of that

18  jury if you do it.

19          The second thing is, if there's a time frame you're

20  talking about here, and it's in that deposition, give the time

21  frame, because if it doesn't have a time frame, then I don't

22  know that it's relevant and I will exclude all of it.

23          So ask the question about if there's a time frame,

24  particularly, then I will allow it.

25          MR. KASTER:  Specifically they're prior to 2009.  I

1  maintain my objection as hearsay.

2          THE COURT:  So that part of the document and any

3  future document from some other case, no mention of what type

4  of case it was, and the specific time frame in this one, you

5  will now ask the witness if this shows that 2009 was the time

6  frame.

7          MR. PISANCHYN:  I want to just make sure.  The

8  judge -- I'll show you the document -- the judge said in

9  another case that she willfully failed to produce documents.

10          MR. KASTER:  Again, Your Honor, that is about another

11  claim.

12          THE COURT:  Are you calling the judge as a witness in

13  the case?

14          MR. PISANCHYN:  No.  I'm going to cross-examine her

15  with the document.  It's not for the truth of the matter

16  asserted.  It's for impeachment.  I will ask her if she's ever

17  done this in the past.

18          THE COURT:  Tell me more particularly what is this.

19          MR. PISANCHYN:  Should I just get the document for

20  you?

21          THE COURT:  No.  I want you to tell me what it is.

22          MR. PISANCHYN:  It's basically a document where

23  basically Miss Wildey submitted four affidavits, and the judge

24  specifically said that they were self-serving and that she had

25  the documents and lied about producing them.

1       MR. KASTER:  Your Honor, I have never seen that

2 document before.  I have never authenticated that document.

3       Your Honor, that's about other claims other than this

4 one.

5       Your Honor, that's about a discovery situation,

6 which, as a matter of law under the O'Donnell case in the

7 Pennsylvania Superior Court, may not be used, and not only

8 about discovery, about discovery in another case.

9       THE COURT:  Show me the document.

10       MR. PISANCHYN:  There is no way I can get it up on

11 your screen.

12       THE COURT:  No.  I want to see the document.

13       MR. PISANCHYN:  We are looking for the document, but,

14 in the meantime, this is something completely different.  This

15 is just a line of questioning.  So you can look at it if you

16 would like to see what I'm talking about.

17       THE COURT:  Show that to counsel.

18       As to the question of whether or not there was any

19 documents or not, I will allow you to ask that question.

20       On redirect, if you want to look at it, you can

21 challenge it, but I'm not so sure that a 2009 document applies

22 or doesn't apply.

23       MR. KASTER:  I will let Your Honor read that.

24       THE COURT:  As to this, who is the judge, by the way?

25       Some judge's order from something, I'm not going to

1 allow that.

2          MR. PISANCHYN:  Your Honor, what I planned on doing

3 was, I planned on -- we believe there wasn't documents given in

4 our case and --

5          THE COURT:  You can make that argument as to what was

6 not given in this case.

7          Whatever happened in some other case, it references

8 other people in that case.  I have no idea what that case is,

9 and I have no idea who this judge is.  I have no idea what the

10 facts were that he based it upon.  So it is not coming in, in

11 this case.  This is case is going to be about this case.

12          So if you have evidence in this case that you

13 requested documents that she has, you can certainly approach

14 her with that.

15          Something that happened in some other case, some

16 unnamed case with some unnamed judge, absolutely is not coming

17 in.  All right, gentlemen?

18          Look it, and we are not going to spend -- we are not

19 going to spend every day in this trial wasting our time with

20 hours or two hours with getting 10 or 15 questions out.  Got

21 it?

22          MR. KASTER:  Thank you, Your Honor.

23     (At this time, the discussion held at sidebar concluded.)

24 BY MR. PISANCHYN:

25 Q.   Ma'am, in this case -- well, let me ask you, first off,

1    were there any committee meeting notes produced?

2    A.    I'm sorry.  I didn't hear you.

3    Q.    Any committee meeting notes produced?

4    A.    I don't recall.

5    Q.    You would agree that in the past, NYCM would actually

6    record its committee meeting minutes, correct?

7    A.    They were transposed into Microsoft Word, yes.

8    Q.    Well, let me ask you, first off, though, the first thing

9    that would happen was, it would be digitally recorded, correct?

10   A.    Not digitally, just a tape recorder.

11   Q.    And when I say digitally, I meant like audio.

12   A.    Yeah.

13   Q.    So that would be the discussion between Adjust Dvoracek,

14   his supervisor and potentially the vice president in regard to

15   how much they should pay on this claim, correct?

16   A.    On which claim?

17   Q.    In general, that's the type of things that used to be

18   recorded, correct, in committee meetings?

19   A.    It would be the entire committee, and it could be the

20   entire team would be there.

21   Q.    And it would be recorded?

22   A.    Yes.

23   Q.    And then the recording would be made into a transcript?

24   A.    It would be a Microsoft Word document, yes.

25   Q.    And that transcript would be distributed to its insurance

1  adjusters?

2  A.    Some of the adjusters would take it, but not all.  It was

3  sort of filed in the Microsoft Word document.

4  Q.    Now, we went through the notes in the case that NYCM

5  provided me, correct?

6        At the time of the deposition, remember you went through

7  them?

8  A.    Yes.

9  Q.    And my question to you is, first off, were there Lotus

10 Notes contained in there?

11       Does NYCM use Lotus Notes?

12 A.    Are you talking about the file review analysis form?

13 Q.    No.  First I'm asking you, does NYCM use Lotus Notes, yes

14 or no?

15 A.    Yes.

16 Q.    So were the Lotus Notes provided to NYCM insured's in this

17 case?

18 A.    The Lotus Notes would be the file review analysis that we

19 did provide.

20 Q.    So you believe they were provided?

21 A.    That's part of the Lotus Notes.

22 Q.    We will go through that, but you believe it was provided

23 here?

24 A.    As far as I know, yes.

25 Q.    Now, you reviewed the notes, and you told me at the time

1  of the deposition that they were all the notes.  We're going to

2  pull them up in a little bit.

3      So I'm only asking you, do you know if the Lotus Notes

4  were contained in that, yes or no?

5  A.   I recall that you showed me Pace documentation, which was

6  the computer logs, the file review analysis, which is also part

7  of Lotus Notes.

8  Q.   So do you know if all the Lotus Notes were provided, yes

9  or no?

10  A.   I don't know the answer to that I guess.

11  Q.   Do you know if they provided any audio recording of the --

12  if Adjuster Dvoracek says that he took this to committee, did

13  they provide the audio recording?

14  A.   There wouldn't be an audio recording.

15  Q.   Why not?

16  A.   They reuse the tapes.

17  Q.   So they don't keep them?

18  A.   No.  They reuse the tapes.

19  Q.   In the past, someone raised the fact, this whole fact, and

20  still to this date, despite that being raised, NYCM still

21  doesn't keep the tapes, correct?

22  A.   We actually don't use audio recording anymore.

23  Q.   Is there a transcript that was provided in this case?

24      In regard to if Adjuster Dvoracek says he took it to

25  conference, was there every a transcript provided to plaintiff

1   about that?

2   A.   It would have been part of those Pace notes or if it had

3   gone to a committee.

4   Q.   Now, my understanding is in the notes, there is actually

5   something that seems pretty neat that would actually put the

6   correspondence in chronological order.

7        Is there something like an index?

8   A.   Which system are you talking about?

9   Q.   I don't know.  What kind of systems do you have at NYCM?

10  A.   We have the Filenet system.  We have the Pace system.  We

11  have the Lotus Notes database.

12  Q.   What about the Nines?

13  A.   The Nines.  That's on an old AS 400 file.

14  Q.   Do you know if this case, when it was initiated, would

15  have been on the Nines?

16  A.   What is the year of this date of loss?

17  Q.   2009.

18  A.   No, it would not.

19  Q.   So there is no Nines for this?

20  A.   No.

21  Q.   Now, let me ask you, there should be somewhere in one of

22  the screens that would be able to tell us an index of all of

23  the documents that were received?

24  A.   The table of contents under Filenet.

25  Q.   That's right, the table of contents.

A.    Correct.

Q.    Do you know where that is?

A.    You can't print the table of contents.

       What you can do is, you have everything in the table of contents, and you print the entire file.

Q.    So we can't see -- so somewhere at NYCM, someone is looking at a table of contents and gets to say, this letter was sent on this date, this letter was received on this date, this letter was sent on this date, this letter was sent.

       Is that, in essence, what the index does?

A.    No.

Q.    Tell me what the index does.

A.    It's just the actual imaged file.  We don't have paper files anymore.  So every time a document comes in, it's part of that file.

Q.    And it will say, though, in chronological order what happened on the file.  It's indexed.

       That's an index, right?

A.    It doesn't necessarily say what happened chronologically. It goes in, and whatever it's called, that's -- I mean, it could be a deposition summary, it could be an attorney bill, it could be a police report.

Q.    It goes in chronologically as it was received?

A.    As it's received, yes.

Q.    So somewhere at NYCM Insurance in Edmeston, we can see

1  when NYCM received any and all documents that it received in

2  this case in chronological order, correct?

3  A.   Yes.

4  Q.   And do you know -- and I can make the representation, and

5  maybe counsel can correct me if I'm wrong, we've never been --

6           THE COURT:  Let's just try to ask questions and not

7  include statements.

8           So we can move this along in a reasonable manner,

9  please just ask questions and allow the witness to answer the

10  questions.

11  BY MR. PISANCHYN:

12  Q.   Has that ever been provided?

13  A.   You have the file, I believe.  That's the file.

14  Q.   And that was never provided, isn't that true?

15  A.   You weren't provided with the file?

16  Q.   I was provided with the file, but no index.

17       Do you know, would the index be provided?

18  A.   The index is just words saying that this is the document.

19  It is not -- I think we're thinking two different -- it's not

20  like a table of contents in a book.

21  Q.   An index --

22  A.   It's an imaged file.  Every document in there, that's what

23  we gave you.

24  Q.   But you could hit control print on that and we would be

25  able to see the order they were received.

1       That's an issue in this case, when NYCM received certain

2  documents that the plaintiff is saying they sent.  Do you

3  understand that?

4  A.   Anything that comes in should be date stamped.

5  Q.   I know, and we went over that, and we're going to go over

6  it in your deposition, but in this case, there's a lot of

7  documents that aren't date stamped, and so I don't know when

8  NYCM received it, fortunately or unfortunately.

9       That's how they were provided by NYCM.  Do you understand

10 that?

11 A.   No, I didn't realize that.

12 Q.   So if there is not a date stamp, and if the insurance

13 adjuster were to say, he doesn't know other than from the

14 notes, we wouldn't know when that document was received,

15 correct?

16 A.   It's not a dated form?  I mean, it didn't get dated?

17 Q.   There's no timestamp on the side of when NYCM would have

18 received it.

19 A.   Was it e-mailed in?

20 Q.   I'm not sure.  They're just documents that don't have that

21 stamp.

22 A.   If it was e-mailed, it might have gone directly, because

23 that's all electronic --

24 Q.   The mailroom?

25 A.   It wouldn't go to a mailroom.  It would just go

1  electronically into the machine.

2  Q.    So let me just get back into it.

3        Before 2013, NYCM adjusters did not have a consistent

4  document according to you, correct?

5  A.    We didn't have a written document.  We had a consistent

6  way of handling files.

7  Q.    That was the same way that you had told me is the same way

8  you adjust claims even as we sit here today, correct?

9  A.    Correct.

10 Q.    NYCM always believes it's important that there is

11 consistency in claims handling?

12 A.    There should be as much as possible.

13 Q.    And it's also important that in the process, because if

14 the examiner understands how to move a claim forward timely,

15 that's important?

16 A.    Yes.

17 Q.    Would you agree that a written policy is always better

18 than a verbal policy?

19 A.    It certainly was when we got larger, absolutely.

20 Q.    So just generally, would you agree that a written policy

21 is always better than a verbal policy?

22         MR. KASTER:  Objection.  It calls for the witness'

23 opinion.

24         THE COURT:  Overruled.

25         THE WITNESS:  I would agree that as we got bigger, it

1  was absolutely necessary.

2  BY MR. PISANCHYN:

3  Q.   In fact, you would agree that NYCM, that's why the best

4  practices were implemented because they're very important, and

5  they put those in writing, correct?

6  A.   Correct.

7  Q.   And so you would agree that NYCM first put it in writing

8  in 2013 because of those reasons?

9  A.   And we had -- teams were joining us, yes.

10  Q.   Was there any other reasons, such as anything else that

11  was going on around that time in 2009?

12  A.   In 2013?

13  Q.   Oh, in 2013, yeah.

14  A.   In 2013 is when we started -- no.  That's when the two

15  different teams were -- they were joining us, and I had not had

16  a lot of interaction with those teams.

17  Q.   You would agree that it's the team leader's job to make

18  sure that NYCM's policies sand procedures are followed?

19  A.   Yes.

20  Q.   And according to the best practices model, they were --

21  NYCM, in essence, got these best practices from a different

22  insurance company?

23  A.   No.  I get them from an actuarial firm.

24  Q.   Okay.  Anyway, these best practices were received from a

25  different company?

39

1  A.   Yes.   I got them from a different -- an actuarial firm for

2  their template.

3  Q.   And it was your testimony that those are the best

4  practices that you're using as we sit here today?

5  A.   No.

6  Q.   Are they the same ones that were used in 2013?

7  A.   What I received from the other company, I needed their

8  template.   So are you saying that I was using their best

9  practices?

10      Because, now, we took their stuff out, because they had to

11  do with an actuarial firm, and we put our information in.

12  Q.   Where is the original template so we can be sure that that

13  happened?

14  A.   I just saved it as my document and moved forward.   So I

15  don't have the original.

16  Q.   So you don't know where that is?

17  A.   I used their template.   It doesn't exist.

18  Q.   Their template, before you put your information in, where

19  is that now?

20  A.   I used it.   It doesn't exist.   I took their stuff out and

21  I saved it as my template and I moved forward.

22  Q.   In regard to the supervisor, in this case, it's your

23  understanding that Joe Catalano, the gentleman sitting here,

24  was the supervisor on the Clemens case?

25  A.   That's what I had come to understand, yes.

1  Q.    And you would agree that it's the supervisor's job to

2  enforce that the examiners are following the best practices,

3  correct?

4  A.    Yes.

5  Q.    And you would also agree that the supervisors have to

6  follow the best practices too?

7  A.    Yes.

8  Q.    And if a supervisor isn't following the best practices,

9  there has to be a person that makes sure that he or she is

10  doing it, the supervisor as well, correct?

11  A.    Yes.

12  Q.    And it was your testimony previously that supervisors do

13  not adjust many claims.  They have very few, correct?

14  A.    Generally, yes.

15  Q.    You had, in fact, told me that it was a rare occasion when

16  a supervisor had to adjust a claim at NYCM, and that would

17  normally be because there was too many files within the

18  litigation unit, so the supervisor would take over a few?

19  A.    Or if there's someone on vacation, or if there's

20  disability, someone was on disability, yes.

21  Q.    At the time of the deposition, I had asked you, do you

22  know who was the adjuster assigned to the case for, say, two

23  years before the case resolved?

24  A.    You asked me that?

25  Q.    I think I may have.  Do you know who it was?

1  A.    I know it's Jim Dvoracek now.

2  Q.    Oh, so it went back to Joe (sic) Dvoracek?

3  A.    No.  He handled it initially from what I understand now,

4  and then it went to Joe Catalano.

5  Q.    And that would be a rare objection?

6  A.    It may have just been simply because Jim had too many

7  files.  I don't know.

8  Q.    Do you know if Jim told you back around that time that he

9  was inundated, had over 250 files, and couldn't handle them

10 all, and his cup was spilling over and making a mess, in other

11 words, in essence?

12 A.    No.

13 Q.    You don't recall that?

14 A.    No.

15 Q.    Do you know looking at this claim whether you ever read

16 that?

17 A.    I haven't looked at this claim.

18 Q.    So you never looked at this claim yet?

19 A.    No.  It was resolved before I got involved.

20 Q.    How about this claim, the one we're here on?

21 A.    No.

22 Q.    So you would agree that at the time of our deposition at

23 least, the supervisor, Adjuster Catalano was the adjuster on

24 Mr. Clemens -- the Clemens family case, correct?

25 A.    I believe so.

1  Q.   And you would agree that there is only four people at NYCM

2  that would able to reprimand Joe Catalano for not doing his

3  claims practice appropriately, including yourself --

4  A.   No.

5  Q.   -- if you included you?

6  A.   I don't have anything to do with Joe.

7  Q.   Well, I'm asking you, there would only be four or five

8  people that could do that, not that you do.  I just don't want

9  to trick you.

10  A.   He reports to Mr. Trueworthy.

11  Q.   Can you replay clip 5589, 1 through 9?

12        MR. KASTER:  Once again, Your Honor, I would just

13  like to see a copy of what it is.

14        THE COURT:  Is this the copy of her deposition?

15        MR. PISANCHYN:  It is, Your Honor.

16        THE COURT:  Do you have copy of her deposition?

17        MR. KASTER:  I do have a copy.  I didn't know what --

18        THE COURT:  Well, I think that all of this has been

19  copies of her deposition.

20        MR. KASTER:  Some of them were depositions from other

21  cases.

22        THE COURT:  We didn't let those in.  We have

23  determined that they don't come in.

24        So this is her deposition.  You should have a copy.

25  She's your client.  Open it up.

1          And here is how we will proceed -- this is how we

2     always proceed -- if you want to show the witness a portion of

3     a deposition, you will refer to the deposition, the actual page

4     in the deposition and the line numbers in the deposition.  You

5     will open up your deposition, and you will look at the page

6     number and the line numbers.

7          This is kind of standard practice.  Let's see if we

8     can move along here.

9          MR. PISANCHYN:  Can I play the clip, Your Honor?

10          THE COURT:  Sure.  So we're still apparently not

11     understanding.

12          Tell us again what page number and lines.

13          MR. PISANCHYN:  Page 58 of Catalano.

14          THE COURT:  Lines?

15          MR. PISANCHYN:  One through 9.  It's actually Wildey.

16          THE COURT:  It's not Catalano.  It's Wildey?

17          MR. PISANCHYN:  Yes.

18          THE COURT:  The lady that's on the stand.

19          It's Page 59?

20          MS. ALBRIGHT:  58, Lines 1 through 9.

21          THE COURT:  Okay.

22     BY MR. PISANCHYN:

23     Q.   Play it, please.

24     A.   (At this time, an audio recording was played.)

25     Q.   So my question to you again, ma'am, is, there would only

1  be four or five people, including yourself, that could write up

2  Joe for not doing his job, correct?

3  A.    No.  I am in charge of those four other supervisors.  Tim

4  Trueworthy is in charge of Joe Catalano.

5       What I was trying to say is that myself or four out of

6  five people, four out of the five supervisors, or Tim

7  Trueworthy, as it relates to Joe.

8  Q.    In regard to policies and procedures for reserves and

9  valuation of the claim, let me ask you, is there any policies

10 or procedures in regard to how NYCM adjusters make reserves at

11 the time of the Clemens matter?

12 A.    At the time of the Clemens matter?

13 Q.    Yes.

14 A.    I don't think I -- are you asking me how they arrived at

15 the reserve on the Clemens matter?

16 Q.    Let me just ask you, there is no policies and procedures

17 in regard to how NYCM adjusters make a reserve, is that

18 correct?

19 A.    Correct.  It would be a file-by-file basis.

20 Q.    Right.  So there is no policies and procedures that tell

21 an insurance adjuster at NYCM how to set reserves?

22 A.    Correct.  It's based on each file.

23 Q.    And there's no policy according to you, but NYCM tried to

24 review and claims reserves and try to set those reserves

25 roughly about once a year, correct?

A.   We want to make sure that we have sufficient money set aside as soon as possible, even if it's based on verbal information, so that as the information comes in, you can then adjust or maneuver that reserve up or down as is necessary.

Q.   But NYCM tries to do it once a year is my question, at least once a year?

A.   No.  The files are actually -- if you see a file that sat that long, generally a litigation file where somebody is not working with you, you would just check that to see if there is anything you can do to get that file moving.

Q.   6626.  That will be lines 22 through 24.  Then 6627, spills over to the next page.

A.   (At this time, an audio recording was played.)

Q.   Would you agree, as I asked you before, that NYCM tries to review claims and reserves at least once a year?

A.   At a minimum once a year, yes.

Q.   Now, are you involved in setting reserves?

A.   It would depend on if it's in the committee meeting or not.

Q.   Are you involved in setting reserves even if it's not in the committee?

A.   There are occasions that I do help people set reserves.

Q.   Let me ask you, is there a policy and procedure in regard to how often a claim is to be reserved?

A.   How often?

1  Q.   Yes.

2  A.   I don't quite understand what you mean by how often.

3  Q.   Like every, like, say, 90 days or every 120 days or every

4  so often.

5  A.   We try to get the information and reserve it appropriately

6  once.  It's a possibility that you might have to increase it

7  with new information or decrease it with new information.

8  Q.   My question is merely, is there a policy and procedure?

9  A.   To reserve it as soon as you know enough information to

10  set a reserve.

11          MR. PISANCHYN:  Can we play 6627?

12          Your Honor, I don't know the procedure.  Should I

13  ask, or may I just play the clip once it's ready?

14          THE COURT:  You can just play the clip once you have

15  identified what the clip is for the other side.

16          Something you might want to be careful of is that

17  Rule 613 talks about prior inconsistent statements.

18          So far all I have heard is nothing that strikes me as

19  being inconsistent.  Things that strike me as being that she

20  said this before, and there is a slight tweak in the language,

21  but not in the substance of the language.

22          It was pretty easy for me to understand when she said

23  that she supervised four of the people, all except that one

24  individual, and yet, we aren't going to sit here and we're not

25  going to play everything the witness -- every question you

1  asked the witness.  We're not going to play what her deposition

2  was related to that same question, unless it actually and

3  specifically involves some inconsistency of substance.  So far,

4  I'm not hearing that.

5  BY MR. PISANCHYN:

6  Q.   So, in essence, it's my understanding that you said that

7  there is no policy or procedure -- let me ask you again.  I

8  will ask you specifically.

9       So there is no policy and procedure in regard to how often

10  a claim is to be reserved, correct?

11  A.   No.

12  Q.   That's incorrect?

13  A.   No.  We would want -- you would want to reserve it as soon

14  as you could timely do it.

15  Q.   Play the clip.

16       (At this time, an audio recording was played.)

17       You would agree that you, at the time of the deposition,

18  agreed to the same question I just had asked?

19  A.   Maybe we're not understanding the question the same way.

20       My whole thought is we try to reserve a file as quickly as

21  we can.  That really would be the policy and procedure.

22  Q.   In regard to documenting a file when you're working on it,

23  is anyone that works on a NYCM Insurance claim supposed to

24  document it in the notes?

25  A.   Anything of substantive matter, yes.

**48**

1  Q.    So, for instance, if an adjuster were to receive a phone

2  call, they should document it, correct?

3  A.    If it has anything to do with substance of that, yes.

4  Q.    If an adjuster makes a call, they should document that as

5  well, correct?

6  A.    Correct.

7  Q.    If an adjuster receives information, the information

8  received should be in the actual file itself, correct?

9  A.    That information would be in that file, in that portion of

10 the file, yes.

11 Q.    When you're reviewing something, should the adjuster

12 document what exactly they're reviewing?

13 A.    If it's something new, absolutely.

14       If it's something they've already received, they may not.

15 Q.    But if they already received it, then they would have

16 already reviewed it and put it in the notes?

17 A.    Right.

18 Q.    So, in essence, when we're looking at these adjuster's

19 notes at some point in time, it's supposed to be, in essence,

20 a history -- an adequate recitation of the history of the

21 claim, correct?

22 A.    Correct.

23 Q.    And would you agree that in the file, there is supposed to

24 be a value which is an opinion on the actual claim in the

25 notes?

1 A.    If there's enough information to put a value on that

2 claim, yes.

3 Q.    So once there's enough information, a value is to be put

4 on a claim, correct?

5 A.    If they have enough information, yes.

6 Q.    You would agree that when NYCM makes an offer, it would be

7 based on whatever the insurance adjuster has in their file?

8            MR. KASTER:  Objection, Your Honor.  It's about the

9 Court order earlier.

10           THE COURT:  Let's have a sidebar.

11           In fact, what we'll do is, we'll take a break and let

12 you guys stretch and use the facilities.  So we will take 10

13 minutes.

14           Now, during the course of the break, no conversation

15 or discussion about the case and no use of electronic devices

16 in any way.

17           Don't do any investigation related to the case.

18 Don't form any opinions, because you haven't heard all of the

19 evidence or any of the law that relates to the case.

20           All that being said, we will see you in about 10

21 minutes.

22      (At this time, a 10-minute recess was taken.)

23      (At this time, the following colloquy occurred on the

24 record at sidebar.)

25           THE COURT:  Okay.

1          MR. KASTER:  Your Honor, the Court has already ruled

2    on the motions in limine actually filed by both parties that

3    settlement offers and negotiations are inadmissible.

4          I understand the question went to the general

5    practice, but if specific negotiations and offers are

6    inadmissible, I don't know how the general practice of coming

7    up with amounts to offer is even relevant given the Court's

8    ruling.

9          THE COURT:  All right.  MR. PISANCHYN.

10          MR. PISANCHYN:  Your Honor, right now in exactly what

11   he said, I'm just getting into general in regard to how the

12   claim is supposed to be handled according to the vice

13   president, and then whether or not the claim was handled,

14   that's his objection of if I am getting into specific

15   negotiations, and I have not.

16          THE COURT:  Well, let me cover two things.

17          First of all, that Judge Conaboy's ruling in my

18   reading of it relates to the fact of any negotiations or

19   mediations that related to the bad faith claim, not that relate

20   to how it was adjusted beforehand, because that information is

21   certainly relevant as to whether or not there is bad faith in

22   this issue.

23          I read his decision as being that any mediation that

24   occurred in this case -- in fact, he used those words

25   specifically -- and any discussions about settlement offers

1  that were made in this case are not admissible, not to be

2  discussed and no part of it.

3         As to what was offered or demanded for that matter in

4  the underlying case, that clearly goes to whether or not it's

5  bad faith.  If you know that it's worth $25,000, and you offer

6  $5, that clearly goes to that.  So I don't read that the way

7  you read that at all.

8         My reading of it is clear.  In fact, I remember him

9  specifically writing in there that nothing but the mediation

10 which related to this case and offers made in this case, and

11 the rules don't allow any rules or discussions that were made

12 in this case, but as to the underlying claim, of course, they

13 come in.

14        So to that extent, to the extent you're objecting to

15 that, it's overruled.  To the extent that there's any

16 conversation or discussion related to anything that involved

17 settlement discussions of this case, they aren't admissible,

18 and unless they became relevant at some point because of some

19 allegation that the defense delayed when it was based on the

20 prosecution's activity in the case.

21        MR. KASTER:  Your Honor, there was certainly a motion

22 in limine filed relative to the mediation.  It was a separate

23 one, but here on Page 12 of Judge Conaboy's order of June 15,

24 2015, the Court is specifically referring to demands or

25 evaluations of the SUM claim, not of the bad faith claim.  It

 1  specifically says in heading 12, the SUM claim negotiation.

 2          MR. PISANCHYN:  Your Honor --

 3          THE COURT:  Just hold on a minute.  One at a time.

 4          Go ahead.

 5          MR. KASTER:  Your Honor, the other thing, at one

 6  point, the SUM claim was part of this case; hence, the ruling.

 7  I just wanted to clarify that point, because Your Honor said

 8  this case.  Obviously, I think Your Honor was talking about the

 9  bad faith case.

10          THE COURT:  I'm talking about the bad faith case when

11  I say this case.

12          MR. KASTER:  I think that Judge Conaboy's ruling is

13  clear that he's referring to the settlement discussions

14  relative to the SUM claim.

15          THE COURT:  I disagree.

16          To me it's absolutely clear that how could you have a

17  bad faith case if you can't talk about what the amounts were

18  that were discussed during the bad faith case, meaning the

19  underlying case.

20          I believe that the correct ruling, and what he, I

21  believe, ruled on in my reading of that is that no conversation

22  or discussions concerning the bad faith claim, counsel's

23  discussion or the mediation particularly that Judge Conaboy

24  ordered with a mediator and then had as a result of that, but

25  as to the bad faith claim, as to the underlying activity, I

1  don't believe that's the case, nor do I believe that Rule 408

2  covers that in a bad faith case.  It certainly covers that we

3  would not be able to talk about any offers or demands that were

4  made that could influence the jury on what is left before them,

5  the bad faith case.  So that's my ruling on it.

6          MR. KASTER:  Your Honor, I just would like to state

7  the law of the cases, the objection we're going to put on the

8  record, understanding Your Honor's ruling.

9          THE COURT:  Your objection is preserved.

10          As I said, I clearly read it to be different than how

11 you read it, and I read the law to be different.  So that is

12 the ruling.

13          MR. KASTER:  Thank you, Your Honor.

14          THE COURT:  Now, MR. PISANCHYN, we are not going to

15 spend days with you asking the witness a question and then

16 trying to bring up what really is consistent, not inconsistent,

17 consistent statements.

18          A prior inconsistent statement is as to substance,

19 not as to, well, I didn't quite -- to me, it was exceptionally

20 clear that she said, I don't supervise that one guy, this

21 Trueworthy, or whatever his name is, he does, and I do the

22 others.

23          We wasted 10, 15 minutes pulling up a document that

24 said exactly the same thing.  We're not doing that, got it?

25          MR. PISANCHYN:  Yes, Your Honor.

1          THE COURT:  So if you want to ask questions, ask

2  whatever you want.  Let's move through it.  If there's an

3  actual inconsistency that is preserved by a prior deposition

4  testimony, I have no problem in bringing that up, but I am not

5  going to bring up effectively twice the same testimony, and my

6  suggestion is that you understand the answer before you start

7  bringing up things that are really consistent.

8      (At this time, the discussion held at sidebar concluded.)

9          THE COURT:  Welcome back.  Please come back up to the

10  stand, and you are reminded that you're still under oath.

11          MR. PISANCHYN:  May I proceed, Your Honor?

12          THE COURT:  Sure.

13  BY MR. PISANCHYN:

14  Q.   In this case then, you were the vice president of claims,

15  correct?

16  A.   I'm the assistant vice president, yes.

17  Q.   And it is important -- so in regard to the Clemens case,

18  you didn't even look at it to determine whether or not bad

19  faith was committed in this case, correct?

20  A.   I have not looked at the file.

21  Q.   And it is important to you as vice president to determine

22  if bad faith was committed in this case, correct?

23  A.   Of course.

24  Q.   And the reason it would be important so NYCM could fix its

25  mistakes if it made them, correct?

1  A.    Correct.

2  Q.    And since 2011, the Clemens have been writing letters to

3  NYCM, did you know that, and they were alleging bad faith, and

4  despite that, it is your testimony as you are sitting here

5  today that you didn't even look at Mr. Clemens' case to see if

6  anything was wrong?

7  A.    No.

8  Q.    In fact, it's your testimony, ma'am, that you said that

9  NYCM will wait until the end result and then determine if a

10  decision is based upon what happens in front of the jury,

11  correct?

12  A.    No.  I said I would wait until the entire issue has been

13  resolved, because there is a lot of legal matters involved that

14  have a bearing on it.

15  Q.    Would you agree that you, as the vice president of NYCM,

16  is unfamiliar with Pennsylvania Law?

17  A.    I am not familiar with Pennsylvania Law.

18  Q.    Even at the time of the deposition in 2014, you didn't

19  know anything or very limited information about Pennsylvania

20  Law, correct?

21  A.    Correct.

22  Q.    And you admitted that being the vice president, you did

23  not know the industry standards in regard to an adjuster

24  committing bad faith, correct?

25  A.    For Pennsylvania?

1  Q.    Just industry standards.

2  A.    But for what state?

3  Q.    Industry standards in Pennsylvania.

4  A.    No, I wouldn't have information about that.  I had very

5  limited information about that.

6  Q.    In fact, you, as vice president of the claims, the only

7  person above you is Tim Trueworthy and then the executives,

8  correct?

9  A.    The executives are above Mr. Trueworthy, yes.

10 Q.    And then there is you below Mr. Trueworthy?

11 A.    Yes.

12 Q.    And so, in fact, you're not aware of anyone at NYCM who

13 knew the industry standards about Pennsylvania at the time I

14 had taken your deposition, correct?

15 A.    No.

16 Q.    No, you did not?

17 A.    I did not.

18 Q.    And you did not know any of NYCM Insurance adjusters that

19 even knew any of the rules or industry standards in

20 Pennsylvania, the industry standards?

21 A.    No.

22 Q.    And you never looked to see, despite Joe Catalano still

23 handling the claim, you never looked to see if he knew anything

24 about Pennsylvania industry standards, correct?

25 A.    I haven't looked at the claim.

1  Q.    But you knew that even after our deposition that

2  Mr. Catalano was handling the claim, correct?

3  A.    Correct.

4  Q.    And my question to you is, is that you did not know -- did

5  you know if Mr. Catalano knew anything about Pennsylvania

6  industry standards?

7  A.    No, I don't.

8  Q.    Not one way or another you didn't know?

9  A.    I don't know.

10 Q.    Right.

11        And at the time of the deposition, at least you being the

12 vice president overseeing the claims, still did not know

13 whether or not Adjuster Dvoracek knew Pennsylvania industry

14 standards, correct?

15 A.    Correct.

16 Q.    And at the time of the deposition, and since you haven't

17 reviewed the case, I guess it still goes for today, would that

18 be correct?

19 A.    Correct.

20 Q.    At the time of the deposition, you did not know if this

21 claim even arose out of Pennsylvania Law or not, correct?

22 A.    Correct.

23 Q.    And that was how many years after the motor vehicle

24 collision?

25 A.    I don't recall.

1  Q.    Do you know when your deposition was taken?

2  A.    I don't recall.

3  Q.    I don't want to misrepresent, but I believe it was 2014.

4  A.    Okay.

5  Q.    Does that seem accurate?

6           MR. KASTER:   When are we talking about?

7  BY MR. PISANCHYN:

8  Q.    Does August 22nd, 2014, seem about right?

9  A.    That seems reasonable.

10  Q.    If NYCM adjusters does not know how they are supposed to

11  handle a claim in different states, what were they supposed to

12  do?

13  A.    They can research it.  There is a lot of different

14  avenues; insurance information, insurance adjusters, counsel.

15  Q.    If NYCM Insurance adjusters said the way they were taught

16  to research it is just to Google it, would that be appropriate?

17  A.    It's a good place to start.  A lot of insurance

18  departments have their information on the internet.

19  Q.    Would you agree that NYCM, if it chose, could have hired

20  an independent adjuster in that state that knew the industry

21  standards of that state and knew the venue to adjust this claim

22  for Mr. Clemens if it chose?

23  A.    They could have.

24  Q.    It was up to them to choose to do so or not, correct?

25  A.    It would go between Mr. Dvoracek and Mr. Catalano, yes.

1 Q.   Would you agree that there is a number of opportunities at

2 NYCM adjusters can utilize that are not familiar with state

3 law?

4      There is a number of avenues they can proceed if they

5 don't know Pennsylvania industry standards and a claim arose or

6 was going to be governed by Pennsylvania industry standards?

7 A.   Yes.

8 Q.   As we sit here today, do you know if any of those avenues

9 were ever pursued?

10 A.   I have not looked at the claim.  I don't know.

11 Q.   And at the time of your deposition when I asked, you told

12 the same thing, you didn't know, right?

13 A.   I hadn't looked at the claim.

14 Q.   Despite that, you said that you felt comfortable allowing

15 the NYCM Insurance adjusters to continue handling the

16 underlying UIM claim, correct?

17 A.   Yes.

18 Q.   Now, I had asked you if you reviewed the file, and you

19 determined that the adjuster was adjusting the claim based on

20 New York industry standards, as opposed to Pennsylvania

21 industry standards.

22      Would you agree that NYCM did anything wrong?

23 A.   I'm sorry.  Say that one more time for me.

24 Q.   So if you reviewed the claim -- in fact, we did review

25 some of the claim at the time of your deposition, correct?

1  A.    Correct.

2  Q.    And I had asked you if the NYCM Insurance adjuster was

3  adjusting the claims under New York Law, when really

4  Pennsylvania Law or industry standards applied, would that be

5  wrong, would it be?

6  A.    Yes.

7  Q.    And at the time that the dispute was whether or not New

8  York or Pennsylvania Law applied, you understand that?

9  A.    That's what I have been led to believe.

10 Q.    At any point in time, have you found out that the Court

11 has judicially determined that Pennsylvania Law applies to this

12 claim?

13 A.    No, I don't think I'm aware of that.

14        MR. PISANCHYN:  Your Honor, I would ask that we take

15 judicial notice that Pennsylvania applies to the claim.

16        THE COURT:  It's clear that Pennsylvania Law has been

17 applied by the Court to this claim as of its decision on that,

18 which I think was back in June of 2015.

19 BY MR. PISANCHYN:

20 Q.    So based on that, ma'am, you just heard that the Court

21 determined that Pennsylvania industry standards apply.

22        If your adjuster was considering under New York Law, that

23 would be an error on behalf of NYCM Insurance, correct?

24 A.    That would be an error.

25 Q.    And that would be wrong for them to do?

1  A.   That would be an error, absolutely.

2  Q.   And it would also be wrong for them to deny a claim based

3  on that fact and prevent Mr. Clemens from being paid the money

4  that was due and owing to him under the contract, correct?

5  A.   If that occurred, yes.

6  Q.   As we sit here today, do you know whether or not your

7  insurance adjuster was relying on an inapplicable defense?

8  A.   I don't recall.  I haven't looked at the file.

9  Q.   Now, NYCM is not authorized to write policies to

10  Pennsylvania residents?

11  A.   We only write in New York State.

12  Q.   For New York?

13  A.   Correct.

14  Q.   In regard to an adjuster's workload, one of your jobs at

15  NYCM is to make sure that everyone has an appropriate amount of

16  work so they are not inundated, correct?

17  A.   That is part of the position, yes.

18  Q.   Has that ever happened where someone was inundated with

19  files at NYCM which would potentially delay claims?

20  A.   We've had individuals that have had too much work, but

21  it's generally based on a possible disability.  So that is one

22  of those situations where we will move the work or have

23  supervisors help us.

24  Q.   So, just to be sure, in the past, NYCM has had issues

25  where someone, like an insurance adjuster, was inundated with

1  files?

2  A.   I don't know that I would say inundated.

3      What happens is somebody goes out on disability and so

4  those files don't have anyone there to work them.

5  Q.   I will ask you a simple question, and that is, at the time

6  of the deposition I asked you specifically, and let me read it

7  to you to be sure, has that ever happened where someone was

8  inundated with files, yes or no?

9  A.   I know that we had situations where people go out on

10 disability and we move that work.

11 Q.   So that's a yes?

12 A.   Yes.

13 Q.   Thank you.

14     According to you, each insurance adjuster had between 125

15 to 175 claims, correct?

16 A.   Correct.

17 Q.   And in this case, Adjuster Dvoracek anticipated, if he

18 testifies consistently with his deposition testimony, he's

19 going to say at the time of the Clemens claim that he had over

20 250 claims.  Does that seem about right?

21 A.   I would have to go back and check.  That doesn't sound

22 completely accurate, but I don't know.

23 Q.   So that the 250 claims doesn't seem accurate to you?

24 A.   It doesn't, but, again, I would have to check that out.

25 Q.   That would be even 75 more claims than even the maximum

1  amount of claims you said, correct?

2  A.    Yes.  I was using an average, I believe, because we do

3  have people that cannot work 140 files, and then, again, we

4  have people that can work more than 175.  So, I mean, when I

5  use that, that's an average.

6  Q.    How about Adjuster Dvoracek, how many can he work?

7  A.    I would have to go back and check to see what his normal

8  workload is.  Off the top of my head, I don't know.

9  Q.    Getting to Adjuster Dvoracek's notes, we should be able to

10  look at his notes and see a plan or an idea and see what

11  medical records they have gotten and also what type of records

12  they are looking for, correct?

13  A.    Between the notes and the actual file, yes.

14  Q.    So, for instance, when someone says that they were looking

15  for wage loss information, we would know in the notes the

16  adjuster would say that in the notes, correct?

17  A.    It would either be in the notes, a letter, an e-mail,

18  something.

19  Q.    In fact, ma'am, you would also agree that if they received

20  employee -- or files, that would be in the notes, correct?

21  A.    Correct.

22  Q.    And also if they received all of the medical records, even

23  if it only showed a bruised nose, that would be in the records,

24  correct?

25  A.    It should be.

1 Q.    And even if it showed just a little bruised nose, that

2 would be summarized by the insurance adjuster and put in the

3 case notes, as in this case, correct?

4 A.    The substantive part would be.  If it's something that

5 they felt was important, yes.

6 Q.    So, in this case, we're going to get to the notes, but the

7 notes in and of themselves have summaries, and that would be

8 who would do the summary of the medicals that would be in the

9 adjuster's notes?

10 A.    It would be the individual reading the medical records,

11 generally speaking.

12 Q.    Would that be the same person that is putting it in the

13 adjuster notes?

14 A.    It should be one in the same person, generally.

15 Q.    So, for instance, an adjuster is basically going to get

16 medical records, whether it's by the plaintiff sending a demand

17 or whether they have authorizations, correct?

18 A.    They would have both those options, yes.

19 Q.    When they got those, they would summarize those and

20 basically take what they believed is important and put them

21 into the notes, correct?

22 A.    Correct.

23 Q.    And then, based on those notes and what they believed is

24 important, NYCM would require that they make an offer based on

25 what they had in the notes in the records, correct?

1 A.    If they felt they had enough to make an offer, yes.

2 Q.    Do you know in this case whether or not they ever made an

3 offer, what Adjuster Dvoracek said?

4 A.    I don't know.

5 Q.    You did know that you were coming to trial?

6 A.    Yes.

7 Q.    And you knew that for a long time?

8 A.    Yes.

9 Q.    You knew that there was going to be at least some people

10 in a jury box, and that I was going to ask you roughly the same

11 questions that I asked you in the deposition?

12 A.    Yes.

13 Q.    And despite that, you would agree that me asking you those

14 questions in the deposition made no difference.  You came here

15 and you're still saying you don't know?

16 A.    I don't know.  I didn't have anything to do with that

17 underlying case.  So it didn't seem appropriate to give myself

18 false information that I did not have.

19 Q.    As the vice president of NYCM?

20 A.    Correct.

21 Q.    Is there any written policies, at least, in regard to

22 knowing how much or how little information should be contained

23 in the adjuster's notes?

24 A.    No.

25 Q.    So you're saying -- you had previously said that it was

1  important to NYCM in regard to consistency, correct?

2  A.    Correct.

3  Q.    But in regard to the adjuster's notes, you say that each

4  adjuster can do their notes completely different, and you, as

5  NYCM's higher up, have no problem with that, correct?

6  A.    Correct.  Some people require a lot more detail and others

7  can be very succinct, but as long as the consistency that we

8  want is the investigation, the gathering of the information and

9  moving forward as quickly as they can.

10  Q.    Now, you would agree that you very rarely review anyone's

11  notes as the vice president of the casualty or claims unit in

12  NYCM?

13  A.    It's not that often, but I do review their notes.

14  Q.    I don't know if I cleared this up, and we've been talking

15  for a long time, and I keep using the term, you and I keep

16  saying casualty, and I have a feeling that someone may not know

17  what we're talking about.

18       Casualty would include the underinsured motorist claim,

19  the claim that Mr. Clemens was making against NYCM, his

20  insurance, for underinsured benefits, correct?

21  A.    Correct.

22  Q.    So when we say casualty, that department encompasses also

23  the underinsured motorist case?

24  A.    Correct.

25  Q.    And you never give criticism or anything in regard to

1 people whether they're putting lots in notes or little in

2 notes, correct?

3 A.   I'm trying to think.  If I see anything that I feel is --

4 where they have missed something, I would bring that to their

5 attention.

6 Q.   Now, is there any specific time period that people should

7 be putting notes in the file?

8      In other words, the specific adjuster who is handling

9 Mr. Clemens' case, should he be putting notes in every so

10 often?

11 A.   As he is getting information, absolutely, or as he's

12 trying to get the information, he should make notes.

13 Q.   Is there a minimum period of time that a note should be

14 entered every time?

15 A.   I would like to think that they're moving them between,

16 like, depending on what they're waiting for or asking for, it

17 could be a 30-day diary, a 60-day diary or a 90-day diary.

18 Q.   Let me ask you this:  Was there ever any written

19 documentation sent to you telling you how often a claim should

20 be updated?

21 A.   To me?

22 Q.   To you.

23 A.   No, I don't recall.  Maybe I don't understand what you're

24 asking me.

25           THE COURT:  Why don't we try first rephrasing the

**68**

1  question.

2        Her answer is, I don't understand what you're asking

3  me.  So why don't you try to rephrase it in a way that maybe

4  she will understand and can answer the question.

5        MR. PISANCHYN:  Can the court reporter repeat my

6  question?  Is that okay?

7        THE COURT:  Sure.

8        COURT REPORTER:  "Question:  Let me ask you this:

9  Was there ever any written documentation sent to you telling

10  you how often a claim should be updated?

11        THE WITNESS:  I don't think I understand the whole

12  question.

13        THE COURT:  Why don't you rephrase the question and

14  see if you can ask it in a different way?

15  BY MR. PISANCHYN:

16  Q.   So my question is a simple one, and it's, has anyone at

17  NYCM ever given you written documentation to tell you how often

18  a claim note has to be entered into the claim system by an

19  insurance adjuster?

20  A.   They should enter a claim note every time that they get a

21  document, every time that file comes up, when they're making

22  phone calls, taking phone calls.

23  Q.   But if there is no activity, is there a minimum amount of

24  time that every certain period of time there has to be or

25  should be an adjuster's note?

1  A.   I would say that the longest we can pend out is 90 days,

2  so they should be doing something within that 90-day period.

3  Q.   So leave me ask you, was there ever written documentation

4  sent to you, ma'am, you, as the vice president of casualty

5  claims, that told you that that had to happen?

6  A.   I don't honestly recall.

7            MR. PISANCHYN:   Your Honor, I will show her a

8  document and see if I can refresh her recollection.

9            THE COURT:   Did you identify it to the other side?

10            MR. PISANCHYN:   CE 777.   On that page, it's 65, lines

11  5 through 9.

12            MR. KASTER:   Is that the deposition transcript?

13            MR. PISANCHYN:   This is her previous deposition of

14  July 26th, 2013.

15            MR. KASTER:   Not in this case?

16            MR. PISANCHYN:   Not in this case.

17            MR. KASTER:   Your Honor, I have not seen that

18  deposition again.

19            THE COURT:   Okay.   Show it to him.

20            MR. KASTER:   Your Honor, I'm just going to object

21  again.   It's not inconsistent.   It's exactly what she testified

22  to.

23            THE COURT:   All right.   Well, let's see.

24  BY MR. PISANCHYN:

25  Q.   It's my understanding that Mr. Trueworthy sent you a memo

1  stating that --

2          THE COURT:  Let's not -- refreshing recollection

3  means, show it to her, ask her to read it, and then you can ask

4  her if that refreshes her recollection, and she can tell us if

5  her answer is any different.

6          THE WITNESS:  I don't -- can you point directly to

7  what you are referring to?

8  BY MR. PISANCHYN:

9  Q.   Sure.  All I'm asking you is, the document that I showed

10 you --

11         THE COURT:  Just show her whatever lines you're

12 saying would help refresh her recollection, allow her to read

13 it.

14         If it's under 612, if that's what you're trying to

15 do, let her review it, and then ask her the question after

16 you're done.

17 BY MR. PISANCHYN:

18 Q.   First off, ma'am, have you had an opportunity to review

19 Page 65?

20 A.   Correct.

21 Q.   On Page 65, did that refresh your recollection, first off,

22 in regard to how many days a file needs to be updated at a

23 minimum?

24 A.   No.  It says, I believe, the longest you can extend a

25 diary was 90 days.

1  Q.    So, just let me ask you, does that, first off, refresh

2  your recollection in regard to how long you can extend the

3  diary?

4  A.    Yes.   I knew that you could go 90 days.

5  Q.    So every 90 days you have to put in a note, is that

6  correct?

7  A.    No.   That's the longest you can actually diary a file out.

8  Q.    When it pops back up, what happens?

9  A.    When it pops back up, that's when you would look at it and

10  see; do I need to make a phone call?  Do I need to do this?  Do

11  I need to do that?

12  Q.    Would you put notes in?

13  A.    If the individuals are working a file, yes.

14       If it's a file that you know you're not going to be able

15  to move, you don't necessarily make a note.

16  Q.    In regard to the file system, how many files are there at

17  NYCM?

18  A.    Altogether?

19  Q.    Yeah; altogether, how many files?

20            THE COURT:  Do we have a time frame or a particular

21  time you're referring to here?

22  BY MR. PISANCHYN:

23  Q.    Maybe I'm phrasing the question -- maybe I could rephrase

24  it to be clear.

25            THE COURT:  Sure.

1  BY MR. PISANCHYN:

2  Q.   How many files do all of the insurance adjusters work out

3  of; in other words, for each individual claim?  I don't mean

4  for every claim.

5  A.   How many files do we have in casualty?

6  Q.   No.  For instance, the Clemens claim, how many files are

7  there?

8  A.   How many files are there for the Clemens?

9  Q.   Yes.  For the Clemens claim, if they had an underinsured

10 motorist claim, how many files would there be that the

11 insurance adjusters at NYCM work out of?

12 A.   One.  You work out of one file.

13 Q.   That's what I'm getting, and that is, is that everyone

14 works out of the same file?

15 A.   Correct.

16 Q.   And by everyone, that's the same as the medical adjuster

17 works out of the same file as the casualty, as well as the

18 property adjuster, correct?

19 A.   It's the same file number, but everything is documented

20 with different perils.

21      So the no fault people have one peril that they can see.

22 The UM adjuster would have a peril they can see.  If there was

23 a collision loss, that's a separate peril, and they can see

24 that.

25      It's all imaged.  It's one file number, but different

1  components that we call perils.

2  Q.    In regard to the perils, though, you would agree that the

3  casualty department, the underinsured motorist adjuster would

4  be able to see the medical notes that the medical adjuster

5  obtained, correct?

6  A.    I don't know that they can.  I'm not certain of that.

7  Q.    Have you previously told me anything different?

8  A.    The only thing --

9  Q.    Can we just play, I guess, clips -- this goes to the heart

10  of the issue, one of them -- 666, 2124; 667, 1 through 9.

11        (At this time, an audio recording was played.)

12              MR. PISANCHYN:  That was consistent, so I apologize

13  for playing it.

14              Your Honor, I have lots of clips.  I'm doing the best

15  I can.

16              THE COURT:  The point is that clips are meant to be

17  if there is a prior inconsistent statement, that's fine, but we

18  are not going to --

19              MR. PISANCHYN:  Your Honor, I thought it was.

20              THE COURT:  I would appreciate you letting me finish.

21              We are not going to have two times testimony on

22  everything that occurs here.  We have talked about this.

23              If it's a substantive difference, then you can offer

24  it under 613, but aside from that, we're now closing in on 4:30

25  on the first day and finishing one witnesses.  This is going to

1 move along.

2 BY MR. PISANCHYN:

3 Q.    So would Adjuster Dvoracek be able to look at the medical

4 file, yes or no?

5 A.    I don't believe so, but I'm not positive with that.

6 Q.    No, no.  According to the policies and procedures of NYCM,

7 should Adjuster Dvoracek be looking at the medical file to be

8 assessing the value of the underinsured motorist claim, yes or

9 no?

10 A.    I can't answer it, because I do not know what -- there are

11 different rules governing the SUM piece of it, and I'm not at

12 all that familiar with those rules, statutes, policy

13 conditions, and such.

14 Q.    You are the SUM vice president.

15       You're saying SUM, which is the underinsured motorist?

16 A.    Correct.

17 Q.    And that's in casualty, and you're the vice president?

18 A.    Correct.

19 Q.    I'm just asking you a question, do you allow your

20 insurance adjusters that are adjusting claims like for

21 Mr. Clemens in this case to review the medical claim file, yes

22 or no?

23 A.    I would leave that information to the supervisors who work

24 those SUM claims daily.  I do not work SUM claims daily.

25 Q.    So there is no set policy and procedure at least coming

1   down from the vice president down?

2   A.    I don't know the rules for SUM claims, I'm sorry.

3   Q.    You would defer to who in regard to the rules in regard to

4   the casualty claims unit and underinsured motorist claims?

5   A.    I would defer to the team supervisors.  They have all that

6   research.

7   Q.    In this case, it's my understanding that Adjuster

8   Catalano, Joe, was the adjuster, correct?

9   A.    Correct.

10  Q.    So who would it be that would tell him whether or not that

11  he can go into the medical file or not?

12  A.    He would know that information.

13  Q.    You would agree that the adjuster should be looking at

14  medical records that were submitted by the plaintiff's

15  attorney?

16  A.    Yes.

17  Q.    And do you know -- let me ask you this; you, as vice

18  president of casualty, the same unit that Mr. Clemens was

19  making a claim in, do you know anything about consent to settle

20  or waiver of subrogation?

21  A.    I do know about the consent to settle briefly.

22  Q.    Do you know anything about waiver of subrogation?

23  A.    Yes, briefly.

24        MR. PISANCHYN:  One second to be sure, please.

25  BY MR. PISANCHYN:

1  Q.    Let me just make sure that I'm phrasing it correctly.

2       Do you know anything about Pennsylvania industry standards

3  in regard to waiver of subrogation or consent to settle?

4  A.    No.

5  Q.    So you do know about New York.  You just don't know

6  anything about Pennsylvania subrogation and waiver of consent

7  to settle, the same law that Mr. Clemens case applies?

8  A.    Correct.

9  Q.    Now, when NYCM hires an attorney -- first off, did NYCM

10 hire an attorney in this case?

11 A.    I believe we did.

12 Q.    And you would agree that you looked -- you eventually had

13 a New York attorney?

14 A.    I believe I did see that information in my deposition.

15 Q.    And at some point, the claim was transferred from the New

16 York attorney to the Pennsylvania attorney?

17 A.    Yes.

18 Q.    And you and I had gone through the bills in regard to that

19 point, up to that point, when we were giving the deposition,

20 roughly how much the insurance or the defense charged NYCM in

21 regard to the case?

22 A.    Yes.

23 Q.    Let me ask you this; first off, the declaration page for

24 Mr. Clemens was $50,000 for underinsured motorist.

25      Do you have any reason to dispute that?

1  A.    No.

2  Q.    Do you have any reason to dispute that according to the

3  adjuster's notes, this claim was initially reserved at $25,000?

4  A.    No.

5  Q.    Do you have any reason to dispute that despite the notes

6  saying that there was supposed to be a $7,000 offer, Adjuster

7  Dvoracek said that he never made an offer on this claim,

8  despite it being reserved at $25,000?

9  A.    I am sorry, what was the question?

10 Q.    Do you have any information that Dvoracek never even made

11 an offer on this claim, never offered a dollar, according to

12 his testimony?

13 A.    I don't know.

14 Q.    You don't know, okay.

15        THE COURT:  The witness, a number of times, has told

16 us that she is not involved with this particular case.

17        So if you have questions that are of a general

18 purpose related to her being an assistant vice president, that

19 is one thing, but it seems to be pretty clear so far that we

20 don't need to ask her a whole lot of questions that are

21 specific to this case, unless you're aware that she has actual

22 information on it, since she keeps telling us she did not

23 review this case.

24        MR. PISANCHYN:  Well, my concern, Your Honor, is they

25 live together.

1    THE COURT:  I get that.  You have made that point,

2 and she has told us a number of times that she doesn't have

3 that.

4    So we're not going to go through every question you

5 want to ask Mr. Catalano.  You can ask him all of those

6 questions.

7    So let's try to understand that she apparently did

8 not review this particular case, and if you have general

9 questions about policy, whatever, that's fine, but so far, I

10 have sat here and listened to her probably 30 times tell us, I

11 don't know, because I haven't reviewed this case.  You don't

12 need to ask those questions anymore.

13 BY MR. PISANCHYN:

14 Q.    Ma'am, we did review the case during the deposition, at

15 least parts in regards to the attorney's fees, correct?

16 A.    You showed me some bills.

17 Q.    Did you come to a number with regard to how much the bills

18 were at in August of 2014?

19 A.    I believe we did.

20 Q.    And it's my understanding that that was a close to, if not

21 over, $20,000 at that time?

22 A.    I thought it was 17.  I had said 17,000 plus.

23 Q.    So you remember that?

24 A.    That number is sticking in my mind.  I'm not positive,

25 though.

1  Q.   So you remember that it was about $17,000?

2  A.   That range.

3  Q.   And at that time, NYCM still had not paid Mr. Clemens a

4  dollar for his underinsured motorist claim, despite it being

5  the year 2014, correct?

6  A.   I don't know.

7  Q.   Do you know if NYCM ever paid Mr. Clemens anything?

8  A.   As I sit here, no.

9  Q.   Do you know is there any benefit for NYCM to pay -- to

10 hold on and not pay a valid claim?

11      Would there be any reason for NYCM to do that?

12 A.   Not if they have the information.

13 Q.   Would you agree that that wouldn't be in your bailiwick,

14 and that would be Mr. Pylinski's in regard to -- well, let me

15 ask you, if NYCM has $25,000, and they can pay it today or they

16 can pay it five years from now, financially, for NYCM

17 Insurance, which is more beneficial?

18 A.   Are you talking about a claim?

19 Q.   Yeah, on a claim.

20      So if NYCM Insurance -- let me just make sure -- so if

21 NYCM Insurance has $25,000, and they could pay that $25,000

22 today, put it on the table, or they can pay it in five years

23 from now, right, so wait five years, financially, for NYCM

24 Insurance, which is more beneficial?

25 A.   As it relates to a claim, we have to have the information

1  in the file.

2      I can't -- it's not what's more beneficial.  It's, we need

3  the information in the file.  So as soon as we can get the

4  information, that's when you can resolve the claim.

5  Q.   But my question is, it's not with a claim.  It has to deal

6  with just the pure dollars and cents of it.

7      So if NYCM has $25,000 and they can pay it today, put it

8  on the desk and leave, or they can pay it five years from now,

9  financially, which is more beneficial for NYCM Insurance, which

10 is more beneficial?

11          MR. KASTER:  Objection, Your Honor.  Again, it calls

12 for an opinion of a lay witness.  She's a witness with some

13 knowledge about claims.

14          She is not a financial person, and she is asked to

15 testify as an expert on financial matters of the company when

16 that is not her background, not her ability, and it's beyond

17 the rules of evidence to ask a lay witness opinion testimony.

18          We are presenting the CFO.  He will be able to answer

19 those questions, but she's in claims, and now she's being asked

20 about strategy with finances.

21          MR. PISANCHYN:  I asked the same question, and she

22 answered it at the deposition, but I will withdraw it.

23          THE COURT:  But that's not an answer to an objection.

24          MR. PISANCHYN:  I'll just withdraw it and move

25 forward.

1 BY MR. PISANCHYN:

2 Q.   You would agree that you had stated in regard to the chief

3 financial officer that you meet with him in teams, and his name

4 is Mr. Pylinski, correct?

5 A.   His name is Mr. Pylinski.

6 Q.   Either way, whatever pronunciation, would you agree that

7 you meet with him at least certain times of year to provide

8 financial information?

9 A.   Yes.

10 Q.   And the casualty claim numbers are important for CFO

11 Pylinski, because he's the chief financial officer, and because

12 when you pay a claim, the money goes out the door, correct?

13           MR. KASTER:   Objection, Your Honor.   It calls for

14 speculation about what is or is not important to another

15 person.

16           THE COURT:   That's overruled.   Go ahead.

17           THE WITNESS:   When we meet with him, we fill him in

18 on the casualty business plan and what our objectives are.   Are

19 we meeting our pre-suit dispute percentage ratio?   Are we

20 shortening the tail on the long tail BI claims?   Things along

21 those lines.

22 BY MR. PISANCHYN:

23 Q.   Well, let me ask you this; you would agree that you meet

24 with Mr. Pylinski about the money going out the door?

25 A.   He gives us an overall view a couple times of, I'm going

1  to say -- I don't recall how often finance does their specific

2  presentations, but it's a very involved overview that takes all

3  the pieces into account.

4  Q.   But let me just ask you, why does Mr. Pylinski meet with

5  you?  What's important?

6     Would you agree it's important because the money goes out

7  the door?

8  A.   We definitely pay clients, yes.

9  Q.   Let me ask you, though, the reason that Mr. Pylinski meets

10 with you, because you're the people that put the money out the

11 door, specifically that terminology?

12 A.   I have used that terminology that claims sends the money

13 out the door and underwriting brings the money in the door.

14    That's not the necessary reason that Mr. Pylinski is

15 meeting with us about -- he's there for the whole -- the

16 overall large picture.  We have to keep him abreast of our

17 objectives.

18 Q.   What does the claims have to do with Mr. Pylinski?

19 A.   We're part of the team.

20 Q.   Right.  And what part of the team are you?

21 A.   We're the claims team.

22 Q.   And what does the claims team do?

23 A.   We pay claims.

24 Q.   And when you pay a claim, you have used the terminology in

25 the past, in fact, when the money goes out the door?

1  A.    That's when we're paying the claims.

2  Q.    Right?

3  A.    Yes.

4  Q.    So when you pay a claim, the money goes out the door?

5  A.    Correct.

6          THE COURT:  I think we have heard that now about four

7  times.  Let's move on to the next question, please.

8  BY MR. PISANCHYN:

9  Q.    Let me ask you; at NYCM Insurance, you, as the vice

10 president, does the insurance company have an aggressive, a

11 medium or a moderate or a low risk of litigation in regard to

12 its strategy?

13 A.    We take each file very separately, because they're all

14 different.  We like to move our files as quickly as possible

15 towards resolution whenever it's possible.

16 Q.    Have you ever met with Mr. Pylinski and he would -- would

17 Mr. Pylinski ever say that you or Mr. Trueworthy would be the

18 person that would know if your insurance company at NYCM is

19 aggressive, medium or moderate or low risk in regard to

20 litigation?

21 A.    Would Mr. Pylinski say that?

22 Q.    That you should know that question.

23 A.    He probably would say that, because he doesn't know

24 anything at all about claims.

25 Q.    So if you had to categorize which claims strategy NYCM

1  has, which is it?

2  A.    Like I said, any file we can move forward and resolve, we

3  absolutely try to get all the information we can to resolve

4  them and move them forward, if those claims are owed.

5  Q.    Now, in regard to this structure of the company, you would

6  agree that each team leader has four or five examiners on their

7  team?

8  A.    Yes.

9  Q.    And when we say team leaders, we're really -- that term is

10 interchangeably with supervisor, in essence?

11 A.    Yes.

12 Q.    So a team leader at NYCM is a supervisor?

13 A.    Yes.

14 Q.    So a supervisor like Mr. Catalano would have four or five

15 adjusters below him?

16 A.    Yes.

17 Q.    And in regard to the executive branch, can you tell me who

18 is in the executive branch?

19 A.    The entire executive branch?

20 Q.    No, just from the CEO down to you.

21 A.    Okay.  We have V. Daniel Robinson, he's our CEO.  Albert

22 Pylinski is our CFO.  We have Cheryl Robinson, she's a first

23 senior vice president.  Michael Carreno is first senior vice

24 president.  We have John Holdorf, who is our senior vice

25 president of finance.  We have Jeff Barrett, who is our senior

1  vice president of underwriting.  We have Bill Couperthwait, who

2  is the vice president of customer service.  Tim Trueworthy, who

3  is our senior vice president of claims.

4  Q.    And would he be above you?

5  A.    Yes, he is.  We have Chad Bars, who is an assistant vice

6  president of an analytical group.  Michele Couperthwait, she is

7  the vice president for people development.  We have Julie

8  Palmer, she is a senior vice president for HR.  I feel like I'm

9  missing somebody.  Mike Olay (phonetic) is vice president for

10 our securities systems.  Steve Cembrinski is a vice president

11 for the infrastructure.

12 Q.    Thank you.

13       Would you agree, though, that out of those, you meet with

14 the CFO and the CEO for quarterly meetings along with

15 Trueworthy?

16 A.    Yes.

17 Q.    And so you specifically have meetings with the CEO, which

18 is the chief financial officer, and that would be VanNess

19 Robinson?

20 A.    It's V. Daniel Robinson.

21 Q.    VanNess is an officer?

22       There's a VanNess Robinson, right?  Am I saying it wrong?

23 A.    It's Vanna Robinson and then V. Daniel Robinson.  I

24 believe they have the same name.  One is a junior, I think.

25 Q.    Father and son?

1  A.    Yes.

2  Q.    And then the other Robinson is the daughter?

3  A.    Cheryl is, yes.

4  Q.    She's going to be the next president?

5  A.    I would think so.

6  Q.    When you go in these quarterly meetings with Pylinski and

7  Robinson, you're going over the pieces of the business plan and

8  their expectations of you?

9  A.    Yes.  We would go over what our objectives were for the

10 year and how we are achieving those objectives.

11 Q.    By objectives, again, you are in the portion of the

12 company that the money goes out the door?

13 A.    The claims division, absolutely.

14 Q.    And you discuss such things as the overall direction of

15 the company, is that correct, between the CEO and the CFO?

16 A.    We're one piece of all the pieces.  So I'm trying to say

17 it correctly.  They would have the overall corporate

18 objectives, and our unit objectives fit into those corporate

19 objectives.

20 Q.    Can you tell me -- I'll move forward.

21     Would you agree that the things that are discussed in the

22 overall direction of the company is the profits, underwriting

23 and overall claims?

24 A.    Among a lot of other pieces of that, yes.

25 Q.    I'm just concerned about these ones.

1      You would agree that you do discuss profits in those

2 meetings with the CEO and CFO, and you're the vice president of

3 claims, the claim department that puts money out the door and

4 pays the claims, correct?

5 A.    In our quarterly meeting or in the stakeholder meeting,

6 the officer meeting?

7 Q.    You're an officer, too, right?

8 A.    Yes.

9 Q.    Let me just ask you, do you ever discuss profits at all?

10 A.    I don't, no.

11 Q.    Do you ever hear of people discussing profits?

12 A.    Yes.

13 Q.    Pylinski?

14 A.    He will give us the overall financial picture of the

15 company, yes.

16 Q.    And the reason you're being told about NYCM's financials

17 is so that the entire organization understands NYCM's profit,

18 correct?

19 A.    The reason we are being told is so that if there's an area

20 of expense that we can reduce that would be helpful,

21 absolutely.

22      I mean, all of our expenses go towards a profit.  I mean,

23 each division has expenses.  I'm probably not the best one to

24 ask this question of.  I'm sure that's Mr. Pylinski's area of

25 expertise.

88

1  Q.    But you would agree that you are part of the casualty

2  team, correct?

3  A.    Yes.

4  Q.    And you would agree that they do, meaning Pylinski does

5  talk to you as part of the casualty team in regard to profits?

6  A.    No.  I'm also part of the claims officer team.  It's the

7  claims officer team that actually has the quarterly meetings.

8  Q.    I'm not trying to mince words.  I'm telling you as they

9  speak to you as part of the casualty team.

10 A.    I'm part of the -- I guess I misunderstood your question.

11 I am part of the casualty team, but when I meet with them, it's

12 as part of the officer team.

13 Q.    So why are they talking to the claims officer team about

14 profitability?

15 A.    Because we're one piece of the puzzle.

16 Q.    So in regard to there, it specifically says that they're

17 talking to the claims officer team, correct?

18 A.    Um-hum.  That's what I just said.  I said claims officer

19 team.  You said casualty team.

20 Q.    You're right.

21        Now, when you go to work as the vice president, are you

22 able to distinguish between those two positions when you're at

23 work?

24 A.    What two positions?

25 Q.    The officer position and vice president of casualty

1 claims.

2 A.    It's one position.   I'm just a member of more than one

3 team.

4 Q.    But when you're receiving that information as claims

5 officer, do you not also then have that information also as the

6 vice president of claims?

7 A.    Yes.

8 Q.    Do you ever utilize that information in a beneficial way

9 for anyone?

10 A.    That information, our financial information, is part of

11 our intranet web.   That's already on our intranet, the

12 financial corner.

13 Q.    And by intranet, which means basically every time an

14 insurance adjuster pulls up their screen, it pops up?

15 A.    They can look on the intranet, and all that information is

16 always on the intranet.

17 Q.    And on the intranet, when that screen pops up, it would

18 say in regard to the ratio?

19 A.    Yes.

20 Q.    And you would also agree in regard to the ratio that would

21 determine whether or not everyone at NYCM was going to receive

22 a bonus, correct?

23 A.    Yes.

24 Q.    As part of the officer team, Mr. Pylinski, when he meets,

25 he does video presentations in regard to the profitability of

1  the company?

2  A.    He does a finance presentation.

3  Q.    Has any of those ever been turned over in discovery?

4  A.    I have no idea.

5  Q.    But there are videos of what his presentations are to the

6  officers in regard to profitability?

7  A.    It would be a PowerPoint presentation.

8  Q.    Now, you would also agree that on or about the time

9  Mr. Clemens' claim or we spoke -- let me strike that and re-ask

10  the question.

11     You would agree that NYCM, at the time of your deposition

12  in 2014, was trying to shorten the long tail on claims?

13  A.    Yes.

14  Q.    What's a long tail?

15  A.    A bodily injury claim.

16  Q.    What's a long tail, not --

17  A.    We're trying to shorten it, to have 90 percent of our

18  claims that are five years or less.

19  Q.    When you say shorten the tail, what you're basically

20  saying is shorten the time it takes to pay a claim?

21  A.    Shorten it so that 90 percent of our claims are within

22  five years of the litigation, yes.

23  Q.    So you're saying that you want 90 percent of your claims

24  to be settled within five years?

25  A.    We want to have 90 percent of our litigation claims to be

1  within five years of the date of loss.

2  Q.   Isn't that a long time?

3  A.   Not with litigation.  Not with litigation.

4          MR. HADDICK:  I apologize for interrupting, Your

5  Honor.  May we approach the bench?

6          THE COURT:  Yes.

7      (At this time, the following colloquy occurred on the

8  record at sidebar.)

9          THE COURT:  How much more do you have of this

10  witness?

11          MR. PISANCHYN:  I do have a good portion.

12          THE COURT:  How much is a good portion?  I'm going to

13  give you probably about 20 more minutes to finish this witness.

14          MR. PISANCHYN:  I'll have more than that.

15          THE COURT:  You will not.  You will finish in 20

16  minutes.

17          MR. KASTER:  That resolves our concern, Your Honor.

18          THE COURT:  20 minutes to finish.

19          So far I have heard question after question after

20  question of the witness not having this case, not being

21  involved in this case, not having anything to do with this

22  case, and then I've got prior deposition testimonies that are

23  consistent with what the witness said.  You got 20 more minutes

24  to finish with this witness.

25          MR. PISANCHYN:  I just need to put this on the

1  record.

2          THE COURT:  Go ahead.  Place your objection.

3          MR. PISANCHYN:  I have quite a few more questions in

4  regard to this.  Due process does mandate that the plaintiff

5  gets to ask his questions.

6          If there's asked and answered questions, then I

7  understand the objection, and I could be limited to that way.

8  I'm not re-asking other questions.  On occasion, maybe two or

9  three times, I have made a mistake.  I think I am human.  I

10 apologize to the Court for that.  I really, really do.  I'm not

11 trying --

12         THE COURT:  Just put your objection on, please.

13         MR. PISANCHYN:  Due process would mandate that I

14 get -- allowed to ask any questions I have that's not

15 duplicative.

16         THE COURT:  You have had two and a half hours so far

17 on this witness.  You got 20 more minutes.

18    (At this time, the discussion held at sidebar

19 concluded.)

20 BY MR. PISANCHYN:

21 Q.  Ma'am, you would agree that during the super storms, part

22 of the casualty unit had to lend support to other units?

23         MR. KASTER:  Your Honor, objection.  This is about

24 the court order.

25         THE COURT:  That objection is sustained.  Next

93

1  question.

2  BY MR. PISANCHYN:

3  Q.   Ma'am, let me ask you this; you had previously said that

4  there was 8 to 10,000 claims a year made in your casualty

5  department, correct?

6  A.   No.  I think --

7           MR. KASTER:  Objection, Your Honor.

8           THE COURT:  The question was, did she previously say

9  that?  Overruled.  Go ahead.

10          THE WITNESS:  I want to say that that's for the

11  claims division.

12  BY MR. PISANCHYN:

13  Q.   Okay.  And you also had told me, what, there'S 25

14  adjusters in the claim division?

15  A.   There's 22 in the home office, yes.

16  Q.   So if you divided that by an average -- and I did it -- it

17  equals 360 claims on average each adjuster would handle,

18  correct?  I mean, if the math is right.

19  A.   Right, but I'm talking about the entire claims division,

20  not casualty division.

21  Q.   Right.  But you said 9,000 claims, and I'm putting 25

22  adjusters, and you would divide 25 by 9,000, which would equal

23  360, if my math is correct?

24  A.   I have 22 adjusters in casualty, but there are other

25  adjusters that do no fault comp collision and such.

1  Q.   But if there's 25 adjusters and 9,000 claims, if you

2  divided those, that would equal that each adjuster would be

3  doing about 360, correct?

4  A.   Yes.  I guess if your numbers are --

5  Q.   If my math is correct.

6  A.   Right.

7  Q.   Now, in regard to a valuation formula, you would agree

8  that there is no formula that NYCM uses, its adjusters use to

9  determine values of cases?

10  A.   Correct.

11  Q.   And we then pulled up --

12       MR. PISANCHYN:  Do we have Plaintiff's 112?  It's

13  Bates No. 1112.

14       THE COURT:  Ladies and gentlemen of the jury, we're

15  going to break for the day.  It is now 5:00, a little bit after

16  5:00, and since the time changed, I am concerned about the

17  jurors and darkness.

18       Now, when you go home tonight, I'm telling you, the

19  first thing that your significant other, spouse, friends,

20  whatever, are going to ask you are, tell me about the case, and

21  it's going to be that as soon as you say, I can't talk about

22  it, they are going to say, you can tell me.  I'm not going to

23  tell anyone.  You're going to hear that.

24       You have to tell them, I cannot.  It's your duty --

25  it's your sworn duty as jurors in order to uphold the rule of

1  law and justice to not discuss the case.

2          You can tell them in a couple days when this case is

3  over with, I will talk to you all day long about anything you

4  want to know about it, but as for right now, you have to be

5  very, very certain that all the information that you have to

6  consider comes only from the four corners of this courtroom.

7          So that means no investigation of any kind on your

8  own.  That includes the internet.  If for some reason there was

9  something about this in the newspaper, which I doubt there will

10 be, you are not allowed to read it.  You can put it aside, and

11 then read it when the case is over with.

12         If, for some reason, there was something on the radio

13 or TV, which I'm sure there will not be, but if there was, you

14 are not to listen to it.  You are not to have any conversation

15 among yourselves or with anybody else.  You are to form no

16 opinions.  You haven't -- we're still on the first witness.  So

17 you haven't heard all the evidence to be presented in the case,

18 and you haven't heard any of the law.  So you really have no

19 foundations in order to begin to have any opinions on the case.

20 So no opinions, no discussions.  If anyone were to try to

21 discuss the case with you, you are to advise us of that.

22         Now, I have looked at where everybody comes from, and

23 we do have jurors that come from a distance.  You know, we're

24 in Federal Court, and so if it was in State court, everybody

25 comes from the county.  In Federal Court, there is actually 34

1  counties in the Middle District of Pennsylvania.  We go as far

2  as all the way past State College.

3         Now, we divide it up by the three areas that the

4  Courts sit, and so there is an 11-county area that comes into

5  the Scranton and Wilkes-Barre area, and some of you live a good

6  distance away.

7         We will begin tomorrow at 9:30 in the morning.  I ask

8  that you be here at 9:20, 9:25 downstairs, and hopefully, we

9  will begin sharp at 9:30.  Also, hopefully tomorrow we will

10  move a little quicker than we've moved today.  That normally

11  happens after the first day.  We begin to kind of get on a

12  track and move a little bit quicker.

13         That being said, have a safe trip home.  If you have

14  any notes, they are to be left inside the jury room.

15     (At this time, the jury exited the courtroom.)

16         THE COURT:  Tonight everyone is going to retool where

17  you're going with this case.

18         I have no problem in allowing you to present

19  evidence.  I am not going to allow us to be continually going

20  over the same thing, or then trying to pull up evidence that is

21  not inconsistent.  It is not fair to the jury, and it's not how

22  we try cases on this side of the street.  I don't know what

23  they do across the street.  That's not what we do here.

24         When we have a witness on the stand that doesn't have

25  any knowledge or information about this particular case, I

1   allowed you to ask questions because she lives with somebody

2   that is a witness in the case.  I don't have a problem in

3   allowing you to ask questions generally about the policies that

4   the company has if she is an assistant vice president, but that

5   being said, we spent two and a half hours on this witness, and

6   I've got to tell, I think we got about 20 to 30 minutes worth

7   of real testimony that makes a difference in the case.

8           So you need to review what it is that you want to ask

9   the witnesses, and you need to focus on who they are and what

10  information they have that is relevant.  We are not going to

11  sit here and go through another two and a half hours.

12          When we come back tomorrow, you get 20 minutes

13  tomorrow to finish the witness.  So I would spend tonight

14  focusing on what it is you need to get from this witness, and

15  then we will move on.

16          I want everyone to remember the rulings that were

17  made in this case.  If you disagree with the rulings, that's

18  fine.  That's your prerogative.  You put it on the record.

19  After that, we go by the rulings that I made and we continue to

20  do it.

21          Now, the last thing I want to say is that -- well, I

22  will leave it at that.

23          MR. HADDICK:  Your Honor, may I place something on

24  the record?

25          THE COURT:  Yes.  Go ahead.

1          MR. HADDICK:  Thank you, Judge.

2          MR. PISANCHYN this morning spent nearly two hours in

3   voir dire.  He spent almost three hours with this witness.

4          Your Honor will recall that last week there was some

5   discussion about Mr. Pisanchyn's expert coming in on Thursday

6   or Friday.

7          Your Honor admonished MR. PISANCHYN that if Your

8   Honor sensed a delay for the purpose of allowing the expert to

9   come on later in the week, that it would be remedied.  I'm

10  simply reminding the Court of that, and in our pretrial

11  memorandum, we did ask for time restrictions for witnesses

12  foreseeing exactly what's happening today.  I simply wanted to

13  place that on the record.

14         MR. PISANCHYN:  First off, my expert will be here

15  Tuesday night, and will be available Wednesday, Thursday and

16  Friday if need be.

17         Certainly I'm allowed to ask questions.  Time

18  restrictions have never been placed on anyone.  I'm trying to

19  move the case forward.  It's a complex case, Your Honor.  It's

20  a bad faith case.  It's difficult for lay people to understand,

21  and I'm doing the best I can.

22         If anyone is going to be punished for what I'm doing,

23  it's going to be me and my clients, but we do get to present

24  the case, and I understand everybody's time is precious, and

25  I'm really not doing this to aggravate or do anything other

1 than try to prove my case legitimately.

2    My clients have waited five years to get to court,

3 and with all due respect, I think we should -- and I'm not

4 saying that anyone is not preventing that, but we should be

5 allowed to move forward.

6    I understand the Court could restrict us, but we just

7 want to put in our case as we want to put in our case and then

8 let the jury decide.

9    The one last thing I wanted to say is, I just wanted

10 to make sure that the witnesses don't speak.  I know they're

11 going to speak, but not speak about the case, because I would

12 imagine they're going to be going home together.  So I would

13 ask that and --

14    THE COURT:  Well, let me first handle Mr. Haddick's

15 question.

16    I appreciate you reminding me of what I did, but I

17 honestly don't need reminding of that.

18    There was a request for specific limits on the time,

19 and I denied that specifically.  That's still the ruling.  I'm

20 not setting a time frame.

21    That being said, I think MR. PISANCHYN went for five

22 hours, and obviously spent two and a half hours, not three

23 hours, on this witness, but the bottom line is that we're going

24 to move quicker, and you will have 20 minutes to finish, but I

25 don't intend to set time limits.

1       I also don't believe, to the extent that there is the
2  insinuation, that MR. PISANCHYN was trying to delay the case so
3  he can call a witness on Thursday.  That's not the impression I
4  have at all.

5       I have more of the impression that the way you
6  prepared this case is perhaps something, as I said, that needs
7  to be adjusted and in how we present evidence to the witnesses
8  here.

9       As I said, I don't know what they do across the
10  street, but the rules of evidence, specifically 612 and 613,
11  are going to govern whether something comes in as a prior
12  inconsistent statement or refreshing recollection.

13       My suggestion is that you review that and the process
14  by which that would be done.  That should eliminate a lot of
15  this.

16       I also don't want to have a lot of questions being
17  asked of a witness when the witness continually tells us, I
18  didn't have anything to do with this file.  If you want to
19  argue later that that's ridiculous that they didn't, go ahead
20  and do that, but, as for now, when a witness says, I didn't do
21  it, we don't need to ask them questions about what they did
22  when they didn't do it.  It's as simple as that.

23       So I have no problem and no concern, MR. PISANCHYN,
24  that you and your clients are receiving due process.  I have no
25  concern that having two and a half hours and something else for

1  this witness is long more than I have seen exceptionally

2  competent lawyers in the past handle the same witness.

3          As far as the complexity of this case, I disagree.

4  This is a bad faith claim that is relatively cut and dry, and

5  that is the question of whether or not the defendant's

6  activities were designed to drag the case out in an unfair

7  method when they could have resolved the case.

8          This is not, in my mind, any different or more

9  complex than any other bad faith claim than I have seen.  There

10  is nothing, in fact, unusual that I can see about this claim.

11  It's just a classic bad faith claim.

12          So we're going to move the case along.  I don't

13  like -- I don't like at all having to interrupt or interfere

14  with counsel's presentation on either side.  I really don't.

15  It's not what I do.  It's not normally what I do, but the other

16  side of the coin is that we need to readjust how we are

17  presenting this case so that we present it in a cogent manner

18  that doesn't have the jury looking up at the ceiling and

19  thinking they have heard the same things over and over again.

20  That's important.

21          All that being said, we are going to begin tomorrow

22  at 9:30.  I would appreciate if you would be here at 9:15

23  tomorrow.

24          As I said, tomorrow I anticipate and expect, as

25  happens in most cases, that after day one, and we kind of get

1  settled, we kind of move a little bit quicker.

2        Thank you.

3     (At this time, the proceedings in the above-captioned

4  matter adjourned.)

# REPORTER'S CERTIFICATE

I, Suzanne A. Halko, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further  certify that the foregoing transcript has been prepared by me or under my supervision.

_____
Suzanne A. Halko, RMR, CRR
Official Court Reporter

REPORTED BY:

SUZANNE A. HALKO, RMR, CRR
     Official Court Reporter
     United States District Court
     Middle District of Pennsylvania
     Scranton, PA  18501-0090


(The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

## $

**$17,000** [1] - 79:1
**$20,000** [1] - 78:21
**$25,000** [7] - 51:5, 77:3, 77:8, 79:15, 79:21, 80:7
**$50,000** [1] - 76:24
**$7,000** [1] - 77:6

## '

**'13** [1] - 15:19

## 1

**1** [6] - 12:23, 20:13, 20:14, 42:11, 43:20, 73:10
**10** [4] - 29:20, 49:12, 49:20, 53:23
**10,000** [1] - 93:4
**10-minute** [1] - 49:22
**11-county** [1] - 96:4
**1112** [1] - 94:13
**112** [1] - 94:12
**12** [2] - 51:23, 52:1
**120** [1] - 46:3
**125** [1] - 62:14
**12th** [1] - 17:19
**140** [1] - 63:3
**15** [3] - 29:20, 51:23, 53:23
**17** [1] - 78:22
**17,000** [1] - 78:22
**17011** [1] - 1:22
**175** [2] - 62:15, 63:4
**18** [3] - 3:21, 4:9, 4:13
**18501-0090** [1] - 103:14
**18503** [1] - 1:18
**1899** [1] - 14:22
**1983** [1] - 5:16
**1984** [1] - 5:17
**1989** [1] - 14:22

## 2

**2** [3] - 1:13, 20:13, 20:14
**20** [8] - 91:13, 91:15, 91:18, 91:23, 92:17, 97:6, 97:12, 99:24
**2009** [5] - 26:25, 27:5, 28:21, 33:17, 38:11
**2011** [1] - 55:2
**2013** [14] - 15:16, 15:17, 15:18, 17:19, 19:15, 22:19, 24:16, 37:3, 38:8, 38:12, 38:13, 38:14, 39:6, 69:14
**2014** [6] - 55:18, 58:3,

58:8, 78:18, 79:5, 90:12
**2015** [4] - 1:13, 17:3, 51:24, 60:18
**21** [1] - 1:21
**2124** [1] - 73:10
**21st** [1] - 1:22
**22** [3] - 45:11, 93:15, 93:24
**22nd** [1] - 58:8
**24** [1] - 45:11
**25** [4] - 93:13, 93:21, 93:22, 94:1
**250** [3] - 41:9, 62:20, 62:23
**26** [2] - 19:15, 22:19
**26th** [3] - 23:17, 24:15, 69:14
**28** [1] - 103:4

## 3

**3** [3] - 2:4, 20:13, 20:14
**3/12** [1] - 18:23
**3/12/13** [1] - 18:3
**3/12/2013** [2] - 18:1, 19:3
**30** [2] - 78:10, 97:6
**30-day** [1] - 67:17
**302** [1] - 1:21
**34** [1] - 95:25
**360** [3] - 93:17, 93:23, 94:3
**3:13-CV-02447** [1] - 1:5

## 4

**4** [2] - 20:13, 20:14
**400** [1] - 33:13
**408** [1] - 53:1
**425** [1] - 1:22
**4:30** [1] - 73:24

## 5

**5** [5] - 6:16, 6:20, 12:23, 51:6, 69:11
**524** [1] - 1:17
**5589** [1] - 42:11
**57** [1] - 24:21
**58** [3] - 24:21, 43:13, 43:20
**59** [1] - 43:19
**5:00** [2] - 94:15, 94:16

## 6

**6** [2] - 6:16, 6:20
**60-day** [1] - 67:17
**61** [2] - 25:19, 25:21
**612** [2] - 70:14, 100:10

**613** [3] - 46:17, 73:24, 100:10
**65** [3] - 69:10, 70:19, 70:21
**6549** [2] - 6:16, 6:19
**6550** [1] - 12:23
**6626** [1] - 45:11
**6627** [2] - 45:11, 46:11
**666** [1] - 73:10
**667** [1] - 73:10
**676** [1] - 25:19
**6849** [1] - 8:25

## 7

**75** [1] - 62:25
**753** [1] - 103:5
**761** [1] - 25:6
**775** [3] - 19:13, 20:9, 22:14
**776** [2] - 22:13, 25:21
**777** [1] - 69:10

## 8

**8** [1] - 93:4

## 9

**9** [5] - 42:11, 43:15, 43:20, 69:11, 73:10
**9,000** [3] - 93:21, 93:22, 94:1
**90** [9] - 46:3, 69:1, 70:25, 71:4, 71:5, 90:17, 90:21, 90:23, 90:25
**90-day** [2] - 67:17, 69:2
**900** [1] - 8:23
**9:15** [1] - 101:22
**9:20** [1] - 96:8
**9:25** [1] - 96:8
**9:30** [3] - 96:7, 96:9, 101:22

## A

**ability** [1] - 80:16
**able** [13] - 6:5, 22:21, 24:22, 33:22, 35:25, 42:2, 53:3, 63:9, 71:14, 73:4, 74:3, 80:18, 88:22
**above-captioned** [1] - 102:3
**above-mentioned** [1] - 103:6
**abreast** [1] - 82:16
**absolutely** [11] - 8:17, 29:16, 37:19, 38:1, 48:13, 52:16, 61:1, 67:11, 84:3, 86:13,

87:21
**according** [10] - 3:7, 14:1, 37:4, 38:20, 44:23, 50:12, 62:14, 74:6, 77:2, 77:11
**account** [1] - 82:3
**accurate** [4] - 18:2, 58:5, 62:22, 62:23
**achieving** [1] - 86:10
**activities** [1] - 101:6
**activity** [3] - 51:20, 52:25, 68:23
**actual** [9] - 14:11, 18:24, 34:13, 43:3, 48:8, 48:24, 54:3, 63:13, 77:21
**actuarial** [3] - 38:23, 39:1, 39:11
**add** [1] - 16:24
**addendum** [1] - 16:25
**address** [1] - 22:8
**adequate** [1] - 48:20
**adjourned** [1] - 102:4
**adjust** [12] - 6:5, 13:22, 13:23, 14:8, 15:5, 16:6, 26:1, 37:8, 40:13, 40:16, 45:4, 58:21
**Adjust** [1] - 30:13
**adjusted** [2] - 50:20, 100:7
**Adjuster** [25] - 6:19, 7:25, 8:2, 8:6, 8:19, 10:3, 10:25, 11:5, 11:13, 11:17, 11:18, 12:5, 12:9, 32:12, 32:24, 41:23, 57:13, 62:17, 63:6, 63:9, 65:3, 74:3, 74:7, 75:7, 77:6
**agreed** [1] - 47:18
**ahead** [7] - 9:8, 52:4, 81:16, 92:2, 93:9, 97:25, 100:19
**Albert** [1] - 84:21
**ALBRIGHT** [2] - 1:16, 43:20
**allegation** [1] - 51:19
**alleged** [1] - 25:17
**alleging** [1] - 55:3
**allow** [8] - 26:24, 28:19, 29:1, 35:9, 51:11, 70:12, 74:19, 96:19
**allowed** [5] - 92:14, 95:10, 97:1, 98:17, 99:5
**allowing** [4] - 59:14, 96:18, 97:3, 98:8
**almost** [1] - 98:3
**altogether** [2] - 71:18, 71:19
**amount** [3] - 61:15, 63:1, 68:23
**amounts** [2] - 50:7, 52:17
**analysis** [3] - 31:12,

72:11, 74:20, 84:15, 93:14, 93:22, 93:24, 93:25, 94:1, 94:8
**adjusting** [6] - 6:3, 13:19, 19:3, 59:19, 60:3, 74:20
**admissible** [3] - 12:3, 51:1, 51:17
**admitted** [1] - 55:22
**admonished** [1] - 98:7
**advise** [1] - 95:21
**affidavits** [1] - 27:23
**affirmed** [1] - 3:7
**afternoon** [1] - 3:11
**aggravate** [1] - 98:25
**aggressive** [2] - 83:10, 83:19
**agree** [55] - 5:9, 6:13, 7:11, 12:5, 12:8, 12:13, 12:16, 12:24, 13:16, 13:19, 14:10, 14:14, 15:24, 19:1, 30:5, 37:17, 37:20, 37:25, 38:3, 38:7, 38:17, 40:1, 40:5, 41:22, 42:1, 45:14, 47:17, 48:23, 49:6, 55:15, 58:19, 59:1, 59:22, 63:19, 65:13, 66:10, 73:2, 75:13, 76:12, 79:13, 81:2, 81:6, 81:23, 82:6, 84:6, 85:13, 86:21, 87:1, 88:1, 88:4, 89:20, 90:8, 90:11, 92:21, 94:7
**adjuster** [37] - 4:20, 4:23, 15:5, 36:13, 40:22, 41:23, 44:21, 48:1, 48:4, 48:7, 48:11, 49:7, 55:23, 58:20, 59:19, 60:2, 60:22, 61:7, 61:25, 62:14, 63:16, 64:2, 64:13, 64:15, 66:4, 67:8, 68:19, 72:16, 72:18, 72:22, 73:3, 73:4, 75:8, 75:13, 89:14, 93:17, 94:2
**adjuster's** [7] - 48:18, 61:14, 64:9, 65:23, 66:3, 68:25, 77:3
**adjusters** [28] - 14:10, 16:6, 16:9, 23:1, 23:2, 23:9, 23:10, 31:1, 31:2, 37:3, 44:10, 44:17, 56:18, 58:10, 58:14, 58:15, 59:2, 59:15, 72:2,

**1**

31:18, 32:6
**analytical** [1] - 85:6
**answer** [15] - 3:25,
8:9, 12:19, 12:25,
23:3, 23:11, 32:10,
35:9, 54:6, 68:2,
68:4, 70:5, 74:10,
80:18, 80:23
**answered** [2] - 80:22,
92:6
**anticipate** [1] - 101:24
**anticipated** [1] - 62:17
**anyway** [1] - 38:24
**apologize** [4] - 7:2,
73:12, 91:4, 92:10
**APPEARANCES** [1] -
1:15
**applied** [3] - 60:4,
60:8, 60:17
**applies** [4] - 28:21,
60:11, 60:15, 76:7
**apply** [3] - 28:22,
60:21, 103:17
**appointed** [1] - 103:4
**appreciate** [5] - 9:6,
20:25, 73:20, 99:16,
101:22
**approach** [2] - 29:13,
91:5
**appropriate** [4] - 6:23,
58:16, 61:15, 65:17
**appropriately** [2] -
42:3, 46:5
**April** [1] - 16:10
**area** [4] - 87:19, 87:24,
96:4, 96:5
**areas** [1] - 96:3
**argue** [1] - 100:19
**argument** [1] - 29:5
**arose** [2] - 57:21, 59:5
**arrived** [1] - 44:14
**AS** [1] - 33:13
**aside** [5] - 23:5, 24:12,
45:2, 73:24, 95:10
**asserted** [2] - 10:6,
27:16
**assessing** [1] - 74:8
**assigned** [1] - 40:22
**assistant** [7] - 5:19,
5:22, 6:1, 54:16,
77:18, 85:5, 97:4
**attention** [1] - 67:5
**attorney** [9] - 24:7,
26:5, 34:21, 75:15,
76:9, 76:10, 76:13,
76:16
**attorney's** [1] - 78:15
**audio** [11] - 7:6, 13:10,
30:11, 32:11, 32:13,
32:14, 32:22, 43:24,
45:13, 47:16, 73:11
**August** [2] - 58:8,
78:18

**B**

**background** [1] -
80:16
**bad** [25] - 12:16,
25:15, 25:17, 26:5,
26:12, 50:19, 50:21,
51:5, 51:25, 52:9,
52:10, 52:17, 52:18,
52:22, 52:25, 53:2,
53:5, 54:18, 54:22,
55:3, 55:24, 98:20,
101:4, 101:9, 101:11
**bailiwick** [1] - 79:13
**Barre** [1] - 96:5
**Barrett** [1] - 84:25
**Bars** [1] - 85:5
**based** [14] - 11:22,
22:12, 29:10, 44:22,
45:2, 49:7, 51:19,
55:10, 59:19, 60:20,
61:2, 61:21, 64:23,
64:24
**basis** [2] - 9:14, 44:19
**Bates** [5] - 6:18, 8:25,
20:9, 25:20, 94:13
**bearing** [1] - 55:14
**became** [1] - 51:18
**BEFORE** [1] - 1:9
**beforehand** [1] -
50:20
**began** [3] - 5:17, 6:2,
15:16
**begin** [5] - 95:19,
96:7, 96:9, 96:11,
101:21
**begins** [1] - 13:15
**behalf** [2] - 19:1,
60:23
**believes** [1] - 37:10
**below** [3] - 4:17,
56:10, 84:15
**bench** [1] - 91:5
**beneficial** [6] - 79:17,
79:24, 80:2, 80:9,
80:10, 89:8
**benefit** [1] - 79:9
**benefits** [1] - 66:20
**BERNIE** [1] - 1:3
**best** [25] - 15:14,

**authenticated** [1] -
28:2
**authorizations** [1] -
64:17
**authorized** [1] - 61:9
**available** [1] - 98:15
**avenues** [3] - 58:14,
59:4, 59:8
**average** [4] - 63:2,
63:5, 93:16, 93:17
**aware** [4] - 21:2,
56:12, 60:13, 77:21

15:17, 15:21, 16:2,
16:3, 16:5, 16:12,
16:18, 16:21, 17:10,
17:15, 17:18, 18:24,
38:3, 38:20, 38:21,
38:24, 39:3, 39:8,
40:2, 40:6, 40:8,
73:14, 87:23, 98:21
**better** [4] - 16:8,
22:23, 37:17, 37:21
**between** [7] - 30:13,
58:25, 62:14, 63:13,
67:15, 86:15, 88:22
**beyond** [1] - 80:16
**BI** [1] - 81:20
**bias** [1] - 4:5
**bigger** [1] - 37:25
**bill** [1] - 34:21
**Bill** [1] - 85:1
**bills** [3] - 76:18, 78:16,
78:17
**binder** [2] - 23:5,
24:12
**bit** [5] - 19:16, 32:2,
94:15, 96:12, 102:1
**blurry** [2] - 22:14,
22:22
**bodily** [1] - 90:15
**bone** [1] - 25:17
**bonus** [1] - 89:22
**book** [1] - 35:14
**bottom** [4] - 16:20,
17:6, 17:17, 99:23
**box** [1] - 65:10
**branch** [5] - 16:9,
16:11, 84:17, 84:18,
84:19
**break** [3] - 49:11,
49:14, 94:15
**briefly** [2] - 75:21,
75:23
**bring** [3] - 53:16, 54:5,
67:4
**bringing** [2] - 54:4,
54:7
**brings** [1] - 82:13
**bruised** [2] - 63:23,
64:1
**BRYON** [1] - 1:20
**Buffalo** [1] - 16:11
**business** [3] - 14:20,
81:18, 86:7
**BY** [33] - 3:10, 4:11,
7:4, 7:10, 10:24,
12:4, 22:15, 23:18,
25:5, 29:24, 35:11,
38:2, 43:22, 47:5,
54:13, 58:7, 60:19,
68:15, 69:24, 70:8,
70:17, 71:22, 72:1,
74:2, 75:25, 78:13,
81:1, 81:22, 83:8,
92:20, 93:2, 93:12,

103:11

**C**

**Camp** [1] - 1:22
**cannot** [2] - 22:22,
63:3, 94:24
**captioned** [1] - 102:3
**careful** [1] - 46:16
**Carreno** [1] - 84:23
**carrier** [2] - 25:12,
25:14
**case** [113] - 11:1, 11:2,
23:25, 25:2, 27:3,
27:4, 27:9, 27:13,
28:6, 28:8, 29:4,
29:6, 29:7, 29:8,
29:11, 29:12, 29:15,
29:16, 29:25, 31:4,
31:17, 32:23, 33:14,
35:2, 36:1, 36:6,
39:22, 39:24, 40:22,
40:23, 41:24, 49:15,
49:17, 49:19, 50:24,
51:1, 51:4, 51:10,
51:12, 51:17, 51:20,
52:6, 52:8, 52:9,
52:10, 52:11, 52:17,
52:18, 52:19, 53:1,
53:2, 53:5, 54:14,
54:17, 54:19, 54:22,
55:5, 57:17, 62:17,
64:3, 64:6, 65:2,
65:17, 66:23, 67:9,
69:15, 69:16, 74:21,
75:7, 76:7, 76:10,
76:21, 77:16, 77:21,
77:23, 78:8, 78:11,
78:14, 91:20, 91:21,
91:22, 94:20, 95:1,
95:2, 95:11, 95:17,
95:19, 95:21, 96:17,
96:25, 97:2, 97:7,
97:17, 98:19, 98:20,
98:24, 99:1, 99:7,
99:11, 100:2, 100:6,
101:3, 101:6, 101:7,
101:12, 101:17
**cases** [5] - 42:21,
53:7, 94:9, 96:22,
101:25
**castigate** [1] - 26:17
**casually** [1] - 5:23
**casualty** [34] - 5:20,
6:14, 12:5, 14:1,
14:3, 14:6, 15:7,
15:8, 16:9, 16:18,
18:19, 66:11, 66:16,
66:18, 66:22, 69:4,
72:5, 72:17, 73:3,
74:17, 75:4, 75:18,
81:10, 81:18, 88:1,
88:5, 88:9, 88:11,

88:19, 88:25, 92:22,
93:4, 93:20, 93:24
**Catalano** [26] - 4:7,
4:13, 4:15, 5:7, 6:23,
7:12, 7:15, 10:25,
11:5, 11:8, 11:14,
12:15, 39:23, 41:4,
41:23, 42:2, 43:13,
43:16, 44:4, 56:22,
57:2, 57:5, 58:25,
75:8, 78:5, 84:14
**Catalano's** [6] - 6:19,
6:22, 7:1, 8:18, 11:8,
11:18
**categorize** [1] - 83:25
**CE** [3] - 25:6, 25:21,
69:10
**cease** [1] - 9:5
**ceiling** [1] - 101:18
**Cembrinski** [1] -
85:10
**CENTRAL** [1] - 1:6
**Central** [3] - 5:15,
22:25, 23:6
**cents** [1] - 80:6
**CEO** [6] - 84:20,
84:21, 85:14, 85:17,
86:15, 87:2
**certain** [6] - 7:15,
36:1, 68:24, 73:6,
81:7, 95:5
**certainly** [6] - 29:13,
37:19, 50:21, 51:21,
53:2, 98:17
**CERTIFICATE** [1] -
103:1
**certificate** [1] - 103:16
**certify** [2] - 103:5,
103:6
**certifying** [1] - 103:17
**CFO** [6] - 80:18,
81:10, 84:22, 85:14,
86:15, 87:2
**Chad** [1] - 85:5
**challenge** [2] - 10:13,
28:21
**change** [1] - 13:5
**changed** [2] - 11:25,
94:16
**charge** [3] - 12:14,
44:3, 44:4
**charged** [1] - 76:20
**CHARLES** [1] - 1:20
**check** [4] - 45:9,
62:21, 62:24, 63:7
**Cheryl** [2] - 84:22,
86:3
**chief** [3] - 81:2, 81:11,
85:18
**Chilcote** [1] - 1:21
**choose** [1] - 58:24
**chose** [2] - 58:19,
58:22

2

**chronological** [3] - 33:6, 34:16, 35:2
**chronologically** [2] - 34:19, 34:23
**claim** [107] - 13:19, 13:22, 13:23, 14:8, 14:14, 14:17, 15:3, 15:6, 15:8, 15:14, 23:15, 23:19, 23:25, 24:20, 25:9, 25:11, 25:13, 25:15, 25:16, 26:5, 26:12, 27:11, 30:15, 30:16, 37:14, 40:16, 41:15, 41:17, 41:18, 41:20, 44:9, 45:24, 47:10, 47:23, 48:21, 48:24, 49:2, 49:4, 50:12, 50:13, 50:19, 51:12, 51:25, 52:1, 52:6, 52:14, 52:22, 52:25, 56:23, 56:25, 57:2, 57:21, 58:11, 58:21, 59:5, 59:10, 59:13, 59:16, 59:19, 59:24, 59:25, 60:12, 60:15, 60:17, 61:2, 62:19, 66:18, 66:19, 67:19, 68:10, 68:18, 68:20, 72:3, 72:4, 72:6, 72:9, 72:10, 74:8, 74:21, 75:19, 76:15, 77:3, 77:7, 77:11, 79:4, 79:10, 79:18, 79:19, 79:25, 80:4, 80:5, 81:10, 81:12, 82:24, 83:4, 87:3, 90:9, 90:15, 90:20, 93:14, 101:4, 101:9, 101:10, 101:11
**claimant** [1] - 25:6
**claims** [76] - 5:20, 6:3, 6:6, 14:21, 16:6, 19:3, 23:1, 23:8, 23:20, 24:14, 25:22, 26:1, 26:2, 26:11, 28:3, 37:8, 37:11, 40:13, 42:3, 44:24, 45:15, 54:14, 56:6, 57:12, 60:3, 61:19, 62:15, 62:20, 62:23, 62:25, 63:1, 66:11, 69:5, 74:20, 74:24, 75:2, 75:4, 80:13, 80:19, 81:20, 82:12, 82:18, 82:21, 82:22, 82:23, 83:1, 83:24, 83:25, 84:4, 85:3, 86:13, 86:23, 87:3, 87:4, 88:6, 88:7, 88:13, 88:17, 88:18, 89:1, 89:4, 89:6, 90:12, 90:18, 90:21,

90:23, 90:25, 93:4, 93:11, 93:17, 93:19, 93:21, 94:1
**clarify** [1] - 52:7
**classic** [1] - 101:11
**clear** [10] - 12:9, 21:13, 24:10, 51:8, 52:13, 52:16, 53:20, 60:16, 71:24, 77:19
**cleared** [1] - 66:14
**clearly** [4] - 12:3, 51:4, 51:6, 53:10
**Clemens** [24] - 14:17, 14:21, 15:3, 39:24, 41:24, 44:11, 44:12, 44:15, 54:17, 55:2, 58:22, 61:3, 62:19, 66:19, 72:6, 72:8, 72:9, 74:21, 75:18, 76:7, 76:24, 79:3, 79:7
**CLEMENS** [2] - 1:3, 1:3
**Clemens'** [3] - 55:5, 67:9, 90:9
**client** [2] - 42:25
**clients** [4] - 82:8, 98:23, 99:2, 100:24
**clip** [12] - 7:5, 8:21, 11:11, 11:23, 13:8, 42:11, 43:9, 46:13, 46:14, 46:15, 47:15
**Clip** [1] - 6:16
**clips** [3] - 73:9, 73:14, 73:16
**close** [1] - 78:20
**closing** [1] - 73:24
**co** [2] - 3:25, 6:21
**co-counsel** [1] - 6:21
**co-employee** [1] - 3:25
**Code** [1] - 103:5
**cogent** [1] - 101:17
**coin** [1] - 101:16
**College** [1] - 96:2
**collision** [3] - 57:24, 72:23, 93:25
**colloquy** [3] - 26:8, 49:23, 91:7
**comfortable** [1] - 59:14
**coming** [7] - 21:12, 29:10, 29:16, 50:6, 65:5, 74:25, 98:5
**committed** [2] - 54:19, 54:22
**committee** [9] - 30:1, 30:3, 30:6, 30:18, 30:19, 32:12, 33:3, 45:18, 45:21
**committing** [1] - 55:24
**comp** [1] - 93:25
**company** [16] - 13:16,

14:20, 16:7, 38:22, 38:25, 39:7, 80:15, 83:10, 83:18, 84:5, 86:12, 86:15, 86:22, 87:15, 90:1, 97:4
**Company** [1] - 6:8
**COMPANY** [1] - 1:6
**competent** [1] - 101:2
**completely** [3] - 28:14, 62:22, 66:4
**complex** [2] - 98:19, 101:9
**complexity** [1] - 101:3
**complies** [1] - 20:24
**comply** [1] - 14:12
**components** [1] - 73:1
**comprehensive** [2] - 15:17, 17:18
**computer** [1] - 32:6
**Conaboy** [1] - 52:23
**Conaboy's** [3] - 50:17, 51:23, 52:12
**concern** [4] - 77:24, 91:17, 100:23, 100:25
**concerned** [2] - 86:25, 94:16
**concerning** [1] - 52:22
**concluded** [2] - 29:23, 54:8, 92:19
**conditions** [1] - 74:13
**conference** [2] - 22:3, 32:25
**consent** [4] - 75:19, 75:21, 76:3, 76:6
**consider** [2] - 14:25, 15:1, 95:6
**considered** [1] - 15:13
**considering** [1] - 60:22
**consistency** [3] - 37:11, 66:1, 66:7
**consistent** [8] - 15:25, 37:3, 37:5, 53:16, 53:17, 54:7, 73:12, 91:23
**consistently** [1] - 62:18
**contained** [3] - 31:10, 32:4, 65:22
**contention** [1] - 25:17
**contents** [6] - 33:24, 33:25, 34:3, 34:5, 34:7, 35:20
**context** [3] - 11:20, 11:23, 21:8
**continually** [2] - 96:19, 100:17
**continue** [2] - 59:15, 97:19
**contract** [1] - 61:4
**control** [3] - 9:5, 35:24, 103:17

**conversation** [5] - 26:11, 49:14, 51:16, 52:21, 95:14
**copies** [2] - 20:19, 42:19
**copy** [11] - 19:19, 19:21, 20:10, 20:23, 21:5, 21:7, 42:13, 42:14, 42:16, 42:17, 42:24
**corner** [1] - 89:12
**corners** [1] - 95:6
**corporate** [3] - 16:8, 86:17, 86:18
**correct** [178] - 3:15, 3:16, 3:18, 3:22, 4:18, 4:21, 4:22, 4:24, 4:25, 5:2, 5:3, 5:5, 5:6, 5:7, 5:14, 5:17, 5:18, 5:21, 5:23, 5:24, 6:3, 6:4, 6:6, 6:7, 6:8, 7:14, 8:10, 8:13, 8:19, 12:11, 13:6, 13:24, 13:25, 14:3, 14:13, 14:16, 14:19, 14:24, 15:6, 15:7, 15:10, 15:19, 15:20, 16:1, 16:3, 16:13, 16:21, 17:16, 18:2, 18:12, 18:14, 18:23, 19:4, 19:7, 19:9, 19:12, 22:17, 22:19, 22:20, 23:2, 24:5, 24:6, 24:8, 24:16, 26:1, 26:2, 26:3, 30:6, 30:9, 30:15, 30:18, 31:5, 32:21, 34:1, 35:2, 35:5, 36:15, 37:4, 37:8, 37:9, 38:5, 38:6, 40:3, 40:10, 40:13, 41:24, 44:2, 44:18, 44:19, 44:22, 44:25, 47:10, 48:2, 48:5, 48:6, 48:8, 48:21, 48:22, 49:4, 52:20, 54:15, 54:19, 54:22, 54:25, 55:1, 55:11, 55:20, 55:21, 55:24, 56:8, 56:14, 56:24, 57:2, 57:3, 57:14, 57:15, 57:18, 57:19, 57:21, 57:22, 58:24, 59:16, 59:25, 60:1, 60:23, 61:4, 61:13, 61:16, 63:12, 63:16, 63:20, 63:21, 63:24, 64:3, 64:17, 64:21, 64:22, 64:25, 65:20, 66:1, 66:2, 66:5, 66:6, 66:20, 66:21, 66:24,

67:2, 70:20, 71:6, 72:15, 72:18, 73:5, 74:16, 74:18, 75:8, 75:9, 76:8, 78:15, 79:5, 81:4, 81:12, 83:5, 86:15, 87:4, 87:18, 88:2, 88:17, 89:22, 93:5, 93:18, 93:23, 94:3, 94:5, 94:10, 103:5
**correctly** [3] - 15:5, 76:1, 86:17
**correspondence** [1] - 33:6
**counsel** [12] - 6:21, 20:10, 21:2, 21:15, 21:20, 21:22, 21:23, 26:7, 28:17, 35:5, 58:14
**counsel's** [2] - 52:22, 101:14
**counties** [1] - 96:1
**county** [1] - 95:25
**Couperthwait** [2] - 85:1, 85:6
**couple** [2] - 81:25, 95:2
**course** [3] - 49:14, 51:12, 54:23
**Court** [19] - 20:8, 20:19, 28:7, 49:9, 50:1, 51:24, 60:10, 60:17, 60:20, 92:10, 95:24, 95:25, 98:10, 99:6, 103:3, 103:4, 103:10, 103:13, 103:13
**COURT** [92] - 1:1, 3:2, 3:4, 4:10, 7:9, 9:2, 9:8, 9:14, 9:23, 10:7, 10:12, 11:24, 19:24, 20:1, 20:10, 20:18, 21:9, 21:15, 21:19, 21:22, 21:25, 22:4, 22:11, 26:6, 26:10, 26:17, 27:2, 27:12, 27:18, 27:21, 28:9, 28:12, 28:17, 28:24, 29:5, 35:6, 37:24, 42:14, 42:16, 42:18, 42:22, 43:10, 43:14, 43:16, 43:18, 43:21, 46:14, 49:10, 49:25, 50:9, 50:16, 52:3, 52:10, 52:15, 53:9, 53:14, 54:1, 54:9, 54:12, 60:16, 67:25, 68:7, 68:8, 68:13, 69:9, 69:19, 69:23, 70:2, 70:11, 71:20, 71:25, 73:16, 73:20, 77:15, 78:1, 80:23, 81:16, 83:6, 91:6,

91:9, 91:12, 91:15, 91:18, 92:2, 92:12, 92:16, 92:25, 93:8, 94:14, 96:16, 97:25, 99:14
**court** [5] - 20:17, 68:5, 92:24, 95:24, 99:2
**Court's** [1] - 50:7
**courtesy** [1] - 9:6
**courtroom** [2] - 95:6, 96:15
**Courts** [1] - 96:4
**cover** [3] - 24:24, 24:25, 50:16
**covers** [1] - 53:2
**created** [1] - 16:3
**criticism** [1] - 66:25
**cross** [5] - 9:9, 19:13, 20:3, 23:17, 27:14
**CROSS** [1] - 2:3
**cross-examine** [1] - 27:14
**cross-examining** [1] - 9:9
**CRR** [2] - 103:9, 103:12
**cup** [1] - 41:10
**customer** [1] - 85:2
**cut** [1] - 101:4

## D

**daily** [2] - 74:24
**Daniel** [3] - 84:21, 85:20, 85:23
**darkness** [1] - 94:17
**database** [1] - 33:11
**DATE** [1] - 1:13
**date** [11] - 24:15, 32:20, 33:16, 34:8, 34:9, 36:4, 36:7, 36:12, 91:1, 103:6
**dated** [2] - 36:16
**dates** [1] - 103:6
**daughter** [1] - 86:2
**days** [9] - 46:3, 53:15, 69:1, 70:22, 70:25, 71:4, 71:5, 95:2
**deal** [1] - 80:5
**decide** [1] - 99:8
**decided** [2] - 15:24, 16:5
**decision** [3] - 50:23, 55:10, 60:17
**declaration** [1] - 76:23
**decrease** [1] - 46:7
**Defendant** [2] - 1:7, 1:20
**defendant's** [1] - 101:5
**defense** [3] - 51:19, 61:7, 76:20
**defer** [2] - 75:3, 75:5

**definitely** [2] - 18:11, 82:8
**delay** [3] - 61:19, 98:8, 100:2
**delayed** [1] - 51:19
**demand** [1] - 64:16
**demanded** [1] - 51:3
**demands** [2] - 51:24, 53:3
**denied** [1] - 99:19
**deny** [1] - 61:2
**department** [4] - 66:22, 73:3, 87:3, 93:5
**departments** [1] - 58:18
**deposition** [65] - 3:13, 3:15, 3:24, 4:12, 5:22, 6:9, 6:11, 6:20, 7:22, 8:3, 8:12, 8:14, 9:22, 12:20, 12:24, 15:11, 19:14, 19:22, 19:23, 22:16, 22:17, 23:17, 24:1, 24:3, 26:20, 31:6, 32:1, 34:21, 36:6, 40:21, 41:22, 42:14, 42:16, 42:19, 42:24, 43:3, 43:4, 43:5, 47:1, 47:17, 54:3, 55:18, 56:14, 57:1, 57:11, 57:16, 57:20, 58:1, 59:11, 59:25, 62:6, 62:18, 65:11, 65:14, 69:12, 69:13, 69:18, 76:14, 76:19, 78:14, 80:22, 90:11, 91:22
**depositions** [1] - 42:20
**designed** [1] - 101:6
**desk** [1] - 80:8
**despite** [2] - 15:3, 32:20, 55:4, 56:22, 59:14, 65:13, 77:5, 77:8, 79:4
**detail** [1] - 66:6
**detailed** [1] - 17:18
**determine** [5] - 54:18, 54:21, 55:9, 89:21, 94:9
**determined** [4] - 42:23, 59:19, 60:11, 60:21
**development** [1] - 85:7
**devices** [1] - 49:15
**diane** [1] - 2:4
**Diane** [6] - 3:5, 17:12, 22:17
**DIANE** [1] - 3:7
**diary** [6] - 67:17, 70:25, 71:3, 71:7
**Dickie** [1] - 1:21

**difference** [3] - 65:14, 73:23, 97:7
**different** [25] - 6:24, 9:11, 10:18, 12:19, 16:22, 25:20, 28:14, 35:19, 38:15, 38:21, 38:25, 39:1, 53:10, 53:11, 58:11, 58:13, 66:4, 68:14, 70:5, 72:20, 72:25, 73:7, 74:11, 83:14, 101:8
**difficult** [2] - 21:19, 98:20
**digitally** [3] - 30:9, 30:10, 30:11
**dire** [1] - 98:3
**direct** [1] - 103:17
**DIRECT** [2] - 2:3, 3:9
**direction** [2] - 86:14, 86:22
**directly** [3] - 4:5, 36:22, 70:6
**disability** [5] - 40:20, 61:21, 62:3, 62:10
**disagree** [2] - 52:15, 97:17, 101:3
**disbelieve** [1] - 11:7
**discovery** [4] - 28:5, 28:8, 90:3
**discuss** [5] - 86:14, 87:1, 87:9, 95:1, 95:21
**discussed** [3] - 51:2, 52:18, 86:21
**discussing** [1] - 87:11
**discussion** [9] - 26:11, 29:23, 30:13, 49:15, 51:16, 52:23, 54:8, 92:18, 98:5
**discussions** [6] - 50:25, 51:11, 51:17, 52:13, 52:22, 95:20
**dispute** [6] - 17:4, 60:7, 76:25, 77:2, 77:5, 81:19
**distance** [2] - 95:23, 96:6
**distinguish** [1] - 88:22
**distributed** [1] - 30:25
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [5] - 96:1, 103:4, 103:13, 103:14
**divide** [2] - 93:22, 96:3
**divided** [2] - 93:16, 94:2
**division** [6] - 86:13, 87:23, 93:11, 93:14, 93:19, 93:20
**document** [39] - 15:25, 16:14, 16:23, 17:23, 20:6, 21:25,

22:1, 22:4, 22:7, 24:22, 27:2, 27:3, 27:8, 27:15, 27:19, 27:22, 28:2, 28:9, 28:12, 28:13, 28:21, 30:24, 31:3, 34:14, 35:18, 35:22, 36:14, 37:4, 37:5, 39:14, 47:24, 48:2, 48:4, 48:12, 53:23, 68:21, 69:8, 70:9
**documentation** [6] - 19:2, 32:5, 67:19, 68:9, 68:17, 69:3
**documented** [1] - 72:19
**documenting** [1] - 47:22
**documents** [17] - 6:19, 17:1, 21:1, 21:2, 23:5, 24:12, 26:4, 27:9, 27:25, 28:19, 29:3, 29:13, 33:23, 35:1, 36:2, 36:7, 36:20
**dollar** [2] - 77:11, 79:4
**dollars** [1] - 80:6
**done** [3] - 27:17, 70:16, 100:14
**door** [10] - 81:12, 81:24, 82:7, 82:11, 82:13, 82:25, 83:4, 86:12, 87:3
**doubt** [1] - 95:9
**Doug** [1] - 23:16
**down** [4] - 45:4, 75:1, 84:20
**downstairs** [1] - 96:8
**drag** [1] - 101:6
**drove** [1] - 3:19
**dry** [1] - 101:4
**due** [6] - 61:4, 92:4, 92:13, 99:3, 100:24
**duly** [1] - 3:7
**duplicative** [1] - 92:15
**during** [7] - 3:24, 4:12, 19:23, 49:14, 52:18, 78:14, 92:21
**duty** [2] - 94:24, 94:25
**Dvoracek** [24] - 7:25, 8:2, 8:7, 10:3, 10:25, 11:5, 11:13, 11:17, 12:5, 12:9, 30:13, 32:12, 32:24, 41:1, 41:2, 57:13, 58:25, 62:17, 63:6, 65:3, 74:3, 74:7, 77:7, 77:10
**Dvoracek's** [2] - 8:19, 63:9

## E

**e-mail** [1] - 63:17
**e-mailed** [2] - 36:19, 36:22
**easy** [2] - 26:14, 46:22
**Edmeston** [2] - 3:17, 34:25
**effectively** [1] - 54:5
**either** [4] - 9:15, 63:17, 81:6, 101:14
**electronic** [2] - 36:23, 49:15
**electronically** [1] - 37:1
**elicited** [2] - 3:24, 4:12
**eliminate** [1] - 100:14
**employee** [2] - 3:25, 63:20
**employment** [2] - 5:12, 6:2
**enacted** [1] - 15:12
**encompasses** [1] - 66:22
**end** [2] - 12:13, 55:9
**enforce** [1] - 40:2
**enter** [1] - 68:20
**entered** [2] - 67:14, 68:18
**entire** [9] - 7:11, 16:7, 30:19, 30:20, 34:5, 55:12, 84:19, 87:17, 93:19
**entitled** [1] - 20:6
**equal** [2] - 93:22, 94:2
**equals** [1] - 93:17
**error** [3] - 60:23, 60:24, 61:1
**es** [1] - 12:21
**especially** [1] - 19:11
**ESQ** [4] - 1:16, 1:16, 1:20, 1:20
**essence** [8] - 13:19, 34:10, 38:21, 41:11, 47:6, 48:18, 48:19, 84:10
**evaluations** [1] - 51:25
**evening** [1] - 20:22
**eventually** [2] - 5:19, 76:12
**evidence** [8] - 29:12, 49:19, 80:17, 95:17, 96:19, 96:20, 100:7, 100:10
**evidentiary** [1] - 9:14
**exactly** [7] - 11:20, 17:1, 48:12, 50:10, 53:24, 69:21, 98:12
**EXAMINATION** [1] - 3:9
**examination** [3] - 19:13, 20:3, 23:17

94

**examine** [1] - 27:14
**examiner** [1] - 37:14
**examiners** [4] - 15:25, 16:18, 40:2, 84:6
**examining** [1] - 9:9
**except** [3] - 14:2, 17:2, 46:23
**exception** [3] - 7:12, 7:15, 12:15
**exceptionally** [2] - 53:19, 101:1
**excess** [2] - 25:12, 25:14
**exclude** [1] - 26:22
**executive** [3] - 84:17, 84:18, 84:19
**executives** [2] - 56:7, 56:9
**exhibit** [3] - 20:11, 20:12, 20:20
**exhibits** [1] - 20:1
**exist** [2] - 39:17, 39:20
**exited** [1] - 96:15
**expect** [1] - 101:24
**expectations** [1] - 86:8
**expense** [1] - 87:20
**expenses** [2] - 87:22, 87:23
**experience** [1] - 6:3
**expert** [4] - 80:15, 98:5, 98:8, 98:14
**expertise** [2] - 13:20, 87:25
**extend** [2] - 70:24, 71:2
**extent** [4] - 51:14, 51:15, 100:1

## F

**facilities** [1] - 49:12
**fact** [16] - 32:19, 38:3, 40:15, 49:11, 50:18, 50:24, 51:8, 55:8, 56:6, 56:12, 59:24, 61:3, 63:19, 82:25, 101:10
**facts** [1] - 29:10
**failed** [1] - 27:9
**fair** [1] - 96:21
**faith** [24] - 25:15, 25:17, 26:5, 26:12, 50:19, 50:21, 51:5, 51:25, 52:9, 52:10, 52:17, 52:18, 52:22, 52:25, 53:2, 53:5, 54:19, 54:22, 55:3, 55:24, 98:20, 101:4, 101:9, 101:11
**false** [2] - 8:22, 65:18
**familiar** [3] - 55:17, 59:2, 74:12

**family** [1] - 41:24
**far** [11] - 3:19, 22:22, 31:24, 46:18, 47:3, 77:19, 78:9, 91:19, 92:16, 96:1, 101:3
**Father** [1] - 85:25
**fault** [2] - 72:21, 93:25
**Federal** [3] - 9:21, 95:24, 95:25
**fees** [1] - 78:15
**felt** [3] - 59:14, 64:5, 65:1
**few** [3] - 40:13, 40:18, 92:3
**file** [51] - 31:12, 31:18, 32:6, 33:13, 34:5, 34:13, 34:15, 34:17, 35:13, 35:15, 35:16, 35:22, 44:19, 44:22, 45:7, 45:8, 45:10, 47:20, 47:22, 48:8, 48:9, 48:10, 48:23, 49:7, 54:20, 59:18, 61:8, 63:13, 67:7, 68:21, 70:22, 71:7, 71:13, 71:14, 71:16, 72:12, 72:14, 72:17, 72:19, 72:25, 74:4, 74:7, 74:21, 75:11, 80:1, 80:3, 83:13, 84:2, 100:18
**file-by-file** [1] - 44:19
**filed** [3] - 31:3, 50:2, 51:22
**Filenet** [2] - 33:10, 33:24
**files** [20] - 34:14, 37:6, 40:17, 41:7, 41:9, 45:7, 61:19, 62:1, 62:4, 62:8, 63:3, 63:20, 71:16, 71:19, 72:2, 72:5, 72:6, 72:8, 72:10, 83:14
**fill** [1] - 81:17
**finance** [3] - 82:1, 84:25, 90:2
**finances** [1] - 80:20
**financial** [9] - 80:14, 80:15, 81:3, 81:8, 81:11, 85:18, 87:14, 89:10, 89:12
**financially** [3] - 79:16, 79:23, 80:9
**financials** [1] - 87:16
**fine** [4] - 21:11, 73:17, 78:9, 97:18
**finish** [8] - 10:12, 73:20, 91:13, 91:15, 91:18, 91:24, 97:13, 99:24
**finishing** [1] - 73:25
**FIRE** [1] - 1:6
**firm** [3] - 38:23, 39:1,

39:11
**Firm** [1] - 1:17
**First** [1] - 9:21
**first** [34] - 3:4, 6:5, 10:1, 16:17, 17:8, 21:3, 21:15, 21:20, 21:23, 22:4, 22:14, 23:1, 23:16, 29:25, 30:8, 31:9, 31:13, 38:7, 50:17, 67:25, 70:18, 70:21, 71:1, 73:25, 76:9, 76:23, 84:22, 84:23, 94:19, 95:16, 96:11, 98:14, 99:14
**fit** [1] - 86:18
**five** [16] - 42:7, 44:1, 44:6, 79:16, 79:22, 79:23, 80:8, 84:6, 84:14, 90:18, 90:22, 90:24, 91:1, 99:2, 99:21
**fix** [1] - 54:24
**focus** [1] - 97:9
**focusing** [1] - 97:14
**follow** [1] - 40:6
**followed** [2] - 20:19, 38:18
**following** [5] - 26:8, 40:2, 40:8, 49:23, 91:7
**follows** [1] - 3:8
**FOR** [2] - 1:1, 2:3
**foregoing** [3] - 103:5, 103:7, 103:16
**foreseeing** [1] - 98:12
**form** [4] - 31:12, 36:16, 49:18, 95:15
**format** [1] - 17:2
**formats** [1] - 16:22
**formula** [2] - 94:7, 94:8
**forth** [1] - 103:6
**fortunately** [1] - 36:8
**forward** [10] - 37:14, 39:14, 39:21, 66:9, 80:25, 84:2, 84:4, 86:20, 98:19, 99:5
**foundations** [1] - 95:19
**four** [12] - 27:23, 42:1, 42:7, 44:1, 44:3, 44:5, 44:6, 46:23, 83:6, 84:6, 84:14, 95:6
**frame** [10] - 24:20, 25:3, 26:19, 26:21, 26:23, 27:4, 27:6, 71:20, 99:20
**Friday** [2] - 98:6, 98:16
**friends** [1] - 94:19
**front** [4] - 8:15, 13:11,

26:17, 55:10
**future** [1] - 27:3

## G

**gather** [1] - 9:3
**gathering** [1] - 66:8
**general** [7] - 25:22, 30:17, 50:4, 50:6, 50:11, 77:17, 78:8
**generally** [7] - 37:20, 40:14, 45:8, 61:21, 64:11, 64:14, 97:3
**gentleman** [1] - 39:23
**gentlemen** [2] - 29:17, 94:14
**given** [7] - 8:15, 17:1, 24:19, 29:3, 29:6, 50:7, 68:17
**Google** [1] - 58:16
**govern** [1] - 100:11
**governed** [1] - 59:6
**governing** [1] - 74:11
**graduated** [1] - 5:16
**group** [1] - 85:6
**guess** [5] - 32:10, 57:17, 73:9, 88:10, 94:4
**guide** [1] - 15:5
**guy** [1] - 53:20
**guys** [1] - 49:12

## H

**HADDICK** [8] - 1:20, 4:3, 6:22, 7:3, 9:5, 91:4, 97:23, 98:1
**Haddick** [1] - 9:4
**Haddick's** [1] - 99:14
**half** [6] - 3:20, 92:16, 97:5, 97:11, 99:22, 100:25
**Halko** [2] - 103:3, 103:9
**HALKO** [1] - 103:12
**handle** [5] - 41:9, 58:11, 93:17, 99:14, 101:2
**handled** [3] - 41:3, 50:12, 50:13
**handles** [1] - 9:3
**handling** [11] - 16:18, 23:1, 23:8, 24:14, 25:22, 37:6, 37:11, 56:23, 57:2, 59:15, 67:8
**head** [1] - 63:8
**heading** [1] - 52:1
**hear** [3] - 30:2, 87:11, 94:23
**heard** [9] - 12:25, 46:18, 49:18, 60:20, 83:6, 91:19, 95:17,

95:18, 101:19
**hearing** [1] - 47:4
**hearsay** [1] - 27:1
**heart** [1] - 73:9
**held** [3] - 29:23, 54:8, 92:18
**help** [5] - 6:21, 16:6, 45:22, 61:23, 70:12
**helpful** [1] - 87:20
**hence** [1] - 52:6
**hereby** [1] - 103:5
**hereinbefore** [1] - 103:6
**hierarchy** [1] - 4:18
**higher** [1] - 66:5
**Hill** [1] - 1:22
**hire** [1] - 76:10
**hired** [2] - 6:5, 58:19
**hires** [1] - 76:9
**history** [2] - 48:20
**hit** [1] - 35:24
**hold** [7] - 5:25, 6:1, 21:19, 21:25, 26:6, 52:3, 79:10
**Holdorf** [1] - 84:24
**home** [4] - 93:15, 94:18, 96:13, 99:12
**honestly** [2] - 69:6, 99:17
**Honor** [58] - 3:3, 4:3, 4:5, 6:25, 7:8, 9:1, 9:13, 9:20, 10:5, 11:22, 19:19, 20:4, 20:5, 21:7, 21:24, 22:9, 26:16, 27:10, 28:1, 28:3, 28:5, 28:23, 29:2, 29:22, 42:12, 42:15, 43:9, 46:12, 49:8, 50:1, 50:10, 51:21, 52:2, 52:5, 52:7, 52:8, 53:6, 53:13, 53:25, 54:11, 60:14, 69:7, 69:17, 69:20, 73:14, 73:19, 77:24, 80:11, 81:13, 91:5, 91:17, 92:23, 93:7, 97:23, 98:4, 98:7, 98:8, 98:19
**Honor's** [1] - 53:8
**HONORABLE** [1] - 1:9
**hopefully** [2] - 96:8, 96:9
**hours** [12] - 3:20, 29:20, 92:16, 97:5, 97:11, 98:2, 98:3, 99:22, 99:23, 100:25
**HR** [1] - 85:8
**hum** [2] - 22:18, 88:18
**human** [1] - 92:9

**I**

**idea** [5] - 29:8, 29:9, 63:10, 90:4
**identified** [1] - 46:15
**identify** [1] - 69:9
**image** [1] - 16:8
**imaged** [3] - 34:13, 35:22, 72:25
**imagine** [1] - 99:12
**impeach** [6] - 6:23, 6:25, 10:1
**impeachment** [2] - 20:4, 27:16
**implemented** [1] - 38:4
**important** [16] - 37:10, 37:13, 37:15, 38:4, 54:17, 54:21, 54:24, 64:5, 64:20, 64:24, 66:1, 81:10, 81:14, 82:5, 82:6, 101:20
**impression** [2] - 100:3, 100:5
**improper** [1] - 10:17
**IN** [1] - 1:1
**inadmissible** [2] - 50:3, 50:6
**inapplicable** [1] - 61:7
**include** [2] - 35:7, 66:18
**included** [1] - 42:5
**includes** [1] - 95:8
**including** [2] - 42:3, 44:1
**inconsistency** [2] - 47:3, 54:3
**inconsistent** [14] - 9:11, 9:16, 10:14, 10:18, 20:5, 22:10, 46:17, 46:19, 53:16, 53:18, 69:21, 73:17, 96:21, 100:12
**incorrect** [2] - 22:24, 47:12
**increase** [1] - 46:6
**independent** [1] - 58:20
**INDEX** [1] - 2:2
**index** [9] - 33:7, 33:22, 34:10, 34:12, 34:18, 35:16, 35:17, 35:18, 35:21
**indexed** [1] - 34:17
**individual** [3] - 46:24, 64:10, 72:3
**individuals** [2] - 61:20, 71:13
**industry** [20] - 13:17, 14:12, 14:15, 55:23, 56:1, 56:3, 56:13, 56:19, 56:20, 56:24, 57:6, 57:13, 58:20,

59:5, 59:6, 59:20, 59:21, 60:4, 60:21, 76:2
**influence** [1] - 53:4
**information** [48] - 17:19, 25:1, 39:11, 39:18, 45:3, 46:5, 46:7, 46:9, 48:7, 48:9, 49:1, 49:3, 49:5, 50:20, 55:19, 56:4, 56:5, 58:14, 58:18, 63:15, 65:18, 65:22, 66:8, 67:11, 67:12, 74:23, 75:12, 76:14, 77:10, 77:22, 79:12, 79:25, 80:3, 80:4, 81:8, 84:3, 89:4, 89:5, 89:8, 89:10, 89:15, 95:5, 96:25, 97:10
**infrastructure** [1] - 85:11
**initiated** [1] - 33:14
**initiation** [1] - 15:3
**injury** [1] - 90:15
**inside** [1] - 96:14
**insinuation** [1] - 100:2
**instance** [4] - 48:1, 63:14, 64:15, 72:6
**instructed** [1] - 26:10
**Insurance** [20] - 4:17, 5:13, 6:8, 11:2, 14:3, 14:7, 14:10, 34:25, 47:23, 56:18, 58:15, 59:15, 60:2, 60:23, 79:17, 79:20, 79:21, 79:24, 80:9, 83:9
**INSURANCE** [1] - 1:6
**insurance** [27] - 4:20, 4:23, 14:20, 15:5, 25:12, 25:14, 30:25, 36:12, 38:22, 44:21, 49:7, 58:14, 58:17, 61:7, 61:25, 62:14, 64:2, 66:20, 68:19, 72:2, 72:11, 74:20, 76:20, 83:10, 83:18, 89:14
**insured's** [1] - 31:16
**intend** [1] - 99:25
**interaction** [1] - 38:16
**interchangeably** [1] - 84:10
**interest** [2] - 25:16, 25:18
**interfere** [1] - 101:13
**internet** [2] - 58:18, 95:8
**interrupt** [1] - 101:13
**interrupting** [1] - 91:4
**intranet** [6] - 89:11, 89:13, 89:15, 89:16, 89:17

**inundated** [6] - 41:9, 61:16, 61:18, 61:25, 62:2, 62:8
**investigation** [3] - 49:17, 66:8, 95:7
**involved** [8] - 41:19, 45:17, 45:20, 51:16, 55:13, 77:16, 82:2, 91:21
**involves** [1] - 47:3
**issue** [4] - 36:1, 50:22, 55:12, 73:10
**issues** [1] - 61:24
**itself** [3] - 13:17, 14:11, 48:8

**J**

**Jeff** [1] - 84:25
**JERS** [2] - 20:15, 20:16
**Jim** [3] - 41:1, 41:6, 41:8
**Jim's** [1] - 11:8
**job** [4] - 26:1, 38:17, 40:1, 44:2
**jobs** [1] - 61:14
**Joe** [20] - 7:12, 7:15, 7:17, 7:19, 7:20, 7:21, 7:23, 7:24, 8:23, 39:23, 41:2, 41:4, 42:2, 42:6, 44:2, 44:4, 44:7, 56:22, 75:8
**John** [1] - 84:24
**join** [1] - 16:10
**joining** [2] - 38:9, 38:15
**JR** [2] - 1:16, 1:20
**Judge** [9] - 6:23, 7:3, 8:16, 9:6, 50:17, 51:23, 52:12, 52:23, 98:1
**JUDGE** [1] - 1:10
**judge** [7] - 27:8, 27:12, 27:23, 28:24, 29:9, 29:16
**judge's** [1] - 28:25
**judicial** [1] - 60:15
**judicially** [1] - 60:11
**Julie** [1] - 85:7
**July** [1] - 15:18, 15:19, 18:10, 18:21, 19:5, 19:6, 19:15, 22:19, 23:17, 24:15, 69:14
**June** [8] - 15:17, 15:19, 18:10, 19:5, 19:6, 51:23, 60:18
**junior** [1] - 85:24
**jurors** [3] - 94:17, 94:25, 95:23
**jury** [13] - 1:12, 8:16,

13:11, 26:18, 53:4, 55:10, 65:10, 94:14, 96:14, 96:15, 96:21, 99:8, 101:18
**justice** [1] - 95:1

**K**

**Kaster** [1] - 9:8
**kASTER** [1] - 29:22
**KASTER** [41] - 1:20, 6:17, 8:24, 9:1, 9:9, 19:19, 19:25, 20:5, 21:4, 21:11, 21:21, 21:24, 22:2, 22:9, 24:24, 25:1, 26:25, 27:10, 28:1, 28:23, 37:22, 42:12, 42:17, 42:20, 49:8, 50:1, 51:21, 52:5, 52:12, 53:6, 53:13, 58:6, 69:12, 69:15, 69:17, 69:20, 80:11, 81:13, 91:17, 92:23, 93:7
**Kaster's** [1] - 9:6
**keep** [6] - 21:7, 32:17, 32:21, 66:15, 82:16
**keeps** [1] - 77:22
**Ken** [1] - 5:4
**kind** [6] - 33:9, 43:7, 95:7, 96:11, 101:25, 102:1
**knowing** [1] - 65:22
**knowledge** [2] - 80:13, 96:25

**L**

**lack** [2] - 16:8, 22:23
**Ladies** [1] - 94:14
**lady** [1] - 43:18
**language** [2] - 46:20, 46:21
**large** [1] - 82:16
**larger** [1] - 37:19
**last** [3] - 97:21, 98:4, 99:9
**law** [2] - 3:8, 28:6, 49:19, 53:7, 53:11, 59:3, 76:7, 95:1, 95:18
**Law** [11] - 1:17, 55:16, 55:17, 55:20, 57:21, 60:3, 60:4, 60:8, 60:11, 60:16, 60:22
**lawyer** [1] - 9:2
**lawyers** [1] - 101:2
**lay** [3] - 80:12, 80:17, 98:20
**leader** [2] - 84:6, 84:12
**leader's** [1] - 38:17
**leaders** [1] - 84:9

**least** [12] - 14:25, 19:19, 26:4, 41:23, 45:6, 45:15, 57:11, 65:9, 65:21, 74:25, 78:15, 81:7
**leave** [4] - 69:3, 74:23, 80:8, 97:22
**led** [1] - 60:9
**LEE** [1] - 1:16
**left** [2] - 53:4, 96:14
**legal** [1] - 55:13
**legitimately** [1] - 99:1
**lend** [1] - 92:22
**less** [1] - 90:18
**letter** [5] - 34:7, 34:8, 34:9, 63:17
**letters** [1] - 55:2
**letting** [1] - 73:20
**lie** [2] - 11:19, 17:20
**lied** [1] - 27:25
**limine** [3] - 50:2, 51:22
**limited** [3] - 55:19, 56:5, 92:7
**limits** [2] - 99:18, 99:25
**line** [5] - 23:1, 28:15, 43:4, 43:6, 99:23
**lines** [6] - 43:12, 43:14, 45:11, 69:10, 70:11, 81:21
**Lines** [1] - 43:20
**list** [4] - 17:18, 20:11, 20:12, 20:20
**listed** [2] - 20:23, 25:3
**listen** [1] - 95:14
**listened** [1] - 78:10
**litigation** [11] - 23:2, 23:9, 23:10, 40:18, 45:8, 83:11, 83:20, 90:22, 90:25, 91:3
**live** [2] - 77:25, 96:5
**lived** [3] - 3:21, 3:25, 4:13
**lives** [1] - 97:1
**living** [1] - 16:23
**local** [2] - 20:18, 20:23
**logs** [1] - 32:6
**longest** [2] - 69:1, 70:24, 71:7
**look** [13] - 16:19, 21:25, 22:4, 28:15, 28:20, 29:18, 43:5, 54:18, 55:5, 63:10, 71:9, 74:3, 89:15
**looked** [1] - 41:17, 41:18, 54:20, 56:22, 56:23, 56:25, 59:10, 59:13, 61:8, 76:12, 95:22
**looking** [1] - 16:17, 17:8, 28:13, 34:7, 41:15, 48:18, 63:12,

63:14, 74:7, 75:13,
101:18
**loss** [4] - 33:16, 63:15,
72:23, 91:1
**Lotus** [10] - 31:9,
31:11, 31:13, 31:16,
31:18, 31:21, 32:3,
32:7, 32:8, 33:11
**low** [2] - 83:11, 83:19

## M

**ma'am** [18] - 4:12, 5:9,
7:11, 8:6, 10:25,
16:17, 19:14, 22:16,
25:6, 29:25, 43:25,
55:8, 60:20, 63:19,
69:4, 70:18, 92:21,
93:3
**Ma'am** [2] - 12:24,
78:14
**machine** [1] - 37:1
**mail** [1] - 63:17
**mailed** [2] - 36:19,
36:22
**mailroom** [2] - 36:24,
36:25
**maintain** [1] - 27:1
**maintained** [1] - 22:25
**maintains** [2] - 23:6,
24:13
**MALACHY** [1] - 1:9
**manage** [1] - 6:8
**manager** [1] - 5:23
**mandate** [2] - 92:4,
92:13
**maneuver** [1] - 45:4
**manner** [2] - 35:8,
101:17
**MANNION** [1] - 1:9
**manual** [1] - 22:25
**March** [2] - 15:16,
17:19
**markings** [1] - 20:20
**mARSHA** [1] - 1:16
**math** [3] - 93:18,
93:23, 94:5
**matter** [9] - 10:6,
27:15, 28:6, 44:11,
44:12, 44:15, 47:25,
51:3, 102:4
**matters** [2] - 55:13,
80:15
**maximum** [1] - 62:25
**McCamey** [1] - 1:21
**mean** [12] - 10:9,
14:17, 18:13, 21:5,
34:20, 36:16, 46:2,
63:4, 72:3, 87:22,
93:18
**meaning** [3] - 14:7,
52:18, 88:4
**means** [5] - 9:23, 70:3,

89:13, 95:7, 103:17
**meant** [2] - 30:11,
73:16
**meantime** [3] - 13:7,
21:1, 28:14
**mediation** [4] - 50:23,
51:9, 51:22, 52:23
**mediations** [1] - 50:19
**mediator** [1] - 52:24
**medical** [12] - 63:11,
63:22, 64:10, 64:16,
72:16, 73:4, 74:3,
74:7, 74:21, 75:11,
75:14
**medicals** [1] - 64:8
**medium** [2] - 83:11,
83:19
**meet** [7] - 81:3, 81:7,
81:17, 81:23, 82:4,
85:13, 88:11
**meeting** [9] - 30:1,
30:3, 30:6, 45:18,
81:19, 82:15, 87:5,
87:6
**meetings** [6] - 30:18,
85:14, 85:17, 86:6,
87:2, 88:7
**meets** [2] - 82:9, 89:24
**member** [1] - 89:2
**memo** [6] - 18:3, 18:5,
18:18, 18:23, 18:24,
69:25
**memorandum** [1] -
98:11
**mention** [1] - 27:3
**mentioned** [2] - 103:5,
103:6
**merely** [1] - 46:8
**mess** [1] - 41:10
**met** [2] - 3:13, 83:16
**method** [1] - 101:7
**Michael** [1] - 84:23
**MICHAEL** [1] - 1:16
**Michele** [1] - 85:6
**Microsoft** [3] - 30:7,
30:24, 31:3
**Middle** [3] - 96:1,
103:4, 103:14
**MIDDLE** [1] - 1:1
**might** [6] - 7:8, 16:24,
36:22, 46:6, 46:16
**Mike** [1] - 85:9
**mince** [1] - 88:8
**mind** [3] - 13:7, 78:24,
101:8
**minimum** [4] - 45:16,
67:13, 68:23, 70:23
**minute** [2] - 26:6, 52:3
**minutes** [12] - 30:6,
49:13, 49:21, 53:23,
91:13, 91:16, 91:18,
91:23, 92:17, 97:6,
97:12, 99:24

**misrepresent** [1] -
58:3
**Miss** [3] - 3:11, 4:7,
27:23
**missed** [1] - 67:4
**missing** [1] - 85:9
**mistake** [1] - 92:9
**mistakes** [1] - 54:25
**misunderstood** [1] -
88:10
**model** [1] - 38:20
**moderate** [2] - 83:11,
83:19
**MONDAY** [1] - 1:13
**money** [12] - 45:1,
61:3, 81:12, 81:24,
82:6, 82:10, 82:12,
82:13, 82:25, 83:4,
86:12, 87:3
**morning** [2] - 96:7,
98:2
**most** [1] - 101:25
**motion** [1] - 51:21
**motions** [1] - 50:2
**motor** [1] - 57:23
**motorist** [10] - 15:9,
66:18, 66:23, 72:10,
73:3, 74:8, 74:15,
75:4, 76:24, 79:4
**move** [22] - 35:8,
37:14, 43:8, 54:2,
61:22, 62:10, 71:15,
74:1, 80:24, 83:7,
83:14, 84:2, 84:4,
86:20, 96:10, 96:12,
97:15, 98:19, 99:5,
99:24, 101:12, 102:1
**moved** [3] - 39:14,
39:21, 96:10
**moving** [4] - 16:7,
45:10, 66:9, 67:15
**MR** [144] - 3:3, 3:10,
4:3, 4:5, 4:11, 6:17,
6:18, 6:22, 6:25, 7:3,
7:4, 7:7, 7:10, 8:24,
8:25, 9:1, 9:5, 9:9,
9:13, 9:20, 9:25,
10:11, 11:22, 12:4,
19:19, 19:22, 19:25,
20:3, 20:5, 20:8,
20:14, 21:4, 21:12,
21:17, 21:21, 21:22,
21:24, 22:2, 22:5,
22:9, 22:13, 22:15,
23:16, 23:18, 24:24,
24:25, 25:1, 25:5,
26:16, 26:25, 27:7,
27:10, 27:14, 27:19,
27:22, 28:1, 28:10,
28:13, 28:23, 29:2,
29:22, 29:24, 35:11,
37:22, 38:2, 42:12,
42:15, 42:17, 42:20,

43:9, 43:13, 43:15,
43:17, 43:22, 46:11,
47:5, 49:8, 50:1,
50:9, 50:10, 51:21,
52:2, 52:5, 52:12,
53:6, 53:13, 53:14,
53:25, 54:11, 54:13,
58:6, 58:7, 60:14,
60:19, 68:5, 68:15,
69:7, 69:10, 69:12,
69:13, 69:15, 69:16,
69:17, 69:20, 69:24,
70:8, 70:17, 71:22,
72:1, 73:12, 73:19,
74:2, 75:24, 75:25,
77:24, 78:13, 80:11,
80:21, 80:24, 81:1,
81:13, 81:22, 83:8,
91:4, 91:11, 91:14,
91:17, 91:25, 92:3,
92:13, 92:20, 92:23,
93:2, 93:7, 93:12,
94:12, 97:23, 98:1,
98:2, 98:7, 98:14,
99:21, 100:2, 100:23
**MS** [3] - 20:12, 20:16,
43:20
**multi** [2] - 25:19,
25:20
**mute** [2] - 7:8, 7:9
**Mutual** [2] - 5:15, 25:8
**MUTUAL** [1] - 1:6

## N

**name** [7] - 24:2, 24:3,
25:2, 53:21, 81:3,
81:5, 85:24
**nearly** [1] - 98:2
**neat** [1] - 33:5
**necessarily** [2] -
34:19, 71:15
**necessary** [3] - 38:1,
45:4, 82:14
**need** [17] - 6:20, 9:5,
11:12, 71:10, 71:11,
77:20, 78:12, 80:2,
91:25, 97:8, 97:9,
97:14, 98:16, 99:17,
100:21, 101:16
**needed** [1] - 39:7
**needs** [2] - 70:22,
100:6
**negotiation** [1] - 52:1
**negotiations** [4] -
50:3, 50:5, 50:15,
50:18
**never** [18] - 8:18,
12:10, 18:22, 19:1,
19:8, 21:4, 28:1,
28:2, 35:5, 35:14,
41:18, 56:22, 56:23,
66:25, 77:7, 77:10,

77:11, 98:18
**new** [5] - 13:7, 16:24,
46:7, 48:13
**NEW** [1] - 1:6
**New** [15] - 3:17, 5:15,
16:11, 22:25, 23:6,
24:13, 59:20, 60:3,
60:7, 60:22, 61:11,
61:12, 76:5, 76:13,
76:15
**newspaper** [1] - 95:9
**next** [4] - 45:12, 83:7,
86:4, 92:25
**NICOLE** [1] - 1:3
**night** [1] - 98:15
**Nines** [4] - 33:12,
33:13, 33:15, 33:19
**NO** [1] - 1:5
**normal** [1] - 63:7
**normally** [3] - 40:17,
96:10, 101:15
**North** [1] - 1:22
**nose** [2] - 63:23, 64:1
**note** [7] - 20:20,
67:13, 68:18, 68:20,
68:25, 71:5, 71:15
**notes** [42] - 30:1, 30:3,
31:4, 31:25, 32:1,
33:2, 33:4, 36:14,
47:24, 48:16, 48:19,
48:25, 63:9, 63:10,
63:13, 63:15, 63:16,
63:17, 63:20, 64:3,
64:6, 64:7, 64:9,
64:13, 64:21, 64:23,
64:25, 65:23, 66:3,
66:4, 66:11, 66:13,
67:1, 67:2, 67:7,
67:9, 67:12, 71:12,
73:4, 77:3, 77:5,
96:14
**Notes** [10] - 31:10,
31:11, 31:13, 31:16,
31:18, 31:21, 32:3,
32:7, 32:8, 33:11
**nothing** [8] - 11:24,
14:19, 15:4, 18:22,
20:16, 46:18, 51:9,
101:10
**notice** [1] - 60:15
**NOVEMBER** [1] - 1:13
**number** [12] - 6:21,
8:24, 43:6, 43:12,
59:1, 59:4, 72:19,
72:25, 77:15, 78:2,
78:17, 78:24
**numbered** [1] - 103:6
**numbers** [4] - 43:4,
43:6, 81:10, 94:4
**NYCM** [95] - 3:6, 4:1,
4:17, 5:13, 5:17,
5:20, 6:2, 6:8, 11:2,
13:15, 14:3, 14:7,

8

14:10, 15:5, 15:12, 17:12, 17:20, 19:1, 30:5, 31:4, 31:11, 31:13, 31:16, 32:20, 33:9, 34:6, 34:25, 35:1, 36:1, 36:8, 36:9, 36:17, 37:3, 37:10, 38:3, 38:7, 38:21, 40:16, 42:1, 44:10, 44:17, 44:21, 44:23, 45:5, 45:14, 47:23, 49:6, 54:24, 55:3, 55:9, 55:15, 56:12, 56:18, 58:10, 58:15, 58:19, 59:2, 59:15, 59:22, 60:2, 60:23, 61:9, 61:15, 61:19, 61:24, 64:24, 65:19, 66:1, 66:12, 66:19, 68:17, 71:17, 72:11, 74:6, 76:9, 76:20, 79:3, 79:7, 79:9, 79:11, 79:15, 79:16, 79:20, 79:21, 79:23, 80:7, 80:9, 83:9, 83:18, 83:25, 84:12, 89:21, 90:11, 94:8
**NYCM's** [4] - 38:18, 66:5, 87:16, 87:17

**O**

**O'Donnell** [1] - 28:6
**oath** [5] - 8:15, 19:11, 24:7, 54:10
**object** [2] - 22:9, 69:20
**objecting** [1] - 51:14
**objection** [23] - 4:3, 7:3, 9:1, 10:4, 10:7, 10:20, 11:24, 22:11, 27:1, 37:22, 41:5, 50:14, 53:7, 53:9, 80:11, 80:23, 81:13, 92:2, 92:7, 92:12, 92:23, 92:25, 93:7
**Objection** [1] - 49:8
**objectives** [8] - 81:18, 82:17, 86:9, 86:10, 86:11, 86:18, 86:19
**obtained** [1] - 73:5
**obviously** [2] - 52:8, 99:22
**occasion** [2] - 40:15, 92:8
**occasions** [1] - 45:22
**occurred** [5] - 26:8, 49:23, 50:24, 61:5, 91:7
**occurs** [1] - 73:22
**OF** [1] - 1:1
**offer** [10] - 49:6, 50:7,

51:5, 64:24, 65:1, 65:3, 73:23, 77:6, 77:7, 77:11
**offered** [2] - 51:3, 77:11
**offering** [1] - 10:17
**offers** [5] - 50:3, 50:5, 50:25, 51:10, 53:3
**office** [1] - 93:15
**officer** [15] - 81:3, 81:11, 85:18, 85:21, 87:6, 87:7, 88:6, 88:7, 88:12, 88:13, 88:17, 88:18, 88:25, 89:5, 89:24
**officers** [1] - 90:6
**Official** [3] - 103:3, 103:10, 103:13
**often** [11] - 45:24, 45:25, 46:2, 46:4, 47:9, 66:13, 67:10, 67:19, 68:10, 68:17, 82:1
**Olay** [1] - 85:9
**old** [1] - 33:13
**once** [10] - 42:12, 44:25, 45:5, 45:6, 45:15, 45:16, 46:6, 46:13, 46:14, 49:3
**one** [40] - 5:13, 8:8, 9:2, 13:23, 15:24, 15:25, 21:21, 22:2, 27:4, 28:4, 33:21, 41:20, 43:15, 46:23, 51:23, 52:3, 52:5, 53:20, 57:8, 59:23, 61:14, 61:21, 64:14, 68:16, 72:12, 72:21, 72:25, 73:10, 73:25, 75:24, 77:19, 86:16, 87:23, 88:15, 89:2, 99:9, 101:25
**One** [1] - 85:24
**ones** [2] - 39:6, 86:25
**open** [2] - 42:25, 43:5
**opening** [1] - 3:1
**opinion** [4] - 37:23, 48:24, 80:12, 80:17
**opinions** [4] - 49:18, 95:16, 95:19, 95:20
**opportunities** [1] - 59:1
**opportunity** [1] - 70:18
**opposed** [1] - 59:20
**options** [1] - 48:2
**order** [12] - 20:24, 26:13, 28:25, 33:6, 34:16, 35:2, 35:25, 49:9, 51:23, 92:24, 94:25, 95:19
**ordered** [1] - 52:24
**organization** [1] -

87:17
**original** [2] - 39:12, 39:15
**originally** [1] - 9:4
**overall** [7] - 81:25, 82:16, 86:14, 86:17, 86:22, 86:23, 87:14
**overruled** [6] - 4:10, 22:11, 37:24, 51:15, 81:16, 93:9
**oversee** [1] - 14:1, 14:6
**overseeing** [1] - 57:12
**overview** [1] - 82:2
**owed** [1] - 84:4
**owing** [1] - 61:4
**own** [1] - 95:8

**P**

**P.C** [1] - 1:21
**PA** [3] - 1:18, 1:22, 103:14
**Pace** [3] - 32:5, 33:2, 33:10
**page** [6] - 8:24, 23:16, 24:24, 24:25, 43:3, 43:5, 43:12, 45:12, 69:10, 76:23
**Page** [8] - 8:25, 25:19, 25:21, 43:13, 43:19, 51:23, 70:19, 70:21
**pages** [2] - 24:21, 25:20
**paid** [3] - 61:3, 79:3, 79:7
**Palmer** [1] - 85:8
**paper** [1] - 34:13
**Paragraphs** [1] - 6:20
**Pardon** [1] - 7:18
**part** [23] - 8:4, 25:25, 27:2, 31:21, 32:6, 33:2, 34:14, 51:2, 52:6, 61:17, 64:4, 82:19, 82:20, 88:1, 88:5, 88:6, 88:9, 88:10, 88:11, 88:12, 89:10, 89:24, 92:21
**particular** [5] - 20:20, 71:20, 77:16, 78:8, 96:25
**particularly** [3] - 26:24, 27:18, 52:23
**parties** [1] - 50:2
**parts** [1] - 78:15
**past** [8] - 9:15, 27:17, 30:5, 32:19, 61:24, 82:25, 96:2, 101:2
**pay** [5] - 30:15, 79:9, 79:10, 79:15, 79:16, 79:21, 79:22, 80:7, 80:8, 81:12, 82:8, 82:23, 82:24, 83:4,

90:20
**paying** [1] - 83:1
**pays** [1] - 87:4
**pend** [1] - 69:1
**PENNSYLVANIA** [2] - 1:1, 1:11
**Pennsylvania** [28] - 28:7, 55:16, 55:17, 55:19, 55:25, 56:3, 56:13, 56:20, 56:24, 57:5, 57:13, 57:21, 59:5, 59:6, 59:20, 60:4, 60:8, 60:11, 60:15, 60:16, 60:21, 61:10, 76:2, 76:6, 76:16, 96:1, 103:4, 103:14
**people** [21] - 6:8, 12:2, 29:8, 42:1, 42:8, 44:1, 44:6, 45:22, 46:23, 62:9, 63:3, 63:4, 65:9, 66:6, 67:1, 67:6, 72:21, 82:10, 85:7, 87:11, 98:20
**percent** [4] - 90:17, 90:21, 90:23, 90:25
**percentage** [1] - 81:19
**perhaps** [1] - 100:6
**peril** [3] - 72:21, 72:22, 72:23
**perils** [3] - 72:20, 73:1, 73:2
**period** [7] - 23:13, 23:21, 24:9, 67:6, 67:13, 68:24, 69:2
**person** [8] - 13:15, 40:9, 56:7, 64:12, 64:14, 80:14, 81:15, 83:18
**phone** [4] - 48:1, 68:22, 71:10
**phonetic** [1] - 85:9
**phrasing** [2] - 71:23, 76:1
**picture** [2] - 82:16, 87:14
**piece** [3] - 74:11, 86:16, 88:15
**pieces** [4] - 82:3, 86:7, 86:16, 86:24
**PISANCHYN** [99] - 1:16, 3:3, 3:10, 4:5, 4:11, 6:18, 6:25, 7:4, 7:7, 7:10, 8:25, 9:13, 9:20, 9:25, 10:11, 10:24, 11:22, 12:4, 19:22, 20:3, 20:8, 20:14, 21:12, 21:17, 21:22, 22:5, 22:13, 22:15, 23:16, 23:18, 24:25, 25:5, 26:16, 27:7, 27:14, 27:19,

27:22, 28:10, 28:13, 29:2, 29:24, 35:11, 38:2, 42:15, 43:9, 43:13, 43:15, 43:17, 43:22, 46:11, 47:5, 50:9, 50:10, 52:2, 53:14, 53:25, 54:11, 54:13, 58:7, 60:14, 60:19, 68:5, 68:15, 69:7, 69:10, 69:13, 69:16, 69:24, 70:8, 70:17, 71:22, 72:1, 73:12, 73:19, 74:2, 75:24, 75:25, 77:24, 78:13, 80:21, 80:24, 81:1, 81:22, 83:8, 91:11, 91:14, 91:25, 92:3, 92:13, 92:20, 93:2, 93:12, 94:12, 98:2, 98:7, 98:14, 99:21, 100:2, 100:23
**Pisanchyn** [2] - 1:17, 3:2
**pisanchyn's** [1] - 98:5
**place** [12] - 3:21, 5:13, 15:15, 15:16, 15:22, 15:25, 16:13, 18:11, 18:21, 58:17, 97:23, 98:13
**Place** [1] - 92:2
**PLACE** [1] - 1:11
**placed** [1] - 98:18
**plaintiff** [4] - 32:25, 36:2, 64:16, 92:4
**PLAINTIFF** [1] - 2:3
**plaintiff's** [1] - 75:14
**Plaintiff's** [1] - 94:12
**Plaintiffs** [2] - 1:4, 1:16
**plan** [3] - 63:10, 81:18, 86:7
**planned** [2] - 29:2, 29:3
**play** [17] - 6:16, 7:5, 8:21, 10:4, 14:11, 11:23, 12:23, 13:8, 43:9, 43:23, 46:11, 46:13, 46:14, 46:25, 47:1, 47:15, 73:9
**played** [6] - 7:6, 13:10, 43:24, 45:13, 47:16, 73:11
**playing** [1] - 73:13
**Plaza** [1] - 1:21
**plus** [1] - 78:22
**point** [11] - 48:19, 51:18, 52:6, 52:7, 60:10, 70:6, 73:16, 76:15, 76:19, 78:1
**police** [1] - 34:22
**policies** [16] - 13:16, 14:15, 15:12, 18:13, 18:17, 23:7, 24:14,

38:18, 44:8, 44:9,
44:16, 44:20, 61:9,
65:21, 74:6, 97:3
**policy** [15] - 13:17,
14:11, 37:17, 37:18,
37:20, 37:21, 44:23,
45:23, 46:8, 47:7,
47:9, 47:21, 74:12,
74:25, 78:9
**popped** [1] - 13:7
**pops** [4] - 71:8, 71:9,
89:14, 89:17
**portion** [6] - 16:20,
43:2, 48:9, 86:11,
91:11, 91:12
**position** [6] - 4:6, 6:1,
22:10, 61:17, 88:25,
89:2
**positions** [3] - 5:25,
88:22, 88:24
**positive** [2] - 74:5,
78:24
**possibility** [1] - 46:6
**possible** [5] - 37:12,
45:2, 61:21, 83:14,
83:15
**potentially** [2] - 30:14,
61:19
**PowerPoint** [1] - 90:7
**practice** [8] - 15:17,
16:18, 17:19, 20:24,
42:3, 43:7, 50:5,
50:6
**practices** [23] - 15:14,
15:22, 16:2, 16:3,
16:5, 16:13, 16:21,
17:10, 17:15, 18:24,
23:1, 23:7, 24:14,
25:22, 38:4, 38:20,
38:21, 38:24, 39:4,
39:9, 40:2, 40:6,
40:8
**pre** [1] - 81:19
**pre-suit** [1] - 81:19
**precious** [1] - 98:24
**prepared** [2] - 100:6,
103:7
**prerogative** [1] - 97:18
**present** [4] - 96:18,
98:23, 100:7, 101:17
**presentation** [3] -
90:2, 90:7, 101:14
**presentations** [3] -
82:2, 89:25, 90:5
**presented** [1] - 95:17
**presenting** [2] - 80:18,
101:17
**preserved** [2] - 53:9,
54:3
**president** [41] - 5:1,
5:4, 5:10, 5:20, 5:23,
6:1, 30:14, 50:13,
54:14, 54:16, 54:21,

55:15, 55:22, 56:6,
57:12, 65:19, 66:11,
69:4, 74:14, 74:17,
75:1, 75:18, 77:18,
83:10, 84:23, 84:24,
84:25, 85:1, 85:2,
85:3, 85:6, 85:7,
85:8, 85:9, 85:10,
86:4, 87:2, 88:21,
88:25, 89:6, 97:4
**press** [1] - 3:6
**pretrial** [1] - 98:10
**pretty** [4] - 16:12,
33:5, 46:22, 77:19
**prevent** [1] - 61:3
**preventing** [1] - 99:4
**previous** [3] - 19:22,
24:21, 69:13
**previously** [8] - 3:14,
3:15, 24:4, 40:12,
65:25, 73:7, 93:3,
93:8
**print** [3] - 34:3, 34:5,
35:24
**problem** [6] - 21:12,
54:6, 66:5, 96:18,
97:2, 100:23
**procedure** [7] - 45:23,
46:8, 46:12, 47:7,
47:9, 47:21, 74:25
**procedures** [12] -
14:15, 15:12, 18:14,
18:18, 23:7, 24:14,
38:18, 44:8, 44:10,
44:16, 44:20, 74:6
**proceed** [5] - 3:2,
43:1, 43:2, 54:11,
59:4
**proceeding** [1] - 25:2
**proceedings** [2] -
102:3, 103:5
**PROCEEDINGS** [1] -
1:12
**process** [5] - 37:13,
92:4, 92:13, 100:13,
100:24
**produce** [1] - 27:9
**produced** [2] - 30:1,
30:3
**producing** [1] - 27:25
**profit** [2] - 87:17,
87:22
**profitability** [3] -
88:14, 89:25, 90:6
**profits** [5] - 86:22,
87:1, 87:9, 87:11,
88:5
**promise** [1] - 26:16
**promoted** [1] - 5:19
**pronunciation** [1] -
81:6
**properly** [1] - 6:6
**property** [1] - 72:18

**prosecution's** [1] -
51:20
**prove** [1] - 99:1
**provide** [4] - 9:21,
31:19, 32:13, 81:7
**provided** [21] - 6:18,
17:19, 17:25, 18:3,
19:21, 19:25, 21:4,
31:5, 31:16, 31:20,
31:22, 32:8, 32:11,
32:23, 32:25, 33:12,
35:14, 35:15, 35:16,
35:17, 36:9
**provisions** [1] - 103:4
**pull** [6] - 16:2, 16:16,
19:13, 22:13, 32:2,
96:20
**pulled** [1] - 94:11
**pulling** [1] - 53:23
**pulls** [1] - 89:14
**punished** [1] - 98:22
**pure** [1] - 80:6
**purpose** [5] - 9:22,
9:23, 77:18, 98:8
**pursuant** [1] - 103:4
**pursued** [1] - 59:9
**put** [27] - 11:23, 15:21,
15:24, 16:13, 21:7,
33:5, 38:5, 38:7,
39:11, 39:18, 48:16,
49:1, 49:3, 53:7,
64:2, 64:20, 71:5,
71:12, 79:22, 80:7,
82:10, 91:25, 92:12,
95:10, 97:18, 99:7
**puts** [1] - 87:3
**putting** [5] - 64:12,
67:1, 67:7, 67:9,
93:21
**puzzle** [1] - 88:15
**Pylinski** [16] - 81:4,
81:5, 81:11, 81:24,
82:4, 82:9, 82:14,
82:18, 83:16, 83:17,
83:21, 84:22, 86:6,
87:13, 88:4, 89:24
**Pylinski's** [2] - 79:14,
87:24

## Q

**quarterly** [4] - 85:14,
86:6, 87:5, 88:7
**questioning** [1] -
28:15
**questions** [28] - 12:25,
22:5, 23:10, 23:22,
23:24, 29:20, 35:6,
35:9, 35:10, 54:1,
65:11, 65:14, 77:17,
77:20, 78:6, 78:9,
78:12, 80:19, 92:3,
92:5, 92:6, 92:8,

92:14, 97:1, 97:3,
98:17, 100:16,
100:21
**quicker** [4] - 96:10,
96:12, 99:24, 102:1
**quickly** [3] - 47:20,
66:9, 83:14
**Quincy** [1] - 25:8
**quite** [4] - 15:4, 46:2,
53:19, 92:3

## R

**radio** [1] - 95:12
**raised** [2] - 32:19,
32:20
**range** [1] - 79:2
**rare** [2] - 40:15, 41:5
**rarely** [1] - 66:10
**ratio** [3] - 81:19,
89:18, 89:20
**re** [2] - 90:9, 92:8
**re-ask** [1] - 90:9
**re-asking** [1] - 92:8
**read** [17] - 16:20,
22:21, 22:22, 28:23,
41:15, 50:23, 51:6,
51:7, 53:10, 53:11,
62:6, 70:3, 70:12,
95:10, 95:11
**reading** [5] - 9:18,
50:18, 51:8, 52:21,
64:10
**readjust** [1] - 101:16
**ready** [3] - 3:2, 13:8,
46:13
**real** [1] - 97:7
**realize** [1] - 36:11
**really** [10] - 47:21,
53:16, 54:7, 60:3,
84:9, 92:10, 95:18,
98:25, 101:14
**reason** [21] - 4:6, 10:4,
10:13, 11:7, 13:5,
15:24, 16:5, 16:7,
17:4, 17:25, 54:24,
76:25, 77:2, 77:5,
79:11, 82:9, 82:14,
87:16, 87:19, 95:8,
95:12
**reasonable** [3] -
12:21, 35:8, 58:9
**reasons** [3] - 9:20,
38:8, 38:10
**receive** [2] - 48:1,
89:21
**received** [19] - 6:6,
33:23, 34:8, 34:23,
34:24, 35:1, 35:25,
36:1, 36:8, 36:14,
36:18, 38:24, 39:7,
48:8, 48:14, 48:15,
63:19, 63:22

**receives** [1] - 48:7
**receiving** [2] - 89:4,
100:24
**recess** [1] - 49:22
**recitation** [1] - 48:20
**recollection** [11] -
9:16, 10:5, 10:22,
11:12, 69:8, 70:2,
70:4, 70:12, 70:21,
71:2, 100:12
**recommendation** [1] -
15:21
**record** [9] - 26:9, 30:6,
49:24, 53:8, 91:8,
92:1, 97:18, 97:24,
98:13
**recorded** [4] - 9:16,
30:9, 30:18, 30:21
**recorder** [1] - 30:10
**recording** [11] - 7:6,
13:10, 30:23, 32:11,
32:13, 32:14, 32:22,
43:24, 45:13, 47:16,
73:11
**records** [8] - 63:11,
63:22, 63:23, 64:10,
64:16, 64:25, 75:14
**redirect** [1] - 28:20
**reduce** [1] - 87:20
**refer** [1] - 43:3
**references** [1] - 29:7
**referring** [6] - 11:20,
13:13, 51:24, 52:13,
70:7, 71:21
**refresh** [7] - 10:5,
10:22, 11:12, 69:8,
70:12, 70:21, 71:1
**refreshes** [1] - 70:4
**refreshing** [2] - 70:2,
100:12
**regard** [46] - 6:21,
15:4, 16:2, 19:2,
22:25, 30:14, 32:24,
39:22, 44:8, 44:10,
44:17, 45:23, 47:9,
47:22, 50:11, 54:17,
55:23, 61:14, 65:21,
66:1, 66:3, 66:25,
70:22, 71:2, 71:16,
73:2, 75:3, 76:3,
76:18, 76:21, 78:17,
79:14, 81:2, 83:11,
83:19, 84:5, 84:17,
88:5, 88:16, 89:18,
89:20, 89:25, 90:6,
92:4, 94:7
**regarding** [4] - 23:7,
24:13, 24:14
**regards** [1] - 78:15
**relate** [1] - 50:19
**related** [6] - 47:2,
49:17, 50:19, 51:10,
51:16, 77:18

**relates** [4] - 44:7, 49:19, 50:18, 79:25
**relative** [2] - 51:22, 52:14
**relatively** [1] - 101:4
**relevance** [1] - 4:4
**relevant** [5] - 26:22, 50:7, 50:21, 51:18, 97:10
**relying** [1] - 61:7
**remedied** [1] - 98:9
**remember** [11] - 10:8, 10:9, 10:21, 10:23, 23:19, 25:9, 31:6, 51:8, 78:23, 79:1, 97:16
**reminded** [1] - 54:10
**reminding** [3] - 98:10, 99:16, 99:17
**repeat** [1] - 68:5
**rephrase** [3] - 68:3, 68:13, 71:23
**rephrasing** [1] - 67:25
**replay** [1] - 42:11
**report** [1] - 34:22
**REPORTED** [1] - 103:11
**reporter** [2] - 68:5, 103:18
**Reporter** [3] - 103:3, 103:10, 103:13
**REPORTER** [1] - 68:8
**REPORTER'S** [1] - 103:1
**reports** [2] - 7:24, 42:10
**representation** [1] - 35:4
**reprimand** [1] - 42:2
**reproduction** [1] - 103:17
**request** [1] - 99:18
**requested** [1] - 29:13
**require** [2] - 64:24, 66:6
**required** [1] - 21:9
**requires** [1] - 20:19
**research** [3] - 58:13, 58:16, 75:6
**reserve** [8] - 44:15, 44:17, 45:4, 46:5, 46:9, 46:10, 47:13, 47:20
**reserved** [4] - 45:24, 47:10, 77:3, 77:8
**reserves** [9] - 44:8, 44:10, 44:21, 44:24, 45:15, 45:17, 45:20, 45:22
**residents** [1] - 61:10
**resolution** [1] - 83:15
**resolve** [3] - 80:4,

84:2, 84:3
**resolved** [4] - 40:23, 41:19, 55:13, 101:7
**resolves** [1] - 91:17
**respect** [1] - 99:3
**respond** [1] - 11:21
**response** [1] - 10:16
**responsibility** [2] - 12:17, 13:12
**responsible** [1] - 16:11
**rest** [1] - 24:1
**restrict** [1] - 99:6
**restrictions** [2] - 98:11, 98:18
**result** [2] - 52:24, 55:9
**retool** [1] - 96:16
**reuse** [2] - 32:16, 32:18
**review** [16] - 31:12, 31:18, 32:6, 44:24, 45:15, 59:24, 66:10, 66:13, 70:15, 70:18, 74:21, 77:23, 78:8, 78:14, 97:8, 100:13
**reviewed** [6] - 31:25, 48:16, 57:17, 59:18, 59:24, 78:11
**reviewing** [2] - 48:11, 48:12
**ridiculous** [1] - 100:19
**risk** [2] - 83:11, 83:19
**RMR** [2] - 103:9, 103:12
**Robinson** [9] - 84:21, 84:22, 85:19, 85:20, 85:22, 85:23, 86:2, 86:7
**rolled** [1] - 15:17
**room** [1] - 96:14
**roughly** [2] - 44:25, 65:10, 76:20
**rule** [3] - 20:6, 20:18, 94:25
**Rule** [2] - 46:17, 53:1
**ruled** [2] - 50:1, 52:21
**Rules** [1] - 9:21
**rules** [11] - 9:24, 20:23, 51:11, 56:19, 74:11, 74:12, 75:2, 75:3, 80:17, 100:10
**ruling** [10] - 50:8, 50:17, 52:6, 52:12, 52:20, 53:5, 53:8, 53:12, 99:19
**rulings** [3] - 97:16, 97:17, 97:19

## S

**safe** [1] - 96:13
**sand** [1] - 38:18
**sat** [2] - 45:7, 78:10

**saved** [2] - 39:14, 39:21
**saw** [1] - 21:21
**SCRANTON** [1] - 1:11
**Scranton** [3] - 1:18, 96:5, 103:14
**screen** [5] - 19:18, 21:13, 28:11, 89:14, 89:17
**screens** [2] - 19:15, 33:22
**second** [6] - 10:1, 22:7, 24:3, 26:7, 26:19, 75:24
**Section** [1] - 103:5
**securities** [1] - 85:10
**see** [40] - 3:13, 6:17, 8:21, 10:16, 19:15, 19:17, 20:6, 22:16, 24:22, 24:25, 26:6, 26:14, 28:12, 28:16, 34:6, 34:25, 35:25, 42:13, 43:7, 45:7, 45:9, 49:20, 55:5, 56:22, 56:23, 63:7, 63:10, 67:3, 68:14, 69:8, 69:23, 71:10, 72:21, 72:22, 72:23, 73:4, 76:14, 101:10
**seeing** [1] - 24:1
**seem** [5] - 58:5, 58:8, 62:20, 62:23, 65:17
**self** [1] - 27:24
**self-serving** [1] - 27:24
**SEMPA** [2] - 20:12, 20:16
**sending** [1] - 64:16
**sends** [1] - 82:12
**senior** [6] - 84:23, 84:24, 84:25, 85:3, 85:8
**sensed** [1] - 98:8
**sent** [10] - 18:23, 25:19, 34:8, 34:9, 36:2, 67:19, 68:9, 69:4, 69:25
**separate** [2] - 51:22, 72:23
**separately** [1] - 83:13
**service** [1] - 85:2
**serving** [1] - 27:24
**set** [8] - 44:21, 44:24, 45:1, 45:22, 46:10, 74:25, 99:25, 103:6
**setting** [3] - 45:17, 45:20, 99:20
**settle** [5] - 26:1, 75:19, 75:21, 76:3, 76:7
**settled** [2] - 90:24, 102:1
**settlement** [4] - 50:3, 50:25, 51:17, 52:13

**several** [2] - 16:21, 23:20
**sharp** [1] - 96:9
**shorten** [5] - 90:12, 90:17, 90:19, 90:20, 90:21
**shortening** [1] - 81:20
**show** [16] - 9:15, 21:1, 21:9, 21:14, 21:15, 21:16, 21:19, 21:23, 27:8, 28:9, 28:17, 43:2, 69:7, 69:19, 70:3, 70:11
**showed** [5] - 32:5, 63:23, 64:1, 70:9, 78:16
**showing** [3] - 9:18, 19:20, 26:4
**shown** [2] - 20:1, 20:7
**shows** [1] - 27:5
**sic** [1] - 41:2
**side** [7] - 22:3, 36:17, 46:15, 69:9, 96:22, 101:14, 101:16
**sidebar** [7] - 26:9, 29:23, 49:10, 49:24, 54:8, 91:8, 92:18
**significant** [3] - 4:8, 14:2, 94:19
**simple** [3] - 62:5, 68:16, 100:22
**simply** [3] - 41:6, 98:10, 98:12
**sit** [8] - 37:8, 39:4, 46:24, 59:8, 61:6, 79:8, 96:4, 97:11
**sitting** [3] - 4:15, 39:23, 55:4
**situation** [1] - 28:5
**situations** [2] - 61:22, 62:9
**slight** [1] - 46:20
**someone** [13] - 8:21, 13:24, 18:17, 18:22, 32:19, 34:6, 40:19, 40:20, 61:18, 61:25, 62:7, 63:14, 66:16
**somewhere** [3] - 33:21, 34:6, 34:25
**son** [1] - 85:25
**soon** [5] - 45:2, 46:9, 47:13, 80:3, 94:21
**sorry** [9] - 7:1, 14:5, 14:22, 19:17, 22:14, 30:2, 59:23, 75:2, 77:9
**sort** [1] - 31:3
**sound** [1] - 62:21
**sounds** [1] - 12:21
**speaking** [1] - 64:11
**specific** [16] - 7:22, 8:4, 8:5, 11:4, 23:13, 23:21, 24:19, 27:4,

50:5, 50:14, 67:6, 67:8, 77:21, 82:1, 99:18
**Specifically** [1] - 26:25
**specifically** [17] - 8:6, 13:13, 26:10, 26:13, 27:24, 47:3, 47:8, 50:25, 51:9, 51:24, 52:1, 62:6, 82:11, 85:17, 88:16, 99:19, 100:10
**speculation** [1] - 81:14
**spend** [4] - 29:18, 29:19, 53:15, 97:13
**spent** [4] - 97:5, 98:2, 98:3, 99:22
**spilling** [1] - 41:10
**spills** [1] - 45:12
**spoken** [1] - 15:11
**spouse** [1] - 94:19
**Spruce** [1] - 1:17
**stakeholder** [1] - 87:5
**stamp** [3] - 25:20, 36:12, 36:21
**stamped** [4] - 6:18, 20:9, 36:4, 36:7
**stand** [5] - 11:10, 12:10, 43:18, 54:10, 96:24
**standard** [1] - 43:7
**standards** [20] - 13:17, 14:12, 14:15, 55:23, 56:1, 56:3, 56:13, 56:19, 56:20, 56:24, 57:6, 57:14, 58:21, 59:5, 59:6, 59:20, 59:21, 60:4, 60:21, 76:2
**start** [2] - 54:6, 58:17
**started** [1] - 38:14
**State** [3] - 61:11, 95:24, 96:2
**state** [5] - 53:6, 56:2, 58:20, 58:21, 59:2
**statement** [11] - 9:10, 9:15, 9:16, 9:19, 10:14, 10:19, 12:3, 20:6, 53:18, 73:17, 100:12
**statements** [7] - 3:1, 9:11, 22:10, 22:12, 35:7, 46:17, 53:17
**STATES** [2] - 1:1, 1:10
**states** [1] - 58:11
**States** [3] - 103:4, 103:4, 103:13
**stating** [1] - 70:1
**statutes** [1] - 74:12
**Steve** [1] - 85:10
**sticking** [1] - 78:24
**still** [12] - 5:25, 32:20,

43:10, 54:10, 56:22, 57:12, 57:17, 65:15, 79:3, 95:16, 99:19
**storms** [1] - 92:21
**strategy** [3] - 80:20, 83:12, 83:25
**street** [3] - 96:22, 96:23, 100:10
**Street** [2] - 1:17, 1:22
**stretch** [1] - 49:12
**strike** [2] - 46:19, 90:9
**strikes** [1] - 46:18
**structure** [1] - 84:5
**stuff** [2] - 39:10, 39:20
**submitted** [3] - 20:15, 27:23, 75:14
**subrogation** [4] - 75:20, 75:22, 76:3, 76:6
**substance** [4] - 46:21, 47:3, 48:3, 53:18
**substantive** [3] - 47:25, 64:4, 73:23
**succinct** [1] - 66:7
**sufficient** [1] - 45:1
**suggestion** [2] - 54:6, 100:13
**suit** [1] - 81:19
**Suite** [1] - 1:21
**SUM** [10] - 51:25, 52:1, 52:6, 52:14, 74:11, 74:14, 74:15, 74:24, 75:2
**summaries** [1] - 64:7
**summarize** [1] - 64:19
**summarized** [1] - 64:2
**summary** [3] - 17:19, 34:21, 64:8
**super** [1] - 92:21
**Superior** [1] - 28:7
**supervise** [4] - 7:11, 7:14, 12:9, 53:20
**supervised** [3] - 12:10, 12:12, 46:23
**supervision** [2] - 103:7, 103:17
**supervisor** [23] - 4:7, 4:23, 5:1, 5:7, 6:13, 8:19, 11:6, 11:8, 11:9, 11:13, 11:18, 11:19, 30:14, 39:22, 39:24, 40:8, 40:10, 40:16, 40:18, 41:23, 84:10, 84:12, 84:14
**supervisor's** [1] - 40:1
**supervisors** [7] - 40:5, 40:12, 44:3, 44:6, 61:23, 74:23, 75:5
**supplements** [1] - 17:18
**supplied** [1] - 20:10
**support** [1] - 92:22

**supposed** [8] - 25:4, 47:23, 48:19, 48:23, 50:12, 58:10, 58:11, 77:6
**sustain** [1] - 10:7
**sustained** [3] - 10:20, 11:24, 92:25
**Suzanne** [2] - 103:3, 103:9
**sUZANNE** [1] - 103:12
**sworn** [4] - 3:7, 9:15, 10:17, 94:25
**system** [5] - 33:8, 33:10, 68:18, 71:16
**systems** [2] - 33:9, 85:10

## T

**table** [7] - 33:24, 33:25, 34:3, 34:4, 34:7, 35:20, 79:22
**tail** [6] - 81:20, 90:12, 90:14, 90:16, 90:19
**talks** [1] - 46:17
**tape** [1] - 30:10
**tapes** [2] - 32:16, 32:18, 32:21
**taught** [2] - 14:8, 58:15
**teach** [1] - 13:24
**team** [25] - 16:9, 30:20, 38:17, 75:5, 82:19, 82:20, 82:21, 82:22, 84:6, 84:7, 84:9, 84:12, 88:2, 88:5, 88:6, 88:7, 88:9, 88:11, 88:12, 88:13, 88:17, 88:19, 89:3, 89:24
**teams** [4] - 38:9, 38:15, 38:16, 81:3
**template** [6] - 39:2, 39:8, 39:12, 39:17, 39:18, 39:21
**term** [4] - 22:24, 66:15, 84:9
**terminology** [3] - 82:11, 82:12, 82:24
**terms** [1] - 4:17
**testified** [3] - 3:8, 9:19, 69:21
**testifies** [1] - 62:18
**testify** [1] - 80:15
**testimonies** [1] - 91:22
**testimony** [17] - 3:15, 3:24, 6:22, 7:2, 10:14, 10:17, 39:3, 40:12, 54:4, 54:5, 55:4, 55:8, 62:18, 73:21, 77:12, 80:17, 97:7

**THE** [96] - 1:1, 1:1, 2:3, 3:2, 3:4, 4:10, 7:9, 9:2, 9:8, 9:14, 9:23, 10:7, 10:12, 11:24, 19:24, 20:1, 20:10, 20:18, 21:9, 21:15, 21:19, 21:22, 21:25, 22:4, 22:11, 26:6, 26:10, 26:17, 27:2, 27:12, 27:18, 27:21, 28:9, 28:12, 28:17, 28:24, 29:5, 35:6, 37:24, 37:25, 42:14, 42:16, 42:18, 42:22, 43:10, 43:14, 43:16, 43:18, 43:21, 46:14, 49:10, 49:25, 50:9, 50:16, 52:3, 52:10, 52:15, 53:9, 53:14, 54:1, 54:9, 54:12, 60:16, 67:25, 68:7, 68:11, 68:13, 69:9, 69:19, 69:23, 70:2, 70:11, 71:20, 71:25, 73:16, 73:20, 77:15, 78:1, 80:23, 81:16, 81:17, 83:6, 91:6, 91:9, 91:12, 91:15, 91:18, 92:2, 92:12, 92:16, 92:25, 93:8, 93:10, 96:16, 97:25, 99:14
**themselves** [1] - 64:7
**thereafter** [1] - 19:8
**they've** [1] - 48:14
**thinking** [2] - 35:19, 101:19
**THIS** [1] - 23:25
**three** [4] - 92:9, 96:3, 98:3, 99:22
**Thursday** [3] - 98:5, 98:15, 100:3
**Tim** [4] - 44:3, 44:6, 56:7, 85:2
**timely** [2] - 37:14, 47:14
**timestamp** [1] - 36:17
**Title** [1] - 103:4
**today** [15] - 3:11, 4:15, 13:6, 14:18, 37:8, 39:4, 55:5, 57:17, 59:8, 61:6, 79:15, 79:22, 80:7, 96:10, 98:12
**together** [2] - 77:25, 99:12
**tomorrow** [7] - 96:7, 96:9, 97:12, 97:13, 101:21, 101:23, 101:24
**tonight** [3] - 94:18, 96:16, 97:13
**took** [4] - 32:12,

32:24, 39:10, 39:20
**top** [5] - 17:8, 17:11, 22:16, 63:8
**towards** [3] - 16:8, 83:15, 87:22
**track** [1] - 96:12
**training** [1] - 6:6
**transcript** [10] - 9:22, 25:20, 30:23, 30:25, 32:23, 32:25, 69:12, 103:5, 103:7, 103:16
**transcripts** [1] - 19:23
**transferred** [1] - 76:15
**translation** [1] - 6:20
**transposed** [1] - 30:7
**TRIAL** [1] - 1:12
**trial** [3] - 20:23, 29:19, 65:5
**trick** [1] - 42:9
**tried** [1] - 44:23
**tries** [2] - 45:5, 45:14
**trip** [1] - 96:13
**true** [4] - 13:8, 17:21, 35:14, 103:5
**Trueworthy** [14] - 5:5, 7:24, 11:9, 42:10, 44:4, 44:7, 53:21, 56:7, 56:9, 56:10, 69:25, 83:17, 85:2, 85:15
**truth** [3] - 10:5, 10:10, 27:15
**try** [12] - 10:22, 35:6, 44:24, 46:5, 47:20, 67:25, 68:3, 78:7, 84:3, 95:20, 96:22, 99:1
**trying** [13] - 44:5, 53:16, 67:3, 67:12, 70:14, 86:16, 88:8, 90:12, 90:17, 92:11, 96:20, 98:18, 100:2
**Tuesday** [1] - 98:15
**turned** [2] - 7:7, 90:3
**TV** [1] - 95:13
**tweak** [1] - 46:20
**twice** [3] - 18:10, 26:12, 54:5
**two** [17] - 3:20, 9:20, 29:20, 35:19, 38:14, 40:22, 50:16, 73:21, 88:22, 88:24, 92:8, 92:16, 97:5, 97:11, 98:2, 99:22, 100:25
**type** [6] - 23:25, 25:11, 25:13, 27:3, 30:17, 63:11

## U

**UIM** [1] - 59:16
**ultimately** [1] - 12:1
**UM** [1] - 72:22

**um-hum** [2] - 22:18, 88:18
**under** [15] - 8:15, 9:23, 19:11, 20:5, 24:7, 28:6, 33:24, 54:10, 60:3, 60:22, 61:4, 70:14, 73:24, 103:7, 103:17
**underinsured** [11] - 15:9, 66:18, 66:20, 66:23, 72:9, 73:3, 74:8, 74:15, 75:4, 76:24, 79:4
**underlying** [6] - 51:4, 51:12, 52:19, 52:25, 59:16, 65:17
**understood** [1] - 13:1
**underwriting** [3] - 82:13, 85:1, 86:22
**unfair** [1] - 101:6
**unfamiliar** [1] - 55:16
**unfortunately** [1] - 36:8
**unit** [21] - 6:14, 7:11, 7:14, 8:4, 11:3, 12:6, 12:14, 12:17, 14:1, 14:3, 14:4, 14:6, 14:7, 15:7, 18:19, 40:18, 66:11, 75:4, 75:18, 86:18, 92:22
**United** [3] - 103:3, 103:4, 103:13
**UNITED** [2] - 1:1, 1:10
**units** [1] - 92:22
**unless** [6] - 10:1, 13:7, 47:2, 51:18, 77:21, 103:17
**unnamed** [2] - 29:16
**unusual** [1] - 101:10
**up** [38] - 7:7, 13:23, 16:2, 16:16, 16:24, 17:3, 19:13, 21:12, 21:17, 22:13, 24:10, 28:10, 32:2, 42:25, 43:5, 44:1, 45:4, 50:7, 53:16, 53:23, 54:4, 54:5, 54:7, 54:9, 58:24, 66:5, 66:14, 68:21, 71:8, 71:9, 76:19, 89:14, 89:17, 94:11, 96:3, 96:20, 101:18
**updated** [2] - 67:20, 68:10, 70:22
**uphold** [1] - 94:25
**uses** [1] - 94:8
**utilize** [2] - 59:2, 89:8

## V

**vacation** [1] - 40:19
**valid** [1] - 79:10
**valuation** [2] - 44:9,

**11**

94:7

**value** [5] - 26:1, 48:24, 49:1, 49:3, 74:8

**values** [1] - 94:9

**Vanna** - 85:23

**VanNess** [3] - 85:18, 85:21, 85:22

**vehicle** [1] - 57:23

**venue** [1] - 58:21

**verbal** [3] - 37:18, 37:21, 45:2

**versions** [1] - 16:21

**vice** [41] - 3:5, 5:1, 5:4, 5:9, 5:20, 5:23, 6:1, 30:14, 50:12, 54:14, 54:16, 54:21, 55:15, 55:22, 56:6, 57:12, 65:19, 66:11, 69:4, 74:14, 74:17, 75:1, 75:17, 77:18, 83:9, 84:23, 84:24, 85:1, 85:2, 85:3, 85:5, 85:7, 85:8, 85:9, 85:10, 87:2, 88:21, 88:25, 89:6, 97:4

**vice-president** [1] - 5:20

**video** [2] - 9:22, 89:25

**videos** [1] - 90:5

**view** [1] - 81:25

**voir** [1] - 98:3

**volume** [1] - 7:7

**VS** [1] - 1:5

---

## W

**wage** [1] - 63:15

**wait** [5] - 10:2, 10:3, 55:9, 55:12, 79:23

**waited** [1] - 99:2

**waiting** [1] - 67:16

**waiver** [4] - 75:20, 75:22, 76:3, 76:6

**wake** [1] - 13:23

**wants** [3] - 10:2, 10:3, 22:6

**wasted** [1] - 53:23

**wasting** [1] - 29:19

**web** [1] - 89:11

**Wednesday** [1] - 98:15

**week** [2] - 98:4, 98:9

**welcome** [1] - 54:9

**whole** [14] - 6:14, 7:14, 12:14, 14:1, 14:3, 14:6, 14:7, 24:22, 32:19, 47:20, 68:11, 77:20, 82:15

**Wildey** [9] - 2:4, 3:5, 3:11, 4:7, 17:12, 22:17, 27:23, 43:15, 43:16

**WILDEY** [1] - 3:7

---

**Wilkes** [1] - 96:5

**Wilkes-Barre** [1] - 96:5

**willfully** [1] - 27:9

**wish** [1] - 10:22

**withdraw** [3] - 7:3, 80:22, 80:24

**within-mentioned** [1] - 103:5

**WITNESS** [6] - 2:2, 37:25, 68:11, 70:6, 81:17, 93:10

**witness** [48] - 3:4, 6:24, 9:3, 9:6, 9:10, 9:11, 9:12, 9:17, 10:13, 10:18, 10:19, 19:20, 20:7, 21:2, 21:14, 21:16, 22:12, 27:5, 27:12, 35:9, 43:2, 46:25, 47:1, 53:15, 77:15, 80:12, 80:17, 91:10, 91:13, 91:20, 91:23, 91:24, 92:17, 95:16, 96:24, 97:2, 97:5, 97:13, 97:14, 98:3, 99:23, 100:3, 100:17, 100:20, 101:1, 101:2

**witness'** [3] - 9:18, 10:14, 37:22

**witnesses** [5] - 73:25, 97:9, 98:11, 99:10, 100:7

**Word** [3] - 30:7, 30:24, 31:3

**word** [1] - 16:8

**words** [7] - 13:22, 35:18, 41:11, 50:24, 67:8, 72:3, 88:8

**workload** [2] - 61:14, 63:8

**works** [3] - 47:23, 72:14, 72:17

**worth** [2] - 51:5, 97:6

**write** [3] - 44:1, 61:9, 61:11

**writing** [15] - 14:19, 15:4, 18:4, 18:6, 18:8, 18:23, 19:4, 19:5, 19:6, 19:9, 24:5, 38:5, 38:7, 51:9, 55:2

**written** [12] - 14:15, 18:13, 18:17, 19:2, 37:5, 37:17, 37:20, 65:21, 67:18, 68:9, 68:17, 69:3

---

## Y

**year** [10] - 33:16, 44:25, 45:5, 45:6, 45:15, 45:16, 79:5,

---

81:7, 86:10, 93:4

**years** [14] - 3:21, 4:9, 4:13, 40:23, 57:23, 79:16, 79:22, 79:23, 80:8, 90:18, 90:22, 90:24, 91:1, 99:2

**YORK** [1] - 1:6

**York** [15] - 3:17, 5:15, 16:11, 22:25, 23:6, 24:13, 59:20, 60:3, 60:8, 60:22, 61:11, 61:12, 76:5, 76:13, 76:16

**yourself** [2] - 42:3, 44:1

**yourselves** [1] - 95:15